1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

13

14

15

16

17

18

19

20

21

22

23

24

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>                    Plaintiff,<br><br>                    v.<br><br>**JESSE WILLMS**, individually and as a director or owner of 1021018, 1016363, and 1524948 Alberta Ltd; Circle Media Bids Limited; Coastwest Holdings Limited; Farend Services Ltd; JDW Media, LLC; Net Soft Media, LLC; Sphere Media, LLC; and True Net, LLC;<br>**PETER GRAVER**, individually and as an officer of JDW Media, LLC;<br>**ADAM SECHRIST**, individually and as a director and shareholder of Circle Media Bids Limited and manager of Sphere Media, LLC;<br>**BRETT CALLISTER**, individually and as an officer of True Net, LLC;<br>**CAREY L. MILNE**, individually and as an officer of Net Soft Media, LLC; | Case No.<br><br>COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF |

25
26
27
28

Complaint for Permanent Injunction/Other Equitable Relief - Page 1

1

2    **1021018 ALBERTA LTD,** also d.b.a.
     Just Think Media, Credit Report America,
     eDirect Software, WuLongsource, and Wuyi
3    Source;
     **1016363 ALBERTA LTD,** also d.b.a.
4    eDirect Software;
     **1524948 ALBERTA LTD,** also d.b.a. Terra
5    Marketing Group, SwipeBids.com, and
     SwipeAuctions.com;
6    **CIRCLE MEDIA BIDS LIMITED,** also
     d.b.a. SwipeBids.com, SwipeAuctions.com,
7    and Selloffauctions.com;
     **COASTWEST HOLDINGS LIMITED;**
8    **FAREND SERVICES LTD;**
     **JDW MEDIA, LLC;**
9    **NET SOFT MEDIA, LLC,** also d.b.a.
     SwipeBids.com;
10   **SPHERE MEDIA, LLC,** also d.b.a.
     SwipeBids.com and SwipeAuctions.com; and
11   **TRUE NET, LLC,** also d.b.a.
     Selloffauctions.com;

12                    Defendants.

13

14        Plaintiff, the Federal Trade Commission ("FTC"), for its complaint alleges:

15        1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission

16   Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 917(c) of the Electronic Fund Transfer Act

17   ("EFTA"), 15 U.S.C. § 1693o(c), to obtain preliminary and permanent injunctive relief,

18   rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-

19   gotten monies, and other equitable relief for defendants' deceptive sales of products, programs,

20   and services via the Internet, and for defendants' unfair conduct in making unauthorized charges

21   to consumers' credit cards and bank accounts and in obtaining merchant processing accounts, in

22   violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 907(a) of

23   EFTA, 15  U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

24                          **JURISDICTION AND VENUE**

25        2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

26   and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 1693o(c).

27

28

     Complaint for Permanent Injunction/Other Equitable Relief - Page 2

1      3.     Venue is proper in this district under 28 U.S.C. §§ 1391(b), (c) and (d), and 15

2  U.S.C. § 53(b).

3                              **PLAINTIFF**

4      4.     **Plaintiff Federal Trade Commission** is an independent agency of the United

5  States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of

6  the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or

7  affecting commerce. The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which

8  prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting

9  commerce. The FTC also enforces EFTA, 15 U.S.C. § 1693 *et seq*, which regulates the rights,

10  liabilities, and responsibilities of participants in electronic fund transfer systems.

11      5.     The FTC is authorized to initiate federal district court proceedings, by its own

12  attorneys, to enjoin violations of the FTC Act and EFTA and to secure such equitable relief as

13  may be appropriate in each case, including rescission or reformation of contracts, restitution, the

14  refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b),

15  56(a)(2)(A), and 1693o(c).

16                            **DEFENDANTS**

17      6.     **Defendant Jesse Willms** ("Willms"), a resident of Alberta, Canada, owns,

18  directs, or otherwise controls each of the corporate defendants. Willms uses or has used each of

19  the corporate defendants to operate his international enterprise marketing products, programs,

20  and services over the Internet. By and through the corporate defendants, he has harmed U.S. and

21  foreign consumers with his unfair and deceptive business practices. At all times material to this

22  complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the

23  authority to control, or participated in the acts and practices set forth in this complaint. Among

24  other things, Willms creates and/or approves the business plans and marketing materials used by

25  the corporate defendants, and negotiates and signs contracts on behalf of the corporate

26  defendants, including contracts for banking and payment processing services. In connection

27  with the matters alleged herein, Willms transacts or has transacted business in this district and

28  throughout the United States.

1      7.    **Defendant Peter Graver** ("Graver"), a resident of Utah, is an officer of

2 defendant JDW Media, LLC, is the registered agent for defendant Sphere Media, LLC, and has

3 served as a signatory on Sphere Media bank accounts. At all times material to this complaint,

4 acting alone or in concert with others, he has formulated, directed, controlled, had authority to

5 control, or participated in the acts and practices of JDW Media and Sphere Media set forth in

6 this complaint. Graver has contracted with Willms and the corporate defendants to provide an

7 array of services including, but not limited to, establishing bank accounts for Willms, setting up

8 companies for the purpose of obtaining banking and merchant processing services for Willms,

9 and participating in the management of said companies. In connection with the matters alleged

10 herein, Graver transacts or has transacted business in this district and throughout the United

11 States.

12      8.    **Defendant Adam Sechrist** ("Sechrist"), a resident of Pennsylvania, is a director

13 and sole shareholder of defendant Circle Media Bids Limited and manager of defendant Sphere

14 Media, LLC. At all times material to this complaint, acting alone or in concert with others, he

15 has formulated, directed, controlled, had authority to control, or participated in the acts and

16 practices of Circle Media Bids and Sphere Media set forth in this complaint. Sechrist has

17 contracted with Willms and the corporate defendants to provide an array of services including,

18 but not limited to, establishing bank accounts for Willms, setting up companies for the purpose

19 of obtaining banking merchant processing services for Willms, and participating in the

20 management of said companies. In connection with the matters alleged herein, Sechrist transacts

21 or has transacted business in this district and throughout the United States.

22      9.    **Defendant Brett Callister** ("Callister"), a resident of Utah, is an officer of

23 defendant True Net, LLC. At all times material to this complaint, acting alone or in concert with

24 others, he has formulated, directed, controlled, had authority to control, or participated in the acts

25 and practices of True Net set forth in this complaint. Callister has contracted with Willms and

26 the corporate defendants to provide an array of services including, but not limited to,

27 establishing bank accounts for Willms, setting up companies for the purpose of obtaining

28 banking merchant processing services for Willms, and participating in the management of said

Complaint for Permanent Injunction/Other Equitable Relief - Page 4

1 companies. In connection with the matters alleged herein, Callister transacts or has transacted
2 business in this district and throughout the United States.

3      10.    **Defendant Carey L. Milne** ("Milne"), a resident of Utah, is an officer of
4 defendant Net Soft Media, LLC. At all times material to this complaint, acting alone or in
5 concert with others, she has formulated, directed, controlled, had authority to control, or
6 participated in the acts and practices of Net Soft Media set forth in this complaint. Milne has
7 contracted with Willms and the corporate defendants to provide an array of services including,
8 but not limited to, establishing bank accounts for Willms, setting up companies for the purpose
9 of obtaining banking merchant processing services for Willms, and participating in the
10 management of said companies. In connection with the matters alleged herein, Milne transacts
11 or has transacted business in this district and throughout the United States.

12      11.    **Defendant 1021018 Alberta Ltd.** is a Canadian limited liability company with
13 its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta. Defendant
14 Willms is the sole owner of this defendant. Its registered trade names are Just Think Media,
15 Credit Report America, Wulongsource, and Wuyi Source (collectively "Just Think Media").
16 Just Think Media also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB; 79
17 Charlton Road, Sherwood Park, AB; and #240, 11 Athabascan Avenue, Sherwood Park, AB.
18 Just Think Media transacts or has transacted business in this district and throughout the United
19 States.

20      12.    **Defendant 1016363 Alberta Ltd.** is a Canadian limited liability company with
21 its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta. Defendant
22 Willms is the sole owner of this defendant. Its registered trade name is eDirect Software.
23 eDirect Software also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB, and 79
24 Charlton Road, Sherwood Park, AB. eDirect Software transacts or has transacted business in
25 this district and throughout the United States.

26      13.    **Defendant 1524948 Alberta Ltd.** is a Canadian limited liability company with
27 its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta. Defendant
28 Willms is the sole owner of this defendant. Its registered trade name is Terra Marketing Group;

Complaint for Permanent Injunction/Other Equitable Relief - Page 5

1   Terra Marketing Group had done business under various names, including as SwipeBids.com
2   and SwipeAuctions.com.  Terra Marketing transacts or has transacted business in this district and
3   throughout the United States.

4        14.     **Defendant Circle Media Bids Limited** is a private limited company
5   incorporated in England, with its registered place of business at 72 High Street, Haslemere,
6   Surrey, England.  Circle Media Bids has done business under various names, including
7   SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com.  Defendant Willms controls
8   Circle Media Bids pursuant to an agreement entered into between Willms and defendant
9   Sechrist.  Under that agreement, defendant Sechrist established Circle Media Bids to facilitate
10  the operation of penny auctions, including those featured on SwipeBids.com,
11  SwipeAuctions.com, and Selloffauctions.com, and to secure banking and merchant processing
12  services for Willms.  Circle Media Bids transacts or has transacted business in this district and
13  throughout the United States.

14       15.     **Defendant Coastwest Holdings Limited** is a Cyprus corporation with its
15  registered place of business at Vasilissis Frederikissis, 33, First Floor, Nicosia, Cyprus.
16  Defendant Willms is the sole owner of Coastwest Holdings, which Willms established to
17  facilitate his Internet operations, as well as to secure offshore merchant banking services.
18  Coastwest Holdings transacts or has transacted business in this district and throughout the United
19  States.

20       16.     **Defendant Farend Services Ltd**. is a Cyprus corporation with its registered
21  place of business at Athinodorou, 3, Dasoupoli, Strovolos, P.C. 2025, Nicosia, Cyprus.
22  Defendant Willms controls Farend Services, and has signed as "President" a Cease and Desist
23  entered into by Farend Services with the State of Utah.  Farend Services was established to
24  facilitate Willms's Internet operations, as well as to secure offshore merchant banking services
25  for Willms.  Farend Services transacts or has transacted business in this district and throughout
26  the United States.

27       17.     **Defendant JDW Media, LLC** is an Idaho limited liability corporation with its
28  registered place of business at 2184 Channing Way, #322, Idaho Falls, Idaho.  Defendant Willms

1  controls JDW Media pursuant to an agreement entered into between Willms and defendant
2  Graver.  Under that agreement, defendant Graver established JDW Media to facilitate Willms's
3  Internet operations and to secure banking and merchant processing services for Willms.  JDW
4  Media transacts or has transacted business in this district and throughout the United States.

5      18.     **Defendant Net Soft Media, LLC** is a Utah limited liability corporation with its
6  registered place of business at 2150 S. 1300 E., Suite 500, Salt Lake City, Utah.  Net Soft Media
7  has done business as SwipeBids.com.  Defendant Willms controls Net Soft Media pursuant to an
8  agreement entered into between Willms and defendant Milne.  Under that agreement, defendant
9  Milne established Net Soft Media to facilitate the operation of penny auctions, including those
10 featured on SwipeBids.com, and to secure banking and merchant processing services for Willms.
11 Net Soft Media transacts or has transacted business in this district and throughout the United
12 States

13     19.     **Defendant Sphere Media, LLC** is a Utah limited liability corporation with its
14 registered place of business at 906 W 400 S., Orem, Utah.  Sphere Media has done business
15 under various names, including as SwipeBids.com and SwipeAuctions.com.  Defendant Willms
16 controls Sphere Media pursuant to an agreement entered into between Willms and defendant
17 Sechrist.  Under that agreement, defendant Sechrist established Sphere Media to facilitate the
18 operation of penny auctions, including those featured on SwipeBids.com and
19 SwipeAuctions.com, and to secure banking and merchant processing services for Willms.
20 Sphere Media transacts or has transacted business in this district and throughout the United
21 States.

22     20.     **Defendant True Net, LLC** is a Nevada limited liability corporation with its
23 registered place of business at 1555 E. Tropicana Ave., Suite 250, Las Vegas, Nevada.  True Net
24 has done business as Selloffauctions.com.  Defendant Willms controls True Net pursuant to an
25 agreement entered into between Willms and defendant Callister.  Under that agreement,
26 defendant Callister established True Net to facilitate the operation of penny auctions, including
27 those featured on Selloffauctions.com, and to secure banking and merchant processing services
28

Complaint for Permanent Injunction/Other Equitable Relief - Page 7

1  for Willms.  True Net transacts or has transacted business in this district and throughout the
2  United States.

3    21.    The corporate defendants have operated as a common enterprise while engaging
4  in the deceptive, unfair, and unlawful acts and practices alleged below.  The corporate
5  defendants have conducted the business practices described below through an interrelated
6  network of companies that have common ownership, control, officers, managers, business
7  functions, employees, and office locations, and have commingled funds.  Because these
8  corporate defendants have operated as a common enterprise, each of them is jointly and severally
9  liable for the acts and practices alleged below.  Defendant Willms has formulated, directed,
10 controlled, had the authority to control, or participated in the acts and practices of the corporate
11 defendants that constitute the common enterprise.  Collectively the corporate defendants and
12 defendant Willms are referred to as the "Willms defendants."

13                                      **COMMERCE**

14    22.    At all times relevant to this complaint, defendants have maintained a substantial
15 course of business in or affecting commerce, as "commerce" is defined in Section 4 of the FTC
16 Act, 15 U.S.C. § 45.

17                          **DEFENDANTS' BUSINESS PRACTICES**
18                                      **Introduction**

19    23.    Using deceptive marketing tactics for a variety of products, programs, and
20 services offered via the Internet, the Willms defendants have made charges to consumers' credit
21 and debit cards that the consumers neither knew about nor agreed to.  Since at least 2007, the
22 Willms defendants' illegal practices have raked in more then $467 million from consumers in
23 the U.S., Canada, the U.K., Australia, and New Zealand.

24    24.    The Willms defendants contract with a network of third parties known as
25 "affiliate marketers" to direct consumers to the Willms defendants' websites.  The affiliate
26 marketers use a variety of e-commerce  advertising techniques, including banner ads, pop-ups,
27 sponsored search terms, and unsolicited email to drive consumer traffic to "landing pages" (the
28 Willms defendants' websites) for the Willms defendants' offers.  The Willms defendants provide

Complaint for Permanent Injunction/Other Equitable Relief - Page 8

1   their affiliate marketers with creative content describing the offers for the affiliate marketers to
2   use in their advertising.  Some affiliate marketers also create their own advertising.  The Willms
3   defendants pay the affiliate marketers for each consumer who, originating from the affiliate
4   marketer's advertisement, lands on one of the Willms defendants' websites, enters his or her
5   credit or debit card information, and is successfully charged by the Willms defendants.

6          25.     Regardless of the specific product, program, or service offered – which has varied
7   widely, from teeth whiteners and quick weight loss products to work-at-home schemes and
8   penny auctions – the Willms defendants induce consumers to enter their credit or debit card
9   information by making false claims about the nature of the offer, including the total cost to the
10  consumer, recurring monthly charges that the Willms defendants make to the consumer's
11  account, and the availability of refunds.

12         26.     The Willms defendants also fail to disclose, or they disclose inadequately, the
13  actual terms and conditions governing the offer.  Information critical to consumers' decision to
14  provide credit or debit card account information is displayed in small fonts, using pale colors
15  that are difficult to view.  This information appears before or after long paragraphs and graphics
16  in places widely separated from the box where consumers are asked to enter billing information,
17  or appears on a separate "terms and conditions" or "terms of use" page, the information hidden
18  in lengthy and dense prose that is difficult to understand.  Other features, such as streaming
19  video, graphics, differing colors and font sizes, and false claims about the limited availability of
20  the offer further distract consumers' attention away from important disclosures about cost,
21  recurring charges, or refund limitations.

22         27.     Through these means, the Willms defendants have charged consumers for
23  undisclosed membership or access fees, and for additional unwanted products, programs, or
24  services bundled in with the initial offer from which consumers could not opt-out (called "forced
25  upsells" in the industry).  The Willms defendants have also made recurring monthly charges to
26  consumers' accounts to which consumers had not agreed, often for continued access to programs
27  or services that consumers did not know they were purchasing (called "continuity plans" in the
28  industry).

28.     In addition to their deceptive billing practices, in connection with weight loss and colon cleansing products offered by the Willms defendants from 2007 through February 2010, the Willms defendants made false and unsubstantiated representations that the products caused rapid, effortless weight loss or could help prevent colon cancer. To lend credibility to these assertions, the Willms defendants also falsely claimed that the products had been endorsed or recommended by celebrities.

29.     The defendants obtain and retain merchant bank accounts through which charges to consumers' VISA and MasterCard accounts can be processed. The Willms defendants' deceptive sales practices, however, have generated a high rate of chargebacks (consumer efforts to cancel or reverse charges to their credit card accounts), which has caused the credit card chargeback monitoring system used by merchant banks to flag the defendants' merchant accounts as problematic. Merchants, like the defendants, with flagged accounts must either lower their chargeback rates or be expelled from the credit card processing system. The Willms defendants, rather than change their business practices and reduce chargebacks, have provided merchant banks with inaccurate information and manipulated sales data to create artificially low chargeback rates. By these tactics, the defendants have been able to continue to process undisclosed, unwanted, and unauthorized charges to consumers' accounts, causing significant and widespread consumer injury.

### The Willms Defendants' Offers

30.     The Willms defendants' offered products, programs, and services have changed over time. From August 2007 through February 2010, the Willms defendants offered purported risk-free trials of teeth whiteners, acai berry weight loss products, colon cleansers, and health supplements containing resveratrol, the supposedly healthful ingredient in red wine. The Willms defendants also offered purported risk-free trials of a work-at-home scheme, access to government grants, and free credit reports.

31.     The Willms defendants changed the product names and associated website landing pages frequently. Sometimes just the landing pages would change, and formatting of graphics, pictures, disclosures, or the product claims would differ. Other times, the Willms

Complaint for Permanent Injunction/Other Equitable Relief - Page 10

1 defendants would change the name of the product itself (even though the ingredients did not
2 vary) so that a particular affiliate marketer could have an "exclusive" offer, or the product could
3 be marketed as new, enhanced, or target a different market.

4  32.  The Willms defendants have offered weight loss products under many names
5 including, but not limited to, Wuyi Burn, Wuyi Tea, Wuyi Source, Easy Weight Loss Tea,
6 AcaiBurn, AcaiBurn Max, Ultra AcaiBurn, AcaiBurn Plus, AcaiEdge Max, Detox AcaiBurn,
7 Max AcaiBurn, Extreme AcaiBurn, Maximum AcaiBurn, Premium AcaiBurn, and AcaiSlim
8 Detox (collectively referred to as "AcaiBurn Products"). The Willms defendants' colon
9 cleansing products include, but are not limited to, PureCleanse, PureCleanse Detox, PureCleanse
10 Ultra, Ultimate PureCleanse, Nature PureCleanse, and PureCleanse Max (collectively referred to
11 as "PureCleanse products"). The Willms defendants' resveratrol products include, but are not
12 limited to, PureResV, ResvEdge, ResvElite, ResvSupreme, and Pureresver.

13  33.  The Willms defendants' teeth whitening products include, but are not limited to,
14 DazzleWhite, DazzleWhiteNow, DazzleWhitePure, DazzleWhiteSupreme, DazzleSmileNow,
15 DazzleSmilePro, DazzleSmilePure, DazzleSmileSupreme, DazzleWhitePro, PremiumWhitePro,
16 PremiumWhiteSource, PremiumWhiteUltra, and VibrantSmileKit.

17  34.  Other products offered by the Willms defendants included a work-at-home
18 scheme marketed under the names OnlineCashSuccessKit, QuickProfitKit, and
19 QuickProfitKitPro; a government grants program, marketed as SuccessGrants; and a free credit
20 report program called CreditReportAmerica.

21  35.  During this period, the Willms defendants also charged consumers for various
22 forced upsells, including programs called Insider Secrets Expert Tips package, Comprehensive
23 Weight Loss ebook, World Club Fitness, Fraud Protection, and ID Theft.

24  36.  Since at least March 2010, the Willms defendants also have marketed penny
25 auctions through web sites called SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com
26 (collectively referred to as "SwipeBids.com"). Penny auctions offer consumers the opportunity
27 to bid on a variety of goods, including electronic devices, retailer gift cards, and even
28 automobiles, for a fraction of their market value. Before a consumer can participate in a penny

Complaint for Permanent Injunction/Other Equitable Relief - Page 11

1 auction, the consumer must purchase bids that typically cost between fifty cents to one dollar.
2 Thus, regardless of whether a consumer ultimately wins or loses a penny auction, the consumer
3 has paid for each bid the consumer places during the auction. In a penny auction, every time a
4 bid is placed on an offered item, the cost of the item increases by a fixed amount, and the auction
5 deadline is extended by a short period of time. The winning bidder must pay the final bidding
6 price on the item, plus shipping and handling charges.

### Misrepresentations About "Free," "Risk-free" and "Bonus"

8    37.    Regardless of the offer, the Willms defendants induce consumers to provide
9 their credit or debit card account information by falsely promising that the product, program, or
10 service can be had on a "free" or "risk-free" trial basis for which consumers pay only a nominal
11 shipping and handling fee. In some instances, the Willms defendants have represented that the
12 product, program, or service is a "bonus" that consumers receive simply by signing up.

13   38.    In connection with their trial offers marketed prior to February 2010, the Willms
14 defendants routinely represented that the offers were "free" or "risk-free." For example, the
15 following and other similar representations appeared on pages of the Willms defendants'
16 websites for each of their offers:

17        a.    "Your risk-free trial is almost ready to ship. Simply use this 100% secure
18 order form to tell us how to bill the small cost to ship you your trial. Oh and don't worry,
19 today you are only being charged for the small shipping charge, and nothing more."

20        b.    "GET YOUR RISK-FREE BOTTLE TODAY!"

21        c.    "Let me allow you to evaluate the results before you pay a cent. The only
22 thing I ask is that you cover the small cost to ship it straight to your door."

23        d.    "We let you try it, before you buy it!"

24        e.    "If you order Resveratrol Edge with Acai today you can have a free trial
25 bottle and only pay for the shipping and handling."

26        f.    **"CLICK HERE** TO TRY IT FOR FREE! Just pay shipping!"

27   39.    Further highlighting that consumers' total monetary outlay was only the nominal
28 shipping and handling fee, many order pages included a summary of ordering information.

Complaint for Permanent Injunction/Other Equitable Relief - Page 12

1 | Consumers viewing such a summary had no reason to believe that they would be charged for the
2 | trial product or the additional bonus products beyond the listed shipping and handling fee.

3 |     40.    In connection with their penny auction offers, the Willms defendants have
4 | routinely represented that consumers would receive "bonus" bids when registering on their
5 | websites. For example, the following and other similar representations appeared on pages of the
6 | Willms defendants' penny auction websites:

7 |     a.    "What You Get: 300 Bonus Bids, Just for Signing Up." and

8 |     b.    **CONGRATULATIONS! AS A BONUS YOU WILL RECEIVE 50**
9 | **BIDS EACH MONTH.  CLICK CONTINUE TO START BIDDING NOW."**

10 |     41.    In fact, the Willms defendants' trial offers and "bonus bids" were not free, risk-
11 | free, or bonuses. Consumers who provided the Willms defendants their credit or debit card
12 | information to cover the costs of shipping and handling or to facilitate future purchases of
13 | auction items were charged for products, programs, and services that they did not know about
14 | and had not agreed to purchase. For example, in connection with the Willms defendants "risk-
15 | free" trial offers, some consumers were charged for a full month's supply of the relevant product
16 | trial sample (typically $79.95) and were assessed a similar recurring monthly charge, while other
17 | consumers were charged a "membership" fee for access to products at a reduced cost for a year.
18 | Consumers also were charged monthly recurring fees for the so-called "bonus" products.
19 | Cancelling these charges, or obtaining refunds, involved separate time-consuming phone calls
20 | and other steps that made the process far from "risk-free."

21 |     42.    In connection with the Willms defendants' penny auction sites, the Willms
22 | defendants' "bonus" bids were not bonuses at all, but rather, in connection with signing up,
23 | consumers were charged for the 300 introductory bonus bids, typically $150. The monthly
24 | bonus bids were not free either, and consumers were charged $11.95 each month to receive that
25 | "bonus."

26
27
28

1

**Undisclosed Charges**

2          43.    The Willms defendants' representations about "free," "risk-free," and "bonus"
3   products, programs, or services caused consumers to believe that they would not be charged for
4   additional amounts after providing their billing information.  The Willms defendants failed to
5   disclose, or to disclose adequately, critical information about the additional charges associated
6   with these offers.

7                                            *Initial Charges*

8          44.    In connection with some of the Willms defendants' trial offers, the Willms
9   defendants failed to adequately disclose that consumers who did not affirmatively cancel within
10  a specified trial period would automatically be enrolled in a one-year membership program for
11  which the Willms defendants charged consumers an up-front, non-refundable fee, often $126.
12  The Willms defendants placed the non-refundable fee disclosure in various places on ordering
13  pages, but never in close proximity to the box where consumers entered their credit or debit card
14  information, in a font size and color comparable to those used for displaying other information
15  (including the numerous references to "free" and "risk-free" trials), or otherwise in a manner that
16  was clear and conspicuous and understandable.  In addition, the charge for the non-refundable
17  fee was mentioned in the separate "terms and conditions" page associated with each offer.  In
18  numerous instances, however, that "terms and conditions" page was <u>not</u> accessible from the
19  ordering page where consumers input their account information because there was no hyperlink
20  to it.  Especially because the web pages repeatedly proclaimed that the trial offer was free or
21  risk-free, and that the only cost to the consumer was a nominal shipping and handling fee,
22  consumers had no reason to search out fine print disclosures or scrutinize dense "terms and
23  conditions" pages looking for information about additional charges or onerous cancellation and
24  refund policies.  The Willms defendants never required consumers to click on or otherwise
25  indicate that they had read, understood, or agreed to those terms and conditions.  Consumers who
26  did locate the page and tried to review it were confronted with a page packed with lengthy,
27  legalistic fine print that typically did not mention a membership fee until they had scrolled half-
28  way through the page.

Complaint for Permanent Injunction/Other Equitable Relief - Page 14

1    45.    In other instances in connection with the Willms defendants' trial offers, the
2  Willms defendants failed to adequately disclose that consumers who did not affirmatively cancel
3  within a specified trial period – by following the Willms defendants' onerous and poorly
4  disclosed rules about cancellations – would automatically be charged for the trial product or
5  service. The initial charges for the Willms defendants' trial products, programs, and services
6  ranged from $40 to $90, depending on the product and the offer. Like the offers where the
7  Willms defendants failed to adequately disclose the annual $126 membership fee, although the
8  placement of the disclosures about the charges varied, the disclosures were not displayed clearly
9  and conspicuously in a place or manner where consumers likely would read and understand them
10 prior to entering their payment information (or any other time). Disclosures about charges to
11 consumers on the terms and conditions pages associated with these offers were similarly
12 obscure. As discussed above, consumers usually could not access the terms and conditions page
13 from the page where they entered payment information, and were not required to affirm that they
14 agreed to or understood the terms associated with their purchase.

15    46.    In connection with the Willms defendants' penny auctions, the Willms defendants
16 typically have failed to disclose adequately that consumers who entered their payment
17 information would be immediately charged a one-year membership fee, often $150 or $159.
18 Consumers' payment information was requested in a box titled "Where Do We Send Your
19 Winning Auctions," which consumers associated with paying for auction items won, or shipping
20 and handling charges, not with a membership fee. A separate box of information, titled
21 "Membership Details" listed "Item: 1-Year Membership; You Pay: 50 cents/bid" and underneath
22 the "1-Year Membership" stated "(Includes 300 Bids)." Underneath, a "You're Guaranteed to
23 Win" box promises consumers that if they "do not win a single auction using the 300 start-up
24 bids included, we will fully refund your bids." Consumers did not understand from this that they
25 would be charged in connection with entering their payment information and joining
26 Swipebids.com. The terms of use page associated with this offer – which consumers typically
27 are not required to accept or agree to prior to joining – obliquely mentions the membership
28 charge in a section detailing the process for exchanges and refunds, but nowhere does it

Complaint for Permanent Injunction/Other Equitable Relief - Page 15

1  affirmatively state that consumers who provide their credit or debit card information will be
2  charged a membership fee.

3                                    *Monthly Recurring Charges*

4       47.    In connection with some offers, consumers who failed to cancel their trial offer
5  within a specific trial period were automatically enrolled in a monthly continuity plan and were
6  charged each month for recurring shipments of the product or continued access to the program or
7  service until the consumer cancelled. Consumers were not adequately told about these recurring
8  charges at the time they provided their payment information and were not provided a way to
9  avoid them. (This form of billing is sometimes known as a negative option continuity program.)
10 At no point during the ordering process were consumers required to affirmatively agree to these
11 ongoing charges.

12      48.    In addition to the monthly recurring charges for the advertised product, most
13 consumers who provided their credit or debit card information were also charged monthly
14 recurring charges for two additional products that they did not order or even want. These upsells
15 were typically digital products (websites to which consumers were provided password access).
16 As discussed above, these purported upsells were often referred to as "bonuses" or otherwise
17 listed as special items that the consumer was receiving for free. For example, on one AcaiBurn
18 website, the Insider Secrets Experts Tips package and Comprehensive Weight Loss ebook were
19 described as "Today's Special #1 and #2 Included in Your Trial!" Without expecting to be
20 charged for these items, consumers had no reason to look for disclosures about these monthly
21 recurring fees. The Willms defendants' ordering pages typically provided information about the
22 monthly charges for upsells, but in fonts smaller than most others used on the page, in places
23 neither obvious nor unavoidable to consumers prior to consumers' entry of their account
24 information, and often buried in boxes with other fine print information. The charges were also
25 disclosed – in dense, fine print, in the middle of lengthy jargon-filled text – in the "Terms and
26 Conditions" page, but that page was not typically accessible from the ordering page where
27 consumers entered their account information. The Willms defendants did not adequately disclose
28 these recurring charges to consumers at the time they provided their payment information.

Complaint for Permanent Injunction/Other Equitable Relief - Page 16

1  Consumers had no way to avoid these charges.  At no point during the ordering process were
2  consumers required to affirmatively agree to these ongoing charges.

3       49.      In connection with their penny auction offers, the Willms defendants have also
4  charged consumers a monthly recurring fee.  This fee, typically $11.95, is not disclosed at all
5  prior to the consumer's entry of payment information.  As discussed above, because consumers
6  think that they are providing their account information so that they may be charged in the future
7  for any bids bought or items shipped, consumers have no expectation that their account will be
8  charged any amount, much less on a recurring basis.  After consumers enter payment
9  information, a screen welcomes them to the auction site and in extra-large font tells consumers
10  that as a "bonus" they will receive 50 bids per month.  In micro-print at the top of that screen is
11  the first mention of the monthly charge, and a box is provided that consumers may check to
12  purportedly avoid the charge. (Even this box is a red herring, because clicking on it does not, in
13  fact, provide consumers a way to cancel the recurring monthly charge.)  Because many
14  consumers believe that the 50 bonus bids are free and do not expect to be charged for them, they
15  do not look for this information or for ways to avoid such charges.  At no point during the
16  ordering process are consumers required to affirmatively agree to the ongoing charges.

17                          **Deceptive Refund Policies**

18       50.      The Willms defendants have routinely represented that they make full refunds to
19  consumers who are dissatisfied with their products, programs, or services.  Sometimes the refund
20  process is even described as "easy."

21       51.      For example, in connection with the Willms defendants' trial product offers, the
22  following and other similar statements appeared on the Willms defendants' websites:

23            a.      "We are so confident that AcaiBurn is the most effective and powerful
24       anti-oxidant cleansing product on the market that if you do not find AcaiBurn right for
25       you we will gladly give you a full refund, no questions asked.  You have nothing to lose
26       except the weight."

27            b.      "Our products are also backed by a risk-free guarantee."

28

Complaint for Permanent Injunction/Other Equitable Relief - Page 17

c.      "TRUE SATISFACTION GUARANTEE. Should you decide to purchase PureCleanse Pro after trying our trial sample bottle, we will back up your order with our 100% satisfaction guarantee."

d.      "Now Every Order Is Fully Covered By Our Iron-clad 60-day Money-back Guarantee."

52.     In connection with the Willms defendants' penny auctions, the following and other similar statements appeared on the Willms defendants' websites:

a.      "Easy Money Back Guarantee . . . Just Follow The 3 Easy Steps"

b.      "Although, most penny auction sites do not offer refunds to their customers, we are so confident that you will win an auction with us that we created our easy Money Back Guarantee; this means that if you are not completely satisfied with Swipebids.com, and have not won any auction items, we will refund the price of your original membership bid pack purchase back to you, no questions asked!"

53.     In numerous instances, the Willms defendants have not provided the promised full refunds to consumers. Often, the Willms defendants' customer service agents have simply denied the availability of refunds. Sometimes the Willms defendants have promised refunds, but never actually issued them.

54.     In addition, in numerous instances, the process to obtain a refund, whether for one of the Willms defendants' trial products, a monthly recurring charge, a forced upsell, or a penny auction membership fee, is not "iron-clad," "easy," or "no questions asked." As further discussed below, the Willms defendants often impose onerous, undisclosed conditions and limitations on issuing refunds. In some instances, consumers only receive refunds after they complain to law enforcement or the Better Business Bureau. Even in those instances, the Willms defendants frequently have only issued partial refunds.

## Undisclosed Limitations on Cancellations and Refunds

55.     Although the Willms defendants made prominent representations about "Satisfaction Guaranteed," "money back guarantee," and "risk-free," the Willms defendants

Complaint for Permanent Injunction/Other Equitable Relief - Page 18

1 failed to inform consumers about important limitations on consumers' abilities to cancel future
2 charges and obtain refunds for past payments.

3        56.     In connection with their trial offers, the Willms defendants failed to adequately
4 inform consumers that in order to cancel the trial and avoid charges for the advertised product,
5 consumers were required to cancel and return the "free trial" product, and the Willms defendants
6 had to receive the returned "free trial" product, before the expiration of the trial period. For
7 offers with tangible products, the trial period was typically 14 days from the date of purchase of
8 the product, but for offers with digital products, such as the work at home products, consumers
9 had as short a period as 24 hours to cancel. Moreover, for tangible products, the Willms
10 defendants required consumers to bear the costs of returning the trial sample, including postage,
11 insurance, and delivery confirmation. The Willms defendants accepted returns only if the
12 consumer first obtained a cancellation number and a separate identification number from
13 customer service prior to shipping the return package. Consumers who did not successfully
14 cancel within the proscribed period were charged the full price of the product, which was not
15 refundable. If the next month's shipment had already left the warehouse, consumers had to
16 return that, too, or be charged (and if they waited to return multiple products at one time, they
17 were only eligible for a refund on the most recent shipment). Future recurring charges for the
18 advertised product would be cancelled, but no money would be refunded. Some of these
19 requirements were explained in the "terms and conditions" page associated with each offer, but
20 the disclosures were neither obvious nor avoidable.

21        57.     In connection with the Willms defendants' forced upsells, the Willms defendants
22 failed to disclose that consumers wishing to cancel had to call a separate toll free number *for*
23 *each upsell* (meaning that to escape all charges associated with the Willms defendants' "risk-
24 free" offer consumers needed to make three separate telephone calls). Moreover, the Willms
25 defendants failed to disclose that each upsell had a different "trial" period in which cancellations
26 were allowed. Consumers who failed to cancel within that trial window, typically 14 or 21 days,
27 would be charged the monthly recurring fee for each upsell product, a charge that was not
28 refundable. The short trial periods for the upsells were particularly pernicious because most

Complaint for Permanent Injunction/Other Equitable Relief - Page 19

1   consumers did not know they were being charged for these products until they received their
2   monthly account statements and saw the charges – which by that time were not refundable.
3   Even then, some consumers did not notice the charges because, in numerous instances, the
4   Willms defendants intentionally charged odd amounts (e.g., $3.24 or $7.35), more reflective of a
5   single purchase than a recurring charge. The Willms defendants did not provide refunds for any
6   but the most recent charges to consumers' accounts.

7       58.    In connection with the recurring monthly charge for the Willms defendants'
8   penny auction offers, despite providing (in micro-print) a link to click for cancellation
9   information, the Willms defendants failed to disclose how to cancel the recurring monthly
10  charge. Consumers who did click to cancel were routed through an array of pages not one of
11  which allowed cancellation of the charge.

## False and Unsubstantiated Efficacy Claims

### *Weight Loss Claims*

14      59.    The Willms defendants have represented that use of the AcaiBurn and
15  PureCleanse products will cause rapid and substantial weight loss and that scientific evidence,
16  including two eight-week, placebo-controlled clinical studies, shows that AcaiBurn and
17  PureCleanse cause rapid and substantial weight loss. The following and other similar
18  representations appeared in banner advertising approved by the Willms defendants for use by
19  their affiliate marketers and also on multiples pages of the Willms defendants' websites:

20      a.    "Lose Weight Fast! Fit into your favorite Jeans! Lose Weight fast with
21  AcaiBurn."

22      b.    "Fast + Natural Weight Loss A system to help you burn calories
23  faster is finally revealed in America!"

24      c.    "WARNING...The Acai Burn System was not created for those people
25  who only want to lose a few measly pounds. The AcaiBurn System was created to help
26  you achieve the incredible body you have always wanted...USE WITH CAUTION!"

27      d.    "BACKED BY CLINICAL RESEARCH The AcaiBurn System is simply
28  fast weight loss that works. The key ingredients in AcaiBurn were clinically tested and

Complaint for Permanent Injunction/Other Equitable Relief - Page 20

1   found to help cause up to 450% MORE WEIGHT LOSS than dieting and exercising

2   alone. Our risk-free trial is in very high demand, and will not be available forever.

3   AcaiBurn is composed of a breakthrough new formula that combines scientific clinical

4   research with the amazing anti-oxidant power of Acai Berry."

5       e.      "The average weight loss was 14.99 and 12.54 pounds with AcaiBurn's

6   key ingredients vs. just 3.06 and 3.53 pounds with a placebo in two 8-week clinical

7   studies. Both groups dieted and exercised. That means the key ingredients in AcaiBurn

8   were found to cause up to 450% MORE WEIGHT LOSS than dieting and exercise alone

9   will get you."

10      f.      "But the true power of PureCleanse Pro comes from clinically proven

11  ingredients (Garcinia cambogia extract, chromium polynicotinate, and Gymnema

12  sylvestre extract). The average weight loss was 14.99 and 12.54 pounds with

13  PureCleanse's key ingredients vs. just 3.06 and 3.53 pounds with a placebo in two 8-

14  week clinical studies. Both groups dieted and exercised. That means the key ingredients

15  in PureCleanse Pro were found to help cause up to 450% MORE WEIGHT LOSS than

16  dieting and exercise alone will get you."

17  60.     The AcaiBurn and PureCleanse products do not cause rapid and substantial

18  weight loss, and the Willms defendants did not possess and rely upon a reasonable basis to

19  substantiate representations that consumers who use the AcaiBurn and PureCleanse products will

20  rapidly lose a substantial amount of weight.

21                              *Colon Cancer Claims*

22  61.     The Willms defendants also have represented that use of PureCleanse products

23  helps prevent the development of colon cancer. The Willms defendants have used an embedded

24  streaming video of a CBS Early Show interview with Katie Couric on many of the PureCleanse

25  product websites. The title of the video clip is "CONQUERING COLON CANCER:

26  PREVENTION AND TREATMENT." The video features, in addition to Ms. Couric, well

27  known actors Diane Keaton, Morgan Freeman, and Jimmy Smits talking about the dangers of

28  colon cancer. Statements made during the video include, but are not limited to:

1          a.      "Colon cancer is the #2 cancer killer in the United States."

2          b.      "Women get colon cancer as often as men."

3          c.      "Hispanics are more likely to be diagnosed in advanced states of colon

4    cancer."

5          d.      "African-Americans have higher mortality rates from colon cancer."

6          e.      "130,000 people in the United States are diagnosed with colon cancer

7    every year."

8          f.      "56,000 people die every year from colon cancer."

9          g.      "Everyone is vulnerable."

10         62.     The Willms defendants juxtaposed the statements about the deadly nature of

11   colon cancer contained in the Katie Couric interview with numerous representations about

12   PureCleanse that implied that PureCleanse would help prevent the development of colon cancer.

13   For example, the Willms defendants' websites have included one of more of the following

14   statements:

15         a.      "Parasites & Toxic Build Up Could be haunting your body."

16         b.      "Promote Health & Longevity."

17         c.      "FLUSH BUILT UP WASTE."

18         d.      "Rid yourself of toxins and parasites."

19         e.      "Research-backed."

20         63.     The PureCleanse products do not help prevent the development of colon cancer,

21   and the Willms defendants did not possess and rely upon a reasonable basis to substantiate

22   representations that the PureCleanse products will help prevent the development of colon cancer.

23                          **False Celebrity and Other Endorsements**

24         64.     In addition to claims about the efficacy of their products, the Willms defendants

25   have displayed the images of celebrities, such as Oprah Winfrey and Rachael Ray, on their

26   websites, and have represented to consumers that such celebrities have endorsed one or more of

27   the Willms defendants' products. For example, one of the Willms defendants' websites for Pro

28

Complaint for Permanent Injunction/Other Equitable Relief - Page 22

1  AcaiBurn showed a picture of Rachel Ray and the statement "Featured on the Rachel Ray
2  Show!"

3      65.    Neither Oprah Winfrey nor Rachael Ray has endorsed any of the Willms
4  defendants' products. Oprah Winfrey has sued Willms in the Southern District of New York for
5  the unauthorized use of her name and likeness on his websites.

6      66.    The Willms defendants also have placed on most of their websites the names and
7  logos for many news agencies and other trusted entities including, but not limited to, CNN,
8  MSNBC, USA Today, CBS, and 60 Minutes, in connection with statements like "Featured On"
9  or " As Seen On TV." None of these entities have endorsed or positively reported on any of the
10  Willms defendants' products.

11               **Evading Risk Management Rules to Obtain Merchant Accounts**

12      67.    In numerous instances, the Willms defendants, as well as defendants Graver,
13  Sechrist, Callister, and Milne have submitted inaccurate information to financial institutions and
14  manipulated sales data reported to the credit card processing system in order to obtain and retain
15  access to merchant processing accounts through which consumers' credit and debit cards may be
16  charged.

17      68.    Merchants (like the Willms defendants) that want to accept credit cards for sales
18  transactions contract with financial institutions called "merchant banks." Merchant banks have
19  various underwriting criteria that a merchant must meet in order to establish a merchant account
20  with the bank. Because merchant banks want to avoid losses associated with consumer reversals
21  of credit card transactions (known as chargebacks), in many instances, these underwriting
22  criteria require that the terms and conditions of a sale are clearly and prominently disclosed to
23  the consumer before the consumer authorizes a credit card payment.

24      69.    On numerous occasions, the Willms defendants have been advised by merchant
25  banks or others involved in arranging for payment processing that their websites did not
26  adequately disclose to consumers the costs and terms of their offers. Rather than curing these
27  deceptions, the Willms defendants have created "dummy" or inactive web sites that were used
28

Complaint for Permanent Injunction/Other Equitable Relief - Page 23

1   only to show merchant banks their purported marketing materials. The Willms defendants then
2   directed consumers to different websites that do not include compliant language.

3       70.     In addition to meeting underwriting requirements with respect to the offer, in
4   most instances, the merchant bank also requires that the merchant be in good standing with the
5   credit card associations. In large part, this means that the merchant has a chargeback or reversal
6   rate that is acceptable to Visa and MasterCard.

7       71.     Both Visa and MasterCard have risk management divisions that monitor merchant
8   chargeback rates. A merchant's chargeback rate is calculated as a ratio or percentage. The
9   numerator is the number of transactions passing through the credit card system in a particular
10  month that are charged back to the merchant bank by the consumer or by the consumer's bank.
11  The denominator is the total number of transactions processed by that merchant through the
12  credit card system in the preceding month. The permissible chargeback ratio for Visa is 1%; the
13  permissible chargeback ratio for MasterCard is .5%. Credit card associations deem chargeback
14  rates exceeding these rates as an indication of a problem involving the merchant, including
15  unauthorized charges to a cardholder's account or deceptive business practices. For much of the
16  time that the Willms defendants marketed products using a trial offer enticement, their
17  chargeback rates far exceeded the chargeback ceilings set by Visa and MasterCard. During
18  some periods, the Willms defendants chargeback rates for some products were as high as 10% to
19  20%.

20      72.     Merchants with impermissible chargeback rates are required to reduce their rates
21  to an acceptable level. If they do not, or cannot, the merchant bank will terminate the merchant.
22  (VISA and MasterCard assess penalties on merchant banks that tolerate merchants with ongoing
23  high chargeback rates.) When a merchant bank terminates a merchant, the merchant is placed on
24  a list of terminated merchants (called the MATCH list) made available to other merchant banks.
25  Once on this list, the merchant may no longer be able to secure a merchant account.

26      73.     Shortly after they began accepting credit card payments, the Willms defendants'
27  chargeback rates exceeded the allowable ratios, and they were terminated by one or more
28  merchant banks and placed on the MATCH list. In response, the defendants created shell

Complaint for Permanent Injunction/Other Equitable Relief - Page 24

1  corporations in the names of other people but which really belonged to the defendants.
2  Defendants then applied for merchant accounts using the shell corporations they had created.
3  Thus, the new merchant accounts could not be easily traced to the defendants. Individual
4  defendants Graver, Sechrist, Callister, and Milne have participated in this by, among other
5  things, serving as nominees for Sphere Media and Circle Media Bids, and signing applications
6  for bank accounts and merchant processing applications for these entities.

7  74. In addition, the Willms defendants have manipulated the manner in which
8  payment data has been submitted to the system. For example, they have structured their sales to
9  assess cardholder accounts for multiple charges of varying prices to artificially increase the
10  volume of sales and thereby lower the ratio of chargebacks to sales; frequently changed the
11  billing descriptors for their products and used multiple merchant descriptors for their products to
12  obscure the actual chargeback rate associated with their products; and engaged in "load
13  balancing," which involves balancing sales across multiple descriptors and through multiple
14  merchant accounts to artificially decrease their chargeback rate. The Willms defendants have
15  also processed payments outside the United States where some banks allow very high
16  chargeback rates and have frequently opened new merchant accounts and used numerous
17  merchant accounts at the same time.

18  75. By submitting inaccurate information to merchant banks and manipulating
19  payment data, the Willms defendants were able to continue to accept credit card payments from
20  consumers for far longer than they would have otherwise been able to, causing substantial
21  consumer injury that was not avoidable by consumers. There are no countervailing benefits to
22  consumers or competition associated with these practices.

23  **Consumer Harm**

24  76. As described above, the Willms defendants have deceived consumers across the
25  United States and worldwide out of millions of dollars. The Willms defendants'
26  misrepresentations, deceptive omissions, and unfair billing practices have generated more than
27  $467 million in gross sales, with unreimbursed consumer injury totaling more than $412 million.
28

Complaint for Permanent Injunction/Other Equitable Relief - Page 25

1    77.    The Willms defendants are not ignorant of the harm they are causing, having been
2  advised of their deceptive practices directly by consumers seeking cancellations and refunds, in
3  consumer complaints to the Better Business Bureau, class action lawsuits by aggrieved
4  consumers, in news stories and expose's, by law enforcement agencies, and by third parties who
5  have terminated business relationships with them. Their chargeback and refund rates far exceed
6  the norm. Nevertheless, the Willms defendants have refused to change their business practices or
7  the manner in which they disclose material information.

8                              **VIOLATIONS OF THE FTC ACT**

9    78.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts
10  or practices in or affecting commerce. Misrepresentations or deceptive omissions of material
11  fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. 15 U.S.C.
12  § 45(a). Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial
13  injury to consumers that consumers cannot reasonably avoid themselves and that is not
14  outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

15    79.    Section 12(a) of the FTC Act, 15 U.S.C. § 52(a), prohibits the dissemination of
16  any false advertisement in or affecting commerce for the purpose of inducing, or which is likely
17  to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of
18  Section 12 of the FTC Act, 15 U.S.C. § 52, AcaiBurn and Pure Cleanse, and other similar
19  products, are either a "food" or "drug" as defined in Section 15(b) and (c) of the FTC Act,
20  15 U.S.C. § 55(b) and (c).

21                                    **COUNT ONE**

22              **Misrepresentations About Risk-free Trial Offers and Bonuses**

23    80.    In connection with the advertising, marketing, promotion, offering for sale, or
24  sale of products, programs, or services, the Willms defendants have represented, directly or
25  indirectly, expressly or by implication, that consumers can obtain a product, program, or service
26  on a "trial" basis, for "free,"or "risk-free" for only a nominal shipping and handling fee, or have
27  represented that consumers can obtain a product, program, or service as a "bonus" for which
28  consumers would not be charged.

Complaint for Permanent Injunction/Other Equitable Relief - Page 26

1    81.    In truth and in fact, in numerous instances in which the Willms defendants have
2  made the representations set forth in Paragraph 80, consumers could not obtain products,
3  programs, or services on a trial basis, for "free," or "risk-free" for only a nominal shipping and
4  handling fee, or obtain products, programs, or services as a "bonus" without charge.

5    82.    Therefore, the making of each of the representations as set forth in Paragraph 80
6  of this Complaint constitutes a deceptive act or practice in violation of Section 5(a) of the FTC
7  Act, 15 U.S.C. § 45(a).

8                                          **COUNT TWO**

9                              **Misrepresentation About Refunds**

10    83.    In connection with the advertising, marketing, promotion, offering for sale, or
11  sale of products, programs, or services, the Willms defendants have represented, directly or
12  indirectly, expressly or by implication, that they will provide a full refund to consumers who
13  request one.

14    84.    In truth and in fact, in numerous instances in which the Willms defendants have
15  made the representation set forth in Paragraph 83, the Willms defendants do not provide a full
16  refund to consumers who request one.

17    85.    Therefore, the making of the representation as set forth in Paragraph 83 of this
18  Complaint constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15
19  U.S.C. § 45(a).

20                                        **COUNT THREE**

21                      **Failure to Disclose Charges to Consumers**

22    86.    In numerous instances, in connection with the advertising, marketing, promotion,
23  offering for sale, or sale of products, programs, or services, the Willms defendants have
24  represented, directly or indirectly, expressly or by implication, that consumers who provide their
25  billing information will incur no risks or obligations, not be charged, or pay only a nominal fee.

26    87.    In numerous instances in which the Willms defendants have made the
27  representations set forth in Paragraph 86, the Willms defendants have failed to disclose, or
28  disclose adequately, material terms and conditions of the offer including, but not limited to, that:

Complaint for Permanent Injunction/Other Equitable Relief - Page 27

1    a. consumers who sign up for some of the Willms defendants' trial offers

2 will be enrolled in a membership program and charged an upfront membership fee if they

3 do not cancel within a certain time period;

4    b. consumers who sign up for some of the Willms defendants' penny auction

5 programs will immediately be charged an upfront fee for registering for which there is no

6 opportunity to cancel;

7    c. consumers who sign up for some of the Willms defendants' trial offers

8 will be charged the full price for a month's supply of the product, or a month's access to

9 the service or program, if they do not cancel and return the product within a certain time

10 period;

11    d. consumers who sign up for some of the Willms defendants' trial offers or

12 penny auction programs will be enrolled in a membership program and be charged a

13 recurring monthly fee if they do not cancel within a certain time period; or

14    e. consumers who sign up for some of the Willms defendants' trial offers

15 will be enrolled in a membership program for upsell items and be charged recurring

16 monthly fees if they do not cancel within a certain time period.

17  88. The Willms defendants' failures to disclose, or disclose adequately, the material

18 information described in Paragraph 87, in light of the representation as set forth in Paragraph 86

19 of this Complaint, constitute deceptive acts or practices in violation of Section 5(a) of the FTC

20 Act, 15 U.S.C. § 45(a).

21         **COUNT FOUR**

22    **Failure to Disclose Limitations on Cancellations and Refunds**

23  89. In numerous instances, in connection with the advertising, marketing, promotion,

24 offering for sale, or sale of products, programs, or services, the Willms defendants have

25 represented, directly or indirectly, expressly or by implication, that consumers who sign up for

26 one of the Willms defendants' trial offers or penny auction programs will incur no risks, that

27 their satisfaction is guaranteed, or that they can obtain a full refund.

28

Complaint for Permanent Injunction/Other Equitable Relief - Page 28

1    90.    In numerous instances in which the Willms defendants have made the
2    representations set forth in Paragraph 89, the Willms defendants have failed to disclose, or
3    disclose adequately, material terms and conditions relating to cancelling future charges or
4    obtaining refunds including, but not limited to:

5           a.    that consumers who attempt to cancel and/or seek a refund must obtain a
6    return tracking number from the Willms defendants before returning the product;

7           b.    that consumers who seek to cancel and/or receive a refund will incur
8    additional costs in returning the product including, but not limited to, paying for return
9    shipping, insurance, and delivery confirmation;

10          c.    that consumers who seek to cancel the upsell products must cancel each
11   program separately within specific, different time periods to avoid additional charges; or

12          d.    the process for consumers to cancel the monthly recurring charges
13   associated with the Willms defendants' trial offers or penny auctions, and the details of
14   defendants' cancellation and refund processes.

15    91.    The Willms defendants' failures to disclose, or disclose adequately, the material
16   information described in Paragraph 90, in light of the representation as set forth in Paragraph 89
17   of this Complaint, constitute a deceptive act or practice in violation of Section 5(a) of the FTC
18   Act, 15 U.S.C. § 45(a).

19                                    **COUNT FIVE**

20                        **False and Unsubstantiated Product Claims**

21    92.    In numerous instances, in connection with the advertising, marketing, promotion,
22   offering for sale, or sale of AcaiBurn and PureCleanse, the Willms defendants have represented,
23   directly or indirectly, expressly or by implication, that use of AcaiBurn and PureCleanse will
24   result in rapid and substantial weight loss, including the claim that individuals who used
25   AcaiBurn or PureCleanse lost 450% more weight than those who only dieted and exercised.

26    93.    In numerous instances, in connection with the advertising, marketing, promotion,
27   offering for sale, or sale of AcaiBurn and PureCleanse, the Willms defendants have represented,
28   directly or indirectly, expressly or by implication, that scientific evidence, including two eight-

Complaint for Permanent Injunction/Other Equitable Relief - Page 29

1  week, placebo-controlled clinical studies, shows that AcaiBurn and PureCleanse cause rapid and
2  substantial weight loss.

3      94.    In numerous instances, in connection with the advertising, marketing, promotion,
4  offering for sale, or sale of PureCleanse, the Willms defendants have represented, directly or
5  indirectly, expressly or by implication, that use of PureCleanse will aid in the prevention of
6  colon cancer.

7      95.    The representations set forth in Paragraphs 92 through 94 are false, misleading, or
8  were not substantiated at the time the representations were made.

9      96.    Therefore, the making of each representation as set forth in Paragraphs 92
10  through 94 of this Complaint constitutes a deceptive act or practice and the making of false
11  advertisements, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

12                                 **COUNT SIX**

13                              **False Endorsements**

14      97.    In numerous instances, in connection with the advertising, marketing, promotion,
15  offering for sale, or sale of products, the Willms defendants have represented, directly or
16  indirectly, expressly or by implication, that their products are used, endorsed, or approved by
17  specifically identified celebrities, such as Oprah Winfrey and Rachael Ray.

18      98.    The representations set forth in Paragraph 97 are false or misleading.

19      99.    Therefore, the making of each of the representations as set forth in Paragraph 97
20  of this Complaint constitutes a deceptive act or practice and the making of false advertisements,
21  in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

22                                **COUNT SEVEN**

23              **Unfairly Charging Consumers Without Authorization**

24      100.   In numerous instances, the Willms defendants have caused charges to be
25  submitted for payment to the credit and debit cards of consumers without the express informed
26  consent of consumers.

27

28

Complaint for Permanent Injunction/Other Equitable Relief - Page 30

1    101.    The Willms defendants' practice as set forth in Paragraph 100 causes or is likely

2 to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and

3 that is not outweighed by countervailing benefits to consumers or competition.

4    102.    Therefore, the Willms defendants' practice as set forth in Paragraph 100 of this

5 Complaint constitutes an unfair act or practice in violation of Section 5 of the FTC Act, 15

6 U.S.C. §§ 45(a) and 45(n).

### COUNT EIGHT

### Unfairly Evading Credit Card Transaction Risk Management Systems

9    103.    In numerous instances, as set forth in Paragraphs 67 to 75, the defendants have

10 provided merchant banks with false or misleading information to obtain and maintain merchant

11 accounts through which the Willms defendants place charges on consumers' credit and debit

12 card accounts.

13    104.    The defendants' act or practice as set forth in Paragraph 103, causes or is likely to

14 cause substantial injury to consumers that is not reasonably avoidable by consumers themselves

15 and is not outweighed by countervailing benefits to consumers or competition.

16    105.    Therefore, the defendants' act or practice as alleged in Paragraph 103 of this

17 Complaint constitutes an unfair act or practice in violation of Section 5 of the FTC Act, 15

18 U.S.C. §§ 45(a) and 45(n).

### VIOLATIONS OF EFTA AND REGULATION E

20    106.    Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized

21 electronic fund transfer from a consumer's account may be authorized by the consumer only in

22 writing, and a copy of such authorization shall be provided to the consumer when made."

23 Section 903(9) of EFTA, 15 U.S.C. § 1693a(9), provides that the term "preauthorized electronic

24 fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially

25 regular intervals."

26    107.    Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), provides that

27 "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by

28

Complaint for Permanent Injunction/Other Equitable Relief - Page 31

1  a writing signed or similarly authenticated by the consumer. The person that obtains the
2  authorization shall provide a copy to the consumer."

3      108.    Section 205.10(b) of the Federal Reserve Board's Official Staff Commentary to
4  Regulation E, 12 C.F.R. § 205.10(b), Supp. I, provides that "[t]he authorization process should
5  evidence the consumer's identity and assent to the authorization." *Id.* at ¶10(b), cmt 5. The
6  Official Staff Commentary further provides that "[a]n authorization is valid if it is readily
7  identifiable as such and the terms of the preauthorized transfer are clear and readily
8  understandable." *Id.* at ¶10(b), cmt 6.

9      109.    Pursuant to Section 917(c) of EFTA, 15 U.S.C. § 1693o(c), every violation of
10  EFTA and Regulation E constitutes a violation of the FTC Act.

11                              **COUNT NINE**

12      **Unauthorized Electronic Fund Transfers from Consumers' Bank Accounts**

13      110.    In numerous instances, the Willms defendants have debited consumers' bank
14  accounts on a recurring basis without obtaining a written authorization signed or similarly
15  authenticated from consumers for preauthorized electronic fund transfers from their accounts,
16  thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of
17  Regulation E, 12 C.F.R. § 205.10(b).

18      111.    In numerous instances, the Willms defendants have debited consumers' bank
19  accounts on a recurring basis without providing to the consumer a copy of a written
20  authorization signed or similarly authenticated by the consumer for preauthorized electronic fund
21  transfers from the consumer's account, thereby violating Section 907(a) of EFTA, 15 U.S.C. §
22  1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

23      112.    By engaging in violations of EFTA and Regulation E as set forth in Paragraphs
24  110 and 111 of this Complaint the Willms defendants have engaged in violations of the FTC
25  Act. 15 U.S.C. § 1693o(c).

26                              **CONSUMER INJURY**

27      113.    Consumers have suffered and will continue to suffer substantial injury as a result
28  of defendants' violations of the FTC Act and EFTA. In addition, the defendants have been

Complaint for Permanent Injunction/Other Equitable Relief - Page 32

1  unjustly enriched as a result of their unlawful acts and practices. Absent injunctive relief by this
2  Court, the defendants are likely to continue to injure consumers, reap unjust enrichment, and
3  harm the public interest.

4  ## THIS COURT'S POWER TO GRANT RELIEF

5  114.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant
6  injunctive and such other relief as the Court may deem appropriate to halt and redress violations
7  of any provision of law enforced by the FTC. The Court, in the exercise of its equitable
8  jurisdiction, may award ancillary relief, including rescission or reformation of contracts,
9  restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and
10 remedy any violation of any provision of law enforced by the FTC.

11 ## PRAYER FOR RELIEF

12     WHEREFORE, plaintiff Federal Trade Commission, pursuant to Section 13(b) of the
13 FTC Act, 15 U.S.C. § 53(b), and Section 917(c) of EFTA, 15 U.S.C. § 1693o(c), and the Court's
14 own equitable powers, requests that this Court:

15 1.  Award plaintiff such preliminary injunctive and ancillary relief as may be
16     necessary to avert the likelihood of consumer injury during the pendency of this
17     action, and to preserve the possibility of effective final relief including, but not
18     limited to, a preliminary injunction and an order freezing assets;

19 2.  Enter a permanent injunction to prevent future violations of the FTC Act and
20     EFTA;

21 3.  Award such relief as the Court finds necessary to redress injury to consumers
22     resulting from defendants' violations of the FTC Act and EFTA including, but not
23     limited to, rescission or reformation of contracts, restitution, the refund of monies
24     paid, and the disgorgement of ill-gotten monies; and

25 4.  Award plaintiff the costs of bringing this action, as well as such other and
26     additional equitable relief as the Court may determine to be just and proper.

27

28

1  Dated: _May 16_____, 2011

2

3                                          Respectfully Submitted,

4                                          WILLARD K. TOM
                                           General Counsel

5                                          ROBERT J. SCHROEDER
                                           Regional Director

6

7

8                                          NADINE S. SAMTER, WSBA #23881
                                           KATHRYN C. DECKER, WSBA #12389
9                                          ELEANOR DURHAM
                                           JULIE K. MAYER, WSBA #34638
10                                         Federal Trade Commission
                                           915 Second Ave., Suite 2896
11                                         Seattle, WA 98174
                                           206-220-4479 (Samter)
12                                         206-220-4486 (Decker)
                                           206-220-4476 (Durham)
13                                         206-220-4475 (Mayer)
                                           206-220-6366 (fax)
14                                          kdecker@ftc.gov
                                            edurham@ftc.gov
15                                          nsamter@ftc.gov.
                                            jmayer@ftc.gov
16                                         Attorneys for Plaintiff Federal Trade Commission

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Permanent Injunction/Other Equitable Relief - Page 34