1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No. |
| Plaintiff, | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| v. | |
| **JESSE WILLMS**, individually and as a director or owner of 1021018, 1016363, and 1524948 Alberta Ltd; Circle Media Bids Limited; Coastwest Holdings Limited; Farend Services Ltd; JDW Media, LLC; Net Soft Media, LLC; Sphere Media, LLC; iand True Net, LLC; **PETER GRAVER**, individually and as an officer of JDW Media, LLC; **ADAM SECHRIST**, individually and as a director and shareholder of Circle Media Bids Limited and manager of Sphere Media, LLC; **BRETT CALLISTER**, individually and as an officer of True Net, LLC; **CAREY L. MILNE**, individually and as an officer of Net Soft Media, LLC; | Note on Motion Calendar: **June 10, 2011** |

Mot. for Prelim. Inj. and Memo of P&A   Page - i

1

2 **1021018 ALBERTA LTD,** also d.b.a.
Just Think Media, Credit Report America,
3 eDirect Software, WuLongsource, and
Wuyi Source;
4 **1016363 ALBERTA LTD,** also d.b.a.
eDirect Software;
5 **1524948 ALBERTA LTD,** also d.b.a.
Terra Marketing Group, SwipeBids.com,
6 and SwipeAuctions.com;
**CIRCLE MEDIA BIDS LIMITED,** also
7 d.b.a. SwipeBids.com, SwipeAuctions.com,
and Selloffauctions.com;
8 **COASTWEST HOLDINGS LIMITED;**
**FAREND SERVICES LTD;**
9 **JDW MEDIA, LLC;**
**NET SOFT MEDIA, LLC,** also d.b.a.
10 SwipeBids.com;
**SPHERE MEDIA, LLC,** also d.b.a.
11 SwipeBids.com and SwipeAuctions.com;
and
12 **TRUE NET, LLC,** also d.b.a.
Selloffauctions.com;

13                         Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**            Page

I.     SUMMARY................................................... 1

II.    THE PARTIES............................................... 2

       A.    Plaintiff............................................. 2

       B.    Corporate Defendants.................................. 3

       C.    Individual Defendants................................ 6

       D.    The Corporate and Individual Defendants Are a Common
             Enterprise........................................... 9

       E.    Jurisdiction and Venue.............................. 10

III.   DEFENDANTS' ILLEGAL BUSINESS PRACTICES................. 10

       A.    Defendants' Misrepresentations About "Free,"
             "Risk-free," and "Bonus" Offers And Undisclosed or
             Inadequately Disclosed Charges To Consumers' Accounts........ 13

       B.    Defendants Impose Deceptive and Undisclosed
             Limitations on Cancellations and Refunds.................... 23

       C.    Defendants Have Made False and Unsubstantiated
             Weight Loss and Colon Cancer Cure Product Claims............ 26

             1.    Defendants' False and Unsubstantiated
                   Weight Loss Claims............................. 26

             2.    Defendants' False and Unsubstantiated
                   Colon Cancer Cure Claims....................... 27

       D.    Defendants Have Disseminated False Claims of Celebrity and Other
             Endorsements............................................... 28

       E.    Defendants' Unfair Practice of Evading Risk
             Management Rules to Obtain Merchant Accounts............... 29

IV.    ARGUMENT................................................ 31

       A.    Section 13(b) of the FTC Act Authorizes This Court to
             Grant the Requested Relief............................. 31

       B.    This Case Meets the Applicable Standard for Entry of
             Preliminary Injunction................................. 32

       C.    The Evidence Demonstrates a Substantial Likelihood of
             Success on the Merits.................................. 33

             1.    Defendants' Deceptive and Unfair Business

Practices Violate Sections 5 and 12 of the FTC Act. . . . . . 33

           a.    Material Misrepresentations About "Free,"
                      "Risk Free," and "Bonus" Offers and
                      Failure to Disclose or Adequately Disclose
                      Charges to Consumers' Accounts. . . . . . . . . . . . .34

           b.    Deceptive and Undisclosed or Inadequately
                      Disclosed Limitations on Cancellations and
                      Refunds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

           c.    False and Unsubstantiated Claims About
                      the AcaiBurn and PureCleanse Products. . . . . . . . 38

           d.    False Celebrity and Other Endorsements. . . . . . . . .40

           e.    Unfair Practice of Evading Risk Management
                      Rules to Obtain Merchant Accounts. . . . . . . . . . . 40

       2.    Defendants' Unauthorized Billing Practices Violate
               Section 907(a) of the EFTA and Section 205.10(b)
               of EFTA's Implementing Regulation E. . . . . . . . . . . . . . . . 41

       3.    Liability of Individual Defendants. . . . . . . . . . . . . . . . . . . . 42

           a.    Jesse Willms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

           b.    Peter Graver, Adam Sechrist, Brett Callister, and
                      Carey Milne. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    D.    The Balance of the Equities Requires Preliminary Relief. . . . . . . . . 45

    E.    An Asset Freeze is Necessary to Preserve Funds for
         Consumer Redress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

1    Plaintiff, Federal Trade Commission ("FTC" or "Commission"), having filed its

2    complaint in this matter for a permanent injunction and other equitable relief, including

3    restitution for consumers injured by defendants' unlawful practices, moves this Court for a

4    preliminary injunction. A proposed order has been filed concurrently. This Court is

5    authorized to grant such relief by Section 13(b) of the Federal Trade Commission Act ("FTC

6    Act"), 15 U.S.C. § 53(b), Section 917(c) of the Electronic Fund Transfer Act ("EFTA"), 15

7    U.S.C. § 1693o(c), and Rule 65(a) of the Federal Rules of Civil Procedure. In support of its

8    motion, plaintiff states that defendants Jesse Willms and the corporate entities he controls

9    (collectively "Willms Defendants"), as well the named principals of those entities, Peter

10   Graver, Adam Sechrist, Brett Callister, and Carey Milne, have engaged in and are likely to

11   engage in acts or practices that violate Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a)

12   and 52, Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of EFTA's

13   implementing Regulation E, 12 C.F.R. § 205.10(b). Plaintiff further submits the following

14   Memorandum of Points and Authorities and accompanying exhibits in support of this Motion

15   for Preliminary Injunction.

16   **I.    SUMMARY**

17    The Willms defendants have marketed numerous products over the Internet, including

18   weight-loss supplements, teeth whiteners, colon cleansers, anti-aging pills, skin creams, work-

19   at-home schemes, credit reports, government grants, and, most recently, penny auctions. The

20   products themselves, however, were merely lures to draw consumers into agreeing to provide

21   their payment information for "risk free" or "free" trial offers and "bonus" products and

22   services. These websites routinely deceived consumers about the true costs of the offers with

23   poorly disclosed or undisclosed costly negative option continuity plans and forced upsells that

24   were charged to consumers' credit or debit card accounts monthly, enabling the Willms

25   defendants to capture many undisclosed charges before consumers noticed them. The Willms

26   defendants have convinced consumers that their offers were "risk free" by representing that

27

28

1  consumers could obtain full refunds on request. Instead, most consumers could not cancel

2  without paying for at least some of the products or services.

3  Not surprisingly, these practices have resulted in ongoing excessive charge reversal

4  rates for the products and services. To avoid detection and to ensure continued access to

5  financial institutions to process consumers' charges, the Willms defendants, with the help of

6  defendants Graver, Sechrist, Callister, and Milne, have engaged in numerous unfair tactics,

7  including creating shell corporations in the U.S. and abroad and fronting them with nominee

8  principals; submitting inaccurate information to financial institutions to get payment

9  processing; and processing payments in ways that mask the extent of their chargeback activity.

10  The Willms defendants also made deceptive and unsubstantiated product claims for two of the

11  products they marketed and sold on their websites: acai berry weight-loss pills (collectively

12  referred to as "AcaiBurn") and colon cleansing pills (collectively referred to as

13  "PureCleanse"), and used deceptive celebrity endorsements to entice consumers to try these

14  products.

15  Defendants' deceptive and unfair practices violate Sections 5 and 12 of the FTC Act

16  and have caused enormous consumer injury. Although defendants claim that they have ceased

17  their unlawful practices, plaintiff has evidence that defendants continue to create and operate

18  new websites with free-to-pay conversion trial offers and negative option features, which are at

19  the core of their deceptive practices. To prevent defendants from continuing to injure

20  unsuspecting consumers, plaintiff seeks a preliminary injunction to require them to cease

21  offering products or programs with negative option and recurring payment features during the

22  pendency of the litigation. Plaintiff further seeks the imposition of an asset freeze to preserve

23  assets for injured consumers.

24  **II.  THE PARTIES**

25  **A.  Plaintiff**

26  The FTC is an independent agency of the United States Government created by statute.

27  15 U.S.C. § 41 *et seq*. It is charged, *inter alia*, with enforcement of Section 5(a) of the FTC

28

Mot. for Prelim. Inj. and Memo of P&A  Page - 2

Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for foods, drugs, devices, services, or cosmetics in or affecting commerce. The FTC also enforces EFTA, 15 U.S.C. § 1693, *et seq.*, which regulates the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. The FTC is authorized to initiate federal district court proceedings to enjoin violations of the FTC Act and EFTA and to secure such equitable relief as may be appropriate, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), and 1693o(c).

## B. Corporate Defendants

**1021018 Alberta Ltd.** is a Canadian limited liability company with its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta.[1] Defendant Willms is the sole owner of this company.[2] The registered trade names for the company are Just Think Media, Credit Report America, Wulongsource, and Wuyi Source (collectively "Just Think Media").[3] Just Think Media also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB; 79 Charlton Road, Sherwood Park, AB; and #240, 11 Athabascan Avenue, Sherwood Park, AB.[4] 1021018 Alberta Ltd., is the Willms company that promoted, marketed, and sold each of defendants' products.[5]

**1016363 Alberta Ltd.** is a Canadian limited liability company with its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta.[6] Defendant Willms is the sole

---

[1] Correspondence from defendants to FTC in response to requests for information and documents, at 95, 111-12, 115, attached to this Memo as PI Exhibit 2 ("PI Ex. 2").

[2] *Id.* at 95.

[3] *Id.* at 39, 95, 111-12.

[4] *Id.* at 39, 95.

[5] *Id.* at 87.

[6] *Id.* at 39.

owner of this company.[7] The registered trade name for the company is eDirect Software.[8] eDirect Software also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB, and 79 Charlton Road, Sherwood Park, AB.[9]

**1524948 Alberta Ltd.** is a Canadian limited liability company with its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta.[10] Defendant Willms is the sole owner of this company. Its registered trade name is Terra Marketing Group.[11] Terra Marketing Group does business under various names, including SwipeBids.com and SwipeAuctions.com.[12]

**Circle Media Bids Limited** is a private limited liability company incorporated in England, with its registered place of business at 72 High Street, Haslemere, Surrey, England. Defendant Sechrist established it to facilitate the operation of online penny auctions, including SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com, and, specifically, to secure offshore merchant banking services for Willms.[13]

**Coastwest Holdings Limited** is a Cyprus corporation with its registered place of business at Vasilissis Frederikissis, 33, First Floor, Nicosia, Cyprus.[14] Defendant Willms is the

---

[7] *Id.* at 95.

[8] *Id.* at 39.

[9] *Id.* In the past, defendants 1021018 Alberta Ltd. and 1016363 Alberta Ltd. have operated as a partnership using the name eDirectsoftware. *Id.*

[10] Declaration of Michelle Brozek (Mar. 14, 2011), at 285, 306-07, ¶ 9 and Attach. C, attached to this Memo as PI Exhibit 6 ("PI Ex. 6").

[11] *Id.* at 285, ¶ 9.

[12] *Id.*

[13] Corporate filings of Circle Media Bids Ltd, at 8-29, attached to this Memo as PI Exhibit 1 ("PI Ex. 1").

[14] PI Ex. 2, at 39, 110.

sole owner of this company; he established it to facilitate his operations and to secure offshore merchant banking services.[15]

**Farend Services Ltd.** is a Cyprus corporation with its registered place of business at Athinodorou, 3, Dasoupoli, Strovolos, P.C. 2025, Nicosia, Cyprus.[16] Defendant Willms controls Farend Services and has signed as "President" of Farend Services on a Cease and Desist Order the company entered into with the State of Utah.[17] Like Coastwest, Farend Services was established to facilitate Willms's Internet operations and to secure offshore merchant banking services for him.[18]

**JDW Media, LLC** is an Idaho limited liability corporation with its registered place of business at 2184 Channing Way, #322, Idaho Falls, Idaho.[19] Defendant Graver established JDW Media to facilitate Willms's Internet operations and to secure banking and merchant processing services for Willms.[20]

**Net Soft Media, LLC** is a Utah limited liability corporation with its registered place of business at 2150 S. 1300 E., Suite 500, Salt Lake City, Utah.[21] Net Soft Media does business as SwipeBids.com.[22] Defendant Milne established Net Soft Media to facilitate the operation of

---

[15] PI Ex. 2, at 95; Declaration of Andrew Chen (May 5, 2011), Attach. M, at 2963-64, attached to this Memo as PI Exhibit 56 ("PI Ex. 56").

[16] PI Ex. 2, at 39, 95; *see* documents defendants provided to the FTC in response to requests for information and documents, at 245-46, attached to this Memo as PI Exhibit 3 ("PI Ex. 3").

[17] *In the Matter of Farend Services Ltd dba Dazzle Smile,* DCP Case #68283, Settlement Agreement (Nov. 30, 2009), Utah Division of Consumer Protection, at 280-81, attached to this Memo as PI Exhibit 5 ("PI Ex. 5").

[18] PI Ex. 2, at 95; PI Ex. 3, at 207-13.

[19] PI Ex. 1, at 4.

[20] PI Ex. 2, at 31, 39, 114-15; Declaration of Eleanor Durham (May 9, 2011), at 2440-41, 2531-53, ¶¶ 24-25 and Attachs. N and O, attached to this Memo as PI Exhibit 50 ("PI Ex. 50").

[21] PI Ex. 1, at 5-6.

[22] PI Ex. 50, at 2637-45, ¶ 32 and Attach. U; Responses of Peter Graver to FTC Civil Investigative Demand (Aug. 25, 2010), at 403-06, 560-63, 635-38, attached to this Memo as PI Exhibit 8 ("PI Ex. 8"); Response of National Bank of California to FTC Civil Investigative Demand (Sept. 30, 2010), at 2386-422, attached to this Memo as PI Exhibit 49 ("PI Ex. 49").

1

2

online penny auctions, including SwipeBids.com, and specifically to secure banking and merchant processing services for Willms.[23]

3

4

5

6

7

8

**Sphere Media, LLC** is a Utah limited liability corporation with its registered place of business at 906 W. 400 S., Orem, Utah.[24] Sphere Media has done business under various names, including SwipeBids.com and SwipeAuctions.com.[25] Defendants Graver and Sechrist established Sphere Media to facilitate the operation of online penny auctions, including SwipeBids.com, and specifically to secure banking and merchant processing services for Willms.[26]

9

10

11

12

13

**True Net, LLC** is a Nevada limited liability corporation with its registered place of business at 1555 E. Tropicana Ave., Suite 250, Las Vegas, Nevada.[27] True Net does business as Selloffauctions.com.[28] Defendant Callister established True Net to facilitate the operation of online penny auctions, including Selloffauctions.com, and specifically to secure banking and merchant processing services for Willms.[29]

14

## C. Individual Defendants

15

16

17

Defendant **Jesse Willms** is a resident of Alberta, Canada. He owns, directs, or otherwise controls each of the named corporate defendants and is the sole named shareholder or owner of four of the ten companies named in the complaint.[30] He created or approved the

18

19

20

[23] Pl Ex. 8, at 389-90, 415-16, 420, 480, 529-30, 560-64, 592-94, 635-38, 645-50.

21

[24] Pl Ex. 1, at 1-3; Pl Ex. 8, at 668-81, 685.

22

[25] Pl Ex. 1, at 3; Pl Ex. 8, at 399, 455, 686-94.

23

[26] Pl Ex. 1, at 1-3; Pl Ex. 8, at 423-36, 439-74, 543-44, 547, 549, 668, 684-94.

24

[27] Pl Ex. 8, at 602-03, 609- 618.

25

[28] *Id.* at 388.

26

[29] *Id.* at 387-88, 391-92, 526-27, 532, 589-91, 599-606, 614-18.

27

[30] Pl Ex. 2, at 95.

28

Mot. for Prelim. Inj. and Memo of P&A Page - 6

companies' business plans, customer service scripts, and websites,[31] and negotiated and signed contracts on behalf of the corporate defendants, including contracts for banking (he is a signatory on at least two U.S. bank accounts), payment processing services, ad networks, fulfillment houses, and domain registration services, and managed those contractual relationships.[32] Willms outsourced a large part of his operations to third parties in the U.S., who have provided products, fulfillment, customer service, and affiliate marketing, for his companies.[33] However, Willms controlled all aspects of the business. He reviewed and approved: (1) all scripts used by customer services agents; (2) the compliance guide his companies used for the website designers and content writers; and (3) all changes to the websites.[34] He also maintained significant control over the functions he outsourced.[35]

Willms describes the remaining named companies as his "agents" and admits that creating these companies was "necessary to facilitate credit card processing."[36] In fact, he set up the shell companies to enable him to secure payment processing when he could no longer

---

[31]  PI Ex. 2, at 93-94 (approves general creatives and ads), 122-23 (conducts final review of all ads).

[32]  PI Ex. 3, at 138-89, 191; see Responses of GC Services, LP to FTC Civil Investigative Demand (Aug. 26, 2010), at 719-29, attached to this Memo as PI Exhibit 9 ("PI Ex. 9"); Responses of PPS Secure, Ltd., to FTC Civil Investigative Demand (Aug. 11, 2010), at 2285-298, attached to this Memo as PI Exhibit 48 ("PI Ex. 48").

[33]  See id.

[34]  PI Ex. 2, at 88, 94.

[35]  Willms and his employees could access directly individual customer accounts, read agents' notes, and customer complaints and refund requests. PI Ex. 9, at 711, 714, 804, 813, 821-24, 828, 830, 833-35, 842-45, 878-88 (pages 802-886 of PI Ex. 9 are transcripts of instant message communications between the Willms defendants and GC Services); LiveOps, Inc., Second Response to FTC Civil Investigative Demand (Nov. 3, 2010) at 910-11, attached to this Memo as PI Exhibit 10 ("PI Ex. 10"); AtLast Holdings, Inc., Response to FTC Civil Investigative Demand (Aug. 20, 2010), at 1056, attached to this Memo as PI Exhibit 11 ("PI Ex. 11"); 1-800 WeAnswer, Inc., Response to FTC Civil Investigative Demand (Aug. 12, 2010), at 1129-31, attached to this Memo as PI Exhibit 12 ("PI Ex. 12"). Willms also approved bonuses to customer service agents for handling the largest call volumes. See PI Ex. 9, at 821-22, 843, 878.

[36]  PI Ex. 2, at 115.

do so on his own because of the excessive charge reversals his practices engendered.[37]  Willms nonetheless exercised substantial control over these companies.[38]

Defendant **Peter Graver**, a Utah resident, is an officer of defendant JDW Media, LLC, and is the registered agent and bank account signatory for defendant Sphere Media, LLC.[39] Graver entered into a contract with defendant Willms to act as the nominee principal of JDW Media, LLC, while Willms maintained control.[40]  Under the contract, Graver has provided an array of services including, but not limited to: (1) setting up U.S. companies for purposes of obtaining bank accounts and merchant processing for Willms;[41] (2) finding nominee principals of those companies to sign on bank accounts so that Willms's involvement would be undetected;[42] (3) transferring money between the Willms entities;[43] and (4) acting as or arranging for others to act as the U.S. signatory on merchant applications for Willms's companies.[44]  The contract specifically provided that Graver would perform these duties as Willms directed, and Graver has had no right and or claim to any monies flowing through the corporations, although he was paid for his services.[45]

---

[37] PI Ex. 2, at 115; PI Ex. 3, at 191, 242-43; *see generally*, PI Ex. 8, which contains email traffic over some period of time evidencing Peter Graver and the Willms defendants' activities setting up the shell corporations and obtaining merchant bank accounts and payment processing for them.

[38] PI Ex. 3, at 242-67; PI Ex. 8, at 401-02, 411, 415-16, 438, 459-62, 475, 486-510, 513-14, 516-17, 536, 541, 543, 550, 554, 578-80, 586-94, 643, 664-67.

[39] PI Ex. 1, at 1-4; PI Ex. 8, at 378.

[40] PI Ex. 3, at 167a-167d (Graver contract with Willms defendants).

[41] PI Ex. 8, at 381-82, 387-91, 396-97, 399-402, 407-09, 415-17, 423-26, 428, 440-43, 464-67, 533-38, 555, 567-77, 599-606, 614, 643-50, 653.

[42] *Id.* at 377, 418-21, 428-31, 454-58, 529-30, 532, 547, 579-80, 619-32, 653-59, 664-82, 693-94.

[43] *Id.* at 384, 393-95, 398, 403-05, 422, 486-509, 513-14, 560-65.

[44] *Id.* at 377, 429-36, 438, 454-58, 479, 518, 529, 547, 581-585, 633-59, 684-94.

[45] *Id.* at 577-80 (payments Graver received for his services to the Willms defendants); PI Ex. 3, at 167a-167d.

Mot. for Prelim. Inj. and Memo of P&A  Page - 8

1

2

3

4

5

6

7

Defendant **Adam Sechrist**, a Pennsylvania resident, is a director and sole shareholder of defendant Circle Media Bids Limited and is the manager of defendant Sphere Media, LLC.[46] Defendant **Brett Callister**, a Utah resident, is an officer of defendant True Net, LLC.[47] Defendant **Carey Milne**, a Utah resident, is an officer of defendant Net Soft Media, LLC.[48] These defendants were nominee principals for the shell corporations and signatories for the companies' associated merchant accounts that they and Graver assisted the Willms defendants in creating.[49] They have signed similar contracts to that of Graver.[50]

8

### D.    The Corporate and Individual Defendants Are a Common Enterprise

9

10

11

12

13

14

Jesse Willms's ownership interests in the corporate defendants, and the exercise of his control and authority over each of them, make them one common enterprise for purposes of liability.[51] Further, the corporations have freely commingled funds, which were transferred to offshore entities Willms controlled.[52] The evidence amply demonstrates that defendants have operated as a common enterprise and, as such, each of the companies and the individuals are jointly and severally liable for the alleged law violations.[53]

15

16

17

[46] PI Ex. 1, at 1-3, 8-13.

18

[47] PI Ex. 8, at 609-11.

19

[48] PI Ex. 1, at 5-6.

20

21

[49] *See, e.g.*, PI Ex. 8, at 399-400, 417-19, 423-24, 547, 549, 582-85, 619-32, 639-42, 653-63, 668-92, (Sechrist's involvement); 387-88, 391-92, 532, 599-606 (Callister's involvement); 529-30, 635, 645-52 (Milne's involvement).

22

23

[50] *Id.* at 586-94. They, too, received a salary or stipend for their services and had no claim to money flowing through the corporations.

24

[51] *See supra* notes 1-50.

25

[52] PI Ex. 3, at 193-96, 198, 202-13, 217-20; PI Ex. 8, at 403-10, 413, 482-509, 516-17, 560-66, 576-77.

26

27

[53] *See FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005); *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1173, 1175 (1st Cir. 1973); *FTC v. Neovi, Inc.*, 598 F.Supp. 2d 1104, 1116 (S.D. Cal. 2008).

28

**E.   Jurisdiction and Venue**

This matter is properly before the Court. The Court has subject matter jurisdiction over the FTC Act and EFTA claims under 28 U.S.C. §§ 1331, 1337(a), and 1345. Defendants used the Internet to market their products and services and shipped their products to consumers in every state in the U.S., every Canadian province, and numerous other countries.[54] These practices "cause or are likely to cause reasonably foreseeable injury within the United States" and, thus, are subject to the FTC's jurisdiction.[55] The Court also has personal jurisdiction over the defendants. Section 13(b) of the FTC Act provides that "process may be served on any person, partnership, or corporation wherever it may be found."[56] Courts have consistently held that, because process can be served anywhere in the United States under the FTC Act, personal jurisdiction is proper anywhere in the United States as well.[57]

**III.   DEFENDANTS' ILLEGAL BUSINESS PRACTICES**

Since at least 2007, the Willms defendants have used deceptive marketing tactics to sell a variety of products, programs, and services via the Internet, including weight loss and colon

---

[54] Pl Ex. 2, at 87.

[55] *See* 15 U.S.C. § 45(a)(4)(A)(i). The U.S. SAFE WEB Act of 2006 specifically amended the FTC Act to grant the Commission this authority over conduct involving "foreign commerce," including the availability of "all remedies . . . with respect to unfair and deceptive acts or practices." 15 U.S.C. § 45(a)(4)(B). Venue is also proper in the Western District of Washington. Pursuant to the FTC Act, an action may be brought in any district where a corporation or person "resides or transacts business." 15 U.S.C. § 53(b). The defendants have transacted business in this district and have generated complaints from Washington state consumers. Declaration of Amy Brannon-Quale (Apr. 4, 2011), at 2667, ¶ 5, attached to this Memo as Pl Exhibit 51 ("Pl Ex. 51"); Declaration of Eric Setala (May 9, 2011), at 2698, ¶ 7, attached to this Memo as Pl Exhibit 54 ("Pl Ex. 54"). Moreover, because personal jurisdiction is proper in this matter, it necessarily follows that venue is proper pursuant to 28 U.S.C. § 1391(c), which provides that venue is proper in any judicial district in which a defendant corporation is subject to personal jurisdiction.

[56] Rule 4(k)(1) of the Federal Rules of Civil Procedure provides that valid service of process is sufficient to establish personal jurisdiction. Courts have uniformly relied on this Rule to interpret statutes which authorize nationwide service of process as also authorizing nationwide personal jurisdiction. *See, e.g., Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (Clayton Act); *Fitzsimmons v. Barton*, 589 F.2d 330, 332 (7th Cir. 1979) (securities laws).

[57] *FTC v. Cleverlink Trading, Ltd., et al.*, No. 05-2889, 2006 U.S. Dist. LEXIS 45244, at *14-15 (N.D. Ill. June 19, 2006); *FTC v. Bay Area Bus. Council, Inc., et al.*, No. 02 C 5762, 2003 U.S. Dist. LEXIS 3865, at *6 (N.D. Ill. Apr. 30, 2003).

Mot. for Prelim. Inj. and Memo of P&A   Page - 10

cleansing supplements with many different names and formulations,[58] a work-at-home scheme, a government grants program, a credit report program, and teeth whiteners.[59] The Willms defendants also have charged consumers for various "upsell" programs and products, including "Insider Secrets Expert Tips" package, "Comprehensive Weight Loss ebook," "World Club Fitness," "Fraud Protection," and "ID Theft."[60] The Willms defendants were not concerned with attracting loyal customers for their products; they made money primarily by charging consumers' accounts without consumers' knowledge or agreement.

In early 2010, the Willms defendants ceased marketing the above items and switched to enticing consumers to participate in online penny auctions through the websites SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com.[61] Penny auctions allow

[58] PI Ex. 2, at 96-98, 130-34.

[59] Declaration of Henry M. Burgoyne, III, at 270, ¶ 3, attached to this Memo as PI Exhibit 4 ("PI Ex. 4"); PI Ex. 2, at 41, 51-55; Declaration of Charles Capron, at 1740, ¶ 2, attached to this Memo as PI Exhibit 21 ("PI Ex. 21") (teeth whitener); Declaration of Joseph Cooper, at 1759, ¶ 2, attached to this Memo as PI Exhibit 22 ("PI Ex. 22") (work at home); Declaration of Michael Herbert, at 1805, ¶¶ 2-3, attached to this Memo as PI Exhibit 25 ("PI Ex. 25") (teeth whitener); Declaration of Tonya Hicks, at 1824, ¶ 2, attached to this Memo as PI Exhibit 26 ("PI Ex. 26") (work at home); Declaration of Clarence Hutton, at 1831, ¶ 4, attached to this Memo as PI Exhibit 27 ("PI Ex. 27") (credit report); Declaration of Gail Lass, at 1838, ¶ 2, attached to this Memo as PI Exhibit 28 ("PI Ex. 28") (teeth whitener); Declaration of Sally Napier, at 1895, ¶¶ 2-3, attached to this Memo as PI Exhibit 31 ("PI Ex. 31") (teeth whitener); Declaration of Ann Otto, at 1913, ¶ 2, attached to this Memo as PI Exhibit 32 ("PI Ex. 32") (teeth whitener); Declaration of Janeway Riley, at 1928, ¶ 2, attached to this Memo as PI Exhibit 33 ("PI Ex. 33") (teeth whitener).

[60] PI Ex. 10, at 910; PI Ex. 11, at 10, 53-54; see Declaration of Darrell Browning, at 1732, ¶ 5, attached to this Memo as PI Exhibit 20 ("PI Ex. 20"); PI Ex. 21, at 1740-42, ¶¶ 5-8; PI Ex. 22, at 1759-60, ¶ 4; Declaration of Carol M. Fahnestock, at 1782, ¶ 9, attached to this Memo as PI Exhibit 23 ("PI Ex. 23"); Declaration of Marilyn Fletcher, at 1794-95, ¶ 4, attached to this Memo as PI Exhibit 24 ("PI Ex. 24"); PI Ex. 25, at 1807, ¶ 10; PI Ex. 26, at 1824-25, ¶¶ 3-4; PI Ex. 27, at 1832-33,¶¶ 7-9; Declaration of Michelle Loew, at 1860, ¶ 5, attached to this Memo as PI Exhibit 29 ("PI Ex. 29"); Declaration of Kia Malott, at 1884-85, ¶ 6, attached to this Memo as PI Exhibit 30 ("PI Ex. 30"); PI Ex. 31, at 1895-97, ¶¶ 4, 9; Declaration of Marley Sharpe, at 1953-54, ¶ 7, attached to this Memo as PI Exhibit 34 ("PI Ex. 34"); Declaration of Anthony Walker, at 1968-69, ¶¶ 9-11, attached to this Memo as PI Exhibit 35 ("PI Ex. 35"); Declaration of Ruth Wittereid, at 1977-78, ¶¶ 5-7, attached to this Memo as PI Exhibit 36 ("PI Ex. 36").

[61] PI Ex. 2, at 124-25, 135-37; Declaration of Shannon Spilo, at 2225, ¶¶ 2-3, attached to this Memo as PI Exhibit 46 ("PI Ex. 46"); Declaration of Betsy Susan Bradley, at 2016, ¶¶ 2-3, attached to this Memo as PI Exhibit 38 ("PI Ex. 38"); Declaration of Kim Cheng, at 2027, ¶¶ 2-4, attached to this Memo as PI Exhibit 39 ("PI Ex. 39"); Declaration of Elizabeth Deuble, at 2042, ¶¶ 2-3, attached to this Memo as PI Exhibit 40 ("PI Ex. 40"); Declaration of Janet DeWoody, at 2097-99, ¶¶ 5-11, attached to this Memo as PI Exhibit 41 ("PI Ex. 41"); Declaration of Amy Hetrick, at 2105, ¶¶ 2-3, attached to this Memo as PI Exhibit 42 ("PI Ex. 42"); Declaration of Susan McNeill-Hotsinpiller, at 2130, 2136, ¶¶ 2-3, 22, attached to this Memo as PI Exhibit 43 ("PI Ex. 43"); Declaration of David

consumers to purchase bids, usually for $0.50 to $1.00 per bid, and place bids to win the opportunity to purchase a variety of goods, including electronic devices, retailer gift cards, and even automobiles, for a fraction of their market value.[62] Every time a bid is placed on an offered item, the bidding price of the item increases by $0.01, and the auction time is extended by a short amount of time.[63] The winning bidder must pay the final bidding price on the item, plus shipping and handling charges.[64] As with the earlier ventures, the Willms defendants used a "free" offer to enroll consumers unwittingly into a program of monthly credit card charges.

The Willms defendants have contracted with a network of third parties known as "affiliate marketers" to direct consumers to the Willms defendants' many websites.[65] The affiliate marketers use banner ads, pop-ups, sponsored search terms, and unsolicited email to drive consumer traffic to the Willms defendants' "landing pages."[66] The Willms defendants have provided them with creative content describing the offers used in creating their advertising.[67] The banner ads contain similar claims to those that appeared on the Willms defendants' websites.[68] The Willms defendants pay the affiliate marketers for each consumer

Pastrick, at 2177, ¶ 3, attached to this Memo as PI Exhibit 44 ("PI Ex. 44"); Declaration of Greg Sherrow, at 2194, 2196, 2199, ¶¶ 4, 10, 19, attached to this Memo as PI Exhibit 45 ("PI Ex. 45").

[62] Declaration of Susan Kleimann, Ph.D., (Mar. 22, 2011), at 1328-32, ¶¶ 28-36 and Attach. H, at 1552-53, attached to this Memo as PI Exhibit 15 ("PI Ex. 15"); *see* Thaler, Richard H., "Economic View: Paying a Price for the Thrill of the Hunt," *New York Times* (Nov. 15, 2009), http://www.nytimes.com/2009/11/15/business/economy/15view.html?pagewanted=print, attached to this Memo as PI Exhibit 14 ("PI Ex. 14").

[63] *Id.*

[64] *Id.*

[65] PI Ex. 2, at 89-90; *see* PI Ex. 4, at 270, ¶ 3.

[66] PI Ex. 3, at 221-39; PI Ex. 4, at 270, ¶ 3; PI Ex. 21, at 1740, ¶ 2; PI Ex. 23, at 1779, ¶ 2; PI Ex. 24, at 1794, ¶ 2; PI Ex. 25, at 1805, ¶¶ 2-3; PI Ex. 28, at 1838, ¶ 2; PI Ex. 30, at 1883, ¶ 2; PI Ex. 31, at 1895, ¶¶ 2-3; PI Ex. 32, at 1913, ¶ 2; PI Ex. 33, at 1928, ¶ 2; PI Ex. 35, at 1966, ¶ 2; PI Ex. 36, at 1799, ¶ 2; PI Ex. 37, at 1995, ¶ 2; PI Ex. 38, at 2016, ¶¶ 2-3; PI Ex. 40, at 2042, ¶ 2; PI Ex. 41, at 2097, ¶¶ 2-3; PI Ex. 42, at 2105, ¶ 2; PI Ex. 43, at 2130, ¶¶ 2-3; PI Ex. 44, at 2177, ¶¶ 2-3; PI Ex. 45, at 2194, ¶ 3; PI Ex. 46, at 2225, ¶¶ 2-3; PI Ex. 22, at 1759, ¶ 2; PI Ex. 26, at 1824, ¶ 2; PI Ex. 27, at 1831, ¶¶ 3-4.

[67] PI Ex. 2, at 91.

[68] PI Ex. 3, at 221-39.

Mot. for Prelim. Inj. and Memo of P&A   Page - 12

who, originating from the affiliate marketer's ad, lands on one of the Willms defendants' websites and is successfully charged by the Willms defendants.[69] Often consumers reach the Willms defendants' websites through other, legitimate websites or through fake news articles on the Internet.[70]

### A. Defendants' Misrepresentations About "Free," "Risk-free," and "Bonus" Offers and Undisclosed or Inadequately Disclosed Charges To Consumers' Accounts

The Willms defendants have represented that their products and programs are "free," "risk-free," or "bonus" in nature, which has led consumers to believe that they would not be charged additional amounts after providing their billing information. This occurred because the Willms defendants have failed to disclose, or to disclose adequately, critical information about the additional charges associated with these offers.

For their trial offers, the Willms defendants have made the following and other similar representations on their website landing pages or in the audio that plays prominently while viewing the landing pages:

> "That's right! All of the incredible benefits of this number-one rated superfood, only found in remote parts of the Brazilian rain forest, is now available to you, in convenient capsule form, through a risk-free, 14-day trial offer. Just pay the small shipping and handling charge."[71]

> "Congratulations! You Are Now Only One Step Away From Claiming Your 14 Day Trial of PureCleanse Detox - You Only Pay The Small Fee Of $4.95 (strikeout) $1.95 For Shipping!"[72]

> "TRY IT NOW FREE!* *Just pay for shipping!"[73]

---

[69] *See* PI Ex. 3, at 142-45, 165-67.

[70] PI Ex. 38, at 2106, ¶ 2; PI Ex. 41, at 2097, ¶¶ 2-3; PI Ex. 42, at 2105, ¶ 2; PI Ex. 44, at 2177, ¶ 2; PI Ex. 45, at 2194, ¶¶ 3-4; PI Ex. 46, at 2225, ¶ 2.

[71] PI Ex. 54, Attach. J, at 2750 (transcript of audio portion of AcaiBurn Max website).

[72] PI Ex. 54, Attach. G, at 2734, Attach. H, at 2741, Attach. I, at 2747.

[73] PI Ex. 3, at 223-25.

Mot. for Prelim. Inj. and Memo of P&A   Page - 13

1    Through the repeated use of the terms "free," "risk-free," and "trial," the Willms defendants

2    have created the net impression that sending away for the trial supplement product obligated

3    the consumer to pay nothing more than the nominal shipping and handling fee.[74]  They

4    reinforced this impression by prominently highlighting the risk-free or free aspects of their

5    offers in large font, highlighted text, placement of the text where it would be most easily seen,

6    and with loud audio voice overs.[75]  They have emphasized that the offer was for a limited time

7    and only available in limited quantities, creating a sense of urgency for the consumer to take

8    advantage of the trial offer.[76]  Consumers were bombarded with pages of text and sometimes

9    audio extolling the benefits of the trial product offered (e.g., lose weight, brighter teeth, etc.),

10   including testimonials from consumers and endorsements by trusted celebrities, such as

11   Rachael Ray and Oprah Winfrey, and media sources, such as CNN, ABC, Fox News, and

12   others.[77]  However, these website design features distracted consumers from the true costs or

13   terms of the offers.[78]  Any mention of costs and terms was minimal or buried in the separate

14

15

16   [74] PI Ex. 15, at 1326, ¶ 25.  Dr. Kleimann is an expert in the effective design of communication in written,

17   spoken, and web-based media and plain language communications.  Dr. Kleimann has reviewed a representative
     sample of the Willms defendants' websites and has opined on their use of rhetoric, web design principles, and

18   whether consumers are likely to see, read, and understand the disclosures of material terms and conditions on the
     websites.  Her findings regarding the net impression of the websites is confirmed by the Willms defendants' actual

19   customers. *See* PI Ex. 23, at 1779, ¶ 2; PI Ex. 24, at 1794, ¶ 2; PI Ex. 26, at 1824, ¶¶ 2-3; PI Ex. 28, at 1838, ¶¶ 2-3;
     PI Ex. 29, at 1859, ¶ 2; PI Ex. 20, at 1731, ¶ 2; PI Ex. 33, at 1928, ¶ 3; PI Ex. 21, at 1740, ¶ 3; PI Ex. 25, at 1805, ¶¶

20   2-3; PI Ex. 31, at 1895, ¶ 2; PI Ex. 32, at 1913, ¶ 2; PI Ex. 37, at 1995, ¶ 2; PI Ex. 30, at 1883, ¶ 2; PI Ex. 35, at
     1966, ¶ 3; PI Ex. 40, at 2042, ¶ 3; PI Ex. 34, at 1952, ¶ 2; *see also* PI Ex. 50, at 2433, 2436, 2437- 40, 2531-46, ¶¶ 6,

21   13, 17-23 (chargeback reason codes), 24 and Attach. N (chargeback plan).

22   [75] PI Ex. 20, at 1731, ¶ 2; PI Ex. 41, at 2097, ¶ 4; PI Ex. 24, at 1794, ¶ 2; PI Ex. 25, at 1805, ¶ 2; PI Ex. 29,
     at 1859, ¶ 2; PI Ex. 35, at 1966, ¶¶ 2-3; PI Ex. 26, at 1824, ¶ 2; PI Ex. 32, at 1913, ¶ 3; Declaration of Laureen

23   France, at 2686-87, ¶¶ 4-6, attached to this Memo as PI Exhibit 53 ("PI Ex. 53"); *see also* PI Ex. 15, at 1333-35,
     ¶¶ 39, 43.

24
     [76] PI Ex. 15, at 1325-26, ¶ 24; PI Ex. 32, at 1913, ¶ 3.
25

26   [77] PI Ex. 36, at 1977, ¶¶ 2-3; PI Ex. 37, at 1995, ¶ 3; PI Ex. 45, at 2194, ¶ 4; PI Ex. 46, at 2225, ¶ 2; PI Ex.
     43, at 2130, ¶ 2; PI Ex. 38, at 2016, ¶ 2; PI Ex. 25, at 1808, ¶ 13; *see also* PI Ex. 15, at 1325, ¶ 23(e)-(g).

27   [78] PI Ex. 15, at 1333-34, 1348-49, ¶¶ 39, 74.

28

1  terms and conditions pages, or was so obscured or ambiguously worded that consumers did not

2  understand the meaning.[79]

3      Consumers who clicked onto the order pages for the trial offers also found the same

4  representations. Most order pages included a prominent summary of the order that was

5  designed to look like an invoice, representing that consumers would only be charged for

6  shipping and handling:

7  **YOUR TRIAL** REVIEW

8

| Items Requested **AcaiBurn** | Today you pay $0.00 | Quantity 1 | Subtotal $0.00 |
|---|---|---|---|
| AcaiBurn System Trial (14 days) | | | |
| Weight Loss e-book Trial | $0.00 | 1 | $0.00 |
| Insider Secrets Trial | $0.00 | 1 | $0.00 |
| Standard Shipping and Handling (5-7 days) | | | $6.95 |
| **Summer AcaiBurn Promotion!** | | | -$2.00 |
| **Trial + Shipping Total** | | | $4.95[80] |

13      In fact, if consumers did not affirmatively cancel and return the trial product before the

14  expiration of the trial period, they were charged for: (1) the trial product itself (typically

15  between $40-$90); (2) monthly recurring fees for enrollment in a continuity program

16  associated with the trial product; (3) the "bonus" products (*e.g.*, "Insider Secrets Expert Tips"

17  package), which were forced upsell products; and (4) monthly recurring fees for enrollment in

18  continuity programs associated with upsell products.[81] These disclosures were usually only on

19

20    [79] *Id.* at 1335-37, ¶¶ 44-46, Attach. A, at 1363-65, Attach. C, at 1438-40, Attach. D, at 1450-51 (trial

21  product terms and conditions pages); PI Ex. 20, at 1731, ¶¶ 2-3; PI Ex. 21, at 1740, ¶¶ 2-3; PI Ex. 23, at 1779, ¶ 2; PI Ex. 24, at 1794, ¶ 2; PI Ex. 25, at 1805, ¶¶ 3-4; PI Ex. 27, at 1831, ¶ 4; PI Ex. 28, at 1838, ¶¶ 2-3; PI Ex. 29, at

22  1859, ¶ 2; PI Ex. 30, at 1883, ¶ 2; PI Ex. 31, at 1895, ¶¶ 2-3; PI Ex. 32, at 1913-14, ¶¶ 3-4; PI Ex. 33, at 1928, ¶¶ 2-3; PI Ex. 34, at 1952, ¶ 2; PI Ex. 35, at 1966, ¶ 3; PI Ex. 36, at 1977, ¶ 3; PI Ex. 37, at 1995-96, ¶¶ 3-4; PI Ex. 53, at

23  2687, ¶ 6.

24    [80] PI Ex. 15, Attach. A, at 1358, Attach. B, at 1423-24, Attach. C, at 1432, 1434, Attach. D, at 1445-46; *see* PI Ex. 50, at 2436, ¶ 15.

25    [81] PI Ex. 15, Attach. A, at 1363-65, Attach. C, at 1438-40; Attach. D, at 1450-51 (trial product terms and

26  condition pages)); PI Ex. 2, at 71. *See* PI Ex. 20, at 1731-32, ¶¶ 3-5, 8; PI Ex. 21, at 1740-42, ¶¶ 5-8; PI Ex. 23, at 1780-82, ¶¶ 3-7; PI Ex. 24, at 1794-95, ¶¶ 4-6; PI Ex. 25, at 1805-06, ¶¶ 4-6; PI Ex. 28, at 1838-39, ¶¶ 3-5; PI Ex.

27  30, at 1884-85, ¶¶ 5-6; PI Ex. 31, at 1895-97, ¶¶ 4-9; PI Ex. 32, at 1914, ¶¶ 5-6; PI Ex. 33, at 1928-29, ¶¶ 5-7; PI Ex. 35, at 1967-69, ¶¶ 6,9; PI Ex. 36, at 1977-78, ¶¶ 5-6; PI Ex. 37, at 1995-97, ¶¶ 3, 6-9.

28

1    the separate and difficult to read terms and conditions pages.[82]  When some of these

2    disclosures appeared on the ordering pages, they were ambiguously worded, incomplete, and

3    confusing to consumers.  Thus, consumers were unaware of these charges.[83]  Moreover,

4    cancelling these charges and obtaining refunds involved separate time-consuming telephone

5    calls and other steps that made the process far from "risk-free."[84]

6         For example, a representative "disclosure" of the membership negative option that

7    appeared on many of the trial offer websites was as follows:

8         You will be billed $4.95 for the shipping and handling of your Use (sic) 14 day
          trial, then **once you choose** to continue losing weight with the AcaiBurn System
9         the low member price of $79.95 per month for every month (Shipped as a fresh,
          3 month supply every 90 days).  And remember, there's never any obligation -
10        you can cancel your membership at any time.  (Emphasis added)[85]

11   The use of this affirmative "choice" language reinforced the net impression that if consumers

12   decide to continue using the product, they can "choose" to become members and receive

13   monthly shipments.[86]  Most consumers did not understand that their inaction would result in

14   automatic monthly membership charges and the shipment of additional products.[87]  Further, the

15   font, graphics, and placement of this "disclosure" on the websites de-emphasized its

16

17        [82] *See supra* note 79, and *infra* notes 95-96.

18        [83] Pl Ex. 20, at 1731, 1733, ¶¶ 2-3, 8; Pl Ex. 21, at 1740-42, ¶¶ 2, 6, 8, 12; Pl Ex. 23, at 1779, ¶ 2; Pl Ex.
     24, at 1794-95, ¶¶ 2, 4, 6, 10; Pl Ex. 25, at 1805-08, ¶¶ 3-5, 8-9, 12-13; Pl Ex. 28, at 1838-39, ¶¶ 3, 5; Pl Ex. 29, at
19   1859-61, ¶¶ 2, 4-5, 7; Pl Ex. 30, at 1883-85, ¶¶ 2, 5-6; Pl Ex. 31, at 1895-97, ¶¶ 3-4, 9, 11; Pl Ex. 32, at 1913-17,
     ¶¶ 3-4, 8, 15; Pl Ex. 33, at 1928-30, ¶¶ 2-3, 5, 10-11; Pl Ex. 34, at 1952-54, ¶¶ 2, 7, 9; Pl Ex. 35, at 1966-70, ¶¶ 3, 5-
20   7, 9, 11, 13; Pl Ex. 36, at 1977, 1979-80, ¶¶ 3, 13; Pl Ex. 37, at 1995-99, ¶¶ 2-5, 8-10, 12; *see* Pl Ex. 50, at 2433-35,
     ¶¶ 6, 8, 13; Pl Ex. 54 at 2698, at ¶ 5.

21
          [84] *See generally* Pl Ex. 9, at 802-86 (GCS scripts and customer service call transcripts); Pl Ex. 10 (LiveOps
22   scripts); Pl Ex. 11 (AtLast scripts); Pl Ex. 50, at 2433-35, ¶¶ 7-8, 13; *see also* Pl Ex. 20, at 1731-33, ¶¶ 4-7; Pl Ex.
     21, at 1741-43, ¶¶ 6-9; Pl Ex. 23, at 1780-82, ¶¶ 3-9; Pl Ex. 24, at 1794-96, ¶¶ 4-6; Pl Ex. 25, at 1806-08, ¶¶ 6-12;
23   Pl Ex. 28, at 1839-42, ¶¶ 5-12; Pl Ex. 29, at 1859-61, ¶¶ 3-7; Pl Ex. 30, at 1883-85, ¶¶ 3-7; Pl Ex. 31, at 1896-97, ¶¶
     5-10; Pl Ex. 32, at 1914-17, ¶¶ 7-15; Pl Ex. 33, at 1929-30, ¶¶ 6-10; Pl Ex. 34, at 1952-54, ¶¶ 4-7; Pl Ex. 35, at
24   1967-70, ¶¶ 5-12; Pl Ex. 36, at 1978-80, ¶¶ 6-13; Pl Ex. 37, at 1996-98, ¶¶ 6-10.

25        [85] Pl Ex. 15, at 1337, ¶ 47 and Attach. A, at 1359, Attach. B, at 1423, Attach. C, at 1431.

26        [86] *Id.* at 1336-37, ¶ 46.

27        [87] *Id.* at 1336, 1348-49, ¶¶ 46, 74; *see supra* notes 80, 83.

28

Mot. for Prelim. Inj. and Memo of P&A   Page - 16

importance, and many consumers did not even see it.[88]  Given this price disclosure, consumers had no reason to search out other disclosures on the websites, nor did they have any reason to believe that affirmative action was required to avoid being charged more than the shipping charge.[89]

The costs of the upsells also were often not mentioned on the landing pages.[90]  The upsells typically were digital products (restricted-access websites) that consumers did not order or even want.[91]  When the upsells appeared on the ordering pages, they were often referred to as "bonuses" or otherwise listed as special items that the consumer would receive for free.[92]  For example, on one website, the "Insider Secrets Experts Tips" package and "Comprehensive Weight Loss ebook" were described as "Today's Special #1 and #2 Included in Your Trial!"[93]  The order summary quoted above lists the trial offer – including these items – as costing the consumers $0.00.[94]  Important details about the upsells appeared in smaller, less prominent fonts than that used in the order summary, and often were buried in boxes filled with other

---

[88]  PI Ex. 15, at 1336, 1340-42, 1344-46, ¶¶ 46, 55, 57, 64, 66-67.

[89]  *See id.* at 1343, ¶ 61; *see also* Testimony of Florencia Marotta-Wurgler and Prepared Statement of Robert J. Meyer, submitted at the Hearing on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers before the U.S. Senate Committee on Commerce and Transportation (Nov. 17, 2009) at 1268-70, 1278-79, 1283, 1286-87, attached to this Memo as PI Exhibit 13 ("PI Ex. 13"); Letter to FTC from Elliot Burg, Assistant Attorney General for the Vermont State Office of the Attorney General regarding Prenotification in Negative Option Rule Review (Oct. 13, 2009), at 1299-304, also attached to this Memo as PI Ex. 13.

[90]  PI Ex. 15, at 1335-36, ¶¶ 45, 46.

[91]  PI Ex. 22, at 1759-60, ¶ 4; PI Ex. 26, at 1824, 1826, ¶¶ 3, 7; PI Ex. 27, at 1831-33, ¶¶ 4, 7-9; PI Ex. 20, at 1732-33, ¶¶ 2-5, 8; PI Ex. 21, at 1742, ¶¶ 8, 12; PI Ex. 23, at 1780-81, ¶ 5; PI Ex. 24, at 1794-95, ¶ 4; PI Ex. 25, at 1806-08, ¶¶ 9-13; PI Ex. 29, at 1859-61, ¶¶ 4-5, 7; PI Ex. 30, at 1884-85, ¶¶ 6, 8; PI Ex. 31, at 1895-97, ¶¶ 4, 9-10; PI Ex. 34, at 1953-54, ¶¶ 7,9; PI Ex. 35, at 1968-69, ¶¶ 9-11; PI Ex. 36, at 1977-80, ¶¶ 5-7, 10, 13; *see also* PI Ex. 50, at 2433-36, ¶¶ 6, 8, 13; PI Ex. 54, at 2698, ¶ 5.

[92]  PI Ex. 15, Attach. A, at 1358, Attach. B, at 1421, 1423, Attach. C, at 1432.

[93]  *Id.*

[94]  *See supra* note 80.

1
2
3
4
5

information or on the separate terms and conditions pages.[95]  The ordering pages also did not have a link to the terms and conditions pages, making it hard for consumers to find them.[96] Consumers typically were not required to affirmatively agree to these ongoing charges, and they had no way to avoid them.  Most consumers did not learn about these charges until after they had provided their payment information or received their account statements.[97]

6
7
8
9
10
11
12
13
14
15
16
17
18
19

      Numerous consumers complained that they believed they had signed up for a "free" trial product or sample and did not know that they would be charged for that product or for additional products and upsells.[98]  The Better Business Bureau in Alberta, Canada ("Alberta BBB"), received at least 2,500 complaints regarding the Willms defendants' trial products, most of which concern billing, refund, and contract issues, including unauthorized charges to consumers' credit cards and bank accounts.[99]  The Alberta BBB has given the Willms defendants an "F" rating.[100]  In the Willms defendants' website live chat transcripts from October 2009 through December 2009, consumers repeatedly indicate that they were unaware that they would be charged for: (1) the "free" trial products; (2) recurring monthly shipments of the trial products; and (3) upsell products on a monthly basis.[101]  Recorded customer service calls contain similar complaints.[102]  The Willms defendants' high credit card chargeback rates

20
21
22
23
24
25
26
27
28

[95] PI Ex. 15, Attach. A, at 1359, Attach. B, at 1421, 1423, Attach. C, at 1432.

[96] *Id.* at 1322-23, 1328, 1334, ¶¶ 20, 28, 39.

[97] *See supra* note 91.

[98] *Id.*

[99] PI Ex. 6, at 284, ¶ 8.

[100] *Id.* at 284, ¶ 7.

[101] PI Ex. 50, at 2436, ¶ 13.

[102] *Id.* at 2433, 2435-36, ¶¶ 5-6, 12-13.

1  and the reasons consumers gave for seeking chargebacks provide more evidence that

2  consumers were unaware they were going to be charged.[103]

3      The Willms defendants knew consumers were unaware of the charges being billed.[104]

4  They also were aware that most consumers did not read or understand the terms and conditions

5  pages.[105]  In fact, they warned their customer service agents to expect a higher volume of

6  consumer calls when the monthly recurring charges were going to appear on consumers' bank

7  account and credit card statements.[106]

8      The penny auction websites also emphasized through the use of graphics, music, color,

9  font, and voice overs that consumers could obtain luxury items at a fraction of their retail

10  cost.[107]  A prominently displayed countdown clock created a sense of urgency.[108]  The websites

11  also induced consumers to register by emphasizing the ease of winning and providing

12  prominent testimonials from "real" winners.[109]  The websites offered consumers "bonus" bids,

13

14

15

16

17

18      [103] *See* PI Ex. 50, at 2437-46, ¶¶ 16-34; PI Ex. 56, at 2904, 2916, 2918-22, ¶¶ 4, 40, 51, 56, 59, 63, 66, 68, 69.

19      [104] PI Ex. 50, at 2437-46, ¶¶ 16-23, 26-27, 30-34 and Attachs. J-N, Q, T, V at 2502-45, 2560-80, 2619-36,
20  2646-61; PI Ex. 9, at 826-27, 829, 874, 880.

21      [105] PI Ex. 50, at 2436, ¶¶ 13-14; PI Ex. 12, at 1142, 1232, 1257.

22      [106]  PI Ex. 9, at 826-27, 829, 874, 880.

23      [107]  PI Ex. 15, at 1328-29, 1334-35, 1337, ¶¶ 29, 33, 40, 43-44, 47; Declaration of Nicole Davis (April 15,
     2011), at 2684, ¶¶ 5-6, attached to this Memo as PI Exhibit 52 ("PI Ex. 52"); PI Ex. 41, at 2097-98, ¶¶ 4-5; PI Ex.
24  42, at 2105-06, ¶¶ 3-5; PI Ex. 44, at 2177-78, ¶¶ 3-4; PI Ex. 45, at 2194, ¶ 4; PI Ex. 46, at 2225, ¶¶ 2-3.

25      [108]  PI Ex. 15, at 1331, ¶ 35(c) and Attach. E, at 1453, Attach. F, at 1491, Attach. G, at 1505; PI Ex. 41, at
     2097-98, ¶ 5; PI Ex. 52, at 2684, ¶ 5; PI Ex. 44, at 2177-78, ¶ 4.
26

27      [109]  PI Ex. 15, at 1329, 1332, ¶¶ 34, 36; PI Ex. 52, at 2684, ¶ 5; PI Ex. 42, at 2105-06, ¶¶ 4-5; PI Ex. 44, at
     2177, ¶ 3.

28

usually 300, for no cost, if consumers "registered" on the websites.[110] They also offered 50 monthly "bonus" bids in addition to the introductory 300 bids.[111] For example:

"What You Get: 300 Bonus Bids, Just for Signing Up."[112]

**"CONGRATULATIONS!  AS A BONUS YOU WILL RECEIVE 50 BIDS EACH MONTH.  CLICK CONTINUE TO START BIDDING NOW."[113]**

In fact, these bonus bids were not free.  Consumers who "registered" on the SwipeBids auction sites and provided their credit card information later found that, by registering, they had agreed to be charged as much as $150 for a "membership," which included the introductory bids as a purported "bonus."[114]  Consumers also later found that their accounts were charged $11.95 each month to receive the additional monthly bids.[115]

These material terms and costs were not adequately disclosed to consumers prior to their registering.[116]  Any reference to the initial membership fee was absent from the landing pages.[117]  When consumers clicked to the second page, a box titled "Membership Details" listed: "Item: 1-Year Membership; You Pay: 50 cents/bid" and underneath the "1-Year

---

[110] PI Ex. 15, Attach. F, at 1497, Attach. H, at 1554-55; PI Ex. 38, at 2016-18, ¶¶ 2-8; PI Ex. 40, at 2042-44, ¶¶ 3-8; PI Ex. 43, at 2130, ¶¶ 2-3.

[111] PI Ex. 15, Attach. F, at 1500-01.

[112] *Id.,* Attach. F, at 1497, Attach. H, at 1554-55.

[113] *Id.*, Attach. F, at 1500-01.

[114] *Id.* at 1337-38, ¶¶ 48-49; PI Ex. 38, at 2017-19, ¶¶ 6, 10, 11; PI Ex. 40, at 2043-44, ¶¶ 8-9; PI Ex. 41, at 2098, ¶¶ 7-8; PI Ex. 42, at 2107, ¶ 8; PI Ex. 43, at 2130-31, ¶ 4; PI Ex. 44, at 2179, ¶ 8; PI Ex. 45, at 2195-96, ¶ 6; PI Ex. 46, at 2226, ¶ 5; *see* PI Ex. 52, at 2684-85, ¶¶ 6-7 (bids deposited on registration) and PI Ex. 53, at 2687, ¶ 7; *see also* MasterCard Response to FTC Civil Investigative Demand (Sept. 29, 2010), at 2986-87, attached to this Memo as PI Exhibit 57 ("PI Ex. 57").

[115] PI Ex. 40, at 2047, ¶¶ 16-17, 20.  *See also* PI Ex. 51, at 2667-68,¶ 9, summarizing that 11 out of 635 consumers who filed complaints with the FTC stated they were charged the undisclosed monthly fee of $11.95 for "bonus" bids.  Many consumer complaints were filed after consumers were charged the initial "membership" fee, but before the monthly recurring charges had started.  *Id.*  Therefore, most consumers likely were not yet aware of the monthly charges at the time they complained to the FTC.  *Id.*

[116] PI Ex. 15, at 1337-44, ¶¶ 47-53, 57, 60-62.

[117] *Id.* at 1334, 1337, ¶¶ 40, 47.

Mot. for Prelim. Inj. and Memo of P&A   Page - 20

Membership" stated "(Includes 300 Bids)."[118] Underneath this box was the statement, "You're Guaranteed to Win," which promised consumers that, if they failed to "win a single auction using the 300 start-up bids included, we will fully refund your bids."[119] This language did not adequately disclose to consumers that they would automatically be charged a membership fee when they entered their credit card information.[120] Across from this box was a box entitled "Where Do We Send Your Winning Auctions?" where consumers were instructed to fill out their payment information.[121] The true costs and terms were only disclosed in the separate terms and conditions pages of the website and buried deeply in small-sized, dense, black and white text.[122]

The recurring fee of $11.95 was also inadequately disclosed. Only *after* consumers entered payment information, a screen welcomed them to the auction site and in extra-large font told consumers that as a "bonus" they would receive 50 bids per month.[123] In micro-print at the top of that screen was the first mention of the monthly charge, which simply advised consumers to click on a hyperlink to *avoid* charges.[124] Consumers thus had no expectation that their accounts would be charged any amount, much less charged monthly on a recurring basis.

Many consumers believed that the auction websites were like other popular auction websites, and the Willms defendants have encouraged this by prominently comparing their websites to eBay.[125] On eBay and other penny auction websites, consumers register for free

---

[118]   *Id.* at 1339, ¶ 51 and Attach. F, at 1497.

[119]   *Id.*

[120]   *Id.* at 1339, ¶¶ 51-52.

[121]   *Id.* at 1338, ¶ 50 and Attach. F, at 1497.

[122]   *Id.* at 1341-44, ¶¶ 57, 60-62 and Attach. E, at 1478-79 (auction site terms and conditions).

[123]   *Id.*, Attach. F, at 1500.

[124]   *Id.*

[125]   PI Ex. 15, at 1337-38, ¶¶ 48-49; PI Ex. 38, at 2016, ¶ 4; PI Ex. 40, at 2042, ¶ 3; PI Ex. 42, at 2105-07, ¶¶ 3, 7; PI Ex. 43, at 2130, ¶ 3; PI Ex. 44, at 2178, ¶ 7; PI Ex. 45, at 2194-95, ¶¶ 2, 4-5; PI Ex. 46, at 2225-26, ¶ 4.

Mot. for Prelim. Inj. and Memo of P&A   Page - 21

and provide their account information for later charges to purchase any items for which they have the winning bid.[126] Thus, many consumers believed that registering with SwipeBids would cost them nothing.[127]

This deceptive marketing led to approximately 1,100 consumer complaints with the Alberta BBB from March 2010 to February 2011, most of which concern unauthorized charges for the upfront $150 membership fee and the $11.95 monthly charge.[128] Indeed, in attempting to resolve their issues with the Alberta BBB, the Willms defendants have produced a bar graph showing that 90 percent of the Alberta BBB complaints for their online auctions were because consumers were "unaware of cost."[129] Finally, the penny auctions also generated very high charge reversal rates.[130]

---

[126] PI Ex. 43, at 2130, ¶ 3; *see* eBay's website at http://pages.ebay.com/help/policies/user-agreement.html; http://pages.ebay.com/help/account questions/why-register.html; and http://pages.ebay.com/help/pay/payingforitems.html; *see also* Quibids.com terms and conditions pages at http://www.quibids.com/help/terms.php?popup.

[127] PI Ex. 15, at 1337-38, ¶¶ 48-49; PI Ex. 38, at 2016, ¶¶ 3-4; PI Ex. 40, at 2042, ¶ 3; PI Ex. 41, at 2097, ¶¶ 2-4; PI Ex. 42, at 2015-07, ¶¶ 3-8; PI Ex. 43, at 2130, ¶¶ 3-4; PI Ex. 44, at 2178, ¶¶ 4-7; PI Ex. 45, at 2194, ¶¶ 5-7; PI Ex. 46, at 2225-26, ¶¶ 3-5.

[128] PI Ex. 6, at 283, ¶¶ 5-6. An additional 80 consumer complaints have been received from November 2010 to January 2011 by the BBB of Southern Nevada for SellOffAuctions.com (the newest iteration of the Willms defendants' online penny auctions). Declaration of Rhonda Mettler (Feb. 4, 2011), at 359-60, ¶ 5, attached to this Memo as PI Exhibit 7 ("PI Ex. 7"). The vast majority of these complaints involve consumers seeking refunds for unexpected and unauthorized charges, which garnered the Willms defendants a "D minus" rating with that BBB. *Id.* at 360, ¶¶ 6-7.

[129] PI Ex. 6, at 285-86, ¶ 11 and Attach. E, at 334. The FTC's complaint database corroborates the BBBs' experiences with the Willms defendants' online auctions. Out of the 635 consumer complaints that the FTC received that could be affirmatively linked to the Willms defendants' online auction websites between January 2010 and February 2011, fully 600 of them complained of being unexpectedly charged a fee of typically $150 to $159. PI Ex. 51, at 2667, ¶ 7.

[130] PI Ex. 49, at 2386-423, PI Ex. 57, at 2886-3002; Declaration of Carey Daoust (May 11, 2011), Attach. A, at 2756-57, attached to this Memo as PI Exhibit 55 ("PI Ex. 55"). Mr. Daoust, an investigator for the Canadian Competition Bureau, searched the trash dumpsters outside of the Willms defendants' office building and copies of websites the Willms defendants appear to be using or going to use. *See* PI Ex. 55, Attach. A, at 2763-95, 2798-2900. Documents found in the dumpster also show that SwipeBids had high chargeback rates. *Id.*, Attach. A, at 2756-57.

### B.  Defendants Impose Deceptive and Undisclosed Limitations on Cancellations and Refunds

The Willms defendants routinely have represented that dissatisfied consumers could easily cancel and obtain a full refund. On the websites for their trial product offers, they have made the following representations:

"We are so confident that AcaiSlim is the most effective and powerful anti-oxidant cleansing product on the market that if you for any reason do not find AcaiSlim right for you within the first 60 days we will gladly give you a full refund, no questions asked. You have nothing to lose except the weight."[131]

"TRUE SATISFACTION GUARANTEE. Should you decide to purchase PureCleanse Pro after trying our trial sample bottle, we will back up your order with our 100% satisfaction guarantee."[132]

"If you don't like it, simply send it back before the trial period ends and you will never be charged. You're covered by my Iron-Clad 60 Day Money Back Guarantee too, so you can take up to 8 weeks to decide if it's the right solution for you."[133]

The Willms defendants have represented their penny auction refund policy as follows:

"YOU'RE GUARANTEED TO WIN. We guarantee that if you sign-up for our membership, and do not win a single auction using the 300 startup bids included, we will fully refund your bids."[134]

These representations are false. Consumers typically could not extricate themselves from the offers and auctions without great difficulty. This was because the Willms defendants have created a maze of convoluted policies, conditions, and limitations to make it virtually impossible for consumers to cancel without paying something. These material limitations on cancelling and obtaining refunds were either not adequately disclosed (buried in the terms and conditions pages) or not disclosed at all. The undisclosed or poorly disclosed limitations and conditions on the trial products included: (1) requiring consumers to return the unopened or unused trial product *before* the expiration of the trial period to avoid being charged for the

---

[131] Declaration of Rachael Ray (Jan. 11, 2011), Attach. D, at 1728, 1730, attached to this Memo as PI Exhibit 19 ("PI Ex. 19").

[132] PI Ex. 54, Attach. G, at 2730, Attach. H, at 2737.

[133] PI Ex. 15, Attach. B, at 1418.

[134] PI Ex. 15, Attach. F, at 1497.

Mot. for Prelim. Inj. and Memo of P&A   Page - 23

1   "free trial;"[135] (2) accepting returns only if the consumer obtained a cancellation number and a

2   separate identification number from customer service prior to shipping the return package;[136]

3   (3) making the trial period shorter than represented by starting the period from the date of the

4   "order," not the date the consumer received the product;[137] (4) requiring consumers who

5   attempt to cancel and obtain a refund through the live chat feature to call the customer service

6   number, where wait periods were often lengthy;[138] and (5) requiring consumers to receive the

7   trial products even when they cancelled immediately.[139]  Consumers who attempted to cancel

8   and obtain refunds for the online penny auctions had similar difficulty.[140]

9       Not only were these conditions and limitations burdensome and incomprehensible, but

10  consumers were unlikely to obtain refunds even when attempting to follow them.[141]  The

11  Willms defendants instructed their customer service agents to avoid providing refunds at all

12  times and penalized or fired them if they gave consumers too many refunds.[142]  When refunds

13

14  [135] *See* PI Ex. 9, at 737-41, 792; PI Ex. 10, at 935, 937-38, 948-49, 958, 961-62; PI Ex. 11, at 1105-06,
    1109, 1111; *see also* PI Ex. 28, at 1838-39, ¶¶ 3-5; PI Ex. 30, at 1884-85, ¶¶ 4-5; PI Ex. 32, at 1915, ¶¶ 9, 12; PI Ex.
15  33, at 1928-29, ¶ 5; PI Ex. 24, at 1795-96, ¶¶ 4, 6; PI Ex. 34, at 1952-53, ¶¶ 4-5; PI Ex. 35, at 1967-68, ¶¶ 5-6; PI
    Ex. 37, at 1996-97, ¶¶ 4, 8-9.

16
    [136] *See* PI Ex. 9, at 738-39; PI Ex. 10, at 935, 948-50.
17
    [137] *See* PI Ex. 9, at 943-45; PI Ex. 10, at 936; *see also* PI Ex. 24, at 1795, ¶ 6; PI Ex. 37, at 1996, ¶¶ 4, 8.
18
    [138] PI Ex. 9, at 742, 792; PI Ex. 28, at 1839-40, ¶¶ 5,7 (on hold 30 minutes); PI Ex. 36, at 1979, ¶ 9 (on
19  hold 30 minutes).

20      [139] *See* PI Ex. 9, at 737, 747, 790; PI Ex. 10, at 961; *see also* PI Ex. 20, at 1731-32, ¶ 4.

21      [140] PI Ex. 43, at 2132-34, ¶¶ 8-14; PI Ex. 12, at 1147-48, 1152-53, 1158-59, 1162, 1169-72, 1182, 1186-
    87, 1189, 1193, 1230, 1263.  Although some of these limitations were explained in the separate "terms and
22  conditions" pages, as with the trial product policies, the failure to make these disclosures prominent and clear made
    them entirely inadequate. PI Ex. 15, at 1341-44, ¶¶ 57, 60-62 and Attach. E., at 1478-79; PI Ex. 40, at 2044-45, ¶¶ 9-
23  10.  Even when consumers figured out how to request a refund, most were unable to qualify because they first had to
    use all of their bids in the auctions.  PI Ex. 15, Attach. E, at 1478-79; PI Ex. 43, at 2131, ¶ 6; PI Ex. 12, at 1181.
24  Many consumers could never use all of their bids because their accounts were automatically credited with an extra
    60 "bonus" bids just for logging in.  PI Ex. 15, Attach. G, at 1510; PI Ex. 43, at 2134, ¶ 15.
25
        [141] PI Ex. 50, at 2433-34, 2436, ¶¶ 7, 13. *See* PI Ex. 26, at 1825-26, ¶¶ 5-6; PI Ex. 27, at 1834, ¶¶ 11-12;
26  PI Ex. 21, at 1742-43, ¶¶ 8-11; PI Ex. 29, at 1860-61, ¶¶ 4-5, 7; PI Ex. 32, at 1915-17, ¶¶ 9-15; PI Ex. 34, at 1953,
27  ¶¶ 5-6; PI Ex. 35, at 1967-69, ¶¶ 5-6, 12; PI Ex. 36, at 1978-79, ¶¶ 7-8; PI Ex. 37, at 1997-98, ¶ 10.

28      [142] *See* PI Ex. 9, at 738, 758, 762, 765; PI Ex. 10, at 970;  PI Ex.11, at 1114.

were given, they were limited to either 50 percent or 100 percent of the most recent charge only, and capped at a total of $500 per consumer.[143]  Many consumers were only able get their money back by threatening to reverse or reversing the credit or debit card charges.[144]  The FTC's consumer complaint database also shows that 529 of the 635 consumers who complained about defendants' online auctions between January 2010 and February 2011 state that they never received a refund, despite attempting to follow the complicated refund process.[145]  For the trial products, out of the 403 consumer complaints the Willms defendants provided to the FTC, only 199 consumers report that they received full refunds.[146]

Consumers wishing to cancel and obtain a refund for the forced upsells had to call a separate toll free number *for each upsell* (meaning consumers needed to make three or more separate telephone calls), even though the upsells often were handled by the same customer service call center.[147]  In fact, the customer service agent scripts that the Willms defendants drafted for the trial products specifically instructed customer service agents not to mention the upsell products when consumers contacted them to cancel the trial product.[148]  Further each upsell had a different "trial" period in which cancellations were allowed, usually shorter than the main product's trial period, making it especially confusing for consumers.[149]  This was

---

[143] Pl Ex. 12, at 1173, 1188-89.

[144] *See* Pl Ex. 9, at 793; Pl Ex. 11, at 1092; Pl Ex. 12, at 1151-53, 1162; *see also* Pl Ex. 21, at 1743, ¶ 11; Pl Ex. 27, at 1834, ¶ 13; Pl Ex. 20, at 1732, ¶ 5; Pl Ex. 33, at 1929, ¶ 7; Pl Ex. 34, at 1953, ¶ 6; Pl Ex. 36, at 1979, ¶¶ 10-12.

[145] Pl Ex. 51, at 2667, ¶ 8.

[146] Pl Ex. 54, at 2697-98, ¶¶ 3-6.  The number of complaining consumers is likely far greater.  The Willms defendants admit that they received 4,212 "inquiries" from state attorneys general and the Better Business Bureau, yet they only produced about 400 of them to the FTC.  Pl Ex. 2, at 50.

[147] *See* Pl Ex. 9, at 779-89; Pl Ex. 10, at 934-35, 939, 954-56, 983, 994-95, 1024-25; Pl Ex. 12, at 1136; Pl Ex. 30, at 1885, ¶ 6; Pl Ex. 31, at 1897, ¶ 9; Pl Ex. 27, at 1833, ¶¶ 8-9; Pl Ex. 21, at 1741-42, ¶¶ 6, 8; Pl Ex. 24, at 1794-95, ¶ 4; Pl Ex. 36, at 1978-79, ¶¶ 7-9.

[148] *See* Pl Ex. 9, at 738; Pl Ex. 10, at 970.  This is confirmed by transcripts of actual customer service calls that the Willms defendants produced to the FTC.  Pl Ex. 50, at 2434, ¶ 8 and Attachs. G and H, at 2479-96.

[149] Pl Ex. 15, Attachs. A and B, at 1359, 1423.

Mot. for Prelim. Inj. and Memo of P&A   Page - 25

particularly pernicious because most consumers did not know they were being charged for these upsell products until they received their monthly account statements – by which time the charges were no longer refundable.

### C.   Defendants Have Made False and Unsubstantiated Weight Loss and Colon Cancer Cure Product Claims

### 1.   Defendants' False and Unsubstantiated Weight Loss Claims

The Willms defendants represented that use of the AcaiBurn and PureCleanse products will cause rapid and substantial weight loss and that scientific evidence, including two eight-week, placebo-controlled clinical studies support this.  The following and other similar representations appeared in banner advertising the Willms defendants approved for use by their affiliate marketers and also on multiples pages of the Willms defendants' websites:

"Lose Weight Fast! Fit into your favorite Jeans!"[150]

"WARNING...The Acai Burn System was not created for those people who only want to lose a few measly pounds.  The AcaiBurn System was created to help you achieve the incredible body you have always wanted...USE WITH CAUTION!"[151]

"The average weight loss was 14.99 and 12.54 pounds with AcaiBurn's key ingredients vs. just 3.06 and 3.53 pounds with a placebo in two 8-week clinical studies.  Both groups dieted and exercised.  That means the key ingredients in AcaiBurn were found to cause up to 450% MORE WEIGHT LOSS than dieting and exercise alone will get you."[152]

These claims are false and unsubstantiated.  Robert F. Kushner, M.D., an expert on obesity and weight loss, states that, based on his professional experience and knowledge and his review of the medical literature, none of the ingredients in these products, individually in any amount or combination, will cause rapid, substantial weight loss.[153]

---

[150] PI Ex. 15, Attach. B, at 1416.

[151] PI Ex. 15, Attach. A, at 1357, Attach. C, at 1431-32.

[152] *Id.*, Attach. A, at 1355, Attach. B, at 1406, 1418, Attach. D, at 1442.

[153] Declaration of Robert F. Kushner, M.D. (Mar. 10, 2011), at 1589, ¶ 11, attached to this Memo as PI Exhibit 16 ("PI Ex. 16").  Although the Willms defendants produced two studies that they assert support their claims that the AcaiBurn and PureCleanse products will cause rapid and substantial weight loss, these studies do not provide competent nor reliable support. Dr. Kushner reviewed the studies the Willms defendants provided to the FTC to support their weight loss claims, as well as additional studies involving some of the ingredients in Acaiburn and PureCleanse, and concluded that none of the studies provides competent and reliable substantiation for the

1          **2.     Defendants' False and Unsubstantiated Colon Cancer Cure Claims**

2          The Willms defendants also made strongly implied representations that use of

3    PureCleanse products helps prevent colon cancer. They embedded streaming video of a CBS

4    Early Show interview with Katie Couric on many of the PureCleanse product websites titled

5    "CONQUERING COLON CANCER: PREVENTION AND TREATMENT." [154]  The video

6    also featured well known actors Diane Keaton, Morgan Freeman, and Jimmy Smits.[155]  Audio

7    statements made during the video included the following:

8          "Colon cancer is the #2 cancer killer in the United States."

9          "Women get colon cancer as often as men."

10         "56,000 people die every year from colon cancer."

11         "Everyone is vulnerable."[156]

12    These statements were played while consumers viewed written representations on the websites

13    that PureCleanse flushes out toxins from the digestive tract, such as:

14         "Since people need to eat and drink to survive, we are constantly at risk of bringing
           these nasty parasites into our bodies."[157]

15
           "Promote Health & Longevity."[158]
16
           "Good Way To Maintain Colon Health."[159]
17
           "Purify & Detoxify Your Body."[160]
18

19

20   Willms defendants' weight loss claims. *Id.* at 1593, 1595-96, ¶¶ 20, 27.

21        [154] Pl Ex. 54, Attach. G, at 2730, Attach. I, at 2745.  To see embedded video, go to:
     http://www.youtube.com/watch?v=bOByopVamiQ.

22        [155] *See* http://www.youtube.com/watch?v=bOByopVamiQ.

23        [156] *Id.*

24        [157] Pl Ex. 54, Attach. H, at 2738.

25        [158] *Id.*, Attach. I, at 2744.

26        [159] *Id.*, Attach. G, at 2730.

27        [160] *Id.*, Attach. I, at 2744.

28

     Mot. for Prelim. Inj. and Memo of P&A   Page - 27

The net impression of this audio and graphic combination is that cleaning out one's colon through the use of PureCleanse will help prevent colon cancer by ridding the colon of toxins and parasites. This claim is false and unsubstantiated. The Willms defendants have provided no evidence to substantiate this claim. The active ingredients in the PureCleanse products are natural laxatives. No competent and reliable scientific evidence exists to provide a reasonable basis for the claim that use of laxatives helps prevent colon cancer.[161] Indeed, no studies have shown a connection between the use of laxatives and the risk of colorectal cancer, and, in fact, the frequent use of laxatives may actually be dangerous and seriously harmful.[162]

## D. Defendants Have Disseminated False Claims of Celebrity and Other Endorsements

The Willms defendants have also displayed images of celebrities, such as Oprah Winfrey and Rachael Ray, representing to consumers that they endorsed one or more of the Willms defendants' products. For example, one of the websites showed a picture of Rachael Ray and the statement "Featured on the Rachael Ray Show!"[163] Similar references to Oprah Winfrey appear as well.[164] The logos for many media outlets such as CNN, MSNBC, FoxNews, USA Today, CBS, ABC, WebMD, Fitness Magazine, and 60 Minutes, appear on the trial offer and penny auction websites in connection with statements like "Featured On" or "As Seen On TV."[165] None of these persons or entities has endorsed or positively reported on any

---

[161] Declaration of Isham M. Reavis (Apr. 6, 2011), at 1685-88, ¶¶ 13-16, attached to this Memo as PI Exhibit 17 ("PI Ex. 17").

[162] *Id.*

[163] PI Ex. 15, Attach. A, at 1351; PI Ex. 19, Attach. A, at 1717, Attach. B, at 1720.

[164] Declaration of Douglas J. Pattison (Feb. 23, 2011) ), Attach. A-C, at 1711, 1713, attached to this Memo as PI Exhibit 18 ("PI Ex. 18").

[165] PI Ex. 19, Attach. A, at 1718, Attach. B, at 1721, Attach. C, at 1724, 1726, Attach. D, at 1728, 1730; PI Ex. 18, Attach. B-C, at 1711, 1713; PI Ex. 15, Attach. B, at 1414, 1420, Attach. C, at 1431, 1434, Attach. E, at 1462, 1472, Attach. F, at 1492-93, 1496, 1498-99, Attach. G, at 1506, 1508, Attach. H, at 1544, 1549, 1551-53, Attach. I, at 1567, 1569-70.

1    of the Willms defendants' products.[166]  In fact, Oprah Winfrey sued Willms for the

2    unauthorized use of her name and likeness on his websites.[167]

3         **E.      Defendants' Unfair Practice of Evading Risk Management Rules to Obtain
                    Merchant Accounts**

4

5         As a result of the deceptive practices described above, a large number of the Willms

6    defendants' customers disputed the charges on their credit cards to get their money back.  This

7    led to excessive chargeback[168] rates with Visa and MasterCard, which, in turn, led to Visa and

8    MasterCard placing the Willms defendants in chargeback monitoring programs.[169]  The Willms

9    defendants were generating chargeback rates of between the threshold level of 1% and as high

10   as 22.7%.[170]  Many of these chargebacks were coded as being unauthorized charges to

11   consumers' accounts or fraudulent transactions.[171]  The Willms defendants were told that to

12   bring their chargeback rates down to an acceptable level, they needed to improve their website

13   disclosures for billing practices and not include "forced" upsells.[172]

14

15        [166]  PI Ex. 18, at 1707-08, ¶¶ 11-14; PI Ex. 19, at 1716, ¶ 7.

16        [167]  PI Ex. 18, at 1705, 1708, ¶¶ 6, 15; *see Dr. Mehmet Oz, et al., v. FWM Laboratories, Inc., et al.*, 09-CV
17   7297 (S.D.N.Y., 2009).  Jesse Willms ultimately settled the case.

18        [168]  A "chargeback" occurs when a cardholder contacts his or her issuer to dispute a charge on the
     cardholder's account statement and the issuer charges that amount back to the acquirer.  PI Ex. 56, at 2907, ¶ 15.
19
20        [169]  PI Ex. 56, at 2918-19, ¶¶ 51, 56; PI Ex. 57, at 2986-87.  Both Visa and MasterCard have risk
     management divisions that monitor merchant chargeback rates.  Visa tracks merchants who, in a calendar month,
     have (1) at least 100 sales transactions, (2) have at least 100 chargebacks, and (3) the chargeback rate is at least 1%.
21   PI Ex. 56, at 2907-08, ¶ 16.  The chargeback rate is calculated as a ratio of the number of transactions passing
     through the payment system in a particular month that are charged back to the acquirer with respect to a particular
22   merchant (numerator) and the total number of transactions charged through the payment system by the merchant
     during the preceding month (denominator).  *Id.*
23
         [170]  PI Ex. 56, at 2904, 2907-11, 2916, 2918-22, ¶¶ 4, 15-17, 40, 51, 56, 59, 63, 66, 68, 69; PI Ex. 57, at
24   2986, 3002; PI Ex. 49, at 2386-422; PI Ex. 55, at 2756-57.

25        [171]  PI Ex. 50, at 2437-40, 2444-45, ¶¶ 17-23, 33 and Attachs. K-M, V, at 2511-30, 2646-61.

26        [172]  PI Ex. 57, at 2986-87; Litle & Co., LLC Responses to FTC Civil Investigative Demand (Feb. 25, 2010
     and Mar. 15, 2010), at 2259-60, attached to this Memo as PI Exhibit 47 ("PI Ex. 47"); PI Ex. 48, at 2276-84 (to
27   make changes "would hurt our bottom line significantly" at 2281); PI Ex. 50, at 2443-46, ¶¶ 30-31, 33 and Attachs.
28   T, V at 2619-36, 2646-61.

1    The defendants failed to comply.[173] Instead, to avoid detection from the payment

2    processing system and to continue charging consumers' accounts, they employed various

3    tactics to minimize or otherwise dilute their high chargeback rates, including: (1) structuring

4    their sales to charge each consumer's account for multiple charges of varying prices (e.g.

5    upsells);[174] (2) processing sales through multiple merchant accounts using different payment

6    processors;[175] and (3) frequently changing and using multiple merchant billing descriptors[176]

7    for their products and engaging in "load balancing," which involved balancing sales across

8    these multiple descriptors and through the multiple merchant accounts.[177] The Willms

9    defendants also created shell corporations in the U.S. and abroad, fronted by nominee

10   principals, to obtain merchant accounts that would not appear to be associated with them.[178]

11   They were able to do this through the services of individual defendants Graver, Sechrist,

12   Callister, and Milne.[179] These individual defendants took on the role of principal and "signer"

13   for the shell entities, and then applied for merchant accounts and opened bank accounts for the

14   Willms defendants.[180] This made it difficult to trace the merchant accounts to Willms, which

15   enabled the Willms defendants to evade Visa's and MasterCard's risk management rules.[181]

---

17   [173] Pl Ex. 3, at 256-68; Pl Ex. 48, at 2281; Pl Ex. 57, at 2986-87.

18   [174] *See supra* note 81.

19   [175] *See* Pl Ex. 8, at 381-82; Pl Ex. 56, at 2904, 2917, ¶¶ 4, 43; Pl Ex. 50, at 2434, 2437, 2440-44, ¶¶ 9, 24-
20   30.

21   [176] *See* Pl Ex. 9, at 779-89; Pl Ex. 10, at 904-05; Pl Ex. 50, at 2434, 2441-43, ¶¶ 9, 26, 28-29; Pl Ex. 56, at
     2904, 2917-21, ¶¶ 4, 46, 51, 54, 56, 59-60, 63, 66, 68. "Billing descriptors," also referred to as credit card or
     merchant descriptors, are the descriptive words that appear on cardholders' account statements next to the charge or
22   debit. Pl Ex. 56, at 2917, ¶ 46.

23   [177] Pl Ex. 3, at 242-43 (Willms put in touch with payment processor who engages in "load balancing").

24   [178] *See supra* notes 13-29, 36-50.

25   [179] *See supra* notes 39-50.

26   [180] *Id.*

27   [181] Pl Ex. 56, at 2904-05, 2916-17, ¶¶ 4, 40-46; Pl Ex. 50, at 2440-46, ¶¶ 24-35 and Attachs. N-W at 2531-
28   665; *see* Pl Ex. 49, at 2313, 2429.

Mot. for Prelim. Inj. and Memo of P&A   Page - 30

1  The Willms defendants also processed payments outside the U.S., where some banks allow

2  very high chargeback rates and where monitoring by Visa and MasterCard is more difficult.[182]

3       As a result of these evasive maneuvers and with the participation of defendants Graver,

4  Sechrist, Callister, and Milne, the Willms defendants have been able to continue to accept

5  credit card payments from consumers for far longer than they would have been able to

6  otherwise – causing substantial consumer injury of over $400 million – that consumers could

7  not avoid.[183]

8  **IV.    ARGUMENT**

9       **A.    Section 13(b) Authorizes the Court to Grant the Requested Relief**

10      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this

11  Court to grant, permanent injunctive relief in "proper cases" and also to award "any ancillary

12  relief necessary to accomplish complete justice." [184]  A routine fraud case such as this one,

13  replete with misrepresentations of material facts in violation of Sections 5(a) and 12 of the

14  FTC Act, qualifies as a "proper case" under Section 13(b).[185]

15      The Court may exercise the full breadth of its equitable authority in a Section 13(b)

16  action because Congress "did not limit that traditional equitable power" when it passed the

17  FTC Act.[186]  Thus, under Section 13(b), the Court may order ancillary equitable remedies, such

18  as rescission of contracts and restitution, as well as whatever additional preliminary relief is

19

20      [182]  Pl Ex. 56, at 2921-22, ¶¶ 67-69; Pl Ex. 50, at 2442-43, ¶¶ 28-29 and Attachs. R, S, at 2351-2665.
   When the Willms defendants were using offshore processors, for much of the time their chargeback rates for some

21  products were 10% to 20%. Pl Ex. 50, at 2442, 2444-46, ¶¶ 28, 33-34 and Attachs. R at 2581, 2587, 2590, 2594,
   2598, 2600.

22

23      [183]  *See* Pl Ex. 2, at 51-55 (gross revenues January 2009 to January 2010 for trial offers), 101-02 (2008
   gross revenues for trial offers), 136 (2010 gross revenues for penny auctions).

24      [184]  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111-13 (9th Cir. 1982).  Section 13(b) of the FTC Act
   authorizes the issuance of injunctive relief in two different situations. Because the FTC proceeds here under the

25  second proviso of Section 13(b), the standard that is prescribed in the first proviso of the Section, which relates to
   the issuance of temporary relief in aid of administrative proceedings, does not apply. *Id.* at 1111.

26

27      [185]  *Id.*

28      [186]  *Id.* at 1113.

Mot. for Prelim. Inj. and Memo of P&A    Page - 31

necessary to preserve the possibility of effective final relief.[187]   The exercise of this broad, equitable authority is particularly appropriate where, as here, the public interest is at stake.[188]

Injunctive relief is appropriate even if a defendant has ceased its illegal activities if there is "cognizable danger of recurrent violation."[189]   The commission of past illegal conduct is "highly suggestive of the likelihood of future violations."[190]   The defendants are skilled in online marketing and at marketing virtually any product or program, and are still marketing trial offers on websites with free-to-pay conversion and negative option continuity plan features.[191]   The risk of continuing law violations necessitates ongoing injunctive relief.

## B.   This Case Meets the Applicable Standard for Entry of a Preliminary Injunction

A plaintiff in a lawsuit between two private parties may obtain a preliminary injunction if it demonstrates that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in plaintiff's favor; and (4) an injunction is in the public interest.[192]   In a statutory enforcement action, however, the government need not show irreparable injury because, if the government shows a likelihood of success on the merits, irreparable injury is presumed.[193]

---

[187]   *Id.* at 1113-14.  *See also* S. Rep. No. 103-130 (1993), *as reprinted in* 1994 U.S.C.C.A.N. 1790-91 ("Section 13 of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act]").

[188]   *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *United States v. Laerdal Mfg.*, 73 F.3d 852, 857 (9th Cir. 1995).

[189]   *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

[190]   *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (*quoting SEC v. Management Dynamics*, 515 F.2d 801, 807 (2d Cir. 1975)).  *See also FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 212 (D. Mass. 2009) *aff'd* 624 F.3d 1 (1st Cir., Oct. 2010); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1017 (N.D. Ind. 2000); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000).

[191]   PI Ex. 55, Attach. A, at 2763-95, 2798-2900.

[192]   *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).

[193]   *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175-76 (9th Cir. 1987); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (unlike private litigants, the FTC need not prove irreparable injury, which is presumed).  In  *FTC v. Inc21*, 688 F. Supp. 2d 927, 936, n.17 (C.D. Ca. 2010), the court held that "[c]ongress determined that the traditional standard was *not* 'appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need

1    Thus, the FTC need only show a likelihood of success on the merits, that the balance of

2    equities tips in its favor, and that the injunction serves the public interest.[194]  In addition, when

3    weighing the public and private equities, the public interest should receive greater weight.[195]

4    As explained in detail below, the FTC is likely to succeed in showing defendants' multiple law

5    violations.  Moreover, the balance of the equities tips decidedly in favor of protecting the

6    public from further harm and preserving assets for eventual consumer redress.[196]

7              C.     **The Evidence Demonstrates a Substantial Likelihood of Success on the**
               **Merits**
8

9                     1.     **Defendants' Deceptive and Unfair Business Practices Violate**
                      **Sections 5 and 12 of the FTC Act**

10          There is no doubt that the Willms defendants' activities qualify as deceptive acts or

11   practices under Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.  An act or

12   practice is deceptive if, first, there is a representation, omission, or practice that, second, is

13   likely to mislead consumers acting reasonably under the circumstances, and third, the

14   representation, omission, or practice is material.[197]  A representation is likely to mislead

15   consumers if it is false.[198]  A representation, omission, or practice is material if it "involves

16   information that is important to consumers and, hence, likely to affect their choice of, or

17

18

19   for injunctive relief.' [citation omitted].  In this light, the recent Supreme Court holding in *Winter*, 129 S. Ct. 365

20   (2008), which clarified the test for applying the 'traditional' equity standard for issuing an injunction, does *not* affect
     the analysis under Section 13(b) of the FTC Act."

21        [194]  *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999).

22        [195]  *Winter*, 129 S. Ct. at 376-77; *Affordable Media*, 179 F.3d at 1236.

23
          [196]  Requiring defendants to comply with the FTC Act, to refrain from fraudulent representations, or to
24   preserve their assets from dissipation or concealment, is not an oppressive hardship.  *World Wide Factors*, 882 F.2d
     at 347; *FTC v. City West Advantage, Inc.*, 2008 WL 2844696 (D. Nev. 2008) (no hardship in requiring defendants to
25   merely follow the law – to refrain from making misrepresentations to consumers).

26        [197]  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001);
     *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).
27

28        [198]  *Pantron I*, 33 F.3d at 1096 & note 22.

1    conduct regarding, a product."[199]  A misrepresentation may be express or implied, and express

2    product claims are presumed to be material.[200]

3                    a.       **Material Misrepresentations About "Free," "Risk Free," and**
                              **"Bonus" Offers and Failure to Disclose or Adequately**
4                             **Disclose Charges to Consumers' Accounts**

5            The Willms defendants induced consumers to provide their payment information by

6    falsely and prominently representing that an item or service could be had on a "free" or "risk-

7    free" trial basis or as a "bonus," for which consumers pay only a nominal shipping and

8    handling fee.[201]  In fact, this was not true.  As discussed above, consumers who ordered the

9    trial products often were charged not only for shipping and handling, but also for costly initial

10   membership fees and forced to pay the full price of the trial products sent to them without their

11   knowledge unless they cancelled before the expiration of the trial period.[202]  The Willms

12   defendants also charged consumers on a recurring basis for additional "upsell" products and

13   programs without consumers' knowledge.[203]  Likewise, consumers who "registered" to

14   participate in the Willms defendants' online penny auctions were charged a purportedly

15   optional and costly initial membership fee to obtain the offered 300 "bonus" bids and,

16   unknown to the consumers, also charged them for additional bids on a recurring basis.[204]

17           The material terms and conditions for the offers and auctions were not disclosed or

18   were inadequately disclosed.[205]  To the extent that they were disclosed, such disclosures

19   appeared in vague, unnoticeable small print or in the separate, hard to find terms and

20

21           [199] *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *In re Cliffdale Associates,*
     *Inc.*, 103 F.T.C. 110, 165 (1984).

22
             [200] *FTC v. Figgie Int'l*, 994 F.2d 595, 604 (9th Cir. 1993); *Pantron I*, 33 F.3d at 1095-96.
23
             [201] *See supra* notes 71-74.
24
             [202] *See supra* notes 81-83.
25
             [203] *See supra* notes 81-83, 91.
26
             [204] *See supra* notes 114-15.
27
             [205] *See supra* notes 82-83, 88, 90-97, 116-24.
28

     Mot. for Prelim. Inj. and Memo of P&A    Page - 34

1    conditions pages on the websites and were minimized, while appeals for the products offered

2    were overly emphasized.[206]  The Willms defendants knew that consumers did not understand

3    the terms and conditions pages, were unlikely to read them, and purposely designed the

4    websites to make it difficult for consumers to find important costs and terms.[207]  The price and

5    terms of a product or service are material to consumers and small print disclaimers, even if

6    truthful, are inadequate to inform consumers of material information.[208]  Based on these

7    marketing practices, reasonable consumers would conclude that further charges would not be

8    incurred.

9        Indeed, the law is clear that negative option plans such as these are deceptive and

10   violate Section 5 of the FTC Act. In *Keithly v. Intelius, Inc.,* 2011 U.S. Dist. LEXIS 16861

11   (W.D. Wash.), this Court recently found the use of similar negative options and continuity

12   features to market products and services on the Internet to be deceptive.  The Court stated that

13   one must consider the net impression an Internet offer creates when determining whether

14   disclosures concerning the offer's features are legally adequate.[209]  The Court opined that: (a)

15   details about the Intelius upsell programs were "the least conspicuous elements on the page,"[210]

16   and (b) "there was nothing on the screen (outside of the disclosure box) to suggest that [the

17   plaintiff] was agreeing to pay for anything other than the background check he had originally

18   sought."[211]  The Court remarked that "subdued" and "easily-overlooked" terms, even if true,

19

20

21

[206]  *See supra* notes 82-83, 88-89, 95-96, 116-24.

22

[207]  *See supra* notes 104-05.

23

[208]  *Cyberspace,* 453 F.3d at 1200.

24

25   [209]  *Keithly v. Intelius Inc.*, 2011 U.S. Dist. LEXIS 16861 at *22 (W.D. Wa., Feb. 8, 2011).  Although the case involved Washington State's Consumer Protection Act, the Court looked to case law construing the FTC Act for guidance. *Id.* at *20-22.

26

27   [210]  *Id.* at *23.

28   [211]  *Id.* at *26.

Mot. for Prelim. Inj. and Memo of P&A  Page - 35

1   did not defeat the plaintiff's claim and concluded that the overall transaction had the capacity
2   to deceive.[212]

3       Negative option and continuity marketing plans are increasingly undergoing scrutiny
4   because of their capacity to deceive. These practices are so pernicious and harmful to
5   consumers that Congress recently enacted the Restore Online Shoppers' Confidence Act, S.
6   3386-2 ("ROSC Act"), to address them. Congress specifically found that sales such as these,
7   which involve "free-to-pay" conversions (i.e., free trial offers) combined with "negative
8   option" sales, take advantage of consumers' expectations that they will have an opportunity to
9   accept or reject an offer at the end of the trial period.[213] The record Congress relied on
10  included testimony that when negative options are used to secure assent to transactions,
11  disclosures must be especially clear and prominent because consumers are not accustomed to
12  purchasing items without affirmatively assenting to those purchases.[214]

13      The evidence overwhelmingly shows that the Willms defendants' marketing techniques
14  fall squarely within the description of the kind of tactics that Congress and the Court in *Intelius*
15  sought to halt. As such, the Willms defendants' misrepresentations of the risk free nature of
16  their offers and failure to disclose or adequately disclose their material costs and terms clearly
17  violate Section 5 of the FTC Act.

18

19

20

21

22

23

24  [212] *Id.* at *28-29.

25  [213] *See* Pub. L. No. 111-345, 124 Stat. 3618 (2010). Section 4 of the ROSC Act specifically prohibits
26  negative option marketing on the Internet unless the marketer clearly and conspicuously discloses all material terms
    of the transaction *before* obtaining a consumer's billing information, obtains a consumer's express informed consent
27  *before* charging him or her, and provides "simple mechanisms" for a consumer to stop recurring charges.

28  [214] *See supra* note 89.

1

2

### b.    Deceptive and Undisclosed or Inadequately Disclosed Limitations on Cancellations and Refunds

3        To emphasize that their offers were truly risk free, the Willms defendants have

4    represented to consumers that they could easily cancel the offers and obtain a full refund.[215]  In

5    fact, the Willms defendants have made it virtually impossible for consumers to obtain refunds

6    and cancel the recurring offers and charges through the use of undisclosed or poorly disclosed

7    limitations.[216]  Further, instructing their customer service and live chat representatives to avoid

8    giving refunds or to remain silent about the undisclosed upsells, forcing consumers to jump

9    through numerous hoops to cancel and obtain refunds, made the Willms defendants' claims of

10   "risk free" and "easy to cancel" a lie.[217]  These undisclosed terms and conditions, which

11   resulted in consumers sometimes paying hundreds of dollars for what they believed were

12   "free" offers, were clearly material to consumers, who would not have agreed to the offers if

13   they knew the real costs and difficulties involved.[218]  The Willms defendants' customer service

14   calls seethe with consumers' frustration in their attempts to obtain refunds.[219]  The Willms

15   defendants' high chargeback rates and poor BBB ratings are further proof that consumers were

16   largely unsuccessful in obtaining refunds from them directly.[220]  Despite ample notice of the

17   problems with their cancellation and refund disclosures (or the lack of them), the Willms

18   defendants nonetheless have continued to blatantly misrepresent that consumers can easily

19

20        [215] *See supra* notes 131-34.

21        [216] *See supra* notes 135-41.

22        [217] *See supra* notes 142-149.

23        [218] Pl Ex. 20, at 1733, ¶ 8; Pl Ex. 21, at 1743, ¶ 12; Pl Ex. 22, at 1761, ¶ 7; Pl Ex. 24, at 1796, ¶ 10; Pl Ex.
24   25, at 1808, ¶ 13; Pl Ex. 26, at 1825-26, ¶¶ 5, 7; Pl Ex. 27, at 1834, ¶ 13; Pl Ex. 29, at 1861, ¶ 7; Pl Ex. 30, at 1885,
     ¶ 8; Pl Ex. 31, at 1898, ¶ 11; Pl Ex. 32, at 1917, ¶ 15; Pl Ex. 33, at 1930, ¶ 11; Pl Ex. 34, at 1954, ¶ 9; Pl Ex. 35, at
25   1970, ¶ 13; Pl Ex. 36, at 1979-80, ¶ 13; Pl Ex. 37, at 1999, ¶ 12; Pl Ex. 38, at 2020, ¶ 16; Pl Ex. 39, at 2030, ¶ 12; Pl
     Ex. 41, at 2100, ¶ 12; Pl Ex. 42, at 2110, ¶ 14; Pl Ex. 43, at 2136, ¶ 23; Pl Ex. 44, at 2180-81, ¶ 15; Pl Ex. 46, at
26   2228, ¶ 12.

27        [219] *See supra* note 84.

28        [220] *See supra* notes 128-29, 168-72.

Mot. for Prelim. Inj. and Memo of P&A   Page - 37

cancel and obtain refunds, and have omitted material information about the conditions and limitations of obtaining refunds, in violation of Section 5 of the FTC Act.

      **c.**    **False and Unsubstantiated Claims About the AcaiBurn and PureCleanse Products**

Section 12 of the FTC Act makes it unlawful to "disseminate, or cause to be disseminated, any false advertisement."[221] The FTC Act defines a "false advertisement" as "an advertisement, other than labeling, which is misleading in a material respect."[222] Further, Section 12(b) of the FTC Act provides that "the dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice . . . within the meaning of section 45 of this title."[223] Thus, a claim that is deemed a false advertisement in violation of Section 12 is also a deceptive and misleading claim under Section 5.

Alternatively, a representation or advertisement that lacks a reasonable basis is considered false.[224] For health-related claims, the advertiser must possess "competent and reliable scientific evidence" to substantiate the claim.[225] For medical, health-related claims, courts have long held that a well-conducted, placebo-controlled, randomized, and double-blind study is necessary to satisfy the "competent and reliable scientific evidence" standard.[226]

---

[221] 15 U.S.C. § 52.

[222] 15 U.S.C. § 55.

[223] 15 U.S.C. § 52(b).

[224] *FTC Policy Statement on Deception*, 103 F.T.C. 174, 175 n.5 (appended to *In re Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984)). *See also, Pantron I*, 33 F.3d at 1096; *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. US Sales Corp.*, 785 F. Supp. 737, 748 (N.D. Ill. 1992) ("Apart from challenging the truthfulness of an advertiser's representations, the FTC may challenge the representation as unsubstantiated if the advertiser lacked a reasonable basis for its claims.").

[225] *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 961 (N.D. Ill. 2006), *aff'd* 512 F.3d 858 (7th Cir. 2008), *citing Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1156-57 (9th Cir. 1984).

[226] *QT*, 448 F. Supp. 2d at 962; *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1274 (S.D. Fla. 1999).

1    When the advertiser lacks adequate substantiation evidence, the advertiser necessarily lacks

2    any reasonable basis for its claims and, as such, the claim is deceptive as a matter of law.[227]

3        The Willms defendants represented to consumers that their AcaiBurn and PureCleanse

4    products will cause rapid and substantial weight loss and that scientific evidence, including

5    two eight-week, placebo-controlled clinical studies, supports this claim.[228]  In fact, these claims

6    are false.  An obesity expert has reviewed the studies on which the Willms defendants rely and

7    stated that they do not adequately substantiate these claims.[229]  Further, these representations

8    are express and, thus, are presumed material to consumers.  Thus, the representations are false

9    in violation of Sections 5 and 12 of the FTC Act.

10       The Willms defendants also have represented to consumers that their PureCleanse

11   products help prevent colon cancer.  They juxtaposed written statements on the websites that

12   PureCleanse "rids the body of toxins," "promotes health & longevity," and is "research tested,"

13   with an embedded video of Katie Couric and other celebrities discussing colon cancer and its

14   prevalence.[230]  This created the net impression that using PureCleanse helps prevent colon

15   cancer by flushing toxins out of the colon.  Avoiding cancer is material to consumers, who

16   forever seek ways to improve their odds against this deadly disease.

17       This claim is false and unsubstantiated.  The Willms defendants have offered no

18   substantiation for their cancer prevention claims.  In addition, a search of the relevant medical

19   literature over the Internet did not reveal any studies showing that there is a connection

20   between the use of laxatives and the risk of colorectal cancer.[231]  Further, it is well accepted in

21   the medical community that the frequent cleansing of one's bowels by the use of laxatives

---

[227] *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1498 (1st Cir. 1989).

[228] *See supra* notes 150-52.

[229] *See supra* note 153.

[230] *See supra* notes 154-60.

[231] *See supra* notes 161-62.

1  may, in fact, be seriously harmful.[232]  Therefore, this representation is unsubstantiated and

2  likely also false in violation of Sections 5 and 12 of the FTC Act.

3  #### d.  False Celebrity and Other Endorsements

4  On their websites, the Willms defendants depict celebrities, such as television

5  personalities Rachael Ray and Oprah Winfrey, and/or news media outlet logos, such as CNN,

6  ABC News, and FOX News, to represent that their offers or products were "seen on" or

7  "featured on" those shows and were therefore endorsed by those celebrities and entities.[233]

8  Celebrity and media outlet endorsements tend to convince consumers that the advertised

9  products are effective.[234]  Indeed, many consumers relate that these endorsements influenced

10 their decision to agree to the Willms defendants' trial offers.[235]  Unfortunately, these

11 consumers were duped because neither Rachael Ray nor Oprah Winfrey, nor the media outlets

12 depicted, endorsed or otherwise approved of the Willms defendants' products.[236]  Therefore,

13 these claims are false representations in violation of Section 5 of the FTC Act.

14  #### e.  Unfair Practice of Unauthorized Billing and Evading Risk Management Rules to Obtain Merchant Accounts

15  Section 5(n) of the FTC Act provides that an act or practice is unfair if:  (1) it causes or

16 is likely to cause substantial injury to consumers that (2) is not reasonably avoidable by

17 consumers, and (3) is not outweighed by countervailing benefits to consumers or to

18 competition.[237]  The Willms defendants routinely submitted charges to consumers' accounts

19 without their express informed consent, either because the consumer was not adequately

20 informed of the terms and conditions of the offer, or the consumer followed the terms and

21

22  [232]  *See supra* note 162.

23  [233]  *See supra* notes 163-65.

24  [234]  Pl Ex. 15, at 1325, 1332, ¶¶ 23(e), 23(g), 36(c).

25  [235]  *See supra* note 77.

26  [236]  *See supra* notes 166-67.

27  [237]  15 U.S.C. § 45(n); *see also Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1363-66 (11th Cir.
28  1988).

1    conditions of the offer to avoid charges but was charged nonetheless.  Such conduct has

2    consistently been held to be an unfair practice in violation of Section 5 of the FTC Act.[238]

3         By routinely submitting unauthorized charges to consumers' accounts, the Willms

4    defendants also generated extremely high chargeback rates.[239]  To continue processing

5    consumers' payments, the Willms defendants engaged in tactics to "game" the payment

6    processing system and avoid detection.[240]  They created shell corporations in the U.S. and

7    abroad with the participation of defendants Graver, Sechrist, Callister, and Milne, who fronted

8    them as officers and "signers" and applied for merchant accounts and accounts with payment

9    processors.[241]  This enabled them to evade Visa's and MasterCard's risk management rules and

10   cause enormous consumer injury – an estimated net injury of over $400 million.[242]  This

11   practice is not only fraudulent, enabling the Willms defendants to continue injuring consumers,

12   but it also offers no countervailing benefit to consumers or to competition.  To the contrary,

13   this practice undermines the entire payment process system and efforts to ensure its stability.

14   Therefore, this is an unfair practice in violation of Section 5 of the FTC Act.

15              **2.      Defendants' Unauthorized Billing Practices Violate Section 907(a) of
                         the EFTA and Section 205.10(b) of EFTA's implementing
16                       Regulation E**

17        The Willms defendants' unauthorized billing practices also violate the EFTA and its

18   implementing Regulation E, as well as the FTC Act.[243]  When the Willms defendants accepted

19   recurring debit card payments from consumers, they failed to:  (1) obtain written authorization

20   from consumers permitting the merchant to place recurring charges on consumers' debit

21

22        [238] *See, e.g., FTC v. Global Mktg. Group, Inc.*, 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla. 2008); *FTC v.
     J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

23

24        [239] *See supra* notes 168-71.

25        [240] *See supra* notes 173-82.

26        [241] *See supra* notes 13-29, 36-50.

27        [242] *See supra* notes 182-83.

28        [243] 15 U.S.C. § 1693o(c).

Mot. for Prelim. Inj. and Memo of P&A   Page - 41

1  accounts; and (2) provide a copy of this written authorization to consumers.[244]  Because the

2  Willms defendants did not comply with either requirement, they violated EFTA, Regulation E,

3  and, in turn, the FTC Act.

4  ### 3.    Liability of Individual Defendants

5      The named individual defendants are personally liable for their participation in the law

6  violations of the corporate defendants. An individual may be held liable for injunctive relief

7  for a corporate defendant's violations of the FTC Act if he or she either (a) participated in the

8  challenged conduct, or (b) had authority to control it.[245]  An individual's status as a corporate

9  officer, authority to sign documents on behalf of the corporate defendant, and active

10  involvement in the making of corporate policy are all factors that tend to demonstrate an

11  individual's authority to control the corporation.[246]  To hold an individual defendant jointly and

12  severally liable for restitution, the FTC must additionally show that he or she has actual

13  knowledge of material misrepresentations, was recklessly indifferent to their truth or falsity,

14  or, at a minimum, was aware of a high probability of fraud and intentionally avoided the

15  truth.[247]  The degree of an individual's participation in business affairs is probative of his

16  knowledge.[248]

17  ### a.    Jesse Willms

18      Defendant Jesse Willms fully controlled or had the authority to control every aspect of

19  the corporate defendants' activities.[249]  Further, he either had actual knowledge that the

20

21  [244] Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R.
§205.10(b).

22

23  [245] *See, e.g., Cyberspace.com,* 453 F.3d at 1202; *Affordable Media,* 179 F.3d at 1234; *Pantron I,* 33 F.3d at
1103.

24  [246] *See, e.g., FTC v. Publishing Clearing House, Inc.,* 104 F.3d 1168, 1170 (9th Cir. 1996); *FTC v. Amy
Travel Service, Inc.,* 875 F.2d 564, 573-74 (7th Cir. 1988).

25

26  [247] *See, e.g., Amy Travel Service,* 875 F.2d at 574.

27  [248] *Id.*

28  [249] *See supra* notes 30-35.

Mot. for Prelim. Inj. and Memo of P&A   Page - 42

1 | websites were deceptive or, at the very least, he was recklessly indifferent to the truth or falsity
2 | of the material misrepresentations made to consumers, or was aware of the high probability of
3 | fraud. The poor BBB ratings and the large number of consumers who complained to the BBB
4 | of unauthorized charges to their bank and credit card accounts, in addition to the high
5 | chargeback rates and the reasons consumers gave for seeking chargebacks, should have alerted
6 | Willms that there were significant problems with the disclosures on the websites.[250] The
7 | customer service scripts, which Willms admits he personally approved, acknowledge that
8 | many consumers do not understand or even read the terms and conditions pages on the
9 | websites.[251] Further, Willms was told on several separate occasions, starting as early as 2008,
10 | that the company had to reduce charge reversals in order to retain payment processing.[252]

11 | Instead of changing the websites to include better disclosures, Willms created shell
12 | corporations to allow him to obtain credit card processing when his chargeback rates became
13 | too high.[253] Willms hoodwinked payment processors so that he could continue to make money
14 | from this fraudulent scheme.[254] Time and again he was told what he needed to do to bring his
15 | business into compliance with the law, yet he did not do so; instead, his representatives
16 | callously acknowledged that if cost and terms disclosures were made clearer to consumers, the
17 | companies would make less money.[255] Thus, Willms should be held personally liable to
18 | provide restitution to consumers for the violations of Sections 5 and 12 of the FTC Act.

19
20
21
22

[250] *See supra* notes 99-104, 128-130, 169-73.

23
[251] *See supra* note 105.

24
[252] *See supra* note 173.

25
[253] *See supra* notes 13-29, 36-50, 173-83.

26
[254] *See supra* notes 173-83.

27
[255] *See supra* notes 172-73.

28

Mot. for Prelim. Inj. and Memo of P&A   Page - 43

### b.   Peter Graver, Adam Sechrist, Brett Callister, and Carey Milne

Defendants Graver, Sechrist, Callister, and Milne participated in the Willms defendants' efforts to avoid having merchant accounts traced to them and to manipulate payment data. Through the activities of these individuals, the Willms defendants were able to continue to accept credit card payments from consumers for far longer than they otherwise would have, which caused substantial consumer injury.

These individual defendants participated directly in these activities and either actually knew that they were submitting inaccurate information to merchant banks, or were recklessly indifferent to the truth or falsity of the information they provided, or, at a minimum, were aware of a high probability of fraud and intentionally avoided the truth. Graver was aware that Willms was creating these shell corporations to avoid detection and to obtain merchant processing.[256] He also had reason to know of Willms's unsavory business practices.[257] Each of the other individuals also knew or had reason to know that they were being used to create corporations and obtain bank accounts for processing consumer transactions, each having signed a contract with Jesse Willms to do this for compensation.[258] Thus, they stated on merchant account applications that they were the owners of the companies they fronted when they knew for a fact that Jesse Willms was the real owner and they had no right to the money flowing through the corporations. Therefore, each of these defendants should be held personally liable for restitution to injured consumers for the Willms defendants' unfair practices to evade VISA's and MasterCard's risk management rules and obtain merchant accounts to continue charging consumers.

---

[256] See supra notes 39-45.

[257] PI Ex. 8, at 468-74 (law enforcement showed up at Graver's door regarding fraud allegations), 552 (Better Business Bureau consumer complaints sent to Graver to pass on to Willms's employees), 580 (Graver knows of "blow up" with MasterCard).

[258] *See supra* notes 46-50.

Mot. for Prelim. Inj. and Memo of P&A   Page - 44

**D.    The Balance of the Equities Requires Preliminary Relief**

Preliminary relief is appropriate if, once the FTC establishes the likelihood of its ultimate success, the Court finds that the equities weigh in favor of granting the relief sought. In weighing the equities, the Ninth Circuit has held that the public interest should receive far greater weight than private interests.[259]  The equities in this case weigh heavily in favor of preliminary injunctive relief.  Given the pervasive nature of the unlawful activity, there is a strong likelihood that, absent injunctive relief, future law violations will occur.[260]  These violations will result in continued and substantial consumer loss.

The private equities in this case are not compelling.  In light of the inherently deceptive nature of free-to-pay conversions and negative option continuity plans, the danger to consumers is great.  Willms failed to comply with payment processor requests that he disclose the true costs and terms because better disclosures would affect his "sales."[261]  Further, despite his knowledge of the FTC's investigation and the imminent filing of this action, he is busy generating new website offers with free-to-pay conversion trial offers and negative options.[262]  Customer service call transcripts for these offers indicate that most consumers are unaware that they are being billed until after their credit cards are charged.[263]  The defendants have not changed their practices and need a court order to govern their activities during the pendency of this litigation.  Thus, the evidence demonstrates that the public equities – the protection of innocent consumers from fraud and the effective enforcement of the law – far outweigh the

---

[259] *Affordable Media*, 179 F.3d at 1236; *FTC v. Warner Communications, Inc.*, 742 F. 2d 1156, 1165 (9th Cir. 1984).

[260] *See FTC v. Southwest Sunsites*, 665 F.2d 711, 723 (5th Cir. 1982) ("A large-scale systematic scheme tainted by fraudulent and deceptive practices gives rise to the reasonable expectation of continued violations absent restraint.").

[261] *See supra* notes 172-73.

[262] Pl Ex. 55, Attach. A., at 2744-50, 2758-2864.

[263] A transcript of online customer service agents' discussions with consumers was recently obtained from the Willms defendants' trash dumpster that reveals that customers signing up for new offers are unaware of the charges. *Id.*, Attach. A, at 2756-57, 2866-68, 2875, 2877, 2882, 2887, 2890, 2893-96.

Mot. for Prelim. Inj. and Memo of P&A   Page - 45

1  defendants' private interest in continuing to make money in this dubious way. The preliminary

2  relief requested is the only way to ensure that consumers are not further injured by these

3  defendants.

4      **E.  An Asset Freeze is Necessary to Preserve Funds for Consumer Redress**

5          To preserve the availability of funds for injured consumers, plaintiff requests that the

6  Court issue an order requiring the preservation of assets and evidence. Such an order is well

7  within the Court's authority.[264] An asset freeze or restriction is appropriate once the Court

8  determines that the FTC is likely to prevail on the merits and restitution would be an

9  appropriate final remedy.[265] "A party seeking an asset freeze must show a likelihood of

10 dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not

11 granted."[266] In *Johnson v. Couturier*, the Ninth Circuit recently upheld an asset freeze because

12 plaintiffs had established they were "likely to succeed in proving that [Defendant]

13 impermissibly awarded himself tens of millions of dollars," and because:

14         Such an individual is presumably more than capable of placing assets in his
           personal possession beyond the reach of a judgment. Accordingly, [Defendant's]
15         own prior conduct establishes a likelihood that in the absence of an asset freeze
           and accounting, Plaintiffs will not be able to recover the improperly diverted
16         funds and will thus be irreparably harmed.[267]

17 Further, where a defendant's business is permeated with fraud, the Court may conclude that the

18 defendant is likely to attempt to dissipate or conceal assets while the action is pending and, to

19

20

21

22     [264] *Singer*, 668 F.2d at 1113 ("§ 13(b) provides a basis for an order freezing assets.").

23

24     [265] *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1031 (7th Cir. 1988).

25     [266] *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). There, the Ninth Circuit overruled its
       holding in *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989), that the petitioner needed to show only a
26     "possibility of dissipation" when seeking an asset freeze. The *Johnson* court based its new "likelihood of
       dissipation" standard on *Winter*, 129 S.Ct. at 374 (2008) (moving party must show a "likelihood" rather than the
27     mere "possibility" of irreparable harm).

28     [267] *Johnson*, 572 F.3d at 1085.

Mot. for Prelim. Inj. and Memo of P&A  Page - 46

1   avoid this, may grant an asset freeze.[268] A defendant's prior attempt to hide assets establishes

2   the likelihood that without an asset freeze, the plaintiff will be unable to recover any funds.[269]

3         An asset freeze in the instant case is necessary to preserve funds for consumer redress.

4   Defendants have caused consumer injury of at least $400 million. They have created shell

5   corporations in several countries to shield themselves from detection and have used offshore

6   bank accounts to move large amounts of cash.[270] Much of this activity aims to conceal or

7   otherwise permit the dissipation of money obtained from their fraudulent business operations.

8   Further, defendants have not disclosed to plaintiff the location of their funds and unknown

9   bank accounts may be in the U.S. and other countries. These funds should be frozen or their

10   use restricted and the offshore funds should be repatriated to preserve the ability to provide

11   restitution for injured consumers. Finally, the defendants may have large amounts of money

12   held in reserve accounts for payment processing. The Court should ensure that this money

13   does not make it back into the hands of the defendants, instead of ultimately being used to

14   either provide consumers with restitution or to resolve consumer chargebacks.

15         The asset freeze should include any assets of the individual defendants, who have no

16   right to dissipate or conceal funds that the Court may later determine were wrongfully gained.

17   If frozen, those assets can be located and inventoried. Freezing individual assets is warranted

18   where the individual defendant controls the business that perpetrated the unfair and deceptive

19   acts or participated directly in those practices.[271]

20

21

22

23   [268] *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972); *SEC v. R.J. Allen & Assocs., Inc.*, 386 F.Supp. 866, 881 (S.D. Fla. 1974).

24

25   [269] *Affordable Media*, 179 F.3d at 1236 (likelihood of dissipation existed "[g]iven the [defendants'] history of spiriting their commissions away to a Cook Islands trust").

26   [270] *See* PI Ex. 3, at 194-96 (moving money to companies and bank accounts in Cyprus); *see also supra* notes 13-29.

27

28   [271] *World Travel Vacation Brokers*, 861 F.2d at 1031.

Mot. for Prelim. Inj. and Memo of P&A   Page - 47

1    **V.    CONCLUSION**

2        For the foregoing reasons, plaintiff FTC hereby moves the Court to grant its motion for

3    preliminary injunction to ensure that defendants cannot continue their fraudulent Internet

4    marketing and billing schemes. As discussed above, defendants have engaged in and are likely

5    again to engage in acts or practices that violate Sections 5(a) and 12 of the FTC Act, 15 U.S.C.

6    §§ 45(a) and 52, Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of

7    EFTA's implementing Regulation E, 12 C.F.R. § 205.10(b). Without the requested relief

8    pending final disposition of this case, defendants will continue to dupe consumers into "risk

9    free" schemes and then impose credit card and debit charges without their consent.

10   Dated: May 16, 2011.

11                                     Respectfully Submitted,

12                                     s/Nadine Samter
13                                     NADINE S. SAMTER, WSBA #23881
                                       KATHRYN C. DECKER, WSBA #12389
14                                     ELEANOR DURHAM (Md. Bar)
                                       JULIE K. MAYER, WSBA #34638
15                                     Federal Trade Commission
                                       915 Second Ave., Suite 2896
16                                     Seattle, WA 98174
                                       206-220-6350 (telephone)
17                                     206-220-6366 (fax)
                                       Email: nsamter@ftc.gov; kdecker@ftc.gov
18                                       edurham@ftc.gov; jmayer@ftc.gov

19                                     Attorneys for Plaintiff Federal Trade Commission

20

21

22

23

24

25

26

27

28

Mot. for Prelim. Inj. and Memo of P&A    Page - 48