below (collectively, the "Agreement"). In this Agreement, "Advertiser" refers to any individual, agency or entity that signs an Insertion Order and submits a Click-Through Ad. "We," "our" and "us" refer to ADX, and "the Site" refers to ADX's worldwide web site hosted at http://www.aaddxxmmllnn.com. By entering into this Agreement and signing an Insertion Order, Advertiser agrees to be bound by the terms and conditions contained herein and therein.

1. **Advertiser Requirements.**

(a) **Generally.** Advertiser will be able to place its advertisements on web sites hosted by certain third party owner-operators, with each advertisement containing a link to Advertiser's web site. ADX will create and send to Advertiser an Insertion Order after receiving information (whether by written correspondence, telephone or email) from Advertiser regarding the placement of a Click-Through Ad. The "Insertion Order" will identify Advertiser's web site and detail the contents of a Click-Through Ad, the start and end dates for that Click-Through Ad ("Flight Dates"), the web sites where that Click-Through Ad will be placed, the amount of traffic to be delivered to Advertiser's web site for that Click-Through Ad, and the fee and payment terms for placement of that Click-Through Ad.

(b) **License Grant.** Advertiser hereby grants to ADX, and to every web site that places Advertiser's Click-Through Ad(s), a non-exclusive, royalty-free, worldwide, limited use license to visit Advertiser's web site via the Advertiser's Click-Through Ad(s) and display the Advertiser's Click-Through Ad(s) on the Site and on each web site that places Advertiser's Click-Through Ad(s).

(c) **Advertiser Fees.** ADX will charge a fee for placement of a Click-Through Ad based on the Required Traffic for that Click-Through Ad. All payments of Advertiser fees to ADX will be made in U.S. dollars on or before the start date specified in the Insertion Order. Unless otherwise agreed, terms will be solely prepay. Advertiser's failure to pay any fees due per the terms of an applicable Insertion Order shall subject Advertiser to late fee charges equal to 1.5% per thirty-day period. In cases where Agency is acting as Agent for Advertiser Agency will be liable for payment unless otherwise agreed to in writing.

(d) **Delivery.** ADX will make every effort to deliver the ads evenly in accordance with instructions on the Insertion Order. In the event of over-delivery by ADX damages will be limited to reimbursement of the over-delivered portion of payment if payment has already been made, or, if payment has not been made, then any over-delivery will be credited in the form of bonus impressions.

(e) **Submission of Click-Through Ads.** Advertiser agrees to e-mail all Click-Through Ads to ADX through an e-mail address provided by ADX before the start date of the Flight Dates specified in the applicable Insertion Order. Advertiser agrees that ADX will not be held responsible with regard to delivering the Required Traffic for any Click-Through Ad if Advertiser e-mails the applicable Click-Through Ad to ADX after the start date specified in an Insertion Order.

(f) **Advertiser Reports.** ADX's proprietary ad serving and tracking system will be the sole and exclusive determinant of Ad traffic measurement. Advertiser Reports will be available online in the Site for review by Advertiser and will be accessible to Advertiser by means of a login identification number and a password that will be issued to Advertiser by ADX upon Advertiser's signing of an Insertion Order.

(g) **ADX Serving Obligation.** Advertiser understands and agrees that ADX's obligation to serve any Ad is contingent upon the signing of an Insertion Order. ADX does not accept verbal Insertion Orders at any time, for any reason. Advertiser agrees that ADX's sole obligation is to use commercially reasonable efforts to place an Ad in conformance with the applicable Insertion Order. Advertiser agrees that Ad-either: i) solely responsible for the operation of an Ad during the applicable Flight Dates and that ADX will not be responsible for delivering the Required Traffic if Advertiser, for any reason, is unable to maintain the operation of such Ad during the applicable Flight Dates.

(h) **Revised Insertion Orders.** ADX reserves the right, subject to Advertiser's approval, to change, modify or alter any Insertion Order including, without limitation, to re-allocate the distribution of any Ad among

Initial here: _____

JTM 05457

available web sites and to adjust the Flight Dates for any Ad. All changes and / or amendments to the terms and conditions of an existing insertion order must be authorized by an officer of ADX.

(i) Cancellations. ADX reserves the right to reject or remove any Ad for any reason. If such rejection or removal is effected by ADX, ADX will refund to Advertiser a pro-rata portion of the fee charged to place the applicable Ad. ADX also reserves the right to remove any Ad from the web site of any Host for any reason, in which case, ADX shall use commercially reasonable efforts to make a comparable placement of such Click-Through Ad to deliver the traffic specified in the applicable Insertion Order.

(j) Logo Display Rights. Advertiser acknowledges that ADX may desire to use Advertiser's name and logo in press releases, product brochures and financial reports, or on the Site, indicating that Advertiser submits Ads, and Advertiser agrees that we may use Advertiser's name and logo in such manner.

2. **Confidentiality: Security.** Information related to Advertiser's activities during the term of this Agreement, including, without limitation, data generated through any Click-Through Ad, as well as all ADX software and other ADX intellectual property (collectively, the "ADX Information") are confidential and proprietary to ADX. Advertiser may not disclose ADX Information to any third party or otherwise use or exploit such information except as may be made public by ADX or as expressly permitted hereunder. Advertiser agrees to undertake reasonable security measures to prevent the disclosure of ADX Information.

3. **Representations.** Advertiser represents and warrants to ADX that (i) Advertiser has all necessary right, power and authority to enter into this Agreement and to perform the acts required of Advertiser hereunder; and (ii) no material that is displayed on Advertiser's web site and no material contained in Advertiser's Click-Through Ad(s) will (A) infringe, violate or misappropriate any copyright, trade secret, trademark or other proprietary or intellectual property right of any third party; (B) constitute libel, defamation, invasion of privacy or the violation of any right of publicity or any other right of any third party; (C) violate any applicable law, statute, ordinance or regulation; (D) be lewd, pornographic or obscene; (E) violate any laws regarding unfair competition, anti-discrimination or false advertising; (F) promote violence or contain hate speech or is threatening or abusive; or (G) contain viruses, Trojan horses, worms or other similar harmful materials. We represent and warrant to Advertiser that we have all necessary right, power and authority to enter into this Agreement and to perform the acts required of us hereunder.

4. **Limitation of Liability.** ADX IS NOT LIABLE FOR ANY CLAIM, REPRESENTATION OR WARRANTY MADE BY ANY ADVERTISER INCLUDING, BUT NOT LIMITED TO, THE CONTENT OF ANY ADVERTISER'S WEB SITE OR THE ALTERATION OF THE APPEARANCE OR SYNTAX OF ANY LINK. UNDER NO CIRCUMSTANCES WILL ADX BE LIABLE TO ANY PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES ARISING FROM ANY HOST'S PERFORMANCE OR NON-PERFORMANCE OR THE OPERATION OF ANY WEB SITE BY ANY ADVERTISER OR HOST, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFIT OR LOST BUSINESS. IN NO EVENT WILL ADX's TOTAL LIABILITY UNDER THIS AGREEMENT EXCEED THE TOTAL FEES RECEIVED BY ADX FROM ADVERTISER UNDER THIS AGREEMENT. ADVERTISER IS SOLELY RESPONSIBLE FOR ANY LEGAL LIABILITY RELATING TO ITS CLICK-THROUGH AD.

5. **Disclaimer.** ADX MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING THE SITE OR ANY CLICK-THROUGH AD, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT, OR ANY WARRANTY ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ADX SPECIFICALLY DISCLAIMS ANY WARRANTY REGARDING (A) ANY PRODUCT OR SERVICE OFFERED OR SOLD THROUGH ANY WEB SITE; (B) THE FUNCTIONALITY, PERFORMANCE OR OPERATION OF ANY WEB SITE; AND (C) THE SUCCESS OF ANY PLACED ADVERTISEMENT. ADX IS NOT RESPONSIBLE FOR THE DEVELOPMENT, OPERATION, MAINTENANCE OR CONTENT OF ANY HOST'S OR ADVERTISER'S WEB SITE.

6. **Term, Termination and Survival.** The term of this Agreement will commence upon the execution hereof by both parties and will continue until terminated by either Advertiser or ADX. Either Advertiser or ADX may terminate this Agreement at any time, with or without cause, by giving the other party written (or e-mail)

September, 2007                    Page 2 of 4                    Initial here: _____

JTM 05458

notice thereof. Such notice will result in the termination of this Agreement after seventy-two (72) hours of receipt. The obligations of the parties, which are intended by their express terms or by necessary implication to survive the expiration or termination of this Agreement, shall so survive.

7.  **Mutual Indemnification.** Both parties agree to indemnify and hold harmless the other party and its directors, officers, employees, agents and authorized representatives from and against any costs, losses, liabilities and expenses (including court costs and reasonable attorneys' fees) that either party may suffer, incur or be subjected to by reason of any legal action, arbitration or other claim by a third party arising out of or as a result of a breach of either party's representations, warranties and agreements made hereunder.

8.  **Relationship.** ADX and all Advertisers are independent contractors, and no partnership, joint venture, agency, franchise, sales representative, or employment relationship will be deemed to exist between or among ADX or any Advertiser by virtue of any party entering into an Advertiser and Advertiser Agency Agreement or Insertion Order. ADX HAS NO RESPONSIBILITY OR LIABILITY WITH RESPECT TO ANY ARRANGEMENTS OR AGREEMENTS THAT ADVERTISER MAY ENTER INTO WITH OTHER HOSTS OR ADVERTISERS. ADVERTISER UNDERSTANDS AND AGREES THAT NO EXCLUSIVE RELATIONSHIP BETWEEN OR AMONG ADX AND ANY HOST OR ADVERTISER IS CREATED OR IMPLIED BY VIRTUE OF ANY PARTY ENTERING INTO ANY ADVERTISER AND ADVERTISER AGENCY AGREEMENT. WE RESERVE THE RIGHT TO SOLICIT ADVERTISERS, EITHER DIRECTLY OR INDIRECTLY, ON TERMS THAT MAY DIFFER FROM THOSE CONTAINED IN ANY ADVERTISER AND ADVERTISER AGENCY AGREEMENT.

9.  **Independent Investigation.** ADVERTISER UNDERSTANDS AND AGREES THAT ADVERTISER WILL NOT HAVE OR ACQUIRE BY VIRTUE OF ENTERING INTO AN ADVERTISER AND ADVERTISER AGENCY AGREEMENT OR INSERTION ORDER ANY VESTED, PROPRIETARY OR OTHER RIGHT IN THE PROMOTION OF ANY PRODUCT OR SERVICES OR IN ANY GOODWILL CREATED BY ADVERTISER'S EFFORTS. ADVERTISER HAS INDEPENDENTLY EVALUATED THE DESIRABILITY OF SUBMITTING ANY CLICK-THROUGH AD AND IS NOT RELYING ON ANY REPRESENTATION, GUARANTEE OR STATEMENT OTHER THAN AS SET FORTH IN AN ADVERTISER AND ADVERTISER AGENCY AGREEMENT OR INSERTION ORDER.

10.  **Governing Law and Jurisdiction.** All disputes between the parties hereto shall be governed by and construed in accordance with the laws of the State of California, without regard to conflict of laws principles. Both parties mutually agree and consent that jurisdiction and venue for all disputes between the parties hereto shall be vested exclusively in the state courts within Los Angeles County.

11.  **Dispute Resolution.** Except for the right of either party to apply to the court of jurisdiction for equitable relief to preserve the status quo or prevent irreparable harm, all disputes regarding or arising between the parties hereto that cannot be resolved amicably by good faith negotiations will be subject to alternate dispute resolution as shown below. In these scenarios :

    a)  **Litigation.** Any amount equal to or less than $5,000.00 shall be litigated in Los Angeles Superior Court, Limited Jurisdiction Small Claims Court for the County of Los Angeles, State of California, Central District, located at 111 N. Hill Street, Los Angeles, California 90012.

    b)  **Arbitration.** For any amount in excess of $5,000.01, the dispute between the parties to this agreement arising out of any of the terms, provisions, or conditions of this agreement shall be submitted to arbitration in Los Angeles, California, before a retired judge of the Los Angeles Superior Court / attorney through ADR Services, Inc. ("ADR Services") at 1900 Avenue of the Stars, Suite 250, Los Angeles, California 90067. For any demand less than $50,000.00, the arbitration shall be held before a single arbitrator and shall be binding with no right of appeal. For any demand in excess of $50,000.01, the arbitration shall be held before a three arbitrator panel and shall be binding with no right of appeal.

    The arbitration shall be conducted pursuant to the Judicial Arbitration Rules of Court, California Rules of Court, Rule 1600 et seq. The arbitration shall be commenced by filing a demand for arbitration with the

JTM 05459

P1 Exhibit 3 Page 00140

arbitration and each party will bear its own costs and attorneys' fees incurred in connection with the arbitration.

12. **Advertising and Creative Guidelines.** By signing this document, Advertiser agrees to be bound by and to comply with the Advertising and Creative Guidelines' incorporated herein by reference.

13. **Miscellaneous.** Except as required by law Advertiser may not, without our prior written consent, issue any press release or make any representations or statements, about us, the Site or any of our products and services. If any provision of this Agreement is held unenforceable, that provision will be enforced to the maximum extent possible so as to affect the intent of the parties to this Agreement. Without prior written consent, Advertiser may not assign or otherwise transfer this Agreement or any of Advertiser's rights or duties under this Agreement. This Agreement will inure to the benefit of ADX, its successors and assigns. Nothing in this Agreement is intended to or will be construed to give any person, other than the parties hereto, any legal or equitable rights, remedy or claim under or in respect of this Agreement or any other provision contained herein. This Agreement constitutes the complete and exclusive understanding and agreement between Advertiser and ADX relating to the subject matter hereof and supersedes all prior or contemporaneous understandings, agreements and communications and/or advertisements with respect to the subject matter hereof. Insertions set forth in the Insertion Order shall govern should such insertions vary from the terms disclosed in this Agreement. This Agreement can be modified only by a formal written agreement signed by persons duly authorized to sign agreements on behalf of Advertiser and ADX.

14. **Counterparts.** This Agreement may be executed in counterparts, by manual or facsimile signature, each of which will be deemed an original and all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Advertiser and Agency Agreement as of the date and year indicated.

AdDynamix                                    Agency / Advertiser

Signature: _____                  Signature: _____

Name: __Orion Madden__                       Name: __Jesse Willer__

Title: __EVP + GM__                          Title: __CEO__

Date: __7.28.08__                            Date: __July 28/08__

September 2007                    Page 4 of 4                    Initial here: _____



**Account Manager (Advaliant):**                    **Account Manager Company:**

Name: Craig Leonard                                 Name: Jesse Wilims

**By signing below, I the undersigned acting as an executive member or agent of Company understand and agree to be held by the terms as set-out in this Insertion Order**

| AdValiant Inc. | Company *Watsource* |
|---|---|
| Signed: | Signed: *[signature]* |
| Printed Name: . | Printed Name: *Jesse Wilims* |
| Date: | Date: *Dec 6/07* |

## Terms and Conditions for Advertising

- **Payment Terms:** AdValiant ( a division of Media Trust Inc.) shall provide an invoice to Company on a monthly basis which shall become **due within 10(ten) days following from the end of every other week by wire as noted on page 1**. Any late payments will accrue interest equal to one percent (1%) per month, or the maximum amount allowable under law, whichever is less, compounded monthly. Outstanding payments not reached by AdValiant by the due date on the invoice will automatically cause the campaign to be placed on hold or redirected at AdValiant's sole discretion. Further, a pre-pay will be required to restart campaign. Any sales or lead activity already generated for the month in which the late payment occurred will also have to be settled in advance of the campaign's restart. Company will be charged $50.00 for payments by checks that are returned due to insufficient funds. AdValiant shall be entitled to recover all reasonable costs of collection (including agency fees, attorneys' fees, in-house counsel costs, expenses and costs) incurred in attempting to collect payment from Company. Company agrees that in the event a collection suit is commenced, in any proceeding for default judgment AdValiant may, in lieu of seeking statutory attorneys' fees, elect to recover one-third of the outstanding principal plus penalties as stipulated. Such an election is in AdValiant's sole discretion.

- **Company Representations.** Company will conduct its web advertising campaigns through AdValiant (a division of Media Trust Inc.) using the highest industry standards which meet or surpass all local, State and Federal laws for advertising; inclusive of the Can-Spam Act of 2003. AdValiant makes no warranties with regards to reviewing such provided creative ahead of time and therefore cannot be held responsible if any portion may be deemed illegal. Company also warrants that it's website, or any website as provided for advertising through this agreement shall not contain, or contain links to, improper or illegal content. AdValiant reserves the right to reject any advertisement, IO, or URL link embodied within an advertisement at any time. Advertisements are accepted upon the representation that Company has the right to publish the contents of the advertisement, without infringing any rights of third parties. Company agrees to indemnify and hold AdValiant and AdValiant's web site affiliates harmless against any and all expenses and losses of any kind (including reasonable attorney's fees and costs) incurred by AdValiant or its web site affiliates in connection with any claim of any kind arising out of publication of the advertisement (including, without limitation, any claim of trademark or copyright infringement, libel defamation, breach of confidentiality, false or deceptive advertising or sales practices) and/or any material of Company's to which users can link through the advertisement. Company shall use best efforts to ensure that any such website they host and is used in generating leads in conjunction with this IO shall be able to withstand above average usage and shall remain functional under such circumstances. Company understands that in the event of a website failure, this could affect both the reputation and economic well-being of AdValiant and agrees ahead of time that a monetary remedy will be sought. Such remedy shall use average conversion rates which are calculated by comparing the number of clicks on an offer compared to the number of successful applications (leads) averaged over the last five (5) days (or less; whichever is most applicable) of the site's normal operation (e.g. # of leads / # of clicks = % or conversion rate); therefore if the average conversion rate is shown to be 2.5% and an affiliate of AdValiant has deemed to have contributed 1000 clicks to a campaign, Company accepts that such remedy will consist of paying for 25 leads even though none have actually been recorded. In the event of this occurrence, AdValiant shall reserve the right to remove or re-assign Company's campaign as they see fit until such time that the site load capacity issues have been resolved.

JTM 05461



- **Limitation of Liability.** AdValiant's AD SPACES, SERVICES AND SOFTWARE ARE PROVIDED "AS IS" AND "AS AVAILABLE" AND AdValiant DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. AdValiant shall not be liable for any of Companys or content providers whose content appear on AdValiant, nor the contents of any advertisements, web sites or web pages. In the event that AdValiant fails to display any advertisements in accordance with this IO (or in the event of any other failure, technical or otherwise), the sole liability of AdValiant to Company shall be limited to either a refund for the advertisement campaign or placement of "make-good" advertising during a reasonable time after. In no event shall AdValiant be responsible for any consequential, special, lost profits, or other damages arising from any failure to timely run the advertising in accordance with the IO. Without limiting the foregoing, AdValiant shall have no liability for any failure or delay resulting from conditions beyond AdValiant's control.

- **Suppression Files*:** Company accepts responsibility to manage their own suppression files on the AdValiant Network. A suppression link, password and username will be sent to you before each of your campaigns commence and it is the Company's sole responsibility to maintain their own lists. *As per Can-Spam, it is suggested that such updates are done at least every 5 days (weekends included) and by law, no later than at least once in a 10 day period.

- **Cancellations.** 72 hours written notice required prior to cancellation. Directly following the written notice, Company accepts that AdValiant will use best efforts to ensure that no more email drops or advertising placements are made. After the initial 72 hour notice and over the next 7 days, Company accepts that they must pay for and track all residual activity as normal. After the total 10 day period the campaign will be deemed to be completed and Company commitment to continue to pay for and track leads will have ceased.

- **Miscellaneous.** No conditions other than those set forth in the IO or these Standard Terms shall be binding on AdValiant unless expressly agreed to in writing by AdValiant. In the event of any inconsistency between the IO and the Standard Terms, the Standard Terms shall control. These Standard Terms, together with the IO, (i) shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts law; (ii) may be amended only by written agreement executed by an authorized representative of each party; and (iii) constitute the complete and entire expression of the agreement between the parties, and shall supersede any and all other agreements, whether written or oral, between the parties.

- **PR, Communiqué's, News Wires, Website Promotion.** In any instance in which the Company would like to make public any part of their business relationship with Advaliant, use the Advaliant name/trademark or those of any parent or sister company's, in their marketing, promotions, media kits, websites, news wires, press releases or any form of public announcement of any kind, Company understands that they must seek EXPRESS WRITTEN CONSENT from AdValiant. All requests should be sent to pr@advaliant.com as well as your account manager. In the absence of a reply, please speak to your Account Manager to expedite a response. AdValiant will use reasonable efforts to reply to all queries in a timely manner however under NO CIRCUMSTANCES will the absence of a response constitute the granting of a request. All requests received as per above will be considered but Advaliant reserves its right to decline such requests at its sole discretion.

** By signing below, I the undersigned acting as an executive member or agent of Company understand and agree to be held by the terms as set-out in the Standard Terms and Conditions**

| AdValiant Inc. | Company _Wu ViSource_ |
| --- | --- |
| Signed: | Signed: _Jon Willis_ |
| Printed Name: | Printed Name: _Jesse Willms_ |
| Date: | Date: _Dec 6/07_ |

JTM 05462



## ADDENDUM TO INSERTION ORDER FOR ADVERTISING

| Advertiser Name ('Company'): | Alberta Ltd. | Phone #: | (780) 498-1624 |
|---|---|---|---|
| Contact Name: | Jesse Willms | Fax # | |
| Address: | 11 Athabascan Ave. | E-mail Address: | jd.jesse@yahoo.com |
| City, State, Zip | Sherwood Pk,, Alberta T8A 6H2, Canada | Web Address: | |

**Campaign Description:**

Cost Per Action (CPA) Campaigns:

| Campaign | CPA |
|---|---|
| www.purecleanseelite.com | $75 |
| www.purecleanseedge.com | $47.50 |
| www.completepurecleanse.com | $70 |
| www.resvelite.com | $75 |
| www.resvultra.com | $50 |
| www.resvedge.com | $50 |
| www.resvsupreme.com | $50 |
| www.completeresv.com | |
| www.pureresv.com | |
| www.guaranapro.com | |
| www.guaranamax.com | |

- Advaliant will be the acting Agency of Record (AOR) on these campaigns; meaning Advaliant has the exclusive rights to represent and distribute the campaigns noted above to the CPA affiliate network and publisher marketplace.

**Advertising Deployment:**

- Solo Emails, Contextual, Banner and Search Engines/Social Media placement using authorized creative only; no incentivized traffic or co-reg placements.

**Duration of Campaign(s):**

Campaign shall commence upon the signing date below and will continue until the required cancellation is received as per the terms and conditions.

| AdValiant Inc.: | Company: |
|---|---|
| Signed: | Signed: |
| Printed Name: | Printed Name: Jesse Willms |
| Date: | Date: April 3/09 |

JTM 05463

P1 Exhibit 3 Page 00144



## INSERTION ORDER FOR ADVERTISING

*Was Jesse faxed?*

| Advertiser Name ('Company'): | Wu-Yi Tea | Phone #: | (780) 498-1624 |
|---|---|---|---|
| Contact Name: | Jesse Willms | Fax # | |
| Address: | | E-mail Address: | jd.jesse@yahoo.com |
| City, State, Zip | | Web Address: | http://www.wu-yisource.com/ |
| (AdValiant Use) AD # | | (AdValiant Use) Category | Not Selected |

**Campaign Description:**

- Wu-Yi Tea Free Sample; $25CPA

**Advertising Deployment:**

- Solo Emails, Contextual, Banner and Search Engine placement using authorized creative only; no copyrighted search terms allowed, no incentivized traffic or co-reg placements.

**Lead Counts:**

- For ALL CAMPAIGNS, a lead or acquisition (a CPA or CPL) shall generally be accepted as any customer that proceeds through any of the various web links (URL's) as supplied by Company to AdValiant (a division of Media Trust Inc.) and successfully completes and submits their information through the Company landing page which results in taking the User to a confirmation page in which the Advaliant tracking pixel is located. This offer is for gross acquisitions and there will be no Chargebacks. Company accepts Advaliant tracking pixel counts as being correct and billable. Upon signing of this document, Company will provide AdValiant with access to Company's internal lead tracking system. Advaliant will work with Company to combat any potential fraudulent and/or non-commissionable activities. In the event that Advaliant at its sole discretion believes that such activity has taken place, with evidence supplied by Company within 7 days of such alleged activity, Advaliant will not bill Company for any commissions accrued by said contravening affiliate.

**Duration of Campaign(s):**

Campaign shall commence upon the signing date below and will continue until the required cancellation is received as per the terms and conditions.

**Prepayment:**

PREPAY: Company agrees to pay Advaliant Inc. upon acceptance of this agreement a prepay of $1500, BY WIRE.

**Payment Terms(s):**

BI-Weekly NET 10; Company agrees to pay AdValiant within 5 (Five) days from the end of the week BY WIRE to:

Account Name: Advaliant, Inc.: Acct#: ▓▓▓▓▓▓ ABA/Routing#: ▓▓▓▓▓▓
Address: Citibank, 399 Park Ave, NewYork, NY, 10022 *Swift*

---

JTM 05464

PI Exhibit 3 Page 00145



## ADDENDUM TO INSERTION ORDER FOR ADVERTISING

| Advertiser Name ('Company'): | Alberta Ltd. | Phone #: | (780) 498-1624 |
|---|---|---|---|
| Contact Name: | Jesse Willms | Fax # | |
| Address: | 11 Athabascan Ave | E-mail Address: | jd.jesse@yahoo.com |
| City, State, Zip | Sherwood Pk., Alberta T8A 6H2, Canada | Web Address: | |

<u>Campaign Description:</u>

Cost Per Action (CPA) Campaigns:

| Campaign | CPA |
|---|---|
| www.purecleanseelite.com | $75 |
| www.purecleanseedge.com | $47.50 |
| www.completepurecleanse.com | $70 |
| www.resvelite.com | $75 |
| www.resvultra.com | $50 |
| www.resvedge.com | $50 |
| www.resvsupreme.com | $50 |
| www.completeresv.com | |
| www.pureresv.com | |
| www.guaranapro.com | |
| www.guaranamax.com | |

- Advaliant will be the acting Agency of Record (AOR) on these campaigns; meaning Advaliant has the exclusive rights to represent and distribute the campaigns noted above to the CPA affiliate network and publisher marketplace.

<u>Advertising Deployment:</u>

- Solo Emails, Contextual, Banner and Search Engines/Social Media placement using authorized creative only; no incentivized traffic or co-reg placements.

<u>Duration of Campaign(s):</u>

Campaign shall commence upon the signing date below and will continue until the required cancellation is received as per the terms and conditions.

| AdValiant Inc.: | Company: |
|---|---|
| Signed: | Signed: |
| Printed Name: | Printed Name: Jesse Willms |
| Date: | Date: April 3/09 |

COPY

JTM 05465

# MARKETING AGREEMENT

This Agreement is made this ____ day of January, 2008 by and between Iworks. Inc.("Iworks") and WuYiSource. _____ ("WuYiSource").   Iworks and WuYiSource shall collectively be referred to as the "Parties".

## RECITALS

WHEREAS, Iworks is in the business of offering certain services, such as product fulfillment, customer service, merchant processing and marketing, any one of or all of which may be performed through third party affiliates, and

WHEREAS, Iworks markets an upsell program called Living Lean (the "Program"), and

WHEREAS, WuYiSource is also in the business of marketing and is interested in placing the Program with its offers as an upsell and will provide upsell customers to said Program, and

WHEREAS, WuYiSource desires to have Iworks provide its product fulfillment, customer service and merchant processing for the Program and to grant to Iworks an exclusive right to offer these services for the Program, and

WHEREAS both Parties desire to enter into a contractual relationship one with another where Iworks will offer the Program and services therefore and WuYiSource will market the same as an upsell to its sites and offers.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises, agreements and conditions stated herein, and with the above recitals incorporated herein, the Parties, intending to be legally bound hereby, agree to the following terms and conditions:

### SECTION ONE
#### Product Fulfillment, Customer Service and Merchant Processing

During the term of this Agreement, Iworks, acting on its own or through a third party, shall be WuYiSource's sole service provider for the services rendered herein below. WuYiSource does hereby grant to Iworks the exclusive right to provide the following services to the Program:

*Product Fulfillment.* Iworks shall provide and maintain online fulfillment for the Program.
*Customer Service.* Iworks shall perform customer service for the Program, and agrees to employ such customer service representatives and other personnel as may be necessary to provide the customer service in a professional manner.
*Merchant Processing.* Iworks shall be responsible for processing sales for the Program, which services shall be performed in a prompt and professional manner.

Page 1 of 6

JTM 05466

## SECTION TWO
### Licence and Representations

Iworks represents and warrants that: (i) it is the sole owner of the intellectual property rights of the Program and all materials related thereto, or has the authorization to use and market the same; (ii) it has not granted, sold, assigned, or transferred to any other person or entity any ownership interest in the Program; and (iii) it has no knowledge of any infringements or conflicts with the asserted rights of others with respect to the intellectual property rights related to the Program.

WuYiSource represents and warrants that: (i) it is the sole owner of the intellectual property rights of its offers and sites and all materials related thereto, or has the authorization to use and market the same; (ii) it has not granted, sold, assigned, or transferred to any other person or entity any ownership interest in the offers; and (iii) it has no knowledge of any infringements or conflicts with the asserted rights of others with respect to the intellectual property rights related to the offers.

The parties agree that at all times during this Agreement, Iworks shall retain all rights to the Program for which Iworks has the right to place on WuYiSource's offers, and WuYiSource shall retain all rights to its offers.

## SECTION THREE
### Costs, Fees and Obligations

Iworks shall bill all valid customers $19.95/month for the Program. WuYiSource shall be entitled to fifty percent (50%) of all valid billings, less charge backs and refunds. WuYiSource understands and agrees that ten percent (10%) of his processing will be held by the merchant bank to be released at a later date.

Iworks shall pay WuYiSource every two weeks. Each payment shall be for the previous two week period. For any charge backs, refunds or any time the client is reimbursed its monies paid, each party shall be responsible for its share of the monies returned to the client. Any monies owed to Iworks for charge backs, refunds or otherwise may be offset by any monies owed to WuYiSource.

WuYiSource shall place the Program on its sites and with its offers and market the Program as an upsell with its own offers and will provide upsell customers to said Program.

## SECTION FOUR
### Term of Agreement

This Agreement shall be from month to month. Either party may cancel and terminate this Agreement upon thirty (30) day written notice. Upon termination of this Agreement, both parties shall return any and all confidential information to the respective party. Notwithstanding termination of this Agreement, Sections Three, Five, Six, Seven, Eight, Nine, and Ten shall nonetheless remain in effect and shall not be effected by said termination.

Marketing Agreement

JTM 05467

P1 Exhibit 3 Page 00148

## SECTION FIVE
### Consideration and Damages

Both Parties fully understand that the other will rely on this Agreement as consideration for and in reliance on this Agreement and that compliance herewith is a crucial element of this Agreement and neither Party would agree hereto without full compliance hereof. Both Parties agree that in the event of any breach of this Agreement that the other's damages are irreparable and that the non-breaching Party shall be entitled to injunctive relief, in addition to such other and further relief as may be proper. In the event of breach of this Agreement, the breaching Party agrees to pay all costs of enforcement of said Agreement, including but not limited to reasonable attorney's fees. This Section shall in no way affect other remedies allowed by law or in equity.

## SECTION SIX
### Liability

WuYiSource agrees to assume any and all liability related to its marketing efforts, offers, sites and advertisements thereof, as well as any spin-off or related products. Iworks agrees to assume liability relating to the Program, as well as its services arising from the Program.

Any actual, out-of-pocket costs and/or fees charged to or paid by either party, or any of their affiliates, for costs related to responding to and/or managing allegations of the other party's Program or offers, or if said costs arise directly from errors in the Program or offers or for violations of its own terms and conditions, said costs and/or fees shall be paid by the other party and it shall be liable for said errors and/or violations thereof.

## SECTION SEVEN
### Non-Disclosure; Confidentiality

Confidential information shall include, but not be limited to information, whether disclosed in oral, electronic or written form that includes any information, technical data, or know-how, including that which relates to research, product plans, products, services, customers, customer lists (including buyer and non-buyer), markets, software, systems, developments, calendar of events, scripts, sales presentations, processes, marketing, artwork, designs, sales, web designs and sales, finances or financial conditions or any other information which the receiving party knows or should know to be confidential.

Each party hereto agrees to hold in confidence, and to use only in connection with performance of its obligations hereunder, all confidential or proprietary information of any other party which it receives or gains access to in connection with this Agreement including the terms of this Agreement and to use reasonable efforts to ensure such confidence by its employees with access to such information. Each party shall take reasonable security precautions, at least as great as precautions taken to protect its own confidential information and no less than industry standards.

Each party hereto shall not disclose confidential information to third parties, unless such disclosure is otherwise granted herein, other than i) to authorized agents whose purpose is to assist with

Marketing Agreement

JTM 05468

compliance of this Agreement; ii) to third party affiliates used in the performance of this Agreement, such as media buyers, or iii) as specifically required by law, but only after due process be provided, with the opportunity to dispute the legality of said request and only after the right to be heard has been provided and the appeals process exhausted. Each party and any agent thereof shall store in a secure area limited to selected personnel and, prior to discarding, shall destroy in a manner rendering data unreadable, all material containing any confidential information.

## SECTION EIGHT
### Return of Confidential Information

Upon expiration, termination or upon the disclosing party's request, the recipient shall cease any and all use of the confidential information and shall promptly return to the disclosing party all confidential information or other materials in the recipients possession or control and any and all copies thereof. The recipient shall also certify in writing to the disclosing party as to the destruction of any materials prepared by or on behalf of the recipient using or based upon the confidential information. The recipient shall immediately notify the disclosing party of any loss of or unauthorized copying, dissemination, use, exploiting or in any way disclosure of the confidential information.

## SECTION NINE
### Indemnification

WuYiSource shall indemnify, hold harmless and defend Iworks from and against any and all claims, losses, damages, demands, liabilities, and costs (including reasonable attorneys' fees) arising from or related to: (i) any breach of any representations, warranty, or covenant made by WuYiSource; (ii) any product liability relating to its sites or offers: (iii) any claim, lawsuit or other liabilities arising from WuYiSource's conduct of its business; (iv) any claim, lawsuit or other liabilities for infringement of any intellectual property rights, copyright infringement, work product or any other claim relating to the sites or offers; (v) any claim, lawsuit or other liabilities relating to any services provided by WuYiSource; or (vi) any claim, lawsuit or other liabilities relating to WuYiSource's marketing methods, including any marketing to persons who have placed their names on a non-email list pursuant to the CAN-SPAM Act of 2003, or in violation of any telemarketing or direct mail laws, rules and regulations.

Iworks shall indemnify, hold harmless and defend WuYiSource from and against any and all claims, losses, damages, demands, liabilities, and costs (including reasonable attorneys' fees) arising from or related to: (i) any breach of any representations, warranty, or covenant made by Iworks; (ii) any product liability relating to the Program; (iii) any claim, lawsuit or other liabilities arising from Iworks' conduct of its business; and (iv) any claim, lawsuit or other liabilities relating to any services provided by Iworks.

Marketing Agreement

Page 4 of 6

JTM 05469

PI Exhibit 3 Page 00150

## SECTION TEN
### Miscellaneous

*Authority*

The undersigned parties represent and warrant that the execution, delivery and performance of this Agreement has been duly authorized by each party and the individuals whose signatures appear below have the authority to execute and deliver this Agreement on behalf of the respective parties.

*Relationship*

The parties do not intent this Agreement or the relationship to constitute a joint venture or partnership of any kind. The parties agree that at all times, both parties are performing as independent contractors, and as such, each party shall be the sole employer of their employees. Under no circumstances shall one party's employees be construed to be employees of the other party, nor shall they have the authority to contract on behalf of or bind the other party.

*Warranties and Representation*

The parties hereto represent that they have read and understand the contents of this Agreement, that they have executed it voluntarily, that they have had ample opportunity to consult with legal counsel of their choosing, and that they have not been influence to do so by any person or persons acting on behalf of any party hereto. Each party has cooperated in the drafting and preparation of this Agreement and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to any interpretation of this Agreement.

*Waiver*

Any waiver by any party of any breach whatsoever, whether such waiver be direct or implied, shall not be construed as a continuing waiver of, or consent to, any subsequent breach of this Agreement on the part of the other party or parties. No failure to exercise any right under this Agreement or to insist on strict compliance by the other party shall constitute a waiver of the right in the future to exercise such right or to insist on strict compliance. No course of dealing or performance between the parties, nor any delay in exercising any right or remedies or otherwise, shall operate as a waiver of any of the rights or remedies of any party.

*Attorney's Fees*

If any legal action or any arbitration or other proceeding is brought or any action taken for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys fees and other costs incurred, including any and all damages incurred therefrom, in addition to any other relief to which they may be entitled.

*Counterparts*

This Agreement may be executed in counterparts and by facsimile signatures, each of which shall be deemed an original and together shall be considered one document. A facsimile shall be deemed an original for all purposes and shall have the same force and effect as an original document.

JTM 05470

### Choice of Governing Law

This Agreement shall be interpreted, construed and enforced according to, and governed by, the laws of the State of Utah. All parties agree that venue shall be proper in Washington County, State of Utah, and each party hereby consents to the jurisdiction of said court.

### Severability

In the event that any provision hereof is found invalid or unenforceable pursuant to judicial decree or decision, the remainder of this Agreement shall remain valid and enforceable according to its terms.

### Headings

The headings in this Agreement are for ready reference only and shall not be used to limit or expand the terms of this Agreement.

### Recitals

The recitals shall be a part of this Agreement and shall be incorporated herein by this reference.

### Binding Effect

This Agreement, and all the terms and provisions hereof, shall be binding upon and shall inure to the benefit of the parties hereto and their executors, administrators, heirs, successors, assigns, agents, attorneys and representatives. The parties represent and warrant that they have not assigned or otherwise transferred their interest pertaining to this Agreement to anyone.

### Entire Agreement

This Agreement constitutes the entire understanding between the parties and there are no representations, warranties, conditions, or agreements other than those expressly set forth herein. No other agreement, statement, promise, warranty or representation made by any party to this Agreement, or by any officer or agent of any party, that is not in writing and signed by all parties in this Agreement, shall be binding.

IN WITNESS WHEREOF, both parties hereby agree to the terms of this Service Agreement, and sign their names as of the day and year first above written.

WuYiSource

By: _Esse Willer_
Its: _CEO_

Iworks, Inc.

By: _Jerem Johnson_
Its: _President_

Marketing Agreement

Page 6 of 6

JTM 05471

# TRAFFIC GENERATION AGREEMENT

This Agreement is made this ___ day of May, 2008 by and between iworks, Inc.("iworks") and WuYiSource, Inc. ("WuYi"). iworks and WuYi shall collectively be referred to as the "Parties".

## RECITALS

WHEREAS, iworks hosts a variety of Grant sites, and

WHEREAS, iworks is in search of an entity that will generate traffic to the sites it hosts, and

WHEREAS, WuYi is in the business of generating traffic, while at the same time optimizing and testing variables for which the traffic is being driven, and

WHEREAS, iworks desires to have WuYi provide its services of generating traffic and optimizing and testing variables for the sites, and

WHEREAS both Parties desire to enter into a contractual relationship one with another .

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises, agreements and conditions stated herein, and with the above recitals incorporated herein, the Parties, intending to be legally bound hereby, agree to the following terms and conditions:

## SECTION ONE
### Proprietary Rights, Licence and Representations for the Hosting of Variant Grant Site Versions

iworks shall host variant versions of Grant programs on various sites.

All intellectual property rights or proprietary property and information, including but not limited to copyrights, trademarks, trade secrets, work product and patents supplied or developed by iworks or of any third party that has provided authorization to iworks to use the same shall be and remain the sole and exclusive property of iworks or that party ("Intellectual Property"). Upon termination of this Agreement, WuYi agrees to discontinue use, destroy and purge from their systems all Intellectual Property, including any and all confidential information as defined herein below.

iworks grants to WuYi, during the term of this Agreement, a non-exclusive licence to generate traffic to various Grant Sites ("Sites"). WuYi, or any third party used by WuYi, shall, in no event, change any of iworks' sites without prior written consent. WuYi, or any third party used by WuYi, shall not use iworks' Marks or Intellectual Property for any purpose or activity except as expressly authorized or specified herein. iworks may offer upsells to any of its programs.

Page 1 of 7

iworks represents and warrants that: (i) it is the sole owner of the Intellectual Property rights of the Sites and all materials related thereto, or has the authorization to use and market the same; and (ii); it has no knowledge of any infringements or conflicts with the asserted rights of others with respect to the Intellectual Property rights related to the Sites.

WuYi represents and warrants that: (i) it shall generate traffic from leads lawfully obtained and in a legal manner without any violation of a federal or state law, rule or regulation, including but not limited to the CAN SPAM ACT of 2003; (ii) it has not granted, sold, assigned, or transferred to any other person or entity any ownership interest in the leads that will be in competition to the Sites; and (iii) it has no knowledge of conflicts or legal issues with the leads used to generate traffic.

The parties agree that at all times during this Agreement and at all times thereafter, iworks shall retain all rights to its Sites and that once a lead is used and said lead purchases from the grant site, that customer becomes iworks' and the lead will not be exclusively owned by WuYi, but will transfer ownership to iworks.

## SECTION TWO
### Costs, Fees and Obligations

iworks shall pay WuYi on a CPA basis. For every valid CPA, iworks shall pay WuYi the initial cost of the CPA that WuYi expends for its publishers and affiliates. WuYi shall distribute said CPA payment to its publishers and affiliates and shall retain no monies for its own gain or profit in any form. iworks shall, in no event, pay for any CPA resulting from fraud as determined by iworks. Once the initial CPA (as provided above) is recouped by iworks along with fulfillment costs and five percent (5%) of merchant fees for every valid sale, the remaining revenue on the main reoccurring grant program and any upsell shall be split fifty/fifty (50/50) between WuYi and iworks.

Any monies paid to WuYi that have resulted in fraudulent activity, shall be returned to iworks, or in the alternative, may be offset by any future monies owed to WuYi. Any monies returned to customers for chargebacks, refunds or any other reason shall be split between WuYi and iworks; any returned monies may be offset by Iworks for monies owed to WuYi.

iworks shall pay the CPA seven days following (net 7) the previous Sunday thru Saturday. Payments shall be based on all valid sales amount minus any offsets, if any.

iworks shall perform its own processing, customer service and fulfillment for the Sites. WuYi shall be responsible for all costs relating to its services.

## SECTION THREE
### Term of Agreement

This Agreement shall be from month to month. Either party may cancel and terminate this Agreement upon thirty (30) day written notice. Upon termination of this Agreement, both parties shall return any and all confidential information to the respective party. Notwithstanding termination of this Agreement, those Sections that by their nature are meant to survive this Agreement, shall survive and shall nonetheless remain in effect and shall not be effected by said termination.

Marketing Agreement                                                              Page 2 of 7

JTM 05473

## SECTION FOUR
### Consideration and Damages

Both Parties fully understand that the other will rely on this Agreement as consideration for and in reliance on this Agreement and that compliance herewith is a crucial element of this Agreement and neither Party would agree hereto without full compliance hereof. Both Parties agree that in the event of any breach of this Agreement that the other's damages are irreparable and that the non-breaching Party shall be entitled to injunctive relief, in addition to such other and further relief as may be proper. In the event of breach of this Agreement, the breaching Party agrees to pay all costs of enforcement of said Agreement, including but not limited to reasonable attorney's fees. This Section shall in no way affect other remedies allowed by law or in equity.

## SECTION FIVE
### Liability

WuYi agrees to assume any and all liability related to its services, as well as the services provided by its publishers and affiliates in relation to this Agreement. iworks agrees to assume liability relating to its Sites, customer service, processing and fulfillment.

Any actual, out-of-pocket costs and/or fees charged to or paid by either party, or any of their affiliates, for costs related to responding to and/or managing allegations of the other party's services or Sites, or if said costs arise directly from errors in the services or Sites, or for violations of its own terms and conditions, said costs and/or fees shall be paid by the party providing the service or owning or managing the Sites.

In that WuYi may be revamping the sites and using its own services for the changes, such as graphic and programing teams, and iworks is concerned with the legality of certain activities, such as arranging graphic and text creatives and desire said changes to be in compliance with federal and state laws, rules and regulations, WuYi agrees that iworks shall, prior to mass level marketing, approve any and all of WuYi's marketing material including, but not limited to graphic and text creatives. Prior to approval by iworks, WuYi may test its changes for conversion results for a period not more than one (1) week. WuYi shall abide by all federal and state laws, rules and regulations, and shall be liable for any violations thereof.

Both Parties understand that compliance herewith is a crucial element of the agreement and neither Party would agree hereto without full compliance hereof. Both Parties agree that noncompliance herewith would create irreparable damages and that the non-breaching Party shall be entitled to injunctive relief, in addition to such other and further relief as may be proper, including damages. This Section shall in no way affect other remedies allowed by law or in equity.

WuYi shall indemnify, hold harmless and defend Iworks from and against any and all claims, losses, damages, demands, liabilities, and costs (including reasonable attorneys' fees) arising from or related to changes in any of its graphic and text creatives that have not been approved in writing by Iworks.

Traffic Generation Agreement

JTM 0547⌐

## SECTION SIX
### Non-Disclosure: Confidentiality

Confidential information shall include, but not be limited to information, whether disclosed in oral, electronic or written form that includes any information, technical data, or know-how, including that which relates to research, product plans, products, services, customers, customer lists (including buyer and non-buyer), markets, software, systems, developments, calendar of events, scripts, sales presentations, processes, marketing, artwork, designs, sales, web designs and sales, finances or financial conditions or any other information which the receiving party knows or should know to be confidential.

Each party hereto agrees to hold in confidence, and to use only in connection with performance of its obligations hereunder, all confidential or proprietary information of any other party which it receives or gains access to in connection with this Agreement including the terms of this Agreement and to use reasonable efforts to ensure such confidence by its employees with access to such information. Each party shall take reasonable security precautions, at least as great as precautions taken to protect its own confidential information and no less than industry standards.

Each party hereto shall not disclose confidential information to third parties, unless such disclosure is otherwise granted herein, other than i) to authorized agents whose purpose is to assist with compliance of this Agreement; or ii) as specifically required by law, but only after due process be provided, with the opportunity to dispute the legality of said request and only after the right to be heard has been provided and the appeals process exhausted. Each party and any agent thereof shall store in a secure area limited to selected personnel and, prior to discarding, shall destroy in a manner rendering data unreadable, all material containing any confidential information.

## SECTION SEVEN
### Return of Confidential Information

Upon expiration, termination or upon the disclosing party's request, the recipient shall cease any and all use of the confidential information and shall promptly return to the disclosing party all confidential information or other materials in the recipients possession or control and any and all copies thereof. The recipient shall also certify in writing to the disclosing party as to the destruction of any materials prepared by or on behalf of the recipient using or based upon the confidential information. The recipient shall immediately notify the disclosing party of any loss of or unauthorized copying, dissemination, use, exploiting or in any way disclosure of the confidential information.

## SECTION EIGHT
### Third Party Services

In the event a third party is used to perform any portion of this Agreement, the party seeking third party services is responsible for ensuring that a written agreement exists that contains terms and conditions not inconsistent with this Agreement, and which are substantially similar to and at least as stringent as those set forth in this Agreement. Either party may require the other to terminate the participation or use of services of any third party with or without cause.

Traffic Generation Agreement

JTM 05475

## SECTION NINE
### Indemnification

WuYi shall indemnify, hold harmless and defend iworks from and against any and all claims, losses, damages, demands, liabilities, and costs (including reasonable attorneys' fees) arising from or related to: (i) any breach of any representations, warranty, or covenant made by WuYi; (ii) any liability relating to its services; (iii) any claim, lawsuit or other liabilities arising from WuYi's conduct of its business; or (iv) any claim, lawsuit or other liabilities relating to WuYi's traffic generation methods, including any marketing to persons who have placed their names on a non-email list pursuant to the CAN-SPAM Act of 2003, or in violation of any federal or state telemarketing, direct mail, or any other laws, rules and regulations.

iworks shall indemnify, hold harmless and defend WuYi from and against any and all claims, losses, damages, demands, liabilities, and costs (including reasonable attorneys' fees) arising from or related to: (i) any breach of any representations, warranty, or covenant made by iworks; (ii) any liability relating to customer service, processing or fulfillment; (iii) any liability relating to its Sites; or (iv) any claim, lawsuit or other liabilities arising from iworks' conduct of its business.

## SECTION TEN
### Miscellaneous

*Authority*
The undersigned parties represent and warrant that the execution, delivery and performance of this Agreement has been duly authorized by each party and the individuals whose signatures appear below have the authority to execute and deliver this Agreement on behalf of the respective parties.

*Relationship*
The parties do not intent this Agreement or the relationship to constitute a joint venture or partnership of any kind. The parties agree that at all times, both parties are performing as independent contractors, and as such, each party shall be the sole employer of their employees. Under no circumstances shall one party's employees be construed to be employees of the other party, nor shall they have the authority to contract on behalf of or bind the other party.

*Warranties and Representation*
The parties hereto represent that they have read and understand the contents of this Agreement, that they have executed it voluntarily, that they have had ample opportunity to consult with legal counsel of their choosing, and that they have not been influence to do so by any person or persons acting on behalf of any party hereto. Each party has cooperated in the drafting and preparation of this Agreement and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to any interpretation of this Agreement.

*Waiver*
Any waiver by any party of any breach whatsoever, whether such waiver be direct or implied, shall not be construed as a continuing waiver of, or consent to, any subsequent breach of

JTM 0547

PI Exhibit 3 Page 00157

this Agreement on the part of the other party or parties. No failure to exercise any right under this Agreement or to insist on strict compliance by the other party shall constitute a waiver of the right in the future to exercise such right or to insist on strict compliance. No course of dealing or performance between the parties, nor any delay in exercising any right or remedies or otherwise, shall operate as a waiver of any of the rights or remedies of any party.

### Attorney's Fees

If any legal action or any arbitration or other proceeding is brought or any action taken for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys fees and other costs incurred, including any and all damages incurred therefrom, in addition to any other relief to which they may be entitled.

### Counterparts

This Agreement may be executed in counterparts and by facsimile signatures, each of which shall be deemed an original and together shall be considered one document. A facsimile shall be deemed an original for all purposes and shall have the same force and effect as an original document.

### Choice of Governing Law

This Agreement shall be interpreted, construed and enforced according to, and governed by, the laws of the State of Utah. All parties agree that venue shall be proper in Washington County, State of Utah, and each party hereby consents to the jurisdiction of said court.

### Severability

In the event that any provision hereof is found invalid or unenforceable pursuant to judicial decree or decision, the remainder of this Agreement shall remain valid and enforceable according to its terms.

### Headings

The headings in this Agreement are for ready reference only and shall not be used to limit or expand the terms of this Agreement.

### Recitals

The recitals shall be a part of this Agreement and shall be incorporated herein by this reference.

### Binding Effect

This Agreement, and all the terms and provisions hereof, shall be binding upon and shall inure to the benefit of the parties hereto and their executors, administrators, heirs, successors, assigns, agents, attorneys and representatives. The parties represent and warrant that they have not assigned or otherwise transferred their interest pertaining to this Agreement to anyone.

### Entire Agreement

This Agreement constitutes the entire understanding between the parties and there are no representations, warranties, conditions, or agreements other than those expressly set forth herein.

Traffic Generation Agreement

Page 6 of 7

JTM 05477

No other agreement, statement, promise, warranty or representation made by any party to this Agreement, or by any officer or agent of any party, that is not in writing and signed by all parties to this Agreement, shall be binding.

IN WITNESS WHEREOF, both parties hereby agree to the terms of this Traffic Generation Agreement, and sign their names as of the day and year first above written.

iworks, Inc.

By: Ryan Riddle
Its: General Manager

WuYiSource, Inc.

By: Jessica Miles
Its: CEO

Traffic Generation Agreement

Page 7 of 7

JTM 05478





249 E Tabernacle, Suite 200
St. George, UT 84770
(435) 688-0634 Fax: (435) 688-8834

# F A X

| | |
|---|---|
| **To:** Jesse Willms<br>**Fax Number:** 780-416-0218 | |
| **From:** Andriea Warren<br>**Fax Number:** 435-688-8834 | |
| **Date:** 5/27/2008 | |
| **Regarding:** Agreement | |
| **Pages including cover:** 8 | |

**Comments:**

**Confidentiality Notice:** The information contained in this facsimile message and the documents accompanying this facsimile are privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the United States Postal Service. We will gladly reimburse your expense in complying with this request.

JTM 05479

 **pulse360**

2390 NORTH FOREST ROAD
SUITE 10
GETZVILLE, NEW YORK 14068

PHONE: 716.636.2888
FAX: 716.636.6244

Date: 2/15/2008

Insertion Order Number: 88564542_002

| Campaign Information | | Invoicing Information | |
|---|---|---|---|
| Advertiser | E Direct Software | Billing Contact: | On File |
| Web Site URL: | wuyisource.com | Email Address: | |
| Additional URL's | | Address: | |
| | | City: | |
| Clients Master Account No. | 88564542 | State: | |
| Sub Account No. | TBD | Zip: | |
| Master Account Line of Credit | $ 250,000.00 | Phone: | |
| | | Fax: | |
| **Client Contact Information** | | **Pulse 360 Contact Information** | |
| Company/Agency: | E Direct Software | | |
| Client Contact: | | Name: | Joe Burton |
| Name: | Jesse Wilms | E-mail: | jonb@pulse360.com |
| E-mail: | id.jesse@yahoo.com | Phone: | 716-817-5085 |
| Phone: | id.jesse@yahoo.com | | |

This serves as an insertion order for: WuyiSource
to purchase Listings, as defined in the attached Sponsored Links Programs Terms & Conditions.

*** All Changes to this document must be in writing. Verbal changes will not be accepted or applied ***
***All changes to this Document will be executed within 24 hours excluding weekends and holidays***
***All changes and cancellations to this document must be forwarded to the attention of Linda Boyle at "lindab@seevast.com" or Fax to 716-636-6218

**Sub Account #:**

| Sub-Account Financial Settings | $$Amount, N/A, or Unlimited |
|---|---|
| **Please operate campaign with the following guidelines:** | |
| Unlimited Budget – No Spending Cap | $$Amount, N/A, or Unlimited |
| Daily Cap | $$Amount, N/A, or Unlimited |
| Monthly Spend Cap | $$Amount, N/A, or Unlimited |
| Total Campaign Spend over Flight (Do Not Exceed) | 72,100 |

Sub Account #: TBD

Flight Start Date: 2/19/2008

Flight End Date: 3/31/2008

| Auto-Scheduler Settings | Please Select Days | Time Periods (EST) |
|---|---|---|
| *Set Account Active On Those Days* | | |
| Monday | X | 12:00a-11:59p |
| Tuesday | X | 12:00a-11:59p |
| Wednesday | X | 12:00a-11:59p |
| Thursday | X | 12:00a-11:59p |
| Friday | X | 12:00a-11:59p |
| Saturday | X | 12:00a-11:59p |
| Sunday | X | 12:00a-11:59p |

**Notes/Special Instructions: CPM Weather**
* Single line listing (same as you have right now)
* Advertisers receives a min 515,000,000 impressions (evenly distributed among 1, 2, 3 spot) from Feb 19- March 31
* Floor of $.14 CPM
* Flat rate of $72,100.
* 2 week out clause

**CLIENT MUST SELECT ONE OPTION**

____Please check here if want Pulse 360 to Manage your account(s) only as described within this I.O.

____Please check here if you would like Pulse 360 to manage your account as Pulse 360 deems necessary. (Note: Client is still fully responsible for all charges regardless of results).

____Please check here if client wants to manage the account in full on their own. Pulse 360 will not make any changes.

JTM 05480

Client Approval

Jesse Willms

Print

CEO

Title

Feb 13/08

Date

Please fax or PDF signed insertion order to 716-636-6218 or "Lindab@seevast.com"

JTM 05481

| TRANSMISSION VERIFICATION REPORT |

TIME    : 02/15/2008 16:34
NAME    : EDIRECTSOFTWARE
FAX     : 7804160218
TEL     :
SER.# : 000E5J164261

| DATE,TIME | 02/15  16:34 |
| FAX NO./NAME | 17166366224 |
| DURATION | 00:00:30 |
| PAGE(S) | 03 |
| RESULT | OK |
| MODE | STANDARD |
|  | ECM |

JTM 05482

Jesse,

Here is the IO.  Please sign this and fax it back to me.  Also do you want us to just invoice you for this on your next invoice, or would you prefer to pay up front?

Yes

Please send me the ad that you want to run (it might not be a bad idea to rotate few of them through) and I will get you set up and ready to go.

Realistically this might not go live on Monday, but of course you will not be charged until the ads are actually live.

If you have any questions don't hesitate to ask.



**Joe Burton**

Senior Account Executive - Direct Sales

P: 716.817.5085

F: 716.636.6224

E: joeb@pulse360.com

**www.pulse360.com**

Read our blog

JTM 05483

Pl Exhibit 3 Page 00164

advaliant

## INSERTION ORDER FOR ADVERTISING

| Advertiser Name (Company): | | Phone #: | |
|---|---|---|---|
| Contact Name: | | Fax # | |
| Address: | | E-mail Address: | |
| City, State, Zip | | Web Address: | |
| Advertiser # (AdValiant Use) | | (AdValiant Use) Category | |

Campaign Description:

Advertising Deployment: (Y = Yes)

| Solo Emails Allowed | | Contextual Traffic Allowed | |
|---|---|---|---|
| Banners Allowed | | Incentivized Traffic Allowed | |
| Search Engine Placement Allowed | | International Traffic Allowed | |
| Co-reg Placement Allowed | | US Traffic Allowed | |

Lead Counts:

For ALL CAMPAIGNS, a lead or acquisition (a CPA or CPL) shall generally be accepted as any customer that proceeds through any of the various web links (URL's) as supplied by Company to AdValiant (a division of MediaTrust Inc.) and successfully completes and submits their information through the Company landing page which results in taking the User to a confirmation page in which the Advaliant tracking pixel is located. This offer is for gross acquisitions and there will be no Chargebacks. Company accepts Advaliant tracking pixel counts as being correct and billable.
Upon signing of this document, Company will provide AdValiant with access to Company's internal lead tracking system. Advaliant will work with Company to combat any potential fraudulent and/or non-commissionable activities. In the event that Advaliant at its sole discretion believes that such activity has taken place, with evidence supplied by Company within 7 days of such alleged activity, Advaliant will not bill Company for any commissions accrued by said contravening affiliate.

Duration of Campaign(s):
Campaign shall commence upon the signing date below and will continue until the required cancellation is received as per the terms and conditions.

Prepayment:
PREPAY: Company agrees to pay Advaliant Inc. upon acceptance of this agreement a prepay of $ 2,500, BY WIRE.

Payment Term(s):
Billing Cycle - Weekly ; Billing Terms - C-Net 15;
Payment Type - Wire

All payments are to be made payable to Advaliant Inc. If payment is to be made by wire, please send to:

Account Name: Advaliant, Inc.: Acct#: ▇▇▇▇▇ ABA/Routing#: ▇▇▇▇▇
Address: Citibank, 399 Park Ave, New York, NY, 10022

| Acct Coord: Email: | Sales Rep: Email: |
|---|---|
| Phone: | Phone: |
| Account Manager (Advaliant): Name: Jivan Manhas | Account Manager Company: Name: |

Please contact your account manager with regards to any questions pertaining to this Insertion Order. Faxes must be signed and faxed back to 888-239-3375 before a campaign can begin.
Opportunity ID.C06500000OCWdNW
Page 1 of 3

JTM 05484



By signing below, I the undersigned acting as an executive member or agent of Company understand and agree to be held by the terms as set-out in this Insertion Order

| AdValiant Inc. | Company |
|---|---|
| Signed: | Signed: |
| Printed Name:<br>Date: | Printed Name:<br>Date: |

Terms and Conditions for Advertising

- **Payment Terms:** AdValiant (a division of MediaTrust Inc.) shall provide an invoice to Company based on the terms set out on page 1 under section "Payment Terms". Any late payments will accrue interest equal to one percent (1%) per month, or the maximum amount allowable under law, whichever is less, compounded monthly. Outstanding payments not reached by AdValiant by the due date on the invoice will automatically cause the campaign to be placed on hold or redirected at AdValiant's sole discretion. Further, a pre-pay will be required to restart campaign. Any sales or lead activity already generated for the month in which the late payment occurred will also have to be settled in advance of the campaign's restart. Company will be charged $50.00 for payments by checks that are returned due to insufficient funds. AdValiant shall be entitled to recover all reasonable costs of collection (including agency fees, attorneys' fees, in-house counsel costs, expenses and costs) incurred in attempting to collect payment from Company. Company agrees that in the event a collection suit is commenced, in any proceeding for default judgment AdValiant may, in lieu of seeking statutory attorneys' fees, elect to recover one-third of the outstanding principal plus penalties as stipulated. Such an election is in AdValiant's sole discretion.

- **Company Representations.** Company will conduct its web advertising campaigns through AdValiant (a division of MediaTrust Inc.) using the highest industry standards which meet or surpass all local, State and Federal laws for advertising; inclusive of the Can-Spam Act of 2003. AdValiant makes no warranties with regards to reviewing such provided creative ahead of time and therefore cannot be held responsible if any portion may be deemed illegal. Company also warrants that it's website, or any website as provided for advertising through this agreement shall not contain, or contain links to, improper or illegal content. AdValiant reserves the right to reject any advertisement, IO, or URL link embodied within an advertisement at any time. Advertisements are accepted upon the representation that Company has the right to publish the contents of the advertisement, without infringing any rights of third parties. Company agrees to indemnify and hold AdValiant and AdValiant's web site affiliates harmless against any and all expenses and losses of any kind (including reasonable attorney's fees and costs) incurred by AdValiant or its web site affiliates in connection with any claim of any kind arising out of publication of the advertisement (including, without limitation, any claim of trademark or copyright infringement, libel defamation, breach of confidentiality, false or deceptive advertising or sales practices) and/or any material of Company's to which users can link through the advertisement. Company shall use best efforts to ensure that any such website they host and is used in generating leads in conjunction with this IO shall be able to withstand above average usage and shall remain functional under such circumstances. Company understands that in the event of a website failure, this could affect both the reputation and economic well-being of AdValiant and agrees ahead of time that a monetary remedy will be sought. Such remedy shall use average conversion rates which are calculated by comparing the number of clicks on an offer compared to the number of successful applications (leads) averaged over the last five (5) days (or less; whatever is most applicable) of the site's normal operation (e.g. # of leads / # of clicks = % or conversion rate); therefore if the average conversion rate is shown to be 2.5% and an affiliate of AdValiant has deemed to have contributed 1000 clicks to a campaign, Company accepts that such remedy will consist of paying for 25 leads even though none have actually been recorded. In the event of this occurrence, AdValiant shall reserve the right to remove or re-assign Company's campaign as they see fit until such time that the site load capacity issues have been resolved.

JTM 05485

Pl Exhibit 3 Page 00166



- **Limitation of Liability.** AdValiant's AD SPACES, SERVICES AND SOFTWARE ARE PROVIDED "AS IS" AND "AS AVAILABLE" AND AdValiant DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE AND IMPLED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. AdValiant shall not be liable for any of Companys or content providers whose content appear on AdValiant, nor the contents of any advertisements, web sites or web pages. In the event that AdValiant fails to display any advertisements in accordance with this IO (or in the event of any other failure, technical or otherwise), the sole liability of AdValiant to Company shall be limited to either a refund for the advertisement campaign or placement of "make-good" advertising during a reasonable time after. In no event shall AdValiant be responsible for any consequential, special, lost profits, or other damages arising from any failure to timely run the advertising in accordance with the IO. Without limiting the foregoing, AdValiant shall have no liability for any failure or delay resulting from conditions beyond AdValiant's control.

- **Suppression Files*:** Company accepts responsibility to manage their own suppression files on the Advaliant Network. A suppression link, password and username will be sent to you before each of your campaigns commence and it is the Company's sole responsibility to maintain their own lists. *As per Can-Spam, it is suggested that such updates are done at least every 5 days (weekends included) and by law, no later than at least once in a 10 day period.

- **Cancellations.** 72 hours written notice required prior to cancellation. Directly following the written notice, Company accepts that AdValiant will use best efforts to ensure that no more email drops or advertising placements are made. After the initial 72 hour notice and over the next 7 days, Company accepts that they must pay for and track all residual activity as normal. After the total 10 day period the campaign will be deemed to be completed and Company commitment to continue to pay for and track leads will have ceased.

- **Miscellaneous.** No conditions other than those set forth in the IO or these Standard Terms shall be binding on AdValiant unless expressly agreed to in writing by AdValiant. In the event of any inconsistency between the IO and the Standard Terms, the Standard Terms shall control. These Standard Terms, together with the IO, (i) shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts law; (ii) may be amended only by written agreement executed by an authorized representative of each party; and (iii) constitute the complete and entire expression of the agreement between the parties, and shall supersede any and all other agreements, whether written or oral, between the parties.

- **PR, Communiqué's, News Wires, Website Promotion.** In any instance in which the Company would like to make public any part of their business relationship with Advaliant, use the Advaliant name/trademark or those of any parent or sister company's, in their marketing, promotions, media kits, websites, news wires, press releases or any form of public announcement of any kind, Company understands that they must seek EXPRESS WRITTEN CONSENT from AdValiant. All requests should be sent to pr@advaliant.com as well as your account manager. In the absence of a reply, please speak to your Account Manager to expedite a response. AdValiant will use reasonable efforts to reply to all queries in a timely manner however under NO CIRCUMSTANCES will the absence of a response constitute the granting of a request. All requests received as per above will be considered but Advaliant reserves its right to decline such requests at its sole discretion.

** By signing below, I the undersigned acting as an executive member or agent of Company understand and agree to be held by the terms as set-out in the Standard Terms and Conditions**

| AdValiant Inc. | Company |
|---|---|
| Signed: | Signed: |
| Printed Name:<br>Date: | Printed Name:<br>Date: |

JTM 05486

P1 Exhibit 3 Page 00167

## CORPORATE SERVICES AGREEMENT

This Corporate Services Agreement ("**Agreement**") is made as of the _____ day of April, 2009, by and between 1021018 Alberta Ltd., a Canadian Company, and Jesse Willms, an individual, whose address is 11 Athabascan Ave. #240 Sherwood Park, Alberta, Canada T8A6H2 ("**Customer**") and Peter Graver, and individual whose address is 2184 Channing Way #322, Idaho Falls, ID 83406 ("**Service Provider**").

### Recitals

**WHEREAS,** Customer is a leading internet marketer, residing in Canada, and is in need of setting up a U.S. company for the purposes of merchant processing,

**WHEREAS,** Service Provider is a U.S. Citizen, in the business of providing corporate services to parties in need of establishing U.S. companies for various reasons,

**WHEREAS,** the parties desire to have Service Provider provide certain corporate services to Customer to comply with U.S. banking requirements in regards to merchant processing,

**WHEREAS,** the parties are willing to enter into this Agreement to define the terms and conditions that will govern their relationship in this regard.

### Agreement

**NOW THEREFORE,** in consideration of the mutual promises contained herein, the parties agree as follows:

**1.     Services.** Service Provider agrees to provide an array of corporate services for Customer including but not limited to the following: setting up U.S. companies for purposes of merchant processing, setting up U.S. bank accounts, participating in the management of said companies as directed by Customer, being the U.S. signatory on merchant applications, and any other service Customer deems necessary to successfully process credit cards in the U.S. Service provider agrees to fulfill these duties in a time manner not to exceed 48 hours. Service provider also agrees to give customer a 3 day notice if he expects to be unavailable for a time period of more than twenty four hours. This notification is to exclude family emergencies or any other unpredictable event.

**2.     Compensation.** In consideration of the Services provided by Service Provider hereunder, Customer agrees to pay Service Provider as follows: $5,000 dollars (five-thousand) a month, payable on the first of each month, with the first payment due upon execution of this agreement. The service provider will have no rights and or claims to any monies flowing through the U.S. Corporation.

1

PWG

JTM 05566

**3.    Term, and Termination.** This Agreement shall commence on the date this Agreement has been executed by both parties ("**Effective Date**") and continue on for one (1) years, unless terminated earlier by either party. This agreement shall automatically renew each year for an additional one year term, unless terminated by either party. Upon 30 (thirty) days written notice, either party may terminate this agreement with or without cause.

**4.    Indemnification.** It is the parties' express intention that in consideration for Service Provider's performance under this Agreement, Customer shall indemnify and hold Service Provider, his representatives, partners, joint venturers, agents and affiliates free and harmless from any and all claims, damages, or lawsuits (including reasonable attorneys' fees) arising out the services performed under this Agreement. It is further agreed that Customer will pay all costs and fees incurred by Service Provider in defending against such claims, damages, or lawsuits.

**5.    Taxes.** Customer shall be responsible for all excise, sales and use taxes, fees, assessments and other charges imposed by any federal, state or local government or agency resulting from tax liability attached to the sales conducted and/or sales revenues collected by any companies Service Provider sets up on behalf of Customer.

**6.    Default.** If either party fails to meet any obligation or duty hereunder or is in default hereunder, the non-defaulting party shall give written notice to the defaulting party, specifying such failure, breach, or default to the defaulting party. If the defaulting party fails to cure the breach or default within such 30 days, then the non-defaulting party may seek any and all remedies available under the laws of the State of Utah.

**7.    Miscellaneous.**

    (a)    **Entire Agreement.**    The parties acknowledge that this Agreement and any documents incorporated or referenced herein constitute the complete and exclusive statement of the agreement between the parties, which supersedes and merges prior proposals, negotiations, understandings and agreements, whether written or oral, between the parties relating to this Agreement. This Agreement may not be modified or altered except by written instrument duly executed by both parties.

    (b)    **Force Majeure.** Neither party shall be liable to the other party for any delay or failure to perform its obligations hereunder (except for payment obligations) due to causes beyond its reasonable control. Performance times shall be

2

PWG

considered extended for a period of time equivalent to the time lost because of any such delay.

(c) **Governing Law.** This Agreement and performance hereunder shall be governed by the laws of the State of Idaho, and the parties hereby consent to the exclusive jurisdiction of the courts of the State of Idaho.

(d) **Assignment.** Either party may assign this Agreement or its rights under this Agreement to any parent, subsidiary or affiliate, or to a third party acquiring all or substantially all of its membership interests or assets.

(e) **Survival.** All provisions of this Agreement relating to confidentiality and indemnity shall survive the termination of this Agreement.

(f) **Notice.** Any notice provided pursuant to this Agreement shall be in writing directed to the addresses referenced above, and shall be deemed given (i) if by hand-delivery, upon receipt thereof, (ii) if mailed, Three (3) days after deposit in the U.S. mails, postage prepaid, certified mail return receipt requested.

(g) **No Waiver.** The waiver or failure of either party to exercise any right in any respect provided for herein shall not be deemed a waiver of any further right hereunder.

(h) **Severability.** If any provision of this Agreement is invalid under any applicable statute or rule of law, it is to that extent deemed omitted, but shall not be deemed to affect the validity or enforceability of any other provision.

(i) **Attorneys' Fees.** In connection with any breach of the provisions of this Agreement by a party hereto, such party shall, in addition to other liability hereunder for such breach, also be liable to the other party for all reasonable attorneys' fees incurred in any way in connection with such breach, the pursuit of rights, remedies, damages, or other interests associated with or in connection with the breach. This includes such fees as are incurred in making demands, effectuating cures, recovering damages and in any dispute resolution forum, whether alternate dispute resolution, court proceedings (including at trial or upon appeal or in any insolvency or bankruptcy proceeding).

3

PWG

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the Effective Date.

1021018 ALBERTA LTD.

By: Jesse Willms
Title: President

PETER GRAVER

By: Peter Graver

4

JTM 05569

# NOVA

## Merchant Application

| Date: 11/02/2007 | Location # ___ of ___ | ☐ New Account | ☐ Add Location Existing MID: | ☐ Re-Enrollment | Member # | Relationship: |
|---|---|---|---|---|---|---|

### MERCHANT INFORMATION

| | |
|---|---|
| Legal or Corporate Name of Business: **1021018 Alberta Ltd** | Business #: **899883102** |
| D/B/A Name of Business: **WU-YI SOURCE** | Year Established: **2002**    Length of Current Ownership: **5** |
| Contact Name: **JESSE D WILLMS** | Mail Statements: ☒ Business Address   ☐ Corporate Address |
| D/B/A Business Address: **240 - 11 ATHABASCAN AVE.** | Store # |

| City: **SHERWOOD PARK** | Province: **AB** | Postal Code: **TBA 6H2** | Country: **CANADA** |
|---|---|---|---|

| Business Telephone ( ) **780.416.0211** | Business Fax: ( ) **780.416.0218** | Cell Telephone ( ) | Customer Service Telephone Number ( ) |
|---|---|---|---|

| E-Mail Address: **JD.JESSE@YAHOO.COM** | Website Address: **WWW.WU-YISOURCE.COM** | Customer Service Website Address (If any): |
|---|---|---|

### CORPORATE ADDRESS (IF DIFFERENT FROM D/B/A BUSINESS ADDRESS)

| Contact Name: | Corporate Telephone: ( ) |
|---|---|
| Corporate Address: | Corporate Fax: ( ) |

| City: | Province: | Postal Code: | Country: |
|---|---|---|---|

### BUSINESS TYPE

☐ Sole Proprietor   ☐ C Corporation - Public Company   ☐ C Corporation – Private Company   ☐ Sub S Corp.   ☒ Limited Liability Corporation   ☐ Govt. (Local/Province/Federal)
☐ General Partnership   ☐ Limited Partnership   ☐ Tax Exempt Organization (include Fed tax ID and documents that support Exempt Status)   ☐ Other (Trusts, etc)

### PRINCIPAL INFORMATION 1 (OWNER / PARTNER / OFFICER)

% of Ownership **100**

| First Name: **JESSE D** | MI: | Last Name: **WILLMS** | ☒ Owner   ☐ Partner   ☐ Officer ___ (Title) |
|---|---|---|---|
| Home Address: **527 - 52328 RR 233** | | | ☐ Other ___ (Please Specify) |
| City: **SHERWOOD PARK** | | | Email Address: **JD.JESSE@YAHOO.COM** |
| Home Telephone: ( ) | | Province: **AB** | Postal Code: **T8B 0A2** |
| Cell Telephone: ( ) **780.498.1624** | | DOB: | Social Insurance #: ~~█~~ |

### PRINCIPAL INFORMATION 2 (OWNER / PARTNER / OFFICER)

% of Ownership ___

| First Name: | MI: | Last Name: | ☐ Owner   ☐ Partner   ☐ Officer ___ (Title) |
|---|---|---|---|
| Home Address: | | | ☐ Other ___ (Please Specify)) |
| City: | | | Email Address: |
| Home Telephone: ( ) | | Province: **AB** | Postal Code: |
| Cell Telephone: ( ) | | DOB: | Social Insurance #: |

Have you or any of the owners/partners/officers of the company ever filed bankruptcy for business or personal bankruptcy? ☐ Yes ☒ No
If yes, please explain: 

Years experience in this industry: Years **5** Months **9**

Has this DBA Account ever accepted credit or debit cards previously? (under current ownership) ☒ Yes ☐ No
If yes, name of previous card acceptance processor: **PAYGEA**
If no and yes have been in business more than 3 months, please explain why you have never accepted credit cards 

Have you or any of the owners/partners/officers of the company ever been terminated or suspended by any card acceptance company? ☐ Yes ☒ No
If yes, please explain: 

Do you operate seasonally? ☐ Yes ☒ No
If yes, please check months closed: ☐ Jan ☐ Feb ☐ Mar ☐ Apr ☐ May ☐ June ☐ July ☐ Aug ☐ Sept ☐ Oct ☐ Nov ☐ Dec

### CARD ACCEPTANCE INFORMATION

*If more than 20% of sales accepted by a retail merchant are via Mail, Telephone or Internet, please complete a separate application package(s) for the MO/TO and Internet Sales.*

| Card Present (swiped) ___%   Card Present (not swiped) ___%   Mail Order ___%   Telephone Order ___%   Internet **100** % (totals must equal 100%) |
|---|
| MCC/SIC Code:   Description of products or services offered: **ECOMMERCE - HERBAL /DIET TEA** |

| Total Monthly Sales of Business: $ **84,000** | Total Monthly VISA/MC Sales: $ **75,000** | Average Sale Amount: $ **75** |
|---|---|---|

For Card Present transactions, when does the customer receive the product or service? ☒ Same Day   ☐ If not same day, ___ # of Days (include shipping timeframe)

For Mail/Telephone or Internet Transactions:
When does the customer receive the product or service? **1** # of Days (include shipping timeframe)
Do you use a fulfillment house or telemarketing company? ☐ Yes ☒ No If yes, please provide name of company, address and telephone. 

For Internet Transactions:
Product Web Site Address: **WWW.WU-YISOURCE.COM**   Does the website meet all internet requirements? ☐ Yes ☐ No   Is this web site secure? ☐ Yes ☐ No

### TERMS OF SERVICE #

Please Initial Here ✗ _~signature~_

JTM 05621

PI Exhibit 3 Page 00168



# Merchant Application

| Deposit Bank Name: | | Transit # | | DDA Account # | USD $ |
|---|---|---|---|---|---|
| Billing Bank Name (if different): | | Transit # | | DDA Account # | |

## VISA AND MASTERCARD ACCEPTANCE AND PRICING

**Card Acceptance** (please check each card you wish to accept):  ☒ Visa   ☒ MasterCard   ☐ Debit

**Pricing Category:**
☐ Retail / Restaurant

| ☐ TIERED | Qualified Rate | | Non-Qualified Rate | |
|---|---|---|---|---|
| | Rate | Per Item | Rate | Per Item |
| VISA Credit/Debit | 2.50 % | $ | % | $ |
| MasterCard Credit/Debit | 2.50 % | $ | % | $ |

☐ INTERCHANGE DIFFERENTIAL          ☐ INTERCHANGE AND ASSESSMENTS PLUS

| | ☐ Rate | ☐ Discount | Per Item |
|---|---|---|---|
| VISA Credit | | % | $ |
| VISA Debit | | % | $ |
| MasterCard Credit | | % | $ |
| MasterCard Debit | | % | $ |

## OTHER FEES

| Fee Type | Amount | Frequency |
|---|---|---|
| Application Fee | $ | Non-refundable |
| Account Maintenance | $ | Per Occurrence |
| Batch Settlement | $ 0.35 | Per Occurrence |
| Debit Setup | $ | One Time Fee |
| Statement Fee | $ | Per Month |
| Installation / Training | $ | One Time Fee |
| Internet | $ | Per Monthly |
| Chargeback Fee | $ 35.00 | Per Occurrence |
| Membership Fee | $ | |
| Minimum Discount | $ 20.00 | Per Month |
| Other _____ | $ | |
| Other _____ | $ | |
| Reprogramming Fee | $ | One Time Fee |
| Return Item Fee | $ 50.00 | Per Occurrence |
| Rush Shipment | $ | One Time Fee |
| Site Survey | $ | One Time Fee |
| Supplies | Direct Bill | Per Occurrence |

## AUTHORIZATION FEES

| Card/Product Type | Amount | Frequency |
|---|---|---|
| VISA | $ 0.35 | Per Authorization |
| MasterCard | $ 0.35 | Per Authorization |
| AMEX - | $ 0.35 | Per Authorization |
| DSCV - 60110 | $ | Per Authorization |
| JCB - | $ | Per Authorization |
| Internet Debit | $ | Per Authorization |
| Voice with AVS | $ | Per Authorization |

| Equipment / Product Description | Item Code | Setup Fee | Monthly Fee | Per Item Fee | Qty | Merchant Owns | Rental * | Exchange ** | Purchase | New / Used | Price | Total Amount Due (Purchase Only) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vertual Merchant | | | 25 | | | ☐ | ☐ | ☐ | ☐ | | $ 199 | $ 199 |
| | | | | | | ☐ | ☐ | ☐ | ☐ | | $ | $ |
| | | | | | | ☐ | ☐ | ☐ | ☐ | | $ | $ |
| | | | | | | ☐ | ☐ | ☐ | ☐ | | $ | $ |

* Rental Agreement if applicable
** Exchange. Equipment to be picked up: _____  Serial Number: _____

Total Due (excluding applicable sales tax)  $ 199

X Please Initial Here _____

JTM 05622



## MERCHANT APPLICATION

Merchant Representations and Certifications. By signing below, the applicant merchant ("Merchant") and its representative(s) represent and warrant to CanadaConex Company, doing business as NOVA Information Systems Canada ("NOVA"), U. S. Bank National Association Canada branch ("VISA Member"), if we provide VISA services to you, and GE Consumer Finance Canada ("MasterCard Member"), if we provide MasterCard services to you, (VISA Member and MasterCard Member shall each be referred to as a "Member", collectively the "Members", and NOVA and the Members shall be collectively referred to as "we", "our" or "us") that (i) all information provided in this merchant application ("Merchant Application") is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant; and (ii) the persons signing this Merchant Application are duly authorized to bind Merchant to all provisions of this Merchant Application and the Agreement. The signature by an authorized representative of Merchant on the Merchant Application, or the transmission of Transaction Receipt or other evidence of a Transaction to us, shall show that the Merchant has read, understood, accepted and agreed to the terms and conditions contained in the Agreement, including, without limitation, this Merchant Application and Terms of Service ("TOS"). If Merchant has not been provided with copies of the TOS and Merchant Operating Guide when signing the Merchant Application or does not receive the TOS and the Merchant Operating Guide in its welcome kit or with its POS Device shipment, then please contact our merchant customer service centre at 1-866-310-3345. Notwithstanding any such non-receipt, Merchant agrees that it is bound by the terms and conditions in the Agreement. Merchant agrees to comply with the Agreement and all applicable laws, rules, and regulations including the rules and regulations of the Payment Networks, and understands that failure to comply will result in termination of processing services. Capitalized terms shall, unless otherwise defined in this Merchant Application, have the same meaning ascribed to them in the TOS.

Merchant agrees to establish and maintain sufficient funds in a designated bank account to accommodate all transactions including, but not limited to, Chargebacks, returns, adjustments, fees, fines, penalties and any other payments due under the Agreement. In addition to the fees set forth in the Merchant Application, you will pay NOVA at the then current rates for account maintenance (e.g., dda/dba changes), special processing, retraining, equipment swaps and research including, but not limited to, research required to respond to any third party or government subpoena, levy or garnishment on your account. Merchant authorizes us to credit/debit such account as necessary to effect all such payments, agrees that all such debits are pre-authorized debits for business purposes as defined under Rule H1 of the Canadian Payments Association Rules and agrees to hereby waive the right to receive advance notice from us of any and all debits made by us from such account or any other account maintained by Merchant at any financial institution.

Merchant understands that we may take any or all of the following actions if considered necessary by us to protect ourselves from financial loss: establish, or require Merchant to establish, a reserve account; impose a processing limit or cap on the dollar amount of sales transactions that we will process for Merchant, which may be changed from time to time with or without notice to Merchant; establish holdback periods on payments to be made to Merchant; and/or suspend the processing of sales drafts for as long as necessary to investigate suspicious, unusual or excessive deposit or transaction activity.

Merchant must obtain an Authorization Code via POS Device, electronic terminal or similar device before completing any transaction. Merchant understands that an AUTHORIZATION CODE IS NOT A GUARANTEE OF ACCEPTANCE OR PAYMENT OF A TRANSACTION. RECEIPT OF AN AUTHORIZATION CODE DOES NOT MEAN THAT MERCHANT WILL NOT RECEIVE A CHARGEBACK FOR THAT TRANSACTION.

JTM 05623



If Merchant terminates the Agreement prior to the end of the initial term of the Agreement, as set forth in the TOS, Merchant will immediately pay NOVA, as liquidated damages, an early termination fee equal to $195, in addition to all other amounts owed. If Merchant terminates an equipment rental prior to the end of the contract term, Merchant will immediately pay NOVA, as liquidated damages, an early termination fee equal to the difference between the rental fees paid to date and the total rental fees for the contract term. Merchant agrees that these early termination fees are not a penalty, but rather are a reasonable pre-estimate of damages in light of the financial harm caused to us by such early termination. NOVA will use best efforts to debit the Merchant's account in the amount of the applicable termination fee within sixty (60) days of receipt of Merchant's written notice of termination of the Agreement.

Merchant, its representative(s) and each person whose information is on this Merchant Application authorizes us prior to our acceptance of this Merchant Application and from time to time thereafter, to (i) investigate the individual and business history and background of Merchant, each such representative, each such person and any other officers, partners, proprietors, and/or owners of Merchant (collectively, the "Merchant Parties"); (ii) obtain credit reports, financial information or other background investigation reports on each of the Merchant Parties from our affiliates, credit agencies, other financial institutions and references provided by the Merchant Parties that we consider necessary to review the acceptance and continuation of this Merchant Application; (iii) use any personal information provided by the Merchant Parties in this Merchant Application or otherwise or obtained by us under any other provision of this paragraph to respond to any further application for our services; (iv) facilitate the provision of our services by sharing such personal information and the results of our enquiries or investigations with our third party service providers, credit and debit card issuers, credit and debit card associations, credit agencies and similar parties; (v) use such personal information to investigate potentially fraudulent or questionable activities regarding the Merchant's account(s) or the use of our services; (vi) use such personal information for reporting purposes under credit or debit card association rules or regulations and to debit and credit card issuers, financial institutions or other credit or debit card related entities; (vii) use such personal information to offer products and services to the Merchant Parties that might be beneficial; (viii) use or disclose such personal information in the course of any actual or potential sale, reorganization, amalgamation or other change to our business; and (ix) collect, use and disclose such personal information when required or permitted by law. The Merchant Parties also authorize any person or credit reporting agency to compile information to answer credit inquiries made by us and to furnish that information to us.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the Canadian government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions and money services business to obtain, verify, and record information that identifies each person who opens an account. This means this we will ask for certain information and identifying documents to allow us to identify any or all of the Merchant Parties.

This Merchant Application may be signed in one or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same Merchant Application. Delivery of executed counterparts of this Merchant Application may be accomplished by a facsimile transmission, and a signed facsimile or copy of this Merchant Application shall constitute a signed original.

## WU-YI SOURCE

Merchant DBA Name

| Signature | JESSE D WILLMS | 11/02/2007 |
|---|---|---|
| Signature | Printed Name & Title | Date |
| | | 11/02/2007 |
| Signature | Printed Name & Title | Date |

JTM 05624



**Organizational Resolution:**

I certify that I hold the office indicated below and am the keeper of the records of the Merchant, that the Merchant is organized and existing under the laws of the jurisdiction indicated below and that the following is a correct copy of certain resolutions adopted at a meeting of the board of directors/general partnership/partners/manager or members of the Merchant, as appropriate, in accordance with the by-laws or other governing document of the Merchant held on the _____ day of **11/02/2007** (month), _____ (year):

1. Resolved, that any one of the following officers of the organization:

Name (print)                    Signature                    Title

**JESSE D WILLMS**          X ~~~~~~~~~~          OWNER/ PRESIDENT

is authorized to:

A) execute on behalf of this organization a Merchant Application with NOVA and any agreements or other necessary documents including any amendments thereto;

B) execute any document requested from time to time be executed in furtherance of the Merchant Application or relationship resulting therefrom;

C) perform all acts that may be necessary to carry out the intent of the Merchant Application and this resolution.

2. Resolved, that the Merchant Application and the resulting relationship with NOVA is ratified and approved;

3. Resolved, that all entities or organizations receiving this Merchant Application are authorized to rely upon this resolution until advised in writing by a like certification of any changes and are authorized to rely on such changed certification.

Secretary/Officer/Director/Member (ULC)/Managing Partner/General Partner/Owner [circle one]:

X ~~~~~~~~~~
Signature          Printed Name & Title   Date   Jurisdiction in which Merchant is organized
                   OWNER/PRESIDENT   NOVEMBER 8, 2007

**Submitted By:**

To the best of my knowledge, I certify that the information provided in this Merchant Application was provided by the Merchant and is true, complete and accurate. I further certify that the signatures were provided by the Merchant's owner(s) or officer(s), as appropriate.

_____          **16731**        **11/02/2007**
Sales Representative Signature   Printed Name    Rep ID #       Date

**FOR OFFICE USE ONLY:**

Accepted by NOVA _____ on behalf of itself and each Member, as applicable.

JTM 05625

To Whom It May Concern:

**COLLECTIVEPOS**
*Helping your business become more profitable*

## RE: VOID CHEQUE VERIFICATION

Our mutual client has applied to Collective Point of Sale Solutions Ltd. for their merchant services. In order to proceed, we require confirmation of their banking details. Please sign and stamp this form where indicated (both are required) to confirm that: a) the bank account referenced below in the attached cheque is active; and b) belongs to the business also referenced below. Once completed, please return it to us by fax at 1-888-297-7607. We thank you in advance for your prompt attention to this matter.

Bank Representative: _____

Telephone #: _____

Signature: _____

| BANK STAMP |
| --- |
| |



I hereby authorize my bank (referenced above in the attached cheque) to confirm to Collective Point of Sale Solutions Ltd. that: a) the above cheque is linked to an active bank account; and b) belongs to:

Legal Name: **1021018 Alberta Ltd**

DBA Name: **WU-YI SOURCE**

Signing Officer (print): **JESSE D WILLMS**

Signature: _____

## WHEN COMPLETED, PLEASE FAX THIS FORM TO 1-888-297-7607

JTM 05626

To Whom It May Concern:



## RE: VOID CHEQUE VERIFICATION

Our mutual client has applied to Collective Point of Sale Solutions Ltd. for their merchant services. In order to proceed, we require confirmation of their banking details. Please sign and stamp this form where indicated (both are required) to confirm that: a) the bank account referenced below in the attached cheque is active; and b) belongs to the business also referenced below. Once completed, please return it to us by fax at 1-888-297-7607. We thank you in advance for your prompt attention to this matter.

Bank Representative: _____

Telephone #: _____

Signature: _____

**BANK STAMP**

**ATTACH VOID CHEQUE HERE**

I hereby authorize my bank (referenced above in the attached cheque) to confirm to Collective Point of Sale Solutions Ltd. that: a) the above cheque is linked to an active bank account; and b) belongs to:

Legal Name: **1021018 Alberta ~~Inc~~** *LTD.*

DBA Name: **WU-YI SOURCE**

Signing Officer (print): ~~240 - 11 ATHABASCAN AVE~~ JESSE D. WILLMS

Signature: ✕ _____

## WHEN COMPLETED, PLEASE FAX THIS FORM TO 1-888-297-7607

JTM 05627



# Merchant Application

NOVA

| Date: 11/02/2007 | Location # of | ☒ New Account | ☐ Add Location Existing MIDs: | ☐ Re-Enrollment | Member # | Relationship: |

## MERCHANT INFORMATION

Legal or Corporate Name of Business: **1021018 Alberta Inc** *LTP.*

Business #:

D/B/A Name of Business: **WU-YI SOURCE**

Year Established **2002** | Length of Current Ownership **5**

Contact Name: **240 - 11 ATHABASCAN AVE**

Mail Statements ☒ Business Address ☐ Corporate Address

D/B/A Business Address: **240 - 11 ATHABASCAN AVE**

Store #:

City: **SHERWOOD PARK** | Province: **AB** | Postal Code: **T8A 6H2** | Country: **CANADA**

Business Telephone: ( ) **780.416.0211** | Business Fax: ( ) **780.416.0218** | Cell Telephone: ( ) | Customer Service Telephone Number: ( )

E-Mail Address: **JD.JESSE@YAHOO.COM** | Website Address: **WWW.WU-YISOURCE.COM** | Customer Service Website Address (if any):

## CORPORATE ADDRESS (IF DIFFERENT FROM D/B/A BUSINESS ADDRESS)

Contact Name: | Corporate Telephone: ( )

Corporate Address: | Corporate Fax: ( )

City: | Province: | Postal Code: | Country:

## BUSINESS TYPE

☐ Sole Proprietor  ☒ C Corporation - Public Company  ☐ C Corporation - Private Company  ☐ Sub S Corp.  ☐ Limited Liability Corporation  ☐ Govt. (Local/Province/Federal)
☐ General Partnership  ☐ Limited Partnership  ☐ Tax Exempt Organization (include Fed tax ID and documents that support Exempt Status)  ☐ Other (Trusts, etc)

## PRINCIPAL INFORMATION 1 (OWNER / PARTNER / OFFICER)

First Name: **JESSE D** | MI: | Last Name: **WILLMS**

% of Ownership **100**

☒ Owner  ☐ Partner  ☐ Officer _____ (Title)
☐ Other _____ (Please Specify)

Home Address: **527 - 52328 RR 233**

Email Address: **JD.JESSE@YAHOO.COM**

City: **SHERWOOD PARK**

Province: **AB** | Postal Code: **T8B 0A2**

Home Telephone: ( ) **780.498.1624**
Cell Telephone: ( )

DOB: | Social Insurance #: ▓▓▓▓▓

## PRINCIPAL INFORMATION 2 (OWNER / PARTNER / OFFICER)

First Name: | MI: | Last Name:

% of Ownership

☐ Owner  ☐ Partner  ☐ Officer _____ (Title)
☐ Other _____ (Please Specify))

Home Address: | Email Address:

City: | Province: **ON** | Postal Code:

Home Telephone: ( )
Cell Telephone: ( )

DOB: | Social Insurance #:

Have you or any of the owners/partners/officers of the company ever filed bankruptcy for business or personal bankruptcy? | ☐ Yes  ☒ No
If yes, please explain:

Years experience in this industry: Years **5** Months **9**

Has this DBA Account ever accepted credit or debit cards previously? (under current ownership) | ☒ Yes  ☐ No
If yes, name of previous card acceptance processor: **PAYGEA**

If so and you have been in business more than 3 months, please explain why you have never accepted credit cards

Have you or any of the owners/partners/officers of the company ever been terminated or suspended by any card acceptance company? | ☐ Yes  ☒ No
If yes, please explain

Do you operate seasonally? ☐ Yes  ☒ No
If yes, please check months closed: ☐ Jan ☐ Feb ☐ Mar ☐ Apr ☐ May ☐ June ☐ July ☐ Aug ☐ Sept ☐ Oct ☐ Nov ☐ Dec

## CARD ACCEPTANCE INFORMATION

If more than 20% of sales accepted by a retail merchant are via Mail Telephone or Internet, please complete a separate application (red reprint) for the MO/TO and Internet Sales

Card Present (swiped) _____ %  Card Present (not swiped) _____ %  Mail Order _____ %  Telephone Order _____ %  Internet **100** % (totals must equal 100%)

MCC/SIC Code: | Description of products or services offered: **ECOMMERCE - HERBAL /DIET TEA**

Total Monthly Sales of Business: $ **84,000** | Total Monthly VISA/MC Sales: $ **75,000** | Average Sale Amount: $ **75**

For Card Present transactions, when does the customer receive the product or service? ☒ Same Day  ☐ If not same day, **1** # of Days (include shipping timeframe)

For Mail/Telephone or Internet Transactions:

When does the customer receive the product or service? _____ **1** # of Days (include shipping timeframe)

Do you use a fulfillment house or telemarketing company? ☐ Yes  ☒ No  If yes, please provide name of company, address and telephone.

For Internet Transactions:

Product Web Site Address: **WWW.WU-YISOURCE.COM**  Does the website meet all internet requirements? ☐ Yes ☐ No  Is this web site secure? ☐ Yes ☐ No

## TERMS OF SERVICE #

Please initial Here _____

JTM 05628


CERIDIAN
CERIDIAN CANADA LTD.
("Ceridian")

**SERVICE AGREEMENT**

| CLIENT INFORMATION | | | | |
|---|---|---|---|---|
| Client Name | | | | |
| Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd. | | | | (the "Client") |
| Full Legal Name (if different than above) | | | | |
| Street Address | | City | Province | Postal Code |
| 85 Cranford Way, Suite 204 | | Sherwood Park | AB | T8H0H9 |
| Type of Business | | | Length of Time in Business (Years) | |
| ecommerce | | | 5+ | |
| Corporation ☒   Partnership ☐   Sole Proprietorship ☐ | | Language Preference: English ☒   French ☐ | | |
| PRIMARY CONTACT FOR AGREEMENT | | | | |
| Name | | E-mail address | | |
| Phyllis Plester | | plester@shaw.ca | | |
| Phone No. | | Fax No. | | |
| 780-416-0211 | | | | |

**1.    Definitions and Interpretation.** As used in the Agreement:

1.1    "*Agreement*" means this agreement, and all Schedules and Exhibits hereto;

1.2    "*Business Day*" means any day of the year other than a Saturday, Sunday or a Statutory or civic holiday in: (i) the provinces of Ontario, Canada or the province in Canada of the Client's registered head office;

1.3    "*Canadian CPI*" means the "All-items Consumer Price Index" (not seasonally adjusted) for Canada, based on percentage increase and net index points, published by Statistics Canada or any successor government agency;

1.4    "*Ceridian Contractor*" means any person who is not a Party or an employee of Ceridian, who Ceridian contracts or otherwise engages to assist with or perform any part of the Services;

1.5    "*Ceridian Property*" means, collectively: (i) any and all systems, hardware, software, networks, online content, applications, source codes, specifications, templates, modules, devices, equipment, documentations or other property owned, licensed, leased, produced, designed, created or used by Ceridian as of the Effective Date or thereafter, whether for purposes of providing the Services pursuant to the Agreement or for any other purpose; (ii) all Confidential Information of Ceridian; (iii) all Materials; and (iv) any and all Intellectual Property in any of the foregoing or related thereto;

1.6    "*Client Data*" means any data and Intellectual Property of the Client supplied by or on behalf of the Client hereunder, or any such data or Intellectual Property created as a result of the processing of such data;

1.7    "*Confidential Information*" means any information identified by either Party as "Confidential" and/or "Proprietary", or which, under the circumstances, ought to be treated as confidential or proprietary, including non-public information related to the disclosing Party's business, employees, service methods, software, documentation, financial information, prices and product plans;

1.8    "*Effective Date*" has the meaning set forth in Section 3.1;

1.9    "*Fees*" means the fees payable by the Client to Ceridian for the Services, as contemplated in Section 4 below, and/or any corresponding Pricing Schedule;

1.10    "*Intellectual Property*" means all intellectual property rights (including all copyrights, patents, trademarks, trade secrets, industrial designs and know how) and all applications, continuations, extensions, notices, licenses, sublicenses, agreements and registrations thereof in any jurisdiction;

1.11    "*Licensed Property*" means such Ceridian Property and Third Party IP as may be required for use directly by the Client for the sole purpose of allowing the Client to receive and use the Services internally, including all computer software and databases supplied by Ceridian to the Client, and the Intellectual Property embodied therein, together with all related application modules, applicable customer implementation and production tool sets and related application support tool sets, all replacements for each of the foregoing, and all modifications, updates, addition or enhancements to such software) and associated user documentation for each of the foregoing;

1.12    "*Materials*" means all materials, including forms (including data collection forms provided by Ceridian), brochures, tip sheets, posters, and online content furnished by Ceridian to the Client, and any derivatives thereof;

1.13    "*Parties*" means collectively the Client and Ceridian, and each is a "Party";

1.14    "*Personal Information*" means information about an identifiable individual and which constitutes information governed by any applicable privacy or data protection law, statute or regulation;

1.15    "*Pricing Schedule*" means the Exhibit A attached hereto (or attached to a Service Exhibit, if the Service Exhibit is executed subsequent to this Agreement and deemed an amendment hereto, as the case may be) setting forth the applicable prices and fees to be paid by the Client in respect of one or more Services;

1.16    "*Service Exhibit(s)*" means the exhibit(s) attached hereto (or executed subsequent to this Agreement and deemed an amendment hereto, as the case may be) describing the Service(s) to be delivered by Ceridian or Ceridian Contractors) to the Client within Canada;

1.17    "*Services*" means, collectively, the services and any Materials, Licensed Property and/or other deliverables to be supplied with the services provided by Ceridian to the Client under this Agreement, as such services are more particularly described in a Service Exhibit, and each is a "Service";

1.18    "*Service Start Date*" means, in respect of a Service, the actual date on which Ceridian commenced providing such Service. The anticipated Service Start Date will be identified in the applicable Service Exhibit or Pricing Schedule, and the Parties shall confirm in writing the actual Service Start Date for each Service when known;

1.19    "*Taxes*" means all sales taxes, value added taxes, goods and services taxes, business transfer taxes, withholding taxes or any other taxes now or hereafter levied or imposed by any governmental authority by reason of or with respect to the provision of the Services to the Client, but, for certainty excluding Ceridian's taxes for income derived under the Agreement;

1.20    "*Third Party IP*" means Intellectual Property expressly identified as property licensed by a third party rather than by Ceridian; and

1.21    "*Third Party License Terms*" means written terms by which a third party licenses the use of the Third Party IP to the Client.

The terms "*including*" and "*includes*" shall, wherever they appear in this Agreement, be deemed to be followed by the statement "without limitation", and neither of such terms shall be construed to limit any words or statement which it follows to the specific or similar items or matters immediately following it.

**2.    Services:**

2.1    Ceridian shall provide the Service(s) to the Client, in Canada, as more particularly set forth in the Service Exhibit(s). Each Service shall be provided on and subject to the terms and conditions of this Agreement.    The Client acknowledges and agrees that certain Services or parts thereof may be subcontracted by Ceridian to Ceridian Contractors.    However, regardless of any such subcontract, Ceridian shall remain solely liable for all of its obligations hereunder, and shall require all of its Ceridian Subcontractors to comply with all applicable provisions of the Agreement, including complying with the obligations relating to Confidential Information and Personal Information as set forth in Sections 5.   All Services are provided to the Client on the strict condition that they are used for the Client's own internal business use and not for re-sale by the Client or for any use by the Client that would constitute providing a service for third parties.

2.2    Some Services include transmission of instructions and other data to third parties who are not subcontractors of Ceridian. In all such cases, the scope of the Services does not include the processing of those instructions by the relevant third party. Accordingly, Ceridian does not accept responsibility for the execution of such instructions or the performance by any third party in connection with but outside the scope of this Agreement (including the transmission of data through third party service providers), and Ceridian shall not be responsible for the

Service Agreement (SBS) v1.1 (Mar1-08)

Page 1 of 3

JTM 05633

consequences if such third parties are unable to receive, transmit or execute data, howsoever arising. For the avoidance of doubt, nothing in this Section 2.2 shall excuse Ceridian's liability for such failures caused by errors or omissions of Ceridian or a Ceridian Contractor.

2.3 Ceridian will use all reasonable efforts to supply the Services in conformance with the dates and times set forth in the Service Exhibit, including the Service Start Date. However, except for any dates which are expressly identified in the Service Exhibit as critical (by way of example only, payroll processing dates), the Parties acknowledge and agree that all dates and times for performance of any obligations in the Service Exhibits have been estimated in good faith, and the Client shall not be entitled to any compensation (and for certainty, in no event shall Ceridian be liable, whether in tort, contract or otherwise, to the Client) for any damage or loss whatsoever resulting from a failure to meet such estimated time frames. Without limiting the generality of the foregoing, but for the avoidance of doubt, if the Service is not available by the Service Start Date, any fixed term of a Service shall not commence until the actual Service Start Date.

2.4 In the event of any conflict between the terms set forth in the main body of this Agreement applicable to all Services, and the terms applicable to only one or more particular Service(s) as set forth in any Service Exhibit and/or Pricing Schedule, the terms of the Service Exhibit and/or Pricing Schedule shall govern.

2.5 For each Service, the Client will appoint one or more individuals to act as its Service Contact, who will serve as the Client's authorized representative for all matters generally in relation to that Service. Ceridian may (if it considers reasonable in the circumstances), but shall not be obliged to, communicate with, provide information to, accept instructions from, or otherwise deal with, any person acting on behalf of the Client in relation to a Service, in addition to such authorized representatives. The Client may at any time change (be individual(s) serving as its authorized representative, by notifying Ceridian in writing of such change, and an authorized representative may delegate (by written notice to Ceridian) some or all of his responsibilities as authorized representative to one or more individuals.

2.6 Any work or services provided by Ceridian to the Client (at the Client's request and/or consent) which are not specifically identified in a Service Exhibit will be provided subject to the terms and conditions of this Agreement, and at Ceridian's then current price for such additional work or services.

3. Term and Termination:

3.1. This Agreement will become effective when signed by the Client and by Ceridian (the "Effective Date"), and shall continue until terminated as follows:

3.1.1. upon 90 days' prior written notice served by either Party;

3.1.2. immediately by Ceridian without further notice to the Client, if the Client fails to pay any Fees when due, and such failure continues for a period of 7 Business Days after Ceridian provides the Client with written notice of such breach;

3.1.3. by either Party if the other Party fails to perform, or is otherwise in default of, any one or more of its material obligations under this Agreement (except failure by the Client to pay Fees, when the provisions of subsection 3.1.2shall prevail), and fails to remedy such failure within 30 days after receiving written notice of default from the non-defaulting Party specifying the particulars of the breach and expressly referring to the threat of termination under this Section 3.1.3, or if such breach is of a nature that it cannot be reasonably remedied within such 30-day period, then if the Party fails to commence to remedy such breach within such 30-day period or thereafter fails to proceed diligently to remedy such breach; or

3.1.4. immediately by either Party if the other Party is, or is deemed for the purposes if any law to be, unable to pay its debts as they fall due or insolvent, or any corporate action, legal proceedings or other procedure or step is taken against the Client in relation to or with a view to winding-up, dissolution, administration (whether out of court or otherwise), reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise, or the appointment of a liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator or similar officer (in each case, whether out of court or otherwise) in respect of the Client or any of its assets, or any analogous procedure or step is taken in any jurisdiction.

4. Fees and Payments:

4.1. The Client will pay the Fees plus all applicable Taxes, in the amounts and in accordance with the payment terms and processes set forth in the Service Exhibits and/or Pricing Schedule. Unless otherwise stated in a Service Exhibit, the Fees shall not be increased in the 12 month period following the Effective Date, and thereafter may be increased by Ceridian no more than once in any 12 month period. All Fees and other amounts payable hereunder are quoted and payable in Canadian currency.

4.2. The Client shall, in addition to all Fees, reimburse Ceridian for all reasonable expenses (if any) in accordance with Ceridian's then current expense policy incurred in connection with the implementation and provision of the Services, including travel, accommodation and meals.

4.3. Ceridian may charge a late payment fee in the amount of 1 1/2% per month for late payments made by the Client. The Client agrees to pay late payment fees including all costs of collection (including reasonable legal fees and expenses). If the Client fails to comply with any of the terms or payment for more than 7 Business Days after receipt of a written demand for payment, Ceridian may, in addition to any other right available to it, suspend performance of all or any part of its Services.

5. Confidentiality and Privacy:

5.1. Neither Party shall disclose Confidential Information of the other Party. The receiving Party shall use the same degree of care as it uses to protect its own Confidential Information of like nature, but no less than a reasonable degree of care, to maintain in confidence the Confidential Information of the disclosing Party. The foregoing obligations shall not apply to any information that (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than the receiving Party; (ii) is subsequently learned from a third party that does not impose an obligation of confidentiality on the receiving Party; (iii) was known to the receiving Party at the time of disclosure; (iv) was generated independently by the receiving Party; or (v) is required to be disclosed by law, subpoena or other legal process. Ceridian may transfer the Client's Confidential Information to a governmental agency or other third party to the extent necessary for Ceridian to perform its obligations under this Agreement or if the Client has given Ceridian written authorization to do so.

5.2. Ceridian and the Client each hereby represent that they have taken all commercially reasonable steps to ensure that they will at all times be in compliance with all applicable laws relating to privacy and the collection, use and disclosure of Personal Information relating to the Services. Ceridian and the Client each hereby represent that any Personal Information provided or to be provided by it to the other Party under this Agreement has been and shall be collected, transferred and/or disclosed in compliance with such privacy laws (including obtaining the proper consent where applicable). The Client acknowledges and agrees that Ceridian may disclose such Personal Information to its employees or other representatives and Ceridian Contractors, provided that such disclosure is limited to those parties who Ceridian reasonably requires to access such information for the Purpose. Ceridian shall advise all such parties who have access to or who are to receive such information of the obligations in the Agreement and instruct such parties to use the Personal Information on a confidential basis and subject to the same conditions and restrictions as apply to Ceridian under the Agreement.

6. Intellectual Property and Licensed Property:

6.1. Subject to the provisions of this Section 6, each Party shall remain the owner of all Intellectual Property it owns prior to the Effective Date and that which it creates in the performance of its obligations under this Agreement. As between the Parties and vis à vis any third party, Ceridian shall remain the sole and exclusive owner of all Ceridian Property and any and all components thereof, whether owned on the Effective Date or acquired thereafter, and except as otherwise expressly stated in this section, no right or interest in the Ceridian Property or any component thereof is granted to the Client. Ceridian hereby grants to the Client, starting on the Effective Date and continuing for so long as required for a Service, a non-exclusive, personal, non-transferable, non-assignable and revocable license to use internally the Licensed Property, in accordance with the following terms:

6.1.1. the Licensed Property shall be used by no more than the express maximum number of concurrent users, if any, and only at the specified location, for the specified period, and for the maximum number of active employee records;

6.1.2. the Client shall not alter, destroy or remove any proprietary or legal markings placed upon or contained within the Licensed Property or any supporting media;

6.1.3. the Client shall not modify, copy, distribute, display, decompile, analyze, translate, disassemble, reverse engineer or otherwise attempt to decrypt or derive the source code, any trade secrets or any proprietary information of, in or related to the Licensed Property or any other Ceridian Property;

6.1.4. the Client shall not use the Licensed Property for any purpose other than to receive and use the Services in the manner contemplated therein;

6.1.5. any Third Party IP comprising part of the Licensed Property, if accompanied by Third Party License Terms, is licensed to the Client by the third party on the terms of the Third Party License Terms and the Client undertakes to comply with the Third Party License Terms and with the License Restrictions, and in all other cases, Ceridian hereby grants the Client a personal, non-exclusive, and non-transferable sub-license to load, store and run such Third Party IP in object code form for the duration of the Service.

6.2. Ceridian will indemnify and hold the Client harmless from and against any and all claims alleging that the Services and any Intellectual Property furnished by Ceridian violate any third party's Canadian patent, trade secret or copyright, except to the extent that such claims arise from the Client's modification of the Services or Intellectual Property or from the Client's use of such Services in excess of the provisions set out in this Section 6. However, Ceridian's liability hereunder shall be conditional upon the Client providing Ceridian with timely written notice of any such claim or threat thereof, and the full and exclusive authority for, and information for and assistance with, the defense and settlement thereof. If such claim has occurred, or in Ceridian's opinion is likely to occur, the Client agrees to permit Ceridian, at its option and expense, either to procure for the Client the right to continue using the Intellectual Property, or replace or modify the same so that it becomes non-infringing. If neither of the foregoing alternatives is reasonably available, Ceridian may immediately terminate its obligations (and the Client's rights) under this Agreement with regard to such Intellectual Property (if the Services are deliverable without such Intellectual Property) or terminate the Agreement in its entirety (to the extent Ceridian is not able to provide the Service without such Intellectual Property).

JTM 05634

## 7. Disposition of Data:

7.1. Except as otherwise expressly provided for in a Service Exhibit, Ceridian will not be responsible for storing copies of the Client's records when Ceridian in its sole discretion no longer requires such information in order to provide Services to the Client, and without limitation, the Client shall be responsible for retaining its own business records according to the schedules established by governmental authorities for the Client. The Client will reimburse Ceridian for the costs of producing any information in Ceridian's possession or control relating to the Client's business or employees that Ceridian produces in response to a Client request or court order. Unless otherwise required by law or as otherwise previously directed in writing by the Client, upon termination of the Agreement, Ceridian may dispose of the Client's records and data in accordance with Ceridian's data retention policy in effect from time to time (but in compliance with all privacy laws as contemplated in Section 5 above).

## 8. Limitation of Remedies:

8.1. Subject to Section 8.2 below, to the maximum extent permitted by applicable law, the Client agrees that Ceridian's total maximum aggregate cumulative liability to the Client for all past, present and future claims, demands, actions, causes of actions, requests, lawsuits, judgments, damages, costs, expenses, prejudices or losses (collectively in this Section referred to as the "Claims") in relation to or arising under this Agreement (whether for breach of contract, strict or statutory liability, negligence or any other legal or equitable theory) shall be limited to the Client's actual direct damages and shall not, under any circumstances, exceed, in the aggregate, for all Claims past, present and future, the greater of: (i) the total amount paid by the Client for the defective Services causing the damages during the 12 months immediately preceding the loss; or (ii) $50,000. This remedy shall be the Client's sole and exclusive remedy against Ceridian.

8.2. Notwithstanding any other provisions of this Agreement, nothing shall exclude or limit either Party's liability for Claims relating to death or personal injury resulting from that Party's negligence, or any acts or omissions for which the governing law prohibits the exclusion or limitation of liability.

8.3. To the maximum extent permitted by applicable law, and notwithstanding anything to the contrary contained in this Agreement, Ceridian shall not be liable for any indirect, consequential (including damages for business interruption or loss of business information or data), special, punitive, exemplary or incidental damages, claims by third parties, or damages for loss of profits, goodwill, anticipated savings or revenues, arising in relation to or under this Agreement, even if advised of the possibility of such damages or if the possibility of such damages was reasonably foreseeable.

## 9. Changes:

9.1. In the event of a change to any federal, provincial or other applicable law or regulation affecting the Services, or any reasonably unforeseen change materially affecting the cost of providing the Services, Ceridian may make changes to the Agreement with 30 days' prior written notice to the Client. If, upon notification of the change, the Client elects not to continue the Services, then notwithstanding anything to the contrary in this Agreement, the Client may terminate the Agreement upon 30 days' prior written notice without penalty or cancellation fees.

## 10. Notices:

10.1. All notices to the Parties shall be in writing (including fax or similar writing) and shall be sent to the Client at the address identified above, and to Ceridian at the address / branch as may be designated from time to time by Ceridian, to the attention of the Client's account representative (if any). All notices terminating or otherwise affecting this Agreement shall also be copied to Ceridian's Legal Department, as follows:

Ceridian Canada Legal Department
125 Garry Street, Winnipeg, MB  R3C 3P2
Fax No. 204.975.8856

or to such other address or fax number as either Party may hereafter specify by written notice to the other Party. Each such notice, request or communication shall be effective upon receipt, provided that if the day of receipt is not a Business Day, then the notice shall be deemed to have been received on the next succeeding Business Day.

## 11. Force Majeure:

11.1. Neither Party shall be held liable or responsible to the other Party nor be deemed to have defaulted under or breached the Agreement for failure or delay in fulfilling or performing any term of the Agreement (except for the failure to pay money) when such failure or delay is caused by or results from causes beyond the reasonable control of the affected Party including fire, floods, embargoes, war, acts of war or terrorism (whether war be declared or not), insurrections, riots, civil commotions, labor unrest or strike, acts of God or acts, omissions or delays in acting by any governmental authority, utility interruptions and the inherent risks and limitations of internet transmission.

## 12. General Provisions:

12.1. The Agreement and the Parties rights and obligations shall be governed by the laws of Ontario, and all federal laws applicable therein.

12.2. The Client shall not transfer or assign this Agreement or any rights hereunder to any other party without the prior written consent of Ceridian, which consent may not be unreasonably withheld or delayed.

12.3. No action under this Agreement may be brought by either Party more than two years after the cause of action has accrued.

12.4. No delay or indulgence by either Party at any time, to enforce any of the provisions of this Agreement, or any right with respect thereto, shall be construed as a waiver of such provision or right, nor shall it prejudice or restrict the rights of that Party. A waiver of its rights shall not operate as a waiver of any subsequent breach. No right, power or remedy conferred upon or reserved for either Party is exclusive of any other right, power or remedy available to that Party and the rights, powers and remedies shall be cumulative.

12.5. This Agreement may be signed in counterparts, including by way of facsimile or .pdf transmission, with the same effect as if both Parties had signed the same document, and a facsimile or pdf copy shall be considered prima facie evidence of the of the information contained in the facsimile or pdf transmission.

12.6. The Parties have expressly requested that the Agreement be drawn up in the English language. Les parties aux présentes ont expressément requis que cette convention soit rédigée en anglais. Expressamente las Partes del presente Contrato solicitan que este documento sea redactado en el idioma inglés. In the event of any contradiction, discrepancy or difference between the English language version and the French or Spanish versions (if any) of the text of this document, or any documents contemplated or referenced hereunder, the English language version shall govern.

12.7. Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.8. Headings in this Agreement are for ease of reference only and will not affect its interpretation.

12.9. The Client acknowledges and agrees that clerical errors shall not affect the validity of the Agreement and Ceridian shall be entitled to unilaterally correct the same. Ceridian shall give the Client written notice of any such correction.

12.10. Unless otherwise expressly stated in any Service Exhibit, all amounts payable under this Agreement shall be payable in lawful money of Canada.

12.11. If more than one entity has signed this Agreement for the same Party, their covenants shall be considered to be joint and several and shall apply to each of them.

12.12. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all prior or contemporaneous agreements and understandings regarding the subject matter hereof, whether written or verbal. Any amendment to this Agreement must be in writing and signed by authorized representatives of both Parties. The Parties agree that facsimile and/or .pdf copies of signatures to this Agreement will be treated as originals.

12.13. Without limiting any of the foregoing, if the Client is domiciled in Quebec, or the Civil Code of Quebec otherwise applies to the Agreement, the Client hereby expressly agrees that the termination and/or resiliation right granted to a "client" under Article 2125 of the Civil Code of Québec, as well as the limitations imposed on the ensuing recovery by the "contractor" or "service provider" under Article 2129 of the Civil Code of Québec, shall not be applicable to the Agreement and the Client hereby expressly waives such rights and limitations.

The Client hereby consents to Ceridian conducting credit investigations, from time to time, including such requests for and exchange of information to and from consumer reporting agencies or credit grantors as it may require to approve and maintain funding arrangements to be granted by Ceridian in relation to the Services, and to provide payment history information to such agencies. The Client acknowledges that this Agreement is conditional upon funding approval of the Client. The Client further acknowledges having read and understood all terms of this document, which are set forth on this page and the preceding 2 pages, and if this form an integral part of the Agreement between Ceridian and the Client if this Agreement is accepted by Ceridian, such acknowledgement being conclusively evidenced by the Client's signature below.

Dated as of the **21** day of **JULY**, 20 **09**

**Ceridian Canada Ltd.**

Per: _____
(Signature)

Print Name: Raymond Kitane

Title: Small Business Consultant
I have the authority to bind the corporation.

**Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd.**
(Name of Client)

Per: _____
(Signature)

Print Name: Jesse Willms

Title: CEO
I have the authority to bind the corporation.

Page 3 of 3

JTM 05635



**CERIDIAN**

CERIDIAN CANADA LTD.
("Ceridian")

SERVICE EXHIBIT

CANADIAN PAYROLL SERVICES

**ANTICIPATED SERVICE START DATE:**

**TERM:** One (1) Year

**TERRITORY:** Canada

| CLIENT INFORMATION | | | | |
|---|---|---|---|---|
| Client Name **Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd.** | | | the "Client" | Current # of Employees **15** |
| Payroll Service Contact Phyllis Plester | Phone No. 780-416-0211 | Fax No. *780-416-0218* | e-mail plester@shaw.ca | |
| Alternate Contact (Optional) *KELSEY DESAUTELS* | Phone No. *780-416-0211* | Fax No. *780-416-0218* | e-mail *Kelsey@justthinkmedia.com* | |
| Type of Business ecommerce | | | Number of Yrs in Business **5+** | |
| Current Accountant (firm / contact name) *KING & COMPANY* | Phone No. *780-423-3437* | Fax No. | e-mail | |
| HOW DID YOU HEAR ABOUT CERIDIAN | ☐ Advertisement ☐ Other | ☐ Professional Association | ☐ Financial Institution | ☒ Word of Mouth ☒ Accountant / Professional Advisor |

## SERVICE PARTICULARS

**Section 1.00    Definitions**

**1.01    Definitions.** As used in this Service Exhibit:

(a) *"Agreement"* means the written services agreement made between the Client and Ceridian to which this Service Exhibit is attached, or, if executed as a separate document, then the written services agreement previously executed by the parties; the details with which the parties are familiar;

(b) *"CRA"* means Canada Revenue Agency, and any successor to such agency;

(c) *"Employees"* means those employees of the Client in Canada in respect of which the Service is to be provided, and for the avoidance of doubt, if no specific group of employees is otherwise indicated in writing by the Client, then such term shall mean all Employees of the Client ordinarily resident in Canada;

(d) *"Fees"* means the fees payable for the Service, as described in Section 4.00 below;

(e) *"Optional Payroll Services"* means those optional Payroll related Services which the Client has elected to receive, as indicated in the Pricing Schedule;

(f) *"Payments"* means the payments to be made by Ceridian on the Client's behalf hereunder, at the Client's request and direction, in respect of wages to its Employees, statutory remittances, and other third party payments as directed by the Client and agreed to by Ceridian;

(g) *"Payroll"* means any given payroll of the Client processed or to be processed by Ceridian under this Service Exhibit;

(h) *"Payroll Data"* means all data necessary for Ceridian to receive from the Client in order to process the Client's Payroll and provide the Service, including: (i) Employee Payroll information data; (ii) employer Payroll information data; and (iii) time data;

(i) *"Payroll Funds"* means those funds to be received by Ceridian from the Client, in an amount equal to the Payments to be made for a particular Payroll, together with the full amount of the Fees due hereunder in respect of such Payroll (and applicable taxes on such Fees);

(j) *"Service"* means the service provided by Ceridian under this Exhibit as described in Section 2.00 below, and for certainty, includes the Optional Payroll Services selected by the Client;

(k) *"Service Start Date"* means the actual date on which Ceridian commences providing the Service. The anticipated Service Start Date is identified above;

(l) *"Trust"* means the Ceridian Canada Payroll Trust, established pursuant to a written declaration of trust dated as of January 30, 1998, or such additional or replacement trust as may hereafter be established by Ceridian for the purposes of receiving Payroll Funds from its clients;

(m) *"Term"* means the fixed term of this Service Exhibit as indicated below, and any renewal thereof.

(n) All other capitalized terms used herein shall have the same meaning as in the Agreement.

**Section 2.00    Services**

**2.01    Service Description.** Ceridian hereby agrees to provide the Client with the following Services in Canada:

(a) calculate the gross to net pay for each of the Client's employees;

(b) coordinating and collecting Payroll input from the Client, at the times, locations and schedules agreed between the Client and Ceridian from time to time, including without limitation Payroll runs classified as follows: a normal run, a bonus run, an update run, a year end update run and a simulated run;

(c) creating and delivering Payroll output in the form of direct deposit payments or cheques in the amount of Employees' net pay, as instructed and at the locations and times advised by the Client from time to time, and remit statutory source deductions as more particularly described below;

(d) producing T4 /Relevé 1 forms (as applicable) and deliver them as with Payroll product;

(e) responding to queries and management requests in relation to the Services, including the provision of telephone support;

(f) managing and maintaining software to process the Client's Payrolls, and implementing modifications to such software and Services as may be required by changes in legislation or other regulatory requirements;

(g) distributing reports, cheques, deposit advices, file transmissions in accordance with the locations and times agreed between the Client and Ceridian from time to time;

(h) providing standardized and customized reports in the form and medium agreed from time to time; and

(i) providing those Optional Payroll Services which the Client has elected to receive (as signified by marking the appropriate box on the Pricing Schedule).

**2.02    Tax Processing / Filings.** Unless otherwise expressly indicated in the Pricing Schedule, Ceridian shall also be responsible for withholding and remitting the Client's statutory remittances including income tax, employment insurance, government pension plans, and other government remittances relating to Payroll. Ceridian will comply with all current statutory deduction rates stipulated by CRA. The statutory remittance funds shall form part of the Payroll Funds to be supplied by the Client. The Client shall provide accurate account numbers, remittance frequency and all other information required from time to time to permit accurate and timely remittance by Ceridian. The Client shall be responsible for notifying Ceridian in writing immediately of any changes to the frequency with which it must make its statutory remittances, and the Client shall provide Ceridian with any notices it receives from the taxing authorities relating to the frequency of such remittances or any other reporting requirements. The Client shall continue to receive, review and be the contact for all correspondence and all other communications with the taxing authorities. However, the Client authorizes Ceridian to discuss matters relating to remittance of the Client's source deductions with such taxing authorities. Ceridian will implement, at no cost to the Client, programming changes to Ceridian's core Payroll system necessary to ensure compliance with laws and regulations pertaining to Payroll gross-to-net calculations. However, the Client shall be responsible for monitoring legal developments specifically applicable to the operation of its business, interpreting applicable laws and regulations, determining the requirements for compliance with such laws and regulations, and identifying any changes required to its internal business rules.

**2.03    Accuracy of Data.** The Client shall forward to Ceridian the necessary Payroll Data to complete the Services which Payroll Data shall be provided to Ceridian such number of days prior to the Payroll date as may, from time to time, be directed by Ceridian. The Client shall be responsible for the accuracy and completeness of the Payroll Data submitted and for any errors in and with respect to Payroll Data. The Client shall review all Payroll data, Payroll registers, reports, cheques and other materials

JTM 05636

received from Ceridian forthwith after receipt thereof, and shall notify Ceridian immediately of any discrepancies or errors in the materials. Without limiting the generality of any other provision of the Agreement, in no event shall Ceridian be responsible for any such errors or discrepancies, whether or not as a result of Ceridian's actions or inactions, unless Ceridian has received written notice from the Client of such error or discrepancy within 10 Business Days of the Client's receipt of such materials. The Client shall indemnify and save Ceridian harmless from and against any and all loss, damage or liability whatsoever which Ceridian may incur from incorrect Payroll Data being supplied by the Client to Ceridian. Ceridian shall not be responsible for the failure of a financial institution to process properly, or on a timely basis, information provided by Ceridian. Ceridian will not have the Client's individual employee EI history in respect of any period prior to converting to the Ceridian system, and accordingly the Client should maintain the records from their previous payroll system in the event amendments to Records of Employment produced by Ceridian are required.

**2.04 Payroll Funds.** Ceridian has established the Trust for the purpose of holding and keeping Payroll Funds and other trust funds received from its Clients separate from Ceridian's own property, and for clarity, the principal amount of the Payroll Funds received by Ceridian from the Client shall at all times while in the possession or control of Ceridian, be held in its capacity as trustee of the Trust. The Client shall forward the Payroll Funds to an account established by the Trust as directed by Ceridian. The Payroll Funds provided by the Client to Ceridian shall be in a form satisfactory to Ceridian. Ceridian shall process the Payments as directed by the Client, by way of signed cheques and/or direct deposits. Ceridian shall not be obliged to release any Payroll documents or to make or honour any Payments until it has received confirmation that the Client's financial institution upon which the Payroll Funds have been drawn has irrevocably honoured such request for advance of funds. The Client agrees to immediately notify Ceridian of any deterioration in its financial condition that would likely jeopardize its ability to provide cleared Payroll Funds to Ceridian. Ceridian reserves the right, at its option, to implement such procedures as may reasonably be required to guarantee the irrevocable receipt by it of the Payroll Funds prior to Ceridian paying out any such funds. The Client acknowledges that Ceridian, as trustee of the Trust, is entitled to invest monies held by the Trust in accordance with the investment guidelines established from time to time by Ceridian's Board of Directors, and that Ceridian, in its own capacity and not as trustee, is entitled as income beneficiary to all income and gains derived or realized from such investments and is not accountable to the Client, its Employees, or any other person for such income or gains. The Trust is entitled to pledge such investments for borrowings of the Trust to facilitate the Payments, rather than converting the investments into cash. Ceridian shall indemnify and save the Client harmless from and against any loss of any portion of the principal amount of the Payroll Funds (including any losses of principal resulting from the investment of the Payroll Funds) caused by Ceridian, in its own capacity or as trustee of the Trust to the extent such Payroll Funds were actually received by Ceridian. At the request of the Client or at Ceridian's option, Ceridian shall pay to the Client an amount equivalent to any Payroll Funds held in the Trust on account of Payments against which stop payments have been placed, or which are, according to banking practice, considered to be stale-dated (less a reasonable administration fee; or at the request of the Client, such Payroll Funds may be credited to the Client's next Payroll at no additional charge to the Client).

**2.05 Grant of Authority.** The Client hereby grants to Ceridian the authority to issue Payments on behalf of the Client, and to take such other action as may be necessary from time to time in connection with the provision of the Services. Such other action might include, without limitation, authority to deliver Payments, authority to instruct its bank to stop payment and authority to refuse payment as required to provide the Services.

**2.06 Direct Deposit.** Ceridian has arranged a direct deposit service with financial institutions. If at any time the Client utilizes this service, Ceridian shall provide a listing of the direct deposits to be supplied to the financial institutions for each Payroll. The listing of direct deposits shall be available to the Client on the Business Day following the preparation of the Payroll. The Client shall review the listing and inform Ceridian of any necessary corrections by 11:00 a.m. Central Time on the Business Day prior to Payroll date. When utilizing the direct deposit service, the Client shall indemnify and save Ceridian harmless from and against any and all loss, damage or liability whatsoever which Ceridian may incur including, without limiting the generality of the foregoing, any loss, damage or liability by reason of:

(a) incorrect information being supplied by the Client to Ceridian;

(b) the failure of the Client to notify Ceridian of irregularities or errors in the listing of direct deposits provided to the Client by Ceridian prior to the release of the direct deposits to financial institutions.

In no event shall Ceridian be liable to the Client for any loss or damage suffered as a result of the failure of a financial institution to process properly, or on a timely basis, information provided by Ceridian.

**2.07 Insurance.** Each of Ceridian and the Client will, at its own expense, effect and maintain such insurance as it deems appropriate in respect of its obligations under the Agreement. Ceridian shall maintain a fidelity bond covering its employees to a minimum of $10,000,000.00.

[Section 2.08, 2.09 and 2.10 ("Hosted Sections") are applicable only when Ceridian is hosting the Application Software]

**2.08 Additional Defined Terms.** As used in the Hosted Sections:

(a) "*Application Software*" means all computer software and databases owned or licensed by Ceridian used to provide the Ceridian hosted Service, and the intellectual property embodied therein, together with all related application modules, applicable customer implementation and production tool sets and related application support tool sets, all replacements for each of the foregoing, and all updates and enhancements for and of each of the foregoing

(b) "*Client Database*" means the human resources and/or payroll information (as applicable) which will be used in connection with the Service to be hosted by Ceridian hereunder;

(c) "*User*" means those individuals authorized from time to time by the Client to access that Service on behalf of the Customer.

**2.09 Service Particulars.** The hosted Service will be available to the Client in accordance with the following:

(a) System Availability - Ceridian shall use reasonable efforts to ensure the Service is available to the Client 99.5% of the time, excluding scheduled downtime. In this regard, it may be necessary to temporarily restrict access to the Client's application and database without prior notice to protect the integrity of the application and database;

(b) Administrator Access - The Client Service contact(s) (as appointed above) will have access to the Users, and among other things will be responsible for designating the Users authorized to use the Service, and in this regard shall be required to take such steps (and provide such particulars for each User) as reasonably required by Ceridian from time to time in order to add, replace or delete Users. Access permissions, such as User identifiers and passwords, will be provided by Ceridian for each User, by email directly to each User;

(c) Set Up / Implementation - Initial set up services include activities required to prepare the hosted environment for the Client's use. Ceridian agrees to make qualified personnel available to set up the servers, database, application and network connectivity needed for Ceridian's application. Implementation may include set up of a standard and test database environment for the Client to use during the implementation phase.

(d) Hosting - The Services will be hosted from one or more facilities operated by or for Ceridian, which may be located in Canada or elsewhere. The Services include the use and access to a highly maintained environment. Ceridian retains the right to select and specify the Application Software providers as needed to maintain the Service. Ceridian will own or otherwise acquire all necessary licenses to operate the Application Software. Any such license agreements will be purchased in Ceridian's name and are not transferable to the Client during or after termination of this Agreement. Updates, patches and upgrades may be applied as determined by Ceridian. Ceridian will maintain the Application Software (there may be use of the Application Software by a single Ceridian client or use of the Application Software by multiple Ceridian clients) and may apply updates and upgrades to the Application Software from time to time. Updates, patches and upgrades to Application Software may be applied as determined by Ceridian.

(e) Data Corruption - If for any reason, the Client's database becomes corrupt, Ceridian will restore the data from the most recent back up. Ceridian will notify the Client within three hours of this event. The Client agrees to verify the accuracy of the restoration within one day of notification, and in any case before using it. The Client also agrees to repeat the entry of any changes lost between the back-up and restoration times. Ceridian will perform data back-ups to magnetic tapes or other media on a daily basis.

(f) Internet Availability - The Client must arrange for Users to obtain access via an internet service provider. The Client is responsible for contracting and maintaining the relationship with the internet service provider (and all costs and expenses in relation thereto). The Client is responsible for ensuring that internet service provider provides adequate performance and response.

(g) Data Accuracy / Integrity – The Client is responsible for maintaining the accuracy of the information in the Client Database. Ceridian will not be responsible or liable for the results of inaccurate data entered into the Client Database. The content of the Client Database shall remain the Client's exclusive property. Upon the Client's request, a copy of the Client Database will be delivered to the Client on CD-ROM upon expiration or termination of this Agreement, at the then current price charged by Ceridian for providing such CD-ROM.

(h) Equipment / Facilities - Ceridian will make available and maintain the servers, routers and other equipment required to operate the Service for the Client's nonexclusive use while providing the Services under the terms of this Service Exhibit. Ceridian retains title and ownership of all equipment. Ceridian retains the right to select the manufacturer and model of any equipment made available for the Client's use, and reserves the right to change the equipment at any time. Equipment will be located in an operations facility that provides an adequate environment for providing the Service.

**2.10 User Requirements.** In order to be able to access the Service, a User must meet the minimum system specifications as established by Ceridian from time to time (none of which are provided or paid for by Ceridian). The Client acknowledges having received Ceridian's current required specifications (which in the case of a Client using the HR Payroll Web Application Software, were set forth in the document titled "HR Payroll Web 3.0 Client Side Configuration Documents"). The Client shall be responsible for maintaining an up-to-date list of authorized Users and will ensure each User takes every reasonable precaution to keep identification numbers, passwords and any other access parameters confidential. The Client Service contact(s) will be authorized to make all changes, additions and deletions to the User identification list. Without limitation, Ceridian is not liable for any damages arising out of misuse by a User of the Service. The Client agrees that the use of Ceridian's website will be for lawful purposes only, and only in connection with accessing the Service. Ceridian may require Users to enter into a user agreement directly with Ceridian. The Users must agree to comply with any terms and conditions of access to Ceridian's website imposed by Ceridian (provided that such user agreement does not require a User to pay a fee for such access). Any action by a User that can be construed, in Ceridian's sole and absolute discretion, as unlawful, invasive of privacy, vulgar, obscene, or otherwise improper, that constitutes a breach by the Client of the terms of this Agreement, and without limiting the rights available, Ceridian shall have the right (but not the obligation) to suspend or terminate all rights of the offending User to

JTM 05637

PI Exhibit 3 Page 00180

the Service, and to terminate this Agreement. The number of Users for an Account shall be limited to the number of Users as set forth in the written Client Set Up Information document.

**Section 3.00    Optional Payroll / HR Related Services**

**3.01 Optional Services.** The following is a description of the Optional Payroll Services, which terms shall apply only if the Client has elected to receive such Optional Payroll Service(s):

• **Payroll Preview.** Ceridian will provide the Client with the ability to view in advance of the Payroll date, using the Ceridian portal accessed through the Internet, the processed Payroll Data (in a PDF format) so as to provide the Client the ability to review and modify the Payroll as necessary prior to final processing. Ceridian will use commercially reasonable efforts to ensure the Payroll preview Service is available 24 hours a day, 7 days a week, except during periods of scheduled maintenance and other times reasonably deemed necessary by Ceridian. The Client shall maintain an up to date list of all authorized users (to a maximum number as reasonably established by Ceridian) and will be responsible for the actions of each such user, and shall take all reasonable precautions to ensure every user keeps his/her password confidential, and uses the Ceridian website only for lawful and proper purposes. Ceridian reserves the right to terminate the Payroll preview Service immediately (and/or the access by any user) in the event the Client and/or any user, uses the Ceridian Internet Site for any purpose construed by Ceridian as improper.

• **Online Paystatements.** Ceridian will provide the Client with the ability to have Employee pay statements and/or tax form (e.g. T4's) (collectively, the "Employment Documents") delivered to the Employees through the use of the secure electronic delivery and payment service (the "epost Service") operated by Canada Post Corporation ("Canada Post"). In order to access the epost Service, an Employee must register for his/her personal epost box, and request (in writing) Ceridian to deliver his/her Employment Documents via epost. All documents delivered through the epost Service are governed by the Canada Post Corporations Act. Delivery of pay statements through the epost Service will only be available to those Employees who are paid by way of electronic funds transfer / direct deposit, but tax forms will be available to all Employees through the epost Service. This Service is made available pursuant to an agreement between Ceridian and Canada Post and is therefore subject to and conditional upon the continued availability of the epost Service by Canada Post. Canada Post is solely responsible for the operation and maintenance of the epost Service, and the rights of use thereof by the Employees. Accordingly, in addition to the terms contained in this Agreement, the rights of the Employees to access their Employment Documents are subject to any terms, conditions and restrictions imposed by Canada Post. Ceridian will not be responsible for any delivery errors or other problems which are attributable to Canada Post. This Service may be immediately terminated at any time by Ceridian in the event that the epost Service becomes unavailable to Ceridian for any reason whatsoever, in which case the Employees will thereafter receive all Employment Documents in paper form. In order to use this Service, an Employee must meet the

minimum computer system specifications as established by Canada Post or Ceridian from time to time for accessing the epost Service. Neither Ceridian nor epost will be responsible if an Employee fails to receive a Pay Statement because the Employee terminated his/her epost box after Ceridian has processed such pay statement for delivery through the epost Service.

• **Online Reports.** Ceridian will provide the Client with the ability to access through the Internet, those designated Payroll reports provided by Ceridian to the Client in relation to the Payroll Services (the "Reports"), for such period of time as reasonably established by Ceridian (currently seven (7) years from the date of each such Report) for so long as this Service remains in force. Reports that are 27 months old or less will be stored online and available for immediate viewing, and older Reports will be stored off line and available for viewing by the end of the Business Day following the User's request for such Report. Ceridian will use commercially reasonable efforts to ensure the Service will be available 24 hours a day, 7 days a week, except during periods of scheduled maintenance and other times reasonably deemed necessary by Ceridian.

• **Employee / Manager Self-Service Module ("ESS / MSS").** Ceridian will provide the Client utilizing Ceridian's payroll solutions with a web-based employee and manager self-service solution that will allow the Client to automate a number of traditionally paper-based processes and systems using the Ceridian portal accessed through the Internet. Ceridian will maintain the Application Software relating to the ESS / MSS, which, for clarity, will be available to the Client and its Employees on a non-exclusive use basis, all in accordance with the Hosted Sections above.

**Section 4.00    Fees and Payment**

**4.01 Fees.** The Fees payable by the Client to Ceridian for the Service during the term are as set forth in the attached Pricing Schedule. The Fees are exclusive of all Taxes. Ceridian shall not increase the Fees during the initial term, and thereafter shall be entitled to increase Fees one time during any 12 month period in an amount not to exceed the Canadian CPI.

**4.02 Payment.** For each Payroll processed, Ceridian shall deduct and retain its Fees from the Payroll Funds received from the Client in respect of that Payroll. Any additional sum due to Ceridian with respect to non-recurring charges shall be due and payable thirty (30) days after receipt by the Client of an invoice from Ceridian.

**Section 5.00    Term**

**5.01 Term.** Unless terminated earlier by a party as a result of the other party failing to perform one or more of its material obligations in the Agreement, the Services shall be effective and binding immediately upon execution hereof, and shall remain in effect for an initial term of One (1) Year commencing on the Service Start Date, and thereafter shall automatically continue on the same terms without the need for any written extension agreement until terminated by either party upon 90 days prior written notice to the other, or otherwise in accordance with the termination provisions in the Agreement.

---

In consideration of the Fees to be paid hereunder, the Client hereby requests that Ceridian provide those Services described herein in accordance with the terms and conditions set forth above and on the preceding 2 pages. This Service Exhibit may be executed either contemporaneously with (and as an appended Exhibit to) the Agreement or as a separate document subsequent to (and not attached to) the Agreement, and in either case the terms of this Service Exhibit shall be deemed to be incorporated into and form an integral part of the Agreement. In the latter case, the Agreement shall be considered amended to add the terms and conditions of this Exhibit, provided that to the extent this Exhibit does not modify the Agreement, the Agreement shall continue in full force and effect, unamended, and this Exhibit will not serve to revise the relationship between the parties, and any and all unremedied and outstanding accounts, defaults, breaches or other matters existing between the parties as at the date of this Exhibit shall remain intact and subsisting notwithstanding the amendment of the Agreement by this Exhibit. In the event of any conflict between the terms of the Agreement and this Service Exhibit, the terms of this Service Exhibit shall govern.

Dated as of the **21** day of **JULY**, 20 **09**

**Ceridian Canada Ltd.**

Per: _____
                    (Signature)

Print Name: Raymond Kitane

Title: Small Business Consultant
            I have the authority to bind the corporation.

**Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd.**
(Name of Client)
Per: _____
                    (Signature)

Print Name: Jesse Willms

Title: CEO
            I have the authority to bind the corporation.

JTM 05638

**CERIDIAN**

CERIDIAN CANADA LTD.
("Ceridian")

### CLIENT SET-UP INFORMATION
### CANADIAN CORPORATE
### PAYROLL / TAX FILING SERVICES
### **ONE SET-UP INFORMATION FORM REQUIRED PER PAYROLL**

☐ All information for this Payroll is the same as Payroll ID _____ EXCEPT as noted below

## CLIENT INFORMATION

**Client Name (full legal name):**
Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd.

**Delivery Address for Payroll (if different than address in Payroll Service Agreement):**

| Street Address | City | Province | Postal Code |
|---|---|---|---|
| | | | |

**Name & E-mail Address for "Stop Payments" and "EFT Rejections" (if different than primary contact in Payroll Service Exhibit/Amending Agreement):**

| First Payroll Input/Live Date: July31/09 | Cheque/Payment Date: Aug6/09 | Pay Period Ending Date:July31/09 |
|---|---|---|

**CLIENT REMITTANCE INFORMATION**   Ceridian Canada Ltd. to collect / remit Federal remittances? ☒ Yes ☐ No

**Federal**
CRA Business Number [8] [4] [5] [8] [0] [3] [1] [4] [7]   RP [0] [0] [0] [1]   EI Rate [1] . [4] [ ]

RP [ ] [ ] [ ] [ ]   EI Rate [ ] . [ ] [ ]

RP [ ] [ ] [ ] [ ]   EI Rate [ ] . [ ] [ ]

**CRA Remittance Frequency:**
☐ Quarterly   ☒ Once/month   ☐ Semi-monthly   ☐ Accelerated (3 days following remit period end)
     (Regular)   (Threshold 1)   (Threshold 2)

**Quebec** *(mandatory if a Quebec registrant)*
☐ Quebec Tax No. [ ][ ][ ][ ][ ][ ][ ][ ][ ][ ] RS [ ][ ][ ] Total Worldwide Payroll Amount $ _____
Remittance Frequency:   ☐ Quarterly   ☐ Once/month   ☐ Twice/month   ☐ Weekly

*Other Provincial / Territorial Remittance Information (mark and complete only jurisdictions where Employees are located and remittances / filings due)*

☒ Alberta

☐ British Columbia

☐ Manitoba   Health & Education Tax No. [ ][ ][ ][ ][ ][ ][ ][ ][ ] MT [ ][ ][ ] ☐ Regular ____ Notched ____

☐ New Brunswick

☐ Newfoundland & Labrador   HAPSET Tax No. [ ][ ][ ][ ][ ] Oracle # [ ][ ][ ][ ]

☐ North West Territories   Payroll Tax No. [ ][ ][ ][ ][ ][ ][ ]

☐ Nova Scotia   WCB Tax No. [ ][ ][ ][ ][ ][ ][ ] NW [ ][ ][ ] Rate [ ][ ][ ]

☐ Nunavut   Payroll Tax No. [ ][ ][ ][ ][ ][ ][ ]

☐ Ontario   Employer Health Tax (EHT) No. [ ][ ][ ][ ][ ][ ][ ][ ] or [ ][ ][ ][ ][ ][ ][ ][ ][ ] TE [ ][ ][ ]
Rate ____   Exemption $ ____   Remittance Frequency:   ☐ Annually   ☐ Monthly

☐ Prince Edward Island

☐ Saskatchewan

☐ Yukon

## SYSTEM & BROWSER REQUIREMENT (complete ONLY for Powerpay Web or Ceridian Hosted Insync)

| Max # of Users: | Password Expiration Policy (choose one): ☐ 30 days ☐ 90 days ☐ 180 days ☐ 360 days | Operating System (e.g. Windows XP): Internet speed (e.g. Cable, 56K): Mac User (OS 9.2 or Higher)? ☐ Yes ☒ No |
|---|---|---|

## IT INFORMATION / CONFIGURATION (complete ONLY for HP Latitude)

| Client IT Contact: | Phone #: | Email: |
|---|---|---|
| # of Internet Connections: (Main & Remote Locations) | Connection Type: (Optional)  ☐ T1  ☐ T2  ☐ Cable  ☐ ADSL | Internet Provider: (Optional) |
| Proxy Server: ☐ Yes ☐ No | Client Firewall / Proxy Server IP Address (Optional): | |

Preferred URL Name*:
**Note: Client name forms part of the URL name. Client may provide a version of its name which it wants to form part of the link to the application.

JTM 05639

☐ All Credit & Banking information for this Payroll is the same as Payroll ID _____ **EXCEPT** as noted below

**CREDIT INFORMATION**

| | |
|---|---|
| Estimated Payroll Amounts (per pay period): | $ 50,000.00 |
| Estimated Maximum Periodic One-Time Payroll Amount (i.e. including Bonus payment): | $ |
| Type of Business: ecommerce | |
| | Number of Years in Business: 5+ |

**Client Preferred Funding Arrangement (check only one option)**
**NOTE:** Funds must be received 2 banking days prior to Paydate

☐ mark box if agreeable to paying employees by "Cheque Only" if PAD with EFT's not approved

☐ Wire Transfer  ☐ Bill Payment  ☐ Client Initiated Transfer  ☒ *Pre Authorized Debit ("PAD")- subject to Ceridian approval

**\*Alternate Funding Arrangement: If PAD is selected above, Client must select one alternate funding option which will be the method of funding if the Client is not approved for PAD funding (check one option only)**

☐ Wire Transfer  ☒ Bill Payment  ☐ Client Initiated Transfer  ☐ Deposit on File  ☐ Letter of Credit

**GENERAL FUNDING TERMS:** All Payroll Funds must be received in Canadian funds. All Client Initiated payments are to be forwarded to the Ceridian Canada Payroll Trust account as designated by Ceridian from time to time.

**\*\*IMPORTANT NOTE:  Complete the shaded areas below with the information of the party named on the bank account\*\***

| Current Financial Institution | Account Manager | Direct Line | # Years with Inst. |
|---|---|---|---|
| RBC ROYAL BANK | CHUCK HERBERT | 780-992-6422 | FIVE |
| Details of Bank Borrowing (if applicable) | Authorized Amount $ | Outstanding Amount $ | |

**\*If the Preferred Funding Arrangement selected is PAD, or refunds are to be made directly to the noted bank account (when necessary), one of the following must be attached (mark box indicating which is attached):**

☒ "Void" cheque (must be electronically personalized / pre-printed by bank)

☐ Letter / e-mail from bank containing its street address, confirming Account No., Transit No. & Financial Institution No. of bank account holder

**TERMS OF AUTHORIZATION TO DEBIT THE ABOVE ACCOUNT:** By signing below, the Client authorizes Ceridian Canada Ltd. ("Ceridian") to debit the following amounts from the above account: (i) in connection with payroll services, all payroll funds (including Ceridian's fees) payable to Ceridian under the written payroll services agreement with Ceridian, with such funds to be debited 2 banking days prior to the scheduled paydate; and (ii) other fees and charges arising under the Client's agreement with Ceridian, such amounts to be withdrawn on the date / frequency set forth in the applicable Service Exhibit / Pricing Schedule signed by the Client, or otherwise on the Business Day following the date Ceridian's invoice is rendered for such other fees / charges (which invoice will be rendered at the times / frequency as set for in the applicable Service Exhibit and/or Pricing Schedule). The Client hereby waives the requirement for Ceridian to provide it with 10 days pre-notification of the debited amounts. The financial institution is not required to verify that any debits drawn by Ceridian are in accordance with this authorization or the Agreement between the Client and Ceridian. Any delivery of this document to Ceridian constitutes delivery by the Client to the financial institution. It is warranted and guaranteed by the Client that all persons whose signatures are required to sign on the above account have signed this document and that the signing of this document has been duly authorized by the Client. This authorization is provided in connection with business services. The Client acknowledges receipt of a signed copy of this document.

**RIGHTS OF RECOURSE / REIMBURSEMENT:** The Client has certain recourse rights if any debit does not comply with this PAD agreement. For example, the Client has the right to receive reimbursement for any debit that is not authorized or is not consistent with this PAD agreement. To obtain more information on the Client's recourse rights, the Client may contact its financial institution or visit www.cdnpay.ca.

**RIGHT OF CANCELLATION:** This authorization shall remain in effect until Ceridian receives written notification from the Client of its change or termination. Such notification must be received by Ceridian at least Ten (10) Business Days before the next scheduled debit at the following address: Ceridian Canada Ltd. 8th Floor, 125 Garry Street, Winnipeg, MB R3C 3P2, Attention: Trust Department, Fax No. 1-866-721-5664, email: trust@ceridian.ca. The Client may obtain a sample cancellation form, or more information on its right to cancel a PAD agreement, at its financial institution or by visiting www.cdnpay.ca.

The Client hereby consents to Ceridian conducting credit investigations, from time to time, including such requests for and exchange of information to and from consumer reporting agencies or credit grantors as it may require to approve and maintain any funding arrangements to be granted by Ceridian in relation to the services, and to provide payment history information to such agencies.

**REFUNDS:** On occasion refunds may be necessary (e.g. stop payment on a direct deposit). Ceridian may automatically re-deposit refunds into the above account.

---

*Complete if party other than Client is named on account / authorizing PAD:*
The undersigned, being the party named on the above identified bank account, has signed this document as if it were the Client for the purposes hereof, and confirms the above disclosure information and authorizes Ceridian Canada Ltd. to make withdrawals from its account in accordance with the terms set forth above.

Name of Party on Bank Account:

Per: _____
                    (Signature)
Name of Signatory: _____

Title: _____

Date: _____
I have the authority to bind the corporation and am also an authorized signatory for the named bank account.

PLEASE ENCLOSE VOID CHEQUE

Client Name:
Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016383 Alberta Ltd.

Per: _____
                    (Signature)
Name of Signatory: Jesse Willms

Title: CEO

Date: July 21, 2009
I have the authority to bind the corporation and if the above account is in the Client's Name, I also confirm I am an authorized signatory for the named bank account.

JTM 05640



**E DIRECT SOFTWARE**
240 - 11 ATHABASCAN AVE.
SHERWOOD PARK, AB   T8A 6H2

ROYAL BANK OF CANADA
SHERWOOD PARK BRANCH
#160, 390 BASELINE ROAD
SHERWOOD PARK, AB   T8H 1X3

001409

PAY

TO THE
ORDER
OF

$

E DIRECT SOFTWARE

PER_____

E DIRECT SOFTWARE

001409

E DIRECT SOFTWARE

001409

JTM 05641



**CERIDIAN CANADA LTD.**

**PRICING SCHEDULE
(POWERPAY WEB)**

Association _None_
Discount _____

This is a Pricing Schedule to an agreement made between Ceridian Canada Ltd. ("Ceridian") and Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd. (the "Client") dated July 21, 2009

| Payroll Frequency: | ☐ Weekly | ☐ Bi-Weekly | ☒ Semi-Monthly | ☐ Monthly |
|---|---|---|---|---|
| Number of Employees: | 15 | | | |

If multiple frequencies, please provide details (i.e., number of ee's per frequency):

| One Time / Implementation Fees / Training Fees | |
|---|---|
| Implementation | $250.00 |
| ***Other (if applicable, describe below)*** | |
| | $ |
| | $ |
| | $ |

| Recurring Fees (per run / annum / event, as indicated) | |
|---|---|
| Base Fee | $14.99 per run |
| Per payment charge (includes online archiving): | |
| ☒ Ceridian Remitting Source Deductions | $1.55 per employee |
| ☐ Client Tax Remitting | $2.55 per employee |
| Year End Package | $39.99 per package (annum) |
| T4's; T4A's; Releve 1 or 2 | $1.99 per form |
| Records of Employment | $1.55 per employee |
| Shipping and Handling [MINIMUM $8.00] | $8.00 per delivery |
| Online Payroll Register | Included |
| Outstanding Cheque / Payment List | Included |
| Standard Report Package | Included |
| Payroll Preview | Included |

| Other *(mark the optional payroll related solutions selected - only those optional services checked will be provided and billed)* | |
|---|---|
| ☒ Self Sealers | $0.20 each |
| ☐ Client Logo:   One Time Set Up Fee | $150.00 |
|              Recurring Fee | $0.05 per payment |
| ☐ Canada Payroll Savings employee deductions | $0.20 per deduction |
| ☐ Online Employee Pay Statements:   One Time Set Up Fee | $150.00 |
|              Recurring Fee | $0.25 per employee |
| ☐ Paperless upsell from existing Online Employee Pay Statements | $150.00 |
| ☐ Self-Print Configuration Fee | $150.00 |
| ☐ Indicia | $0.10 each + postage |

JTM 05642

| Sundry Items (Prices noted below reflect Ceridian's cost of providing the services noted and are subject to future increase by Ceridian without any or further notice to Client.) | |
|---|---|
| Import Activation | $250.00 |
| Stop Payment without refund cheque | $10.00 each |
| Stop Payment with refund cheque | $15.00 each |
| EFT/Cheque Trace (includes copy of physical cheque, front and back) | $15.00 each |
| EFT Reject (EFT returned by bank due to incorrect/invalid account information) | $10.00 each |
| Cheque Inquiry/Investigation (does not include physical copy of cheque) | $10.00 each |
| Customer Initiated Refunds (including monthly refund for uncashed items over 18 months old) | $25.00 each |
| Collection costs for NSF returns | $50.00 each (minimum) |
| Off Schedule Processing Fee | $15.00 each |
| Option Change Fee | $20.00 each |

**\*ADDITIONAL SOLUTION (if applicable)    Solution Name:**

| One Time / Implementation Fees / Training Fees | |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |

Dated as of the 21 day of July, 2009.

**Ceridian Canada Ltd.**

Per: _____
                  (Signature)
Print Name: Raymond Kitane

Title: Small Business Consultant
          I have the authority to bind the corporation.

**Edirect Software Limited Partnership by its general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd.**
(Name of Client)
Per: _____
                  (Signature)
Print Name: Jessa Willms

Title: CEO
          I have the authority to bind the corporation.

*The information contained in this Pricing Schedule constitutes Confidential Information, as that term is defined in the Agreement. As such, it is for the Client's internal use only and shall not be disclosed to any third party.*

JTM 05643



**SERVICE EXHIBIT**

**CANADIAN LIFEWORKS**
(LifeWorks for Small Business)

CERIDIAN CANADA LTD.

ANTICIPATED SERVICE START DATE:

TERRITORY: Canada

FOR INTERNAL USE ONLY

Agreement/Payroll Account ID _____

Sales Person: _____

Sales ID: _____

Additional Information Attached ☐

| CLIENT INFORMATION | | |
|---|---|---|
| **CLIENT NAME** | | **CURRENT # OF EMPLOYEES** |
| Edirect Software Limited Partnership by it's general partners 1021018 Alberta Ltd. (the "Client") & 1016363 Alberta Ltd. | | 15 |

| EXISTING AGREEMENT: | Agreement No. | | Agreement Date: | |
|---|---|---|---|---|
| | | | | (the "Original Agreement") |

**FEES AND PAYMENTS**

| Payroll ID | | Payroll Frequency: | ☐ Weekly | ☐ Bi-Weekly |
|---|---|---|---|---|
| | | | ☒ Semi-Monthly | ☐ Monthly |
| Fee Per Covered Employee: | $12.00 annually / $0.50 per semi-monthly payroll | Total Estimated Annual Fee | $ | (plus Taxes) |

**SERVICE PARTICULARS**

The Services to be provided by Ceridian hereunder consist of making available to the Participants the employee assistance and work life program commonly referred to as "Ceridian One Source for Small Business" the particulars of which are as set forth in Section 2.00 ("Service Description").

**SERVICE PARTICULARS**

### Section 1.00 Definitions

1.01 Definitions. As used in this Service Exhibit:

(a) "Agreement" means the written services agreement made between the Client and Ceridian to which this Service Exhibit is attached, or if executed as a separate document, then the written services agreement made between the parties referenced on first page of this Exhibit;

(b) "Employees" means those employees of the Client in Canada in respect of which the Service is to be provided, and for the avoidance of doubt, if no specific group of employees is indicated herein, then such term shall mean all Employees of the Client ordinarily resident in Canada, and each is an "Employee";

(c) "Fees" means the fees payable for the Service, as described in Section 3.00 below;

(d) "Participants" means the Employees and all Immediate Relatives;

(e) "Immediate Relative" means the Employee's spouse (legal or common-law), and any unmarried children of the Employee (or of the Employee's spouse if they are also the Employee's children, or if the Employee's spouse is living with the Employee) who are either under 18 years of age, or who are 18 years of age or older and in full-time attendance at a college, university or other similar post-secondary institute, and who are residents of Canada.

(f) "Service" means the service provided by Ceridian under this Exhibit as described in Section 2.00 below, and for certainty, includes any Additional Fee for Service Offerings as described in Section 2.05 below;

(g) "Service Start Date" means, in respect of the Service, the actual date on which Ceridian commences providing the Service. The anticipated Service Start Date is identified above;

(h) "Term" means the fixed term of the Original Agreement, and any renewal thereof.

All other capitalized terms used herein shall have the same meaning as in the Original Agreement.

### Section 2.00 Services and Responsibilities

**Ceridian's Responsibilities**

2.01 Ceridian will provide the Participants with access to the following via a toll-free telephone number (Ceridian will respond to requests for assistance within reasonable time frames appropriate for the specific request):

a. immediate access to EAP intake counsellor for information, assessment, action planning, crisis intervention assistance, and community referrals, 24-hours a day, 365 days a year.

b. Referrals to community service agencies, and/or introduction to local professional resources in the client's geographic area.

c. Small Business Model: Each program participant, in need of further counselling, will receive a referral to a local community agency, or an introduction to local professional counselling resources. Any fees associated with counselling resources are the responsibility of the client.

d. Personalized referrals to applicable direct services or programs for childcare, elder care, private schools, colleges/universities and other life event resources.

e. immediate practical information on a wide variety of issues, in the form of phone consultation, downloadable educational materials, and LifeWorks® Online.

f. Personal and relationship issues (including but not limited to relationship issues, stress, change, grief and loss, family and marital issues, adjustment disorder, depression, anxiety, domestic violence).

g. Addiction disorders (including but not limited to drug and alcohol abuse, eating disorders, gambling addiction).

h. Work issues (including but not limited to business travel, retirement, co-worker relationships, discrimination and harassment, burnout, job search skills, job insecurity).

i. Telephonic Financial consultation (access to Ceridian's Financial Management Plan resources and supporting materials). Ceridian LifeWorks Services does not provide investment advice or loan funds.

j. Legal assistance (including but not limited to divorce, family matters, landlord/ tenant and real estate, consumer concerns, criminal matters, debtor/ creditor, legal rights). Ceridian LifeWorks Services does not provide legal advice or representation.

k. Parenting and child care consultation and referral (including but not limited to parenting skills, child development, adoption as well as referrals to childcare centres, family day care, adoption agencies, in-home care, nannies, nursery schools, sick child/back up care).

l. School information and referral (including but not limited to working with teachers, school problems/study habits, preparing for/adjusting to college/university as well as referrals to public and

JTM 05644

PI Exhibit 3 Page 00187

private schools, college/university and vocational schools, special needs programs).

m. Elder care/ adult disabilities telephonic consultation and referral (including but not limited to caring for elders, the aging process, caregiver support as well as referrals to adult day care, in-home services, nursing homes, retirement communities, subsidized housing, hospices, meal programs, transportation).

n. Everyday issues (including but not limited to how to choose a doctor, buying a home, consumer issues, buying or leasing a car and locating time saving services in the community such as pet sitters, and home contractors).

o. Support for Teens (including information/support for teenagers and to parents of teens on such issues as teen behaviour and development, self-esteem, stress, school and career planning, violence, alcohol and drugs, eating disorders, smoking, sexual identity and other teen health issues).

p. Health and Wellness (including but not limited to information and counselling on preventative health and wellness services including weight management and nutrition, exercise and fitness, injury and chronic disease self-management, pre and post natal health and alternative care options).

q. Smoking Cessation Program (including but not limited to online quit smoking guidance, quit buddies, nicotine dependency test, email support, and professionally moderated online support groups)

## Client's Responsibilities

2.02    The Client will be required to designate a liaison to consult with Ceridian in developing and executing an implementation and ongoing communication plan.

2.03    The relationship between Ceridian and the Employees will be confidential. Ceridian will be under no obligation to communicate with the Client about any information Ceridian and/or its Affiliates obtain in this relationship, even if the communication might be beneficial to the Client (unless otherwise expressly agreed upon by the Employee in writing with Ceridian). Ceridian will have the right to communicate directly and privately with Employees as necessary to carry out its obligations to the Employees.

2.04    The Services may include problem intervention and referrals for counselling. These Services are not intended to replace disciplines requiring provincial and federal licensure such as the practice of law or medicine. An independent lawyer, doctor or applicable licensed professional will be involved when activities constitute the practice of law, medicine or other licensed discipline. In the case of providing information on third party services and programs, such information will be accompanied by a disclaimer indicating that it is the Employees' responsibility to ascertain quality, capability and suitability of a service for the Employees' needs and that no warranty as to such services is made in connection with such information provided. In this regard, Ceridian will provide information on licensed, certified or registered services, where such regulation is in effect. Where recognized existing community services are legally exempt from regulation or where regulation is not in effect, Employees' may be provided with information on such services but will be advised that such services are not required to be licensed, certified or registered. Ceridian is not responsible or liable for, nor does Ceridian provide, insurance for the actions or inaction of such third parties.

## Additional Fee for Service Offerings available to LifeWorks for Small Business Clients on an ad hoc basis (but NOT covered in the Fees payable for the One Source for Small Business Service):

2.05    The following additional services are available on an ad hoc basis (on the terms and conditions of the Agreement) and may be provided to the Client upon request for the following fees (fees subject to change without notice):

• Orientation Sessions to Managers and Employees (1/2 hour to 1 hour in length): $250.00 per session, plus any travel expenses incurred.

• On-site Visibility Event participation: $200.00 per hour, plus any travel expenses incurred.

• 1-Hour lunch and learn Seminars - these seminars cover a wide-range of workforce effectiveness topics: $350.00, plus any travel expenses incurred.

• On-Site Employee Intervention:  $350.00 per hour with greater than 24 hours' notice, plus any travel expenses incurred. If less notice is given, then $500.00 or part thereof.

• Critical Incident Stress Management (CISM) interventions (up to a maximum of 3 hours in length per session): $750.00/session, plus any travel expenses incurred. A CISM intervention is defined as one session with one counselor per one incident occurring at a single worksite location. If multiple counselors or counseling is required in multiple locations, additional fees will be billed as appropriate.

### Standard Components of CISM:

Ceridian Corporation ("Ceridian") will provide services to all of Client's managers, supervisors, and human resources staff ("Eligible Individuals") via a dedicated toll-free telephone number. Ceridian will respond to requests for assistance within Canada and within timeframes appropriate for the specific request. Services include:

• Access to qualified consultants 24-hours a day, 365 days a year, for information and action planning.

• Critical Incident Management Services – Specially trained consultants available to managers and supervisors, for consultation and coordination of on-site support for critical incidents. Set-up and coordination of on-site debriefing or defusing.

The LifeWorks® On-site Critical Incident Stress Management (CISM) service:

a.    is provided on-site within 24 to 72 hours of the incident by trauma response specialists.

a.    is available for individuals and groups.

The services outlined above may include problem intervention and referrals for counselling. These services are not intended to replace disciplines requiring Provincial and/or Federal licensure such as the practice of law or medicine. A referral will be made to an independent lawyer, doctor, or applicable licensed professional when activities constitute the practice of law, medicine or other licensed discipline.

If Ceridian refers Eligible Individuals to established community resources, Ceridian will use reasonable efforts to refer Eligible Individuals to qualified persons or organizations for assistance.

The relationship between Eligible Individuals and Ceridian will be confidential. Ceridian will be under no obligation to communicate with Client about any information Ceridian obtains in this relationship, even if the communication might be beneficial to Client. Ceridian will have the right to communicate directly and privately with Eligible Individuals as necessary to carry out its obligations to Client or Eligible Individual.

## Section 3.00  Term and Termination

3.01    Term. This Service Exhibit will become effective when signed by Client and accepted by Ceridian commencing as of the Service Start Date. Upon the expiration of the Term, this Service Exhibit will automatically renew on a month to month basis unless cancelled in writing by either party upon 30 days notice to the other. Renewal prices are subject to change upon written notice to Client.

## Section 4.00  Fees and Payment

4.01 Fees.  The Fees payable by the Client to Ceridian for the Service during the term are as set forth in the attached Pricing Schedule. The Fees are exclusive of all Taxes. Ceridian shall not increase the Fees during the initial term, and thereafter shall be entitled to increase Fees one time during any 12 month period in an amount not to exceed the Canadian CPI.

4.02 Payment.  For each Payroll run processed, Ceridian shall invoice via the Payroll Funds Summary for each non-terminated employee an amount equal to the Fee per Covered Employee per Payroll noted above. Fees will be collected together with Payroll Funds and service charges for that Payroll run in the customary manner. Any additional sum due to Ceridian with respect to ad-hoc non-recurring charges shall be due and payable thirty (30) days after receipt by the Client of an invoice from Ceridian. As used herein, "Payroll" and "Payroll Funds" shall have the meaning given to

JTM 05645

such terms in the payroll services agreement/exhibit made between the Client and Ceridian.

## Section 5.00 General Provisions

5.01 The parties mutually acknowledge that this Agreement does not and will not serve to revise the relationship between the parties, and it is mutually agreed that any and all unremedied and outstanding accounts, defaults, breaches or other matters, existing between the parties as at the effective date of this Agreement shall remain intact and subsisting notwithstanding this Agreement.

5.02 The Original Agreement shall be considered amended by this Agreement, provided that to the extent that this Agreement does not modify the Original Agreement, the Original Agreement shall continue in full force and effect, and the parties hereby affirm the terms and provisions of the Original Agreement accordingly.

5.03 The Original Agreement, as modified and amended by this Agreement constitutes the entire agreement between Ceridian and the Customer pertaining to the goods and/or services described in the Original Agreement, and may be amended only by an agreement in writing signed by Ceridian and the Customer, and the Customer acknowledges that there are no representations, warranties, promises, agreements or inducements pertaining to such goods and/or services or this Agreement not embodied herein.

**Ceridian Canada Ltd.**

Per: _____
                        (Signature)
Print Name: Raymond Kitane

Title: Small Business Consultant

Date: July 21, 2009
        I have the authority to bind the corporation.

**Edirect Software Limited Partnership by it's general partners 1021018 Alberta Ltd. & 1016363 Alberta Ltd.**
(Name of Client)
Per: _____
                        (Signature)
Print Name: Jesse Willms

Title: CEO

Date: July 21, 2009
        I have the authority to bind the corporation.

Page 3 of 3

JTM 05646

**Unknown**

| | |
|---|---|
| **From:** | Lee Aho [lee@integraclick.com] |
| **Sent:** | Tuesday, October 27, 2009 11:49 AM |
| **To:** | Jesse Willms |
| **Subject:** | Copy of Google Letter |

Dear AdWords Advertiser,

We're writing to let you know about a change to Google's advertising policies that could affect your AdWords account.

Beginning in the coming weeks, we'll no longer accept ads that promote Unacceptable Business Practices. This includes, but is

not limited to, negative option or unclear billing, the sale of normally free items or services, and false celebrity

endorsements.

Our system identified your account as potentially affected by this policy change, specifically as it relates to negative

option or unclear billing. Negative option billing specifically relates to sites that offer free trials, services, or other

offers in conjunction with a subscription service. Sites in violation of this policy automatically enter users into a

subscription if they do not cancel within the pre-determined trial period. In order to comply, these pages must contain an

opt-in checkbox that contains the price and billing interval of the subscription service on the page where a user enters

their billing information.

When we make this change any URLs in violation of this policy may be submitted for Landing Page Quality disabling. Once this

has been completed you will have 10 days to make any necessary changes to your website in order to comply before the

disabling will take effect. We ask that you make changes to your ads and/or website to comply, so that your campaigns can

continue to run.

As a business, Google must make decisions regarding the advertising we accept. We've given much thought to our stance on this

content, as well as the potential effect our policy decision could have on AdWords advertisers, and we apologize for any

inconvenience it may cause you.

Sincerely,

The Google AdWords Team

3/4/2010

JTM 05668

## Unknown

| | |
|---|---|
| **From:** | Dustin Sparman [dustin@vantagepayments.com] |
| **Sent:** | Thursday, June 11, 2009 3:26 PM |
| **To:** | 'Jesse Willms' |
| **Cc:** | 'Nathan Shew'; 'ravi'; 'Graham Gochneaur' |
| **Subject:** | Domestic Porcessing Application |

**Attachments:** ECOMM Merchant Application and Agreement 06_09_09.pdf; Teledraft IntegraClick Merchant Settlement Schedule 1 (2).doc

Jesse,

I have attached the following documents for our domestic processing solution
1. Merchant Application
2. Settlement addendum

Please fill out and sign both documents. For the merchant application only fill out the information that applies to your company. As discussed, we will need a US incorporation with US Bank, and a US director. It's best to keep your name off of the app due to the TMF issue.

In addition to the application please send me:
- Processing statements (3 months) Do you have any others besides the Paygea account? I want to compare and see what looks better. (if not, don't worry about it)
- Bank statements (3months) - Already received
- Financials - 2008 financials, and YTD if you have them. Please include balance sheet and income statement
- Customer service and compliance overview- basically the bank would like to get an idea of how customer centric your organization including hours of operation, methods of contact (email, phone, etc...) ability to refund, communication with associations, etc...
- Drivers License/Passport/Utility Bill of application **signer/owner**
- Tax returns- Past 2 years of company tax returns
- Articles of incorporation- US Domestic Incorporation and Federal Tax ID #
- List of products and URLS, as well as website Terms and conditions, refund policy, privacy policy, contact information, etc....
- Fulfillment Center information, vendor/distribution agreements
- Order Process and Fulfillment method.
- list of fraud scrub measures implemented to prevent fraudsters
- Voided check or bank letter from a US depository account ( I would suggest your US HSBC account)

Please let me know if you need help on any of this. I'll be travelling until Sunday so my cell number is the best way to get in touch. Nathan will also be able to assist, his info is below

Nathan J. Shew
Nathan@vantagepayments.com
[Mobile] 360-430-4758 | [Office] 480-609-5730 x 2150 | [Fax] 866-316-9993

3/4/2010

JTM 05676

# Unknown

**From:** Craig Leonard [cleonard@advaliant.com]
**Sent:** Friday, January 02, 2009 1:07 PM
**To:** jd.jesse@yahoo.com
**Subject:** for next week

Hey Jesse,

Just organizing for next week. Below are my initiatives with you. I have additional things to tackle with Mark and Mike – as well as with all of my team members to keep everything moving.

Please add to this as you see fit. Can you and I chat everyday at 1p your time to make sure all these are moving forward correctly?

- Jesse
  - Daily – 1p mst
  - Current Offers:
    - Daily review
    - Get Acai cranking in UK
    - Acai goal: 10K/day; All others: 5K/day
    - Quality assurance system – info from Jivan
    - Open offers via all pubs to appropriate countries – adval tech already initiated
  - New Offers:
    - Launch Colon
    - Test Facebook/Make Money
    - Cash Advance offer research – top offers, overview of payouts/lead sale processes
    - Mobile offer – short code and set up info
  - Other
    - Individual Affiliate Agreement
    - Shared yahoo email – back-tracing emails
    - Getting Justin running on make money offers
    - Schedule meetings with networks for vegas
    - Planning for next month in vegas

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.733 / Virus Database: 271.1.1/2650 - Release Date: 01/27/10 12:36:00

3/4/2010

JTM 05679

Unknown

**From:** Jesse Willms [jd.jesse@yahoo.com]
**Sent:** Monday, June 15, 2009 10:28 AM
**To:** plester@shaw.ca
**Cc:** dustin@vantagepayments.com
**Subject:** Fw: Offshore processing solution

Phyllis,

Please complete this app.

Thanks
Jesse

--- On Thu, 6/11/09, Dustin Sparman *<dustin@vantagepayments.com>* wrote:

From: Dustin Sparman <dustin@vantagepayments.com>
Subject: Offshore processing solution
To: "'Jesse Willms'" <jd.jesse@yahoo.com>
Cc: "'Nathan Shew'" <nathan@vantagepayments.com>, "'ravi'" <ravi@clickbooth.com>, "'Grah
<graham@integraclick.com>
Date: Thursday, June 11, 2009, 12:50 PM

Jesse,

Per our conversation you would like to set up with our offshore solution as well. To get the bal
link below and fill out the online application. I already spoke with the bank re: your account so

https://forms.netsuite.com/app/site/crm/externalleadpage.nl?
compid=917714&formid=60&h=35f6e803a9f32cf2d69c&category=VantagePayments&custent

A few things:

- You can use your Canadian incorporation for this.

- TMF shouldn't be a huge deal, but if you have another contact person it would be preferre
ever been TMF'd.

- Regarding estimates, you mentioned 1- 2MM per month. This processor lines to see volur
please be accurate in your projections.

- Please include your main URL and send me a list of all other URL's you want to register

Once you submit this application shoot me an email and let me know and I'll follow up with the
more documents which we can pull together quickly.

Once approved it a pretty quick set up time, we can have you processing by next week.

Thanks,

3/4/2010

JTM 05715

## Unknown

| | |
|---|---|
| **From:** | Phyllis Plester [plester@shaw.ca] |
| **Sent:** | Thursday, October 22, 2009 9:17 PM |
| **To:** | 'Jesse Willms' |
| **Subject:** | FW: Wires - Riverico |
| **Importance:** | High |
| **Attachments:** | pastedGraphic.pdf; ATT00584.htm; pastedGraphic.pdf; ATT00587.htm; pastedGraphic.pdf; ATT00590.htm; pastedGraphic.pdf; ATT00593.htm; pastedGraphic.pdf; ATT00596.htm; pastedGraphic.pdf; ATT00599.htm; Dan to Pay 102009.pdf; ATT00602.htm |

Jesse,

This seems sooooooooo inefficient [and expensive]!!! Why can't we have Dan wire lump sum $ to our HSBC accounts in Seattle from each of the 4 Cyprus accounts and I can do the wires to our vendors on-line? Right now he's transferring $ daily from 3 Cyprus accounts to the major Cyprus account [Rivierico] anyway. In HSBC all I have to do is set up any NEW Beneficiary info ONCE then sending the wires is only a few key strokes the next time -- and done. If he wants, I can send daily reports to him -- after the wires have been transmitted

I still don't have access to any of the Cyprus bank accounts. I have not received up-to-date bank statements showing $ in and out. I have received only a few wire confirmations in the past few weeks. The Cash-Flow projections don't match what Dan is showing [I will forward you a copy of what he sends us following this email -- FYI 1, 2, 3 and 4].

php

---

**From:** Daniel Sullivan [mailto:dan@deedevelopments.com]
**Sent:** October 21, 2009 11:59 PM
**To:** CLEANTHIS ROUSSAKIS
**Cc:** Andreas Hadjioannou; Phyllis Plester
**Subject:** Wires - Riverico

Dear Cleanthis,

Starting after today, Phyllis Plester (copied on this e-mail: plester@shaw.ca) is going to be the primary person for sending wires for the following 4 companies. Can you please make sure to send Phyllis a copy of these companies bank movement worksheets and SWIFT wire receipts each day?

1) RIVERICO TRADING LIMITED ▆▆▆▆

2) BESIANA SERVICES LTD ▆▆▆▆▆▆
3) MORGANA INVESTMENTS LIMITED ▆▆
▆▆▆▆▆

4) GENTA HOLDINGS LIMITED ▆▆▆▆▆
▆▆▆▆

I am expecting the following wires from Wirecard today.

1) RIVERICO TRADING LIMITED ▆▆▆▆
▆▆▆▆             651,788.53
2) BESIANA SERVICES LTD ▆▆▆▆▆▆▆     586,541.44

3/4/2010

JTM 05730

3) MORGANA INVESTMENTS LIMITED ████     146,087.93
████████
4) GENTA HOLDINGS LIMITED ██████████     157,986.46

**After the wires are received, please make the following transfers:**

A) Please transfer $947,000.00 from BESIANA SERVICES LTD to RIVERICO TRADING LIMITED as a loan

B) Please transfer $217,000.00 from MORGANA INVESTMENTS LIMITED to RIVERICO TRADING LIMITED as a loan

C) Please transfer $232,800.00 from GENTA HOLDINGS LIMITED to RIVERICO TRADING LIMITED as a loan

**Then please make the following 7 wire transfers from RIVERICO TRADING LIMITED:**

1) Advaliant: invoices 8399 & 8383 for $347,225.38

    Account Name: Advaliant Inc.
    Account #: ██████████
    Bank Name: Citibank
    Bank Address: 339 Park Avenue, New York, NY 10022
    Bank Routing #: ██████████

2) Bloosky invoices 5243 & 5245 for $177,898.00

    Account Name: Bloosky Interactive Media
    Account Address: PO box 1941, Orem, UT 84059
    Bank: Wells Fargo Bank, NA
    Bank Address: 255 2nd Ave South, Minneapolis, MN 55479
    Acct #: ██
    ABA #: ████
    Swift #: ████

3) For Your Smiles Only, LLC: invoice 6328 for $158,125.00

    Account Name: For Your Smiles Only, LLC
    Account #: ██████████
    Bank Name: Bank of America
    Bank Address: 2310 FM 1960 Rd W, Houston, TX 77090
    Bank Routing #: ██████████
    SWIFT# ████████

4) IntegraClick/Clickbooth: invoice JL101509BBA for $535,460.00

    Account Name: IntegraClick, Inc.
    Account #: ██████████
    Bank Name: Bank of America

3/4/2010

JTM 05731

Bank Address: 304 West Venice Avenue, Venice, FL 34285
Bank Routing #: ▓▓▓▓▓

5) Epic Advertising: for invoice 120004275 for $822,980.00

    Account Name: Epic Advertising Inc.
    Account #: ▓▓▓▓
    Bank Name: RBC Royal Bank
    Bank Address: 260 East Beaver Creek Road, Richmond Hill, ON L4B-3M3
    SWIFT #: ROYCCAT2
    Transit #: 06032
    **INTERMEDIARY BANK:**
    JP Morgan Chase, NA
    ABA#: ▓▓▓▓▓▓

6) International Print Specialists invoices 2075 & 2076 for $60,701.16

    Company address: 3432 Denmark Avenue, Suite 51, Egan MN 55123
    Bank Name:? Wells Fargo Bank NA
    Bank Address: 14325 Cedar Avenue, Apple Valley, MN 55124?
    Account Name: International Print Specialists?
    Routing # ▓▓▓▓
    Account #? ▓▓▓▓▓

7) Ion Labs invoice 091509 for $54,933.15

    Account Name: Ion Labs, Inc.
    Account Address: 5459 115th Avenue North, Clearwater FL 33760
    Bank: Regions Bank
    Bank Address: 5200 Easy Bay Drive, Clearwater, FL
    Acct #: ▓▓▓▓▓
    ABA #: ▓▓▓▓▓

Thanks,
Dan

Daniel J Sullivan
Chief Financial Officer
dan@deedevelopments.com

No virus found in this incoming message.

3/4/2010

JTM 05732

## Unknown

**From:** Jared Klein [jaredk@hydranetwork.com]
**Sent:** Tuesday, November 25, 2008 3:08 PM
**To:** jd.jesse@yahoo.com
**Subject:** legal feedback

See below – this should help...

Okay. Looking at the very lengthy LP, the disclosures are there but could be emphasized a bit in terms of **bolding** the typeface for the cancellation policy area, which is in a light gray box with semi-grayed text. The average user would unlikely understand that you have three (3) charges and three (3) separate cancellation phone numbers to call in order to completely cancel from all of these linked charge items, and that there's a "no-refunds" policy in place. So that disclosure needs to be a little more prominently displayed. One possibility is to take the pricing information from Section 5.1 of the Terms and Conditions, boil it down into simple terms, and then display it as a sidebar/skyscraper near the top of the LP. In that way, nobody can complain that "we didn't know," etc.

Additionally, the word "free" appears in the LP something like 16 or so times. There are a lot of different charges associated with the options available for this product, which are disclosed in the Terms and Conditions (Section 5.1). They are a little misleading, so I would recommend adding a "qualification" very near the first "FREE" to the effect of "Shipping and Handling charges of $4.95 apply if you are qualified for the FREE trial."

Otherwise, not bad. One concern, however, is the inability of customers to get through to the company. That's a HUGE problem; if they need to add phone lines then they should get do so. Nothing says "FRAUD" like the inability to connect to a human being who wants to cancel.

hydra
**Jared Klein |** Senior Account Executive
310-659-5755 x2115   fax 310-861-1880   aim HydraJaredK
8800 Wilshire Boulevard, 2nd Floor | Beverly Hills, CA 90211
hydranetwork.com   Inc.5 OTop10

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.733 / Virus Database: 271.1.1/2650 - Release Date: 01/27/10 12:36:00

3/4/2010

JTM 05788

## Unknown

| | |
|---|---|
| **From:** | Phyllis Plester [plester@shaw.ca] |
| **Sent:** | Wednesday, December 09, 2009 12:05 PM |
| **To:** | 'Jesse Willms' |
| **Subject:** | RE: Cyprus Banks December 9th |
| **Importance:** | High |

**Attachments:** December 9, 2009 Summary ALL os.xls

Are you saying I should pay the Advertisers, etc. from HSBC Seattle – eDIRECT's account? Why didn't Dan send it to Cyprus bank and pay everybody from there? He has all the information on what is owing, to who and their bank info, etc. I would have to start right now to get these out before today's cutoff. A lot of these are not even set up as "Beneficiaries" in eDIRECT's bank and I would have to check and double-check each one that is to in to be certain the bank info is still current.

Attached is what I have sent Dan to pay that is still owing. Can you/or Curtis advise me which ones I should pay please. We owe a lot more than $2,000,000.

php

---

**From:** Jesse Willms [mailto:jd.jesse@yahoo.com]
**Sent:** December 9, 2009 9:39 AM
**To:** Phyllis Plester
**Subject:** RE: Cyprus Banks December 9th

I had Dan wire it, till they figured out all the Visa reconciling, they owe us like 10+ million, but I wanted money in short term.

Can we meet at one at office, so were before cutoff, so we can pay everyone? Should get rest of money later this week, I'll go down thursday to resolve everything. Very annoying when we switch merchant accounts, were also gonna plan long term solutions to prevent this in the future.

jesse

--- On Wed, 12/9/09, Phyllis Plester *<plester@shaw.ca>* wrote:

From: Phyllis Plester <plester@shaw.ca>
Subject: RE: Cyprus Banks December 9th
To: jd.jesse@yahoo.com
Date: Wednesday, December 9, 2009, 8:20 AM

Yes, $2,000,000.00 !!!! ☺ Where did this come from?

php

---

**From:** jd.jesse@yahoo.com [mailto:jd.jesse@yahoo.com]
**Sent:** December 9, 2009 7:52 AM
**To:** Phyllis Plester
**Subject:** Re: Cyprus Banks December 9th

Any wires into hsbc?

3/4/2010

JTM 05850

## Unknown

**From:** Jesse Willms [jd.jesse@yahoo.com]
**Sent:** Thursday, October 22, 2009 10:25 AM
**To:** Heman Ortegon-Rico
**Subject:** Re: Fwd: 30 day MBG

lets go over when you get back.

Jesse

--- On Wed, 10/21/09, Hernan Ortegon-Rico <*hernan@justthinkmedia.com*> wrote:

From: Hernan Ortegon-Rico <hernan@justthinkmedia.com>
Subject: Fwd: 30 day MBG
To: "Jesse Willms" <jd.jesse@yahoo.com>
Date: Wednesday, October 21, 2009, 5:29 PM

Nancys feedback

Sent from my iPhone

Begin forwarded message:

> **From:** Nancy Carr <nancy@justthinkmedia.com>
> **Date:** October 21, 2009 10:52:26 AM CDT
> **To:** Hernan Ortegon-Rico <hernan@justthinkmedia.com>
> **Subject: Re: 30 day MBG**
>
> Hi Hernan,
>
> If we were to do that, I am not sure we would still be able to claim that
> there is a 30 day MBG.
> The way it is right now, the customer has to call within 21 days to cancel
> account in order for the auto shipment to not go out. So if they call on day
> 22 or 23 to cancel, it is too late to stop the auto shipment, so it has shipped.
>
> If they are upset at this point about the trial product charge, up until now we
> have been telling them they can return for full refund as they are covered
> under 30 day MBG. So now, we would be telling them that there is another
> shipment on the way because they did not cancel within 21 days and they
> can return that within 30 days, but now the first (trial) product is no longer
> covered by 30 days. Hmmm, I think it will get ugly. I think we would
> have to change our MBG to state it is only on auto shipments perhaps.
> Maybe we can make the trial a 21 day MBG.
>
> I think it could be done, but I do not think we could advertise that all of it is
> a 30 day MBG and if we try, it will be one big nightmare for Agents to
> determine when and which charges are covered. They are having a struggle

3/4/2010

JTM 05904

with all the things we ask them to deal with as it is.

Just my opinion. :)

Nancy


On Wed, Oct 21, 2009 at 9:15 AM, Hernan Ortegon-Rico
<hernan@justthinkmedia.com> wrote:
: Hello Nancy,

We would like your feedback again and this time regarding the 30 day
MBG. We would like to start it from the day of the trial charge (1.95, 2.95
or 4.95), this would mean that only one charge would ever qualify for
refund. Once the autoshipment is sent, the trial is no longer refundable.
This will decrease refunds dramatically and increase our ROI (return on
investment)
We really want to go ahead with this, we just need your feedback as to
when we can start or If you like the idea,

Thank you,
Sent from my iPhone


--
Nancy Carr
Operations Manager,
GC Operations
nancy@justthinkmedia.com

Office: 780-416-0211
Fax:    780-416-0218

JustThink Media Inc.
www.justthinkmedia.com


Confidentiality Notice: The information contained in this e-mail is for the
intended recipient(s) alone. It may contain privileged and confidential
information that is exempt from disclosure under law and if you are not an
intended recipient, you must not copy, distribute or take any action in
reliance on it. If you have received this e-mail in error, please notify us
immediately.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.733 / Virus Database: 271.1.1/2650 - Release Date: 01/27/10 12:36:00


3/4/2010

JTM 05905