1    The Honorable Judge Marsha J. Pechman

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
9                                    AT SEATTLE

10

11   **FEDERAL TRADE COMMISSION**,          Case No. 2:11-cv-0828-MJP

12
                                            **AMENDED MOTION FOR**
13               Plaintiff,                  **PRELIMINARY INJUNCTION AND**
                                            **MEMORANDUM OF POINTS AND**
14        v.                                **AUTHORITIES IN SUPPORT**

15   **JESSE WILLMS**, et al.,               **[REFORMATTED]**

16                                          Note on Motion Calendar: **July 22, 2011**
                 Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**                                    Page

I.    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Corporate Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      D.    The Corporate and Individual Defendants Are a Common
            Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      E.    Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  DEFENDANTS' ILLEGAL BUSINESS PRACTICES . . . . . . . . . . . . . . . 9

      A.    Defendants' Misrepresentations About "Free,"
            "Risk-free," and "Bonus" Offers And Undisclosed or
            Inadequately Disclosed Charges To Consumers' Accounts . . . . . . 11

      B.    Defendants Impose Deceptive and Undisclosed
            Limitations on Cancellations and Refunds . . . . . . . . . . . . . . . . . . 21

      C.    Defendants Have Made False and Unsubstantiated
            Weight Loss and Colon Cancer Cure Product Claims . . . . . . . . . . 24

            1.    Defendants' False and Unsubstantiated
                  Weight Loss Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            2.    Defendants' False and Unsubstantiated
                  Colon Cancer Cure Claims . . . . . . . . . . . . . . . . . . . . . . . . 25

      D.    Defendants Have Disseminated False Claims of Celebrity and Other
            Endorsements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      E.    Defendants' Unfair Practice of Evading Risk
            Management Rules to Obtain Merchant Accounts . . . . . . . . . . . . . 27

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      A.    Section 13(b) of the FTC Act Authorizes This Court to
            Grant the Requested Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      B.    This Case Meets the Applicable Standard for Entry of
            Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      C.    The Evidence Demonstrates a Substantial Likelihood of
            Success on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            1.    Defendants' Deceptive and Unfair Business

|  |  |  |  | Practices Violate Sections 5 and 12 of the FTC Act. . . . . . 32 |
|--|--|--|--|

a.    Material Misrepresentations About "Free,"
"Risk Free," and "Bonus" Offers and
Failure to Disclose or Adequately Disclose
Charges to Consumers' Accounts. . . . . . . . . . . . . 32

b.    Deceptive and Undisclosed or Inadequately
Disclosed Limitations on Cancellations and
Refunds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

c.    False and Unsubstantiated Claims About
the AcaiBurn and PureCleanse Products. . . . . . . . . 35

d.    False Celebrity and Other Endorsements. . . . . . . . .37

e.    Unfair Practice of Evading Risk Management
Rules to Obtain Merchant Accounts. . . . . . . . . . . .38

2.    Defendants' Unauthorized Billing Practices Violate
Section 907(a) of the EFTA and Section 205.10(b)
of EFTA's Implementing Regulation E. . . . . . . . . . . . . . . 39

3.    Liability of Individual Defendants. . . . . . . . . . . . . . . . . . . 39

a.    Jesse Willms. . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

b.    Peter Graver, Adam Sechrist, Brett Callister, and
Carey Milne. . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

D.    The Balance of the Equities Requires Preliminary Relief. . . . . . . . .41

E.    An Asset Freeze is Necessary to Preserve Funds for
Consumer Redress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

1    Plaintiff, Federal Trade Commission ("FTC" or "Commission"), having filed its

2    complaint in this matter for a permanent injunction and other equitable relief, including

3    restitution for consumers injured by defendants' unlawful practices, moves this Court for a

4    preliminary injunction.  A proposed order has been filed concurrently.  This Court is

5    authorized to grant such relief by Section 13(b) of the Federal Trade Commission Act ("FTC

6    Act"), 15 U.S.C. § 53(b), Section 917(c) of the Electronic Fund Transfer Act ("EFTA"), 15

7    U.S.C. § 1693o(c), and Rule 65(a) of the Federal Rules of Civil Procedure.  In support of its

8    motion, plaintiff states that defendants Jesse Willms and the corporate entities he controls

9    (collectively "Willms Defendants"), as well the named principals of those entities, Peter

10   Graver, Adam Sechrist, Brett Callister, and Carey Milne, have engaged in and are likely to

11   engage in acts or practices that violate Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a)

12   and 52, Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of EFTA's

13   implementing Regulation E, 12 C.F.R. § 205.10(b).  Plaintiff further submits the following

14   Memorandum of Points and Authorities and accompanying exhibits in support of this Motion

15   for Preliminary Injunction.

16   **I.      SUMMARY**

17   The Willms defendants have marketed numerous products over the Internet, including

18   weight-loss supplements, teeth whiteners, colon cleansers, anti-aging pills, skin creams, work-

19   at-home schemes, credit reports, government grants, and, most recently, penny auctions.  The

20   products themselves, however, were merely lures to draw consumers into agreeing to provide

21   their payment information for "risk free" or "free" trial offers and "bonus" products and

22   services.  These websites routinely deceived consumers about the true costs of the offers with

23   poorly disclosed or undisclosed costly negative option continuity plans and forced upsells that

24   were charged to consumers' credit or debit card accounts monthly, enabling the Willms

25   defendants to capture many undisclosed charges before consumers noticed them.  The Willms

26   defendants have convinced consumers that their offers were "risk free" by representing that

27

28

1   consumers could obtain full refunds on request.  Instead, most consumers could not cancel

2   without paying for at least some of the products or services.

3          Not surprisingly, these practices have resulted in ongoing excessive charge reversal

4   rates for the products and services.  To avoid detection and to ensure continued access to

5   financial institutions to process consumers' charges, the Willms defendants, with the help of

6   defendants Graver, Sechrist, Callister, and Milne, have engaged in numerous unfair tactics,

7   including creating shell corporations in the U.S. and abroad and fronting them with nominee

8   principals; submitting inaccurate information to financial institutions to get payment

9   processing; and processing payments in ways that mask the extent of their chargeback activity.

10  The Willms defendants also made deceptive and unsubstantiated product claims for two of the

11  products they marketed and sold on their websites:  acai berry weight-loss pills (collectively

12  referred to as "AcaiBurn") and colon cleansing pills (collectively referred to as

13  "PureCleanse"), and used deceptive celebrity endorsements to entice consumers to try these

14  products.

15         Defendants' deceptive and unfair practices violate Sections 5 and 12 of the FTC Act

16  and have caused enormous consumer injury.  Although defendants claim that they have ceased

17  their unlawful practices, plaintiff has evidence that defendants continue to create and operate

18  new websites with free-to-pay conversion trial offers and negative option features, which are at

19  the core of their deceptive practices.  To prevent defendants from continuing to injure

20  unsuspecting consumers, plaintiff seeks a preliminary injunction to require them to cease

21  offering products or programs with negative option and recurring payment features during the

22  pendency of the litigation.  Plaintiff further seeks the imposition of an asset freeze to preserve

23  assets for injured consumers.

24  **II.     THE PARTIES**

25          **A.     Plaintiff**

26          The FTC is an independent agency of the United States Government created by statute.

27  15 U.S.C. § 41 *et seq*.  It is charged, *inter alia*, with enforcement of Section 5(a) of the FTC

28

1  Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting

2  commerce, and Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false

3  advertisements for foods, drugs, devices, services, or cosmetics in or affecting commerce.  The

4  FTC also enforces EFTA, 15 U.S.C. § 1693, *et seq*., which regulates the rights, liabilities, and

5  responsibilities of participants in electronic fund transfer systems.  The FTC is authorized to

6  initiate federal district court proceedings to enjoin violations of the FTC Act and EFTA and to

7  secure such equitable relief as may be appropriate, including rescission or reformation of

8  contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

9  15 U.S.C. §§ 53(b), 56(a)(2)(A), and 1693o(c).

10  **B.    Corporate Defendants**

11  **1021018 Alberta Ltd.** is a Canadian limited liability company with its registered place

12  of business at #2500, 10104 103rd Avenue, Edmonton, Alberta.  Defendant Willms is the sole

13  owner of this company.  The registered trade names for the company are Just Think Media,

14  Credit Report America, Wulongsource, and Wuyi Source (collectively "Just Think Media").

15  Just Think Media also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB; 79

16  Charlton Road, Sherwood Park, AB; and #240, 11 Athabascan Avenue, Sherwood Park, AB.

17  1021018 Alberta Ltd. is the Willms company that promoted, marketed, and sold each of

18  defendants' products. PI Ex. 2, at 39, 87, 95, 111-12, 115.

19  **1016363 Alberta Ltd.** is a Canadian limited liability company with its registered place

20  of business at #2500, 10104 103rd Avenue, Edmonton, Alberta.  Defendant Willms is the sole

21  owner of this company.  The registered trade name for the company is eDirect Software.

22  eDirect Software also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB, and

23  79 Charlton Road, Sherwood Park, AB.  In the past, defendants 1021018 Alberta Ltd. and

24  1016363 Alberta Ltd. have operated as a partnership using the name eDirectsoftware.  PI Ex. 2,

25  at 39, 95.

26  **1524948 Alberta Ltd.** is a Canadian limited liability company with its registered place

27  of business at #2500, 10104 103rd Avenue, Edmonton, Alberta.  Defendant Willms is the sole

28

owner of this company.  Its registered trade name is Terra Marketing Group.  Terra Marketing Group does business under various names, including SwipeBids.com and SwipeAuctions.com. PI Ex. 6, at 285, 306-07, ¶ 9 and Attach. C.

**Circle Media Bids Limited** is a private limited liability company incorporated in England, with its registered place of business at 72 High Street, Haslemere, Surrey, England. Defendant Sechrist established it to facilitate the operation of online penny auctions, including SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com, and, specifically, to secure offshore merchant banking services for Willms.  PI Ex. 1, at 8-29.

**Coastwest Holdings Limited** is a Cyprus corporation with its registered place of business at Vasilissis Frederikissis, 33, First Floor, Nicosia, Cyprus.  Defendant Willms is the sole owner of this company; he established it to facilitate his operations and to secure offshore merchant banking services.  PI Ex. 2, at 39, 95, 110; PI Ex. 56, Attach. M, at 2963-64.

**Farend Services Ltd.** is a Cyprus corporation with its registered place of business at Athinodorou, 3, Dasoupoli, Strovolos, P.C. 2025, Nicosia, Cyprus.  PI Ex. 2, at 39, 95; PI Ex. 3, at 245-46.  Defendant Willms controls Farend Services and has signed as "President" of Farend Services on a Cease and Desist Order the company entered into with the State of Utah. PI Ex. 5, at 280-81.  Like Coastwest, Farend Services was established to facilitate Willms's Internet operations and to secure offshore merchant banking services for him.  PI Ex. 2, at 95; PI Ex. 3, at 207-13.

**JDW Media, LLC** is an Idaho limited liability corporation with its registered place of business at 2184 Channing Way, #322, Idaho Falls, Idaho.  Defendant Graver established JDW Media to facilitate Willms's Internet operations and to secure banking and merchant processing services for Willms.  PI Ex. 1, at 4; PI Ex. 2, at 31, 39, 114-15; PI Ex. 50, at 2440-41, 2531-53, ¶¶ 24-25 and Attachs. N and O.

**Net Soft Media, LLC** is a Utah limited liability corporation with its registered place of business at 2150 S. 1300 E., Suite 500, Salt Lake City, Utah.  Net Soft Media does business as SwipeBids.com.  PI Ex. 1, at 5-6; PI Ex. 8, at 403-06, 560-63, 635-38; PI Ex. 49, at 2386-422;

PI Ex. 50, at 2637-45, ¶ 32 and Attach. U.  Defendant Milne established Net Soft Media to facilitate the operation of online penny auctions, including SwipeBids.com, and specifically to secure banking and merchant processing services for Willms.  PI Ex. 8, at 389-90, 415-16, 420, 480, 529-30, 560-64, 592-94, 635-38, 645-50.

**Sphere Media, LLC** is a Utah limited liability corporation with its registered place of business at 906 W. 400 S., Orem, Utah.  Sphere Media has done business under various names, including SwipeBids.com and SwipeAuctions.com.  Defendants Graver and Sechrist established Sphere Media to facilitate the operation of online penny auctions, including SwipeBids.com, and specifically to secure banking and merchant processing services for Willms.  PI Ex. 1, at 1-3; PI Ex. 8, at 399, 423-36, 439-74, 543-44, 547, 549, 668-81, 684-94.

**True Net, LLC** is a Nevada limited liability corporation with its registered place of business at 1555 E. Tropicana Ave., Suite 250, Las Vegas, Nevada.  True Net does business as Selloffauctions.com.  Defendant Callister established True Net to facilitate the operation of online penny auctions, including Selloffauctions.com, and specifically to secure banking and merchant processing services for Willms.  PI Ex. 8, at 387-88, 391-92, 526-27, 532, 589-91, 599-606, 609- 618.

### C.    Individual Defendants

Defendant **Jesse Willms** is a resident of Alberta, Canada.  He owns, directs, or otherwise controls each of the named corporate defendants and is the sole named shareholder or owner of four of the ten companies named in the complaint.  PI Ex. 2, at 95.  He created or approved the companies' business plans, customer service scripts, and websites, and negotiated and signed contracts on behalf of the corporate defendants, including contracts for banking (he is a signatory on at least two U.S. bank accounts), payment processing services, ad networks, fulfillment houses, and domain registration services, and managed those contractual relationships.  PI Ex. 2, at 93-94, 122-23; PI Ex. 3, at 138-89, 191; PI Ex. 9, at 719-29; PI Ex. 48, at 2285-298.  Willms outsourced a large part of his operations to third parties in the U.S. who have provided products, fulfillment, customer service, and affiliate marketing for his

companies.  PI Ex. 2, at 93-94, 122-23; PI Ex. 3, at 138-89, 191; PI Ex. 9, at 719-29; PI Ex. 48, at 2285-298.  However, he maintained control of all aspects of the business.  He reviewed and approved: (1) all scripts used by customer service agents; (2) the compliance guide his companies used for the website designers and content writers; and (3) all changes to the websites.  PI Ex. 2, at 88, 94.  He also maintained significant control over the functions he outsourced.  PI Ex. 9, at 711, 714, 804, 813, 821-24, 828, 830, 833-35, 842-45, 878-88 (transcripts of instant messages between the Willms defendants and their call center are at 802-86); PI Ex. 10, at 910-11; PI Ex. 11, at 1056; PI Ex. 12, at 1129-31.  Willms also approved bonuses to customer service agents for handling the largest call volumes.  See PI Ex. 9, at 821-22, 843, 878.

Willms describes the remaining named companies as his "agents," admitting that creating these companies was "necessary to facilitate credit card processing" and that he set them up to enable him to secure payment processing when he could no longer do so on his own because of the excessive charge reversals his practices engendered.  PI Ex. 2, at 115; PI Ex. 3, at 191, 242-43; see generally, PI Ex. 8 (defendant Peter Graver's email with other defendants about establishing shell corporations, merchant bank accounts, and payment processing for Willms defendants).  Willms nonetheless exercised substantial control over these companies.  PI Ex. 3, at 242-67; PI Ex. 8, at 401-02, 411, 415-16, 438, 459-62, 475, 486-510, 513-14, 516-17, 536, 541, 543, 550, 554, 578-80, 586-94, 643, 664-67.

Defendant **Peter Graver**, a Utah resident, is an officer of defendant JDW Media, LLC, and is the registered agent and bank account signatory for defendant Sphere Media, LLC.  Graver entered into a contract with defendant Willms to act as the nominee principal of JDW Media, LLC, while Willms maintained control.  Under the contract, Graver has provided an array of services including, but not limited to: (1) setting up U.S. companies for purposes of obtaining bank accounts and merchant processing for Willms; (2) finding nominee principals of those companies to sign on bank accounts so that Willms's involvement would be undetected; (3) transferring money between the Willms entities; and (4) acting as or arranging

1   for others to act as the U.S. signatory on merchant applications for Willms's companies.  The

2   contract specifically provided that Graver would perform these duties as Willms directed, and

3   Graver has had no right and or claim to any monies flowing through the corporations, although

4   he was paid for his services. PI Ex. 1, at 1-4; PI Ex. 3, at 167a-167d; PI Ex. 8, at 377-78, 381-

5   82, 384, 387-391, 393-405, 407-09, 415-26, 428-36, 438, 440-43, 454-58, 464-67, 479, 486-

6   509, 513-14, 518, 529-30, 532-38, 547, 555, 560-65, 567-77, 579-85, 599-606, 614, 619-59,

7   664-94.

8       Defendant **Adam Sechrist**, a Pennsylvania resident, is a director and sole shareholder of

9   defendant Circle Media Bids Limited and is the manager of defendant Sphere Media, LLC.  PI

10  Ex. 1, at 1-3, 8-13.  Defendant **Brett Callister**, a Utah resident, is an officer of defendant True

11  Net, LLC.  PI Ex. 8, at 609-11.  Defendant **Carey Milne**, a Utah resident, is an officer of

12  defendant Net Soft Media, LLC.  PI Ex. 1, at 5-6.  These defendants were nominee principals

13  for the shell corporations and signatories for the companies' associated merchant accounts that

14  they and Graver assisted the Willms defendants in creating.  See, e.g., PI Ex. 8, at 399-400,

15  417-19, 423-24, 547, 549, 582-85, 619-32, 639-42, 653-63, 668-92 (Sechrist); 387-88, 391-92,

16  532, 599-606 (Callister); 529-30, 635, 645-52 (Milne).  They have signed contracts similar to

17  that of Graver.  PI Ex. 8, at 586-94.  They, too, had no claim to money flowing through the

18  corporations.

19      **D.      The Corporate and Individual Defendants Are a Common Enterprise**

20      Jesse Willms's ownership interests in the corporate defendants, and the exercise of his

21  control and authority over each of them, make them one common enterprise for purposes of

22  liability.  Further, the corporations have freely commingled funds, which were transferred to

23  offshore entities Willms controlled.  See PI Ex. 3, at 193-96, 198, 202-13, 217-20; PI Ex. 8, at

24  403-10, 413, 482-509, 516-17, 560-66, 576-77.  The evidence amply demonstrates that

25  defendants have operated as a common enterprise and, as such, each of the companies and the

26  individuals is jointly and severally liable for the alleged law violations.  See FTC v. Bay Area

27  Business Council, Inc., 423 F.3d 627, 635 (7th Cir. 2005); Sunshine Art Studios, Inc. v. FTC,

28

1   481 F.2d 1171, 1173, 1175 (1st Cir. 1973); FTC v. Neovi, Inc., 598 F.Supp. 2d 1104, 1116

2   (S.D. Cal. 2008).

3         **E.**      **Jurisdiction and Venue**

4        This matter is properly before the Court.  The Court has subject matter jurisdiction over

5   the FTC Act and EFTA claims under 28 U.S.C. §§ 1331, 1337(a), and 1345.  Section 5 of the

6   FTC Act explicitly authorizes the Commission to prevent "unfair or deceptive acts or

7   practices."  The statute defines such acts or practices to include foreign commerce that "cause

8   or are likely to cause reasonably foreseeable injury within the United States" or "involve

9   material conduct occurring within the United States." 15 U.S.C. § 45(a)(4)A.  In this case,

10  defendants used the Internet to market their products and services and shipped their products to

11  consumers in every state in the U.S., every Canadian province, and numerous other countries.

12  PI Ex. 2, at 87.   The U.S. SAFE WEB Act of 2006 specifically amended the FTC Act to grant

13  the Commission authority over conduct involving "foreign commerce," including the

14  availability of  "all remedies . . . with respect to unfair and deceptive acts or practices."  15

15  U.S.C. § 45(a)(4)(B).  Although many of these practices originate in Canada, they "cause or

16  are likely to cause reasonably foreseeable injury within the United States" and, thus, violate the

17  FTC Act.  See 15 U.S.C. § 45(a)(4)(A)(i).

18       In addition to subject matter jurisdiction, the Court also has personal jurisdiction over the

19  defendants.  F.R.C.P. 4(k)(1)(c) provides that valid service of process is sufficient to establish

20  personal jurisdiction when authorized by a federal statute.  Courts have uniformly relied on

21  this Rule to interpret statutes authorizing worldwide service of process as also authorizing

22  personal jurisdiction in the United States, as long as the party has sufficient contact with the

23  United States.  See, e.g., Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174,

24  1180 (9th Cir. 2004) (Clayton Act); Fitzsimmons v. Barton, 589 F.2d 330, 332 (7th Cir. 1979)

25  (securities laws).  In this instance, the FTC Act is the authorizing federal statute.  Section 13(b)

26  of the FTC Act provides that "process may be served on any person, partnership, or

27  corporation wherever it may be found," thus authorizing worldwide service of process.  Courts

28

have consistently held that, because process can be served anywhere in the United States under the FTC Act, personal jurisdiction is proper anywhere in the United States as well.  FTC v. Cleverlink Trading, Ltd., et al., No. 05-2889, 2006 U.S. Dist. LEXIS 45244, at *14-15 (N.D. Ill. June 19, 2006); FTC v. Bay Area Bus. Council, Inc., et al., No. 02 C 5762, 2003 U.S. Dist. LEXIS 3865, at *6 (N.D. Ill. Apr. 30, 2003).   Further, the foreign defendants in this case are subject to personal jurisdiction with the United States so long as they have "acted within any district of the United States or sufficiently caused foreseeable consequences in this country." See Action Embroidery Corp., 368 F.3d at 1180 (quoting Securities Inv. Prot. Corp. v. Vigman, 764 F.2d 1309, 1316 (9th Cir. 1985)). The defendants' use of the Internet to market and sell their products to consumers in the United States, including consumers in Western Washington, sufficiently caused foreseeable consequences in this country, thus subjecting them to the Court's in personam jurisdiction.  PI Ex. 2, at 87; PI Ex. 51, at 2667, ¶ 5; PI Ex. 54, at 2698, ¶ 7.

Venue is also proper in the Western District of Washington.  Pursuant to the FTC Act, an action may be brought in any district where a corporation or person "resides or transacts business." 15 U.S.C. § 53(b).  Additionally, with respect to defendants Jesse Willms and the foreign corporations, 28 U.S.C. § 1391(d) states that "an alien may be sued in any district." The defendants have transacted business in this district and have generated complaints from Western Washington consumers.  PI Ex. 51, at 2667, ¶ 5; PI Ex. 54, at 2698, ¶ 7.  Moreover, because personal jurisdiction is proper in this matter, it necessarily follows that venue is proper pursuant to 28 U.S.C. § 1391(c) (venue is proper in any judicial district in which a defendant corporation is subject to personal jurisdiction).

## III.  DEFENDANTS' ILLEGAL BUSINESS PRACTICES

Since at least 2007, the Willms defendants have used deceptive marketing tactics to sell a variety of products, programs, and services via the Internet, including weight loss and colon cleansing supplements with many different names and formulations, a work-at-home scheme, a government grants program, a credit report program, and teeth whiteners.  PI Ex. 2, at 41, 51-

55, 96-98, 130-34; PI Ex. 4, at 270, ¶ 3; PI Ex. 21, at 1740, ¶ 2; PI Ex. 22, at 1759, ¶ 2; PI Ex. 25, at 1805, ¶¶ 2-3; PI Ex. 26, at 1824, ¶ 2; PI Ex. 27, at 1831, ¶ 4; PI Ex. 28, at 1838, ¶ 2; PI Ex. 31, at 1895, ¶¶ 2-3; PI Ex. 32, at 1913, ¶ 2; PI Ex. 33, at 1928, ¶ 2.  The Willms defendants also have charged consumers for various "upsell" programs and products, including the "Insider Secrets Expert Tips" package, "Comprehensive Weight Loss ebook," "World Club Fitness,"  "Fraud Protection," and "ID Theft."  PI Ex. 10, at 910; PI Ex. 11, at 10, 53-54; <u>see</u> PI Ex. 20, at 1732, ¶ 5; PI Ex. 21, at 1740-42, ¶¶ 5-8; PI Ex. 22, at 1759-60, ¶ 4; PI Ex. 23, at 1782, ¶ 9; PI Ex. 24, at 1794-95, ¶ 4; PI Ex. 25, at 1807, ¶ 10; PI Ex. 26, at 1824-25, ¶¶ 3-4; PI Ex. 27, at 1832-33, ¶¶ 7-9; PI Ex. 29, at 1860, ¶ 5; PI Ex. 30, at 1884-85, ¶ 6; PI Ex. 31, at 1895-97, ¶¶ 4, 9; PI Ex. 34, at 1953-54, ¶ 7; PI Ex. 35, at 1968-69, ¶¶ 9-11; PI Ex. 36, at 1977-78, ¶¶ 5-7.  The Willms defendants were not concerned with attracting loyal customers for their products; they made money primarily by charging consumers' accounts without consumers' knowledge or agreement.

In early 2010, the Willms defendants ceased marketing the above items and switched to enticing consumers to participate in online penny auctions through the websites SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com.  PI Ex. 2, at 124-25, 135-37; PI Ex. 46, at 2225, ¶¶ 2-3; PI Ex. 38, at 2016, ¶¶ 2-3; PI Ex. 39, at 2027, ¶¶ 2-4; PI Ex. 40, at 2042, ¶¶ 2-3; PI Ex. 41, at 2097-99, ¶¶ 5-11; PI Ex. 42, at 2105, ¶¶ 2-3; PI Ex. 43, at 2130, 2136, ¶¶ 2-3, 22; PI Ex. 44, at 2177, ¶ 3; PI Ex. 45, at 2194, 2196, 2199, ¶¶ 4, 10, 19.  Penny auctions allow consumers to purchase bids, usually for $0.50 to $1.00 per bid, and place bids to win the opportunity to purchase a variety of goods, including electronic devices, retailer gift cards, and even automobiles, for a fraction of their market value.  PI Ex. 15, at 1328-32, ¶¶ 28-36 and Attach. H, at 1552-53; PI Ex. 14.  Every time a bid is placed on an offered item, the bidding price of the item increases by $0.01, and the auction time is extended by a short amount of time.  The winning bidder must pay the final bidding price on the item, plus shipping and handling charges.  PI Ex. 15, at 1328-32, ¶¶ 28-36 and Attach. H, at 1552-53; PI

Ex. 14.  As with the earlier ventures, the Willms defendants used a "free" offer to enroll consumers unwittingly into a program of monthly credit card charges.

The Willms defendants have contracted with a network of third parties known as "affiliate marketers" to direct consumers to the Willms defendants' many websites.  PI Ex. 2, at 89-90; see PI Ex. 4, at 270, ¶ 3.  The affiliate marketers use banner ads, pop-ups, sponsored search terms, and unsolicited email to drive consumer traffic to the Willms defendants' "landing pages."  PI Ex. 3, at 221-39; PI Ex. 4, at 270, ¶ 3; PI Ex. 21, at 1740, ¶ 2; PI Ex. 23, at 1779, ¶ 2; PI Ex. 24, at 1794, ¶ 2; PI Ex. 25, at 1805, ¶¶ 2-3; PI Ex. 28, at 1838, ¶ 2; PI Ex. 30, at 1883, ¶ 2; PI Ex. 31, at 1895, ¶¶ 2-3; PI Ex. 32, at 1913, ¶ 2; PI Ex. 33, at 1928, ¶ 2; PI Ex. 35, at 1966, ¶ 2; PI Ex. 36, at 1799, ¶ 2; PI Ex. 37, at 1995, ¶ 2; PI Ex. 38, at 2016, ¶¶ 2-3; PI Ex. 40, at 2042, ¶ 2; PI Ex. 41, at 2097, ¶¶ 2-3; PI Ex. 42, at 2105, ¶ 2; PI Ex. 43, at 2130, ¶¶ 2-3; PI Ex. 44, at 2177, ¶¶ 2-3; PI Ex. 45, at 2194, ¶ 3; PI Ex. 46, at 2225, ¶¶ 2-3; PI Ex. 22, at 1759, ¶ 2; PI Ex. 26, at 1824, ¶ 2; PI Ex. 27, at 1831, ¶¶ 3-4.  The Willms defendants have provided them with creative content describing the offers used in creating their advertising.  PI Ex. 2, at 91.  The banner ads contain similar claims to those that appeared on the Willms defendants' websites.  PI Ex. 3, at 221-39.  The Willms defendants pay the affiliate marketers for each consumer who, originating from the affiliate marketer's ad, lands on one of the Willms defendants' websites and is successfully charged by the Willms defendants.  See PI Ex. 3, at 142-45, 165-67.  Often consumers reach the Willms defendants' websites through other, legitimate websites or through fake news articles on the Internet.  PI Ex. 38, at 2106, ¶ 2; PI Ex. 41, at 2097, ¶¶ 2-3; PI Ex. 42, at 2105, ¶ 2; PI Ex. 44, at 2177, ¶ 2; PI Ex. 45, at 2194, ¶¶ 3-4; PI Ex. 46, at 2225, ¶ 2.

### A. Defendants' Misrepresentations About "Free," "Risk-free," and "Bonus" Offers and Undisclosed or Inadequately Disclosed Charges To Consumers' Accounts

The Willms defendants have represented that their products and programs are "free," "risk-free," or "bonus" in nature, which has led consumers to believe that they would not be charged additional amounts after providing their billing information.  This occurred because

the Willms defendants have failed to disclose, or to disclose adequately, critical information about the additional charges associated with these offers.

For their trial offers, the Willms defendants have made the following and other similar representations on their website landing pages or in the audio that plays prominently while viewing the landing pages:

> "That's right!  All of the incredible benefits of this number-one rated superfood, only found in remote parts of the Brazilian rain forest, is now available to you, in convenient capsule form, through a risk-free, 14-day trial offer.  Just pay the small shipping and handling charge."

PI Ex. 54, Attach. J, at 2750.

> "Congratulations!  You Are Now Only One Step Away From Claiming Your 14 Day Trial of PureCleanse Detox - You Only Pay The Small Fee Of $4.95 (strikeout) $1.95 For Shipping!"

PI Ex. 54, Attach. G, at 2734, Attach. H, at 2741, Attach. I, at 2747.

> "TRY IT NOW FREE!* *Just pay for shipping!"

PI Ex. 3, at 223-25.

Through the repeated use of the terms "free," "risk-free," and "trial," the Willms defendants have created the net impression that sending away for the trial supplement product obligated the consumer to pay nothing more than the nominal shipping and handling fee.  PI Ex. 15, at 1326, ¶ 25.  They reinforced this impression by prominently highlighting the risk-free or free aspects of their offers in large font, highlighted text, placement of the text where it would be most easily seen, and loud audio voice overs.  PI Ex. 20, at 1731, ¶ 2; PI Ex. 41, at 2097, ¶ 4; PI Ex. 24, at 1794, ¶ 2; PI Ex. 25, at 1805, ¶ 2; PI Ex. 29, at 1859, ¶ 2; PI Ex. 35, at 1966, ¶¶ 2-3; PI Ex. 26, at 1824, ¶ 2; PI Ex. 32, at 1913, ¶ 3; PI Ex. 53, at 2686-87, ¶¶ 4-6; see PI Ex. 15, at 1333-35, ¶¶ 39, 43.  They have emphasized that the offer was for a limited time and only available in limited quantities, creating a sense of urgency for the consumer to take advantage of the trial offer.  PI Ex. 15, at 1325-26, ¶ 24; PI Ex. 32, at 1913, ¶ 3.  Consumers were bombarded with pages of text and sometimes audio extolling the benefits of the trial product offered (e.g., lose weight, brighter teeth, etc.), including testimonials from consumers and

endorsements by trusted celebrities, such as Rachael Ray and Oprah Winfrey, and media

sources, such as CNN, ABC, Fox News, and others.  PI Ex. 36, at 1977, ¶¶ 2-3; PI Ex. 37, at

1995, ¶ 3; PI Ex. 45, at 2194, ¶ 4; PI Ex. 46, at 2225, ¶ 2; PI Ex. 43, at 2130, ¶ 2; PI Ex. 38, at

2016, ¶ 2; PI Ex. 25, at 1808, ¶ 13; see PI Ex. 15, at 1325, ¶ 23(e)-(g).  However, these website

design features distracted consumers from the true costs or terms of the offers.  PI Ex. 15, at

1333-34, 1348-49, ¶¶ 39, 74.  Any mention of costs and terms was minimal or buried in the

separate terms and conditions pages, or was so obscured or ambiguously worded that

consumers did not understand the meaning.  PI Ex. 15, at 1335-37, ¶¶ 44-46, Attach. A, at

1363-65, Attach. C, at 1438-40, Attach. D, at 1450-51; PI Ex. 20, at 1731, ¶¶ 2-3; PI Ex. 21, at

1740, ¶¶ 2-3; PI Ex. 23, at 1779, ¶ 2; PI Ex. 24, at 1794, ¶ 2; PI Ex. 25, at 1805, ¶¶ 3-4; PI Ex.

27, at 1831, ¶ 4; PI Ex. 28, at 1838, ¶¶ 2-3; PI Ex. 29, at 1859, ¶ 2; PI Ex. 30, at 1883, ¶ 2; PI

Ex. 31, at 1895, ¶¶ 2-3; PI Ex. 32, at 1913-14, ¶¶ 3-4; PI Ex. 33, at 1928, ¶¶ 2-3; PI Ex. 34, at

1952, ¶ 2; PI Ex. 35, at 1966, ¶ 3; PI Ex. 36, at 1977, ¶ 3; PI Ex. 37, at 1995-96, ¶¶ 3-4; PI Ex.

53, at 2687, ¶ 6.

Dr. Kleimann, an expert in the effective design of communication in written, spoken, and

web-based media and plain language communications, reviewed a representative sample of

these websites and concluded that the Willms defendants' use of rhetoric and web design

emphasizes the "free" aspects of the offers and the attributes of the products offered while

minimizing key information.  PI Ex. 15, at 1333-34, ¶¶ 39-40 (conclusion regarding both trial

offer and penny auction websites).  She concludes that this web design and use of rhetoric will

discourage and distract consumers from seeing, reading, or understanding the disclosures of

material terms and conditions on the websites when they appear.  PI Ex. 15, at 1348-49, ¶¶ 74-

75.  These conclusions are confirmed by the Willms defendants' actual customers.  See PI Ex.

23, at 1779, ¶ 2; PI Ex. 24, at 1794, ¶ 2; PI Ex. 26, at 1824, ¶¶ 2-3; PI Ex. 28, at 1838, ¶¶ 2-3;

PI Ex. 29, at 1859, ¶ 2; PI Ex. 20, at 1731, ¶ 2; PI Ex. 33, at 1928, ¶ 3; PI Ex. 21, at 1740, ¶ 3;

PI Ex. 25, at 1805, ¶¶ 2-3; PI Ex. 31, at 1895, ¶ 2; PI Ex. 32, at 1913, ¶ 2; PI Ex. 37, at 1995, ¶

2; PI Ex. 30, at 1883, ¶ 2; PI Ex. 35, at 1966, ¶ 3; PI Ex. 40, at 2042, ¶ 3; PI Ex. 34, at 1952,

¶ 2; see also PI Ex. 50, at 2433, 2436-40, 2531-46, ¶¶ 6, 13, 17-23 (chargeback reason codes), 24 and Attach. N (chargeback plan).

Consumers who clicked onto the order pages for the trial offers also found the same representations.  Most order pages included a prominent summary of the order that was designed to look like an invoice, representing that consumers would only be charged for shipping and handling:

**YOUR TRIAL** REVIEW

| Items Requested | Today you pay | Quantity | Subtotal |
|---|---|---|---|
| **AcaiBurn**<br>AcaiBurn System Trial (14 days) | $0.00 | 1 | $0.00 |
| Weight Loss e-book Trial | $0.00 | 1 | $0.00 |
| Insider Secrets Trial | $0.00 | 1 | $0.00 |
| | Standard Shipping and Handling (5-7 days) | | $6.95 |
| | **Summer AcaiBurn Promotion!** | | -$2.00 |
| | **Trial + Shipping Total** | | **$4.95** |

PI Ex. 15, Attach. A, at 1358, Attach. B, at 1423-24, Attach. C, at 1432, 1434, Attach. D, at 1445-46; see PI Ex. 50, at 2436, ¶ 15.

In fact, if consumers did not affirmatively cancel and return the trial product before the expiration of the trial period, they were charged for: (1) the trial product itself (typically between $40-$90); (2) monthly recurring fees for enrollment in a continuity program associated with the trial product; (3) the "bonus" products (e.g., "Insider Secrets Expert Tips" package), which were forced upsell products; and (4) monthly recurring fees for enrollment in continuity programs associated with upsell products.  PI Ex. 15, Attach. A, at 1363-65, Attach. C, at 1438-40; Attach. D, at 1450-51; PI Ex. 2, at 71.  See PI Ex. 20, at 1731-32, ¶¶ 3-5, 8; PI Ex. 21, at 1740-42, ¶¶ 5-8; PI Ex. 23, at 1780-82, ¶¶ 3-7; PI Ex. 24, at 1794-95, ¶¶ 4-6; PI Ex. 25, at 1805-06, ¶¶ 4-6; PI Ex. 28, at 1838-39, ¶¶ 3-5; PI Ex. 30, at 1884-85, ¶¶ 5-6; PI Ex. 31, at 1895-97, ¶¶ 4-9; PI Ex. 32, at 1914, ¶¶ 5-6; PI Ex. 33, at 1928-29, ¶¶ 5-7; PI Ex. 35, at 1967-69, ¶¶ 6,9; PI Ex. 36, at 1977-78, ¶¶ 5-6; PI Ex. 37, at 1995-97, ¶¶ 3, 6-9.  These disclosures were usually only on the separate and difficult to read terms and conditions pages.  When some of these disclosures appeared on the ordering pages, they were ambiguously worded,

incomplete, and confusing to consumers.  Thus, consumers were unaware of these charges.  PI Ex. 20, at 1731, 1733, ¶¶ 2-3, 8; PI Ex. 21, at 1740-42, ¶¶ 2, 6, 8, 12; PI Ex. 23, at 1779, ¶ 2; PI Ex. 24, at 1794-95, ¶¶ 2, 4, 6, 10; PI Ex. 25, at 1805-08, ¶¶ 3-5, 8-9, 12-13; PI Ex. 28, at 1838-39, ¶¶ 3, 5; PI Ex. 29, at 1859-61, ¶¶ 2, 4-5, 7; PI Ex. 30, at 1883-85, ¶¶ 2, 5-6; PI Ex. 31, at 1895-97, ¶¶ 3-4, 9, 11; PI Ex. 32, at 1913-17, ¶¶ 3-4, 8, 15; PI Ex. 33, at 1928-30, ¶¶ 2-3, 5, 10-11; PI Ex. 34, at 1952-54, ¶¶ 2, 7, 9; PI Ex. 35, at 1966-70, ¶¶ 3, 5-7, 9, 11, 13; PI Ex. 36, at 1977, 1979-80, ¶¶ 3, 13; PI Ex. 37, at 1995-99, ¶¶ 2-5, 8-10, 12; see PI Ex. 50, at 2433-35, ¶¶ 6, 8, 13; PI Ex. 54 at 2698, at ¶ 5.  Moreover, cancelling these charges and obtaining refunds involved separate time-consuming telephone calls and other steps that made the process far from "risk-free."  See generally PI Ex. 9, at 802-86; PI Ex. 10; and PI Ex. 11 (customers service scripts and customer service call transcripts).  See also PI Ex. 50, at 2433-35, ¶¶ 7-8, 13; PI Ex. 20, at 1731-33, ¶¶ 4-7; PI Ex. 21, at 1741-43, ¶¶ 6-9; PI Ex. 23, at 1780-82, ¶¶ 3-9; PI Ex. 24, at 1794-96, ¶¶ 4-6; PI Ex. 25, at 1806-08, ¶¶ 6-12; PI Ex. 28, at 1839-42, ¶¶ 5-12; PI Ex. 29, at 1859-61, ¶¶ 3-7; PI Ex. 30, at 1883-85, ¶¶ 3-7; PI Ex. 31, at 1896-97, ¶¶ 5-10; PI Ex. 32, at 1914-17, ¶¶ 7-15; PI Ex. 33, at 1929-30, ¶¶ 6-10; PI Ex. 34, at 1952-54, ¶¶ 4-7; PI Ex. 35, at 1967-70, ¶¶ 5-12; PI Ex. 36, at 1978-80, ¶¶ 6-13; PI Ex. 37, at 1996-98, ¶¶ 6-10.

For example, a representative "disclosure" of the membership negative option that appeared on many of the trial offer websites was as follows:

> You will be billed $4.95 for the shipping and handling of your Use (sic) 14 day trial, then **once you choose** to continue losing weight with the AcaiBurn System the low member price of $79.95 per month for every month (Shipped as a fresh, 3 month supply every 90 days).  And remember, there's never any obligation - you can cancel your membership at any time.

PI Ex. 15, at 1337, ¶ 47 and Attach. A, at 1359, Attach. B, at 1423, Attach. C, at 1431 (emphasis added).  The use of this affirmative "choice" language reinforced the net impression that if consumers decide to continue using the product, they can "choose" to become members and receive monthly shipments. PI Ex. 15, at 1336-37, ¶ 46.  As noted above, most consumers did not understand that their inaction would result in automatic monthly membership charges

and the shipment of additional products. Further, the font, graphics, and placement of this "disclosure" on the websites de-emphasized its importance, and many consumers did not even see it. PI Ex. 15, at 1336, 1340-42, 1344-46, ¶¶ 46, 55, 57, 64, 66-67. Given this price disclosure, consumers had no reason to search out other disclosures on the websites, nor did they have any reason to believe that affirmative action was required to avoid being charged more than the shipping charge. See PI Ex. 15, at 1343, ¶ 61; see also PI Ex. 13, at 1268-70, 1278-79, 1283, 1286-87, 1299-304.

The costs of the upsells also were often not mentioned on the landing pages. PI Ex. 15, at 1335-36, ¶¶ 45, 46. The upsells typically were digital products (restricted-access websites) that consumers did not order or even want. PI Ex. 22, at 1759-60, ¶ 4; PI Ex. 26, at 1824, 1826, ¶¶ 3, 7; PI Ex. 27, at 1831-33, ¶¶ 4, 7-9; PI Ex. 20, at 1732-33, ¶¶ 2-5, 8; PI Ex. 21, at 1742, ¶¶ 8, 12; PI Ex. 23, at 1780-81, ¶ 5; PI Ex. 24, at 1794-95, ¶ 4; PI Ex. 25, at 1806-08, ¶¶ 9-13; PI Ex. 29, at 1859-61, ¶¶ 4-5, 7; PI Ex. 30, at 1884-85, ¶¶ 6, 8; PI Ex. 31, at 1895-97, ¶¶ 4, 9-10; PI Ex. 34, at 1953-54, ¶¶ 7, 9; PI Ex. 35, at 1968-69, ¶¶ 9-11; PI Ex. 36, at 1977-80, ¶¶ 5-7, 10, 13; see also PI Ex. 50, at 2433-36, ¶¶ 6, 8, 13; PI Ex. 54, at 2698, ¶ 5. When the upsells appeared on the ordering pages, they were often referred to as "bonuses" or otherwise listed as special items that the consumer would receive for free. PI Ex. 15, Attach. A, at 1358, Attach. B, at 1421, 1423, Attach. C, at 1432. For example, on one website, the "Insider Secrets Experts Tips" package and "Comprehensive Weight Loss ebook" were described as "Today's Special #1 and #2 Included in Your Trial!" PI Ex. 15, Attach. A, at 1358, Attach. B, at 1421, 1423, Attach. C, at 1432. The order summary quoted above lists the trial offer – including these items – as costing the consumers $0.00. Important details about the upsells appeared in smaller, less prominent fonts than that used in the order summary, and often were buried in boxes filled with other information or on the separate terms and conditions pages. PI Ex. 15, Attach. A, at 1359, Attach. B, at 1421, 1423, Attach. C, at 1432. The ordering pages also did not have a link to the terms and conditions pages, making it hard for consumers to find them. PI Ex. 15, at 1322-23, 1328, 1334, ¶¶ 20, 28, 39. Consumers typically were not

1    required to affirmatively agree to these ongoing charges, and they had no way to avoid them.

2    Most consumers did not learn about these charges until after they had provided their payment

3    information or received their account statements.

4           Numerous consumers complained that they believed they had signed up for a "free" trial

5    product or sample and did not know that they would be charged for that product or for

6    additional products and upsells.  The Better Business Bureau in Alberta, Canada ("Alberta

7    BBB") received at least 2,500 complaints regarding the Willms defendants' trial products,

8    most of which concern billing, refund, and contract issues, including unauthorized charges to

9    consumers' credit cards and bank accounts.  PI Ex. 6, at 284, ¶ 8.  The Alberta BBB has given

10   the Willms defendants an "F" rating.  PI Ex. 6, at 284, ¶ 7.  In the Willms defendants' website

11   live chat transcripts from October 2009 through December 2009, consumers repeatedly

12   indicate that they were unaware that they would be charged for: (1) the "free" trial products;

13   (2) recurring monthly shipments of the trial products; and (3) upsell products on a monthly

14   basis.  PI Ex. 50, at 2436, ¶ 13.  Recorded customer service calls contain similar complaints.

15   PI Ex. 50, at 2433, 2435-36, ¶¶ 5-6, 12-13.  The Willms defendants' high credit card

16   chargeback rates and the reasons consumers gave for seeking chargebacks provide more

17   evidence that consumers were unaware they were going to be charged.  See PI Ex. 50, at 2437-

18   46, ¶¶ 16-34; PI Ex. 56, at 2904, 2916, 2918-22, ¶¶ 4, 40, 51, 56, 59, 63, 66, 68, 69.

19          The Willms defendants knew consumers were unaware of the charges being billed.  PI

20   Ex. 50, at 2437-46, ¶¶ 16-23, 26-27, 30-34 and Attachs. J-N, Q, T, V at 2502-45, 2560-80,

21   2619-36, 2646-61; PI Ex. 9, at 826-27, 829, 874, 880.  They also were aware that most

22   consumers did not read or understand the terms and conditions pages.  PI Ex. 50, at 2436,

23   ¶¶ 13-14; PI Ex. 12, at 1142, 1232, 1257.  In fact, they warned their customer service agents to

24   expect a higher volume of consumer calls when the monthly recurring charges were going to

25   appear on consumers' bank account and credit card statements.  PI Ex. 9, at 826-27, 829, 874,

26   880.

27

28

The penny auction websites also emphasized through the use of graphics, music, color, font, and voice overs that consumers could obtain luxury items at a fraction of their retail cost. PI Ex. 15, at 1328-29, 1334-35, 1337, ¶¶ 29, 33, 40, 43-44, 47; PI Ex. 52, at 2684, ¶¶ 5-6; PI Ex. 41, at 2097-98, ¶¶ 4-5; PI Ex. 42, at 2105-06, ¶¶ 3-5; PI Ex. 44, at 2177-78, ¶¶ 3-4; PI Ex. 45, at 2194, ¶ 4; PI Ex. 46, at 2225, ¶¶ 2-3.  A prominently displayed countdown clock created a sense of urgency.  PI Ex. 15, at 1331, ¶ 35(c) and Attach. E, at 1453, Attach. F, at 1491, Attach. G, at 1505; PI Ex. 41, at 2097-98, ¶ 5; PI Ex. 52, at 2684, ¶ 5; PI Ex. 44, at 2177-78, ¶ 4.  The websites also induced consumers to register by emphasizing the ease of winning and providing prominent testimonials from "real" winners.  PI Ex. 15, at 1329, 1332, ¶¶ 34, 36; PI Ex. 52, at 2684, ¶ 5; PI Ex. 42, at 2105-06, ¶¶ 4-5; PI Ex. 44, at 2177, ¶ 3.  The websites offered consumers "bonus" bids, usually 300, for no cost, if consumers "registered" on the websites.  PI Ex. 15, Attach. F, at 1497, Attach. H, at 1554-55; PI Ex. 38, at 2016-18, ¶¶ 2-8; PI Ex. 40, at 2042-44, ¶¶ 3-8; PI Ex. 43, at 2130, ¶¶ 2-3.  They also offered 50 monthly "bonus" bids in addition to the introductory 300 bids.  PI Ex. 15, Attach. F, at 1500-01.  For example:

"What You Get: 300 Bonus Bids, Just for Signing Up."

PI Ex. 15,  Attach. F, at 1497, Attach. H, at 1554-55.

**"CONGRATULATIONS!  AS A BONUS YOU WILL RECEIVE 50 BIDS EACH MONTH.  CLICK CONTINUE TO START BIDDING NOW."**

PI Ex. 15,  Attach. F, at 1500-01**.**  In fact, these bonus bids were not free.  Consumers who "registered" on the SwipeBids auction sites and provided their credit card information later found that, by registering, they had agreed to be charged as much as $150 for a "membership," which included the introductory bids as a purported "bonus."  PI Ex. 15, at 1337-38, ¶¶ 48-49; PI Ex. 38, at 2017-19, ¶¶ 6, 10, 11; PI Ex. 40, at 2043-44, ¶¶ 8-9; PI Ex. 41, at 2098, ¶¶ 7-8; PI Ex. 42, at 2107, ¶ 8; PI Ex. 43, at 2130-31, ¶ 4; PI Ex. 44, at 2179, ¶ 8; PI Ex. 45, at 2195-96, ¶ 6; PI Ex. 46, at 2226, ¶ 5; PI Ex. 52, at 2684-85, ¶¶ 6-7; PI Ex. 53, at 2687, ¶ 7; see also PI Ex. 57, at 2986-87. Consumers also later found that their accounts were charged $11.95 each

1  month to receive the additional monthly bids.  PI Ex. 40, at 2047, ¶¶ 16-17, 20; see PI Ex. 51,

2  at 2667-68, ¶ 9.

3         These material terms and costs were not adequately disclosed to consumers prior to their

4  registering.  PI Ex. 15, at 1337-44, ¶¶ 47-53, 57, 60-62.  Any reference to the initial

5  membership fee was absent from the landing pages.  PI Ex. 15, at 1334, 1337, ¶¶ 40, 47.

6  When consumers clicked to the second page, a box titled "Membership Details" listed:  "Item:

7  1-Year Membership; You Pay: 50 cents/bid" and underneath the "1-Year Membership" stated

8  "(Includes 300 Bids)."  PI Ex. 15, at 1339, ¶ 51 and Attach. F, at 1497.  Underneath this box

9  was the statement, "You're Guaranteed to Win," which promised consumers that, if they failed

10  to "win a single auction using the 300 start-up bids included, we will fully refund your bids."

11  PI Ex. 15, at 1339, ¶ 51 and Attach. F, at 1497.  This language did not adequately disclose to

12  consumers that they would automatically be charged a membership fee when they entered their

13  credit card information.  PI Ex. 15, at 1339, ¶¶ 51-52.  Across from this box was a box entitled

14  "Where Do We Send Your Winning Auctions?" where consumers were instructed to fill out

15  their payment information.  PI Ex. 15, at 1338, ¶ 50 and Attach. F, at 1497.  The true costs and

16  terms were only disclosed in the separate terms and conditions pages of the website and buried

17  deep in small-sized, dense, black and white text.  PI Ex. 15, at 1341-44,  ¶¶ 57, 60-62 and

18  Attach. E, at 1478-79.

19         The recurring fee of $11.95 was also inadequately disclosed.  Only after consumers

20  entered payment information, a screen welcomed them to the auction site and in extra-large

21  font told consumers that as a "bonus" they would receive 50 bids per month.  PI Ex. 15,

22  Attach. F, at 1500.  In micro-print at the top of that screen was the first mention of the monthly

23  charge, which simply advised consumers to click on a hyperlink to avoid charges.  PI Ex. 15,

24  Attach. F, at 1500.  Consumers thus had no expectation that their accounts would be charged

25  any amount, much less charged monthly on a recurring basis.

26          Many consumers believed that the auction websites were like other popular auction

27  websites, and the Willms defendants have encouraged this by prominently comparing their

28

websites to eBay.  PI Ex. 15, at 1337-38, ¶¶ 48-49; PI Ex. 38, at 2016, ¶ 4; PI Ex. 40, at 2042, ¶ 3; PI Ex. 42, at 2105-07, ¶¶ 3, 7; PI Ex. 43, at 2130, ¶ 3; PI Ex. 44, at 2178, ¶ 7; PI Ex. 45, at 2194-95, ¶¶ 2, 4-5; PI Ex. 46, at 2225-26, ¶ 4.  On eBay and other penny auction websites, consumers register for free and provide their account information for later charges to purchase any items for which they have the winning bid.  PI Ex. 43, at 2130, ¶ 3; see eBay's website at *http://pages.ebay.com/help/policies/user-agreement.html*; *http://pages.ebay.com/help/account questions/why-register.html*; and *http://pages.ebay.com/help/pay/payingforitems.html*; see also Quibids.com terms and conditions pages at *http://www.quibids.com/help/terms.php?popup*.  Thus, many consumers believed that registering with SwipeBids would cost them nothing.  PI Ex. 15, at 1337-38, ¶¶ 48-49; PI Ex. 38, at 2016, ¶¶ 3-4; PI Ex. 40, at 2042, ¶ 3; PI Ex. 41, at 2097, ¶¶ 2-4; PI Ex. 42, at 2015-07, ¶¶ 3-8; PI Ex. 43, at 2130, ¶¶ 3-4; PI Ex. 44, at 2178, ¶¶ 4-7; PI Ex. 45, at 2194, ¶¶  5-7; PI Ex. 46, at 2225-26, ¶¶ 3-5.

This deceptive marketing led to approximately 1,100 consumer complaints with the Alberta BBB from March 2010 to February 2011, most of which concern unauthorized charges for the upfront $150 membership fee and the $11.95 monthly charge.  PI Ex. 6, at 283, ¶¶ 5-6.  An additional 80 consumer complaints were received from November 2010 to January 2011 by the BBB of Southern Nevada for SellOffAuctions.com (the newest iteration of the Willms defendants' online penny auctions).  PI Ex. 7, at 359-60, ¶ 5.  The vast majority of these complaints involve consumers seeking refunds for unexpected and unauthorized charges, which garnered the Willms defendants a "D minus" rating with that BBB.  PI Ex. 7, at 360, ¶¶ 6-7.  Indeed, in attempting to resolve their issues with the Alberta BBB, the Willms defendants have produced a bar graph showing that 90 percent of the Alberta BBB complaints for their online auctions were because consumers were "unaware of cost."  PI Ex. 6, at 285-86, ¶ 11 and Attach. E, at 334.  The FTC's complaint database corroborates the BBBs' experiences with the Willms defendants' online auctions.  Out of the 635 consumer complaints that the FTC received that could be affirmatively linked to the Willms defendants' online auction

websites between January 2010 and February 2011, fully 600 of them complained of being unexpectedly charged a fee of typically $150 to $159.  PI Ex. 51, at 2667, ¶ 7.

Finally, the penny auctions also generated very high charge reversal rates.  PI Ex. 49, at 2386-423; PI Ex. 57, at 2886-3002; PI Ex. 55, Attach. A, at 2756-57.  Mr. Carey Daoust, an investigator for the Canadian Competition Bureau, searched the trash dumpsters outside of the Willms defendants' office building and found documents showing that SwipeBids had high chargeback rates.  PI Ex. 55,  Attach. A, at 2756-57.

**    B.    Defendants Impose Deceptive and Undisclosed Limitations on Cancellations and Refunds**

The Willms defendants routinely have represented that dissatisfied consumers could easily cancel and obtain a full refund.  On the websites for their trial product offers, they have made the following representations:

> "We are so confident that AcaiSlim is the most effective and powerful anti-oxidant cleansing product on the market that if you for any reason do not find AcaiSlim right for you within the first 60 days we will gladly give you a full refund, no questions asked.  You have nothing to lose except the weight."

PI Ex. 19, Attach. D, at 1728, 1730.

> "TRUE SATISFACTION GUARANTEE.  Should you decide to purchase PureCleanse Pro after trying our trial sample bottle, we will back up your order with our 100% satisfaction guarantee."

PI Ex. 54, Attach. G, at 2730, Attach. H, at 2737.

> "If you don't like it, simply send it back before the trial period ends and you will never be charged.  You're covered by my Iron-Clad 60 Day Money Back Guarantee too, so you can take up to 8 weeks to decide if it's the right solution for you."

PI Ex. 15, Attach. B, at 1418.

The Willms defendants have represented their penny auction refund policy as follows:

> "YOU'RE GUARANTEED TO WIN.  We guarantee that if you sign-up for our membership, and do not win a single auction using the 300 startup bids included, we will fully refund your bids."

PI Ex. 15, Attach. F, at 1497.

These representations are false.  Consumers typically could not extricate themselves from the offers and auctions without great difficulty.  This was because the Willms defendants have

created a maze of convoluted policies, conditions, and limitations to make it virtually

impossible for consumers to cancel without paying something.  These material limitations on

cancelling and obtaining refunds were either not adequately disclosed (buried in the terms and

conditions pages) or not disclosed at all.  The undisclosed or poorly disclosed limitations and

conditions on the trial products included: (1) requiring consumers to return the unopened or

unused trial product *before* the expiration of the trial period to avoid being charged for the

"free trial," see PI Ex. 9, at 737-41, 792; PI Ex. 10, at 935, 937-38, 948-49, 958, 961-62; PI Ex.

11, at 1105-06, 1109, 1111; see also PI Ex. 28, at 1838-39, ¶¶ 3-5; PI Ex. 30, at 1884-85, ¶¶ 4-

5; PI Ex. 32, at 1915, ¶¶ 9, 12; PI Ex. 33, at 1928-29, ¶ 5; PI Ex. 24, at 1795-96, ¶¶ 4, 6; PI Ex.

34, at 1952-53, ¶¶ 4-5; PI Ex. 35, at 1967-68, ¶¶ 5-6; PI Ex. 37, at 1996-97, ¶¶ 4, 8-9; (2)

accepting returns only if the consumer obtained a cancellation number and a separate

identification number from customer service prior to shipping the return package, see PI Ex. 9,

at 738-39; PI Ex. 10, at 935, 948-50; (3) making the trial period shorter than represented by

starting the period from the date of the "order," not the date the consumer received the product,

see PI Ex. 9, at 943-45; PI Ex. 10, at 936; see also PI Ex. 24, at 1795, ¶ 6; PI Ex. 37, at 1996,

¶¶ 4, 8; (4) requiring consumers who attempt to cancel and obtain a refund through the live

chat feature to call the customer service number, where wait periods were often lengthy, PI Ex.

9, at 742, 792; PI Ex. 28, at 1839-40, ¶¶ 5,7; PI Ex. 36, at 1979, ¶ 9; and (5) requiring

consumers to receive the trial products even when they cancelled immediately, see PI Ex. 9, at

737, 747, 790; PI Ex. 10, at 961; see also PI Ex. 20, at 1731-32, ¶ 4.

Consumers who attempted to cancel and obtain refunds for the online penny auctions had

similar difficulty.  PI Ex. 43, at 2132-34, ¶¶ 8-14; PI Ex. 12, at 1147-48, 1152-53, 1158-59,

1162, 1169-72, 1182, 1186-87, 1189, 1193, 1230, 1263.  Although some of these limitations

were explained in the separate "terms and conditions" pages, as with the trial product policies,

the failure to make these disclosures prominent and clear made them entirely inadequate.  PI

Ex. 15, at 1341-44, ¶¶ 57, 60-62 and Attach. E, at 1478-79; PI Ex. 40, at 2044-45, ¶¶ 9-10.

Even when consumers figured out how to request a refund, most were unable to qualify

1  because they first had to use all of their bids in the auctions.  PI Ex. 15, Attach. E, at 1478-79;

2  PI Ex. 43, at 2131, ¶ 6; PI Ex. 12, at 1181.  Many consumers could never use all of their bids

3  because their accounts were automatically credited with an extra 60 "bonus" bids just for

4  logging in.  PI Ex. 15, Attach. G, at 1510; PI Ex. 43, at 2134, ¶ 15.

5       Not only were these conditions and limitations burdensome and incomprehensible, but

6  consumers were unlikely to obtain refunds even when attempting to follow them.  PI Ex. 50, at

7  2433-34, 2436, ¶¶ 7, 13; see PI Ex. 26, at 1825-26, ¶¶ 5-6; PI Ex. 27, at 1834, ¶¶ 11-12; PI Ex.

8  21, at 1742-43, ¶¶ 8-11; PI Ex. 29, at 1860-61, ¶¶ 4-5, 7; PI Ex. 32, at 1915-17, ¶¶ 9-15; PI Ex.

9  34, at 1953, ¶¶ 5-6; PI Ex. 35, at 1967-69, ¶¶ 5-6, 12; PI Ex. 36, at 1978-79, ¶¶ 7-8; PI Ex. 37,

10  at 1997-98, ¶ 10.  The Willms defendants instructed their customer service agents to avoid

11  providing refunds at all times and penalized or fired them if they gave consumers too many

12  refunds.  See PI Ex. 9, at 738, 758, 762, 765; PI Ex. 10, at 970;  PI Ex.11, at 1114.  When

13  refunds were given, they were limited to either 50 percent or 100 percent of the most recent

14  charge only, and capped at a total of $500 per consumer.  PI Ex. 12, at 1173, 1188-89.  Many

15  consumers were only able get their money back by threatening to reverse or reversing the

16  credit or debit card charges.  See PI Ex. 9, at 793; PI Ex. 11, at 1092; PI Ex. 12, at 1151-53,

17  1162; see also PI Ex. 21, at 1743, ¶ 11; PI Ex. 27, at 1834, ¶ 13; PI Ex. 20, at 1732, ¶ 5; PI Ex.

18  33, at 1929, ¶ 7; PI Ex. 34, at 1953, ¶ 6; PI Ex. 36, at 1979, ¶¶ 10-12.

19       The FTC's consumer complaint database also shows that 529 of the 635 consumers who

20  complained about defendants' online auctions between January 2010 and February 2011 state

21  that they never received a refund, despite attempting to follow the complicated refund process.

22  PI Ex. 51, at 2667, ¶ 8.  For the trial products, out of the 403 consumer complaints the Willms

23  defendants provided to the FTC, only 199 consumers report that they received full refunds.  PI

24  Ex. 54, at 2697-98, ¶¶ 3-6.  The number of complaining consumers is likely far greater because

25  the Willms defendants admit that they received 4,212 "inquiries" from state attorneys general

26  and the BBB, yet they only produced about 400 of them to the FTC.  PI Ex. 2, at 50.

27

28

1    Consumers wishing to cancel and obtain a refund for the forced upsells had to call a

2  separate toll free number *for each upsell* (meaning consumers needed to make three or more

3  separate telephone calls), even though the upsells often were handled by the same customer

4  service call center.  See PI Ex. 9, at 779-89; PI Ex. 10, at 934-35, 939, 954-56, 983, 994-95,

5  1024-25; PI Ex. 12, at 1136; PI Ex. 30, at 1885, ¶ 6; PI Ex. 31, at 1897, ¶ 9; PI Ex. 27, at 1833,

6  ¶¶ 8-9; PI Ex. 21, at 1741-42, ¶¶ 6, 8; PI Ex. 24, at 1794-95, ¶ 4; PI Ex. 36, at 1978-79, ¶¶ 7-9.

7  In fact, the customer service agent scripts that the Willms defendants drafted for the trial

8  products specifically instructed customer service agents not to mention the upsell products

9  when consumers contacted them to cancel the trial product.  See PI Ex. 9, at 738; PI Ex. 10, at

10  970.  This is confirmed by transcripts of actual customer service calls that the Willms

11  defendants produced to the FTC.  PI Ex. 50, at 2434, ¶ 8 and Attachs. G and H, at 2479-96.

12  Further each upsell had a different "trial" period in which cancellations were allowed, usually

13  shorter than the main product's trial period, making it especially confusing for consumers.  PI

14  Ex. 15, Attachs. A and B, at 1359, 1423.  This was particularly pernicious because most

15  consumers did not know they were being charged for these upsell products until they received

16  their monthly account statements – by which time the charges were no longer refundable.

17    **C.    Defendants Have Made False and Unsubstantiated Weight Loss and Colon Cancer Cure Product Claims**

18
19    **1.    Defendants' False and Unsubstantiated Weight Loss Claims**

19    The Willms defendants represented that use of the AcaiBurn and PureCleanse products

20  will cause rapid and substantial weight loss and that scientific evidence, including two eight-

21  week, placebo-controlled clinical studies support this.  The following and other similar

22  representations appeared in banner advertising the Willms defendants approved for use by their

23  affiliate marketers and also on multiples pages of the Willms defendants' websites:

24    "Lose Weight Fast!  Fit into your favorite Jeans!"

25  PI Ex. 15, Attach. B, at 1416.

26    "WARNING...The Acai Burn System was not created for those people who only want to
27  lose a few measly pounds.  The AcaiBurn System was created to help you achieve the
   incredible body you have always wanted...USE WITH CAUTION!"

28

PI Ex. 15, Attach. A, at 1357, Attach. C, at 1431-32.

> "The average weight loss was 14.99 and 12.54 pounds with AcaiBurn's key ingredients vs. just 3.06 and 3.53 pounds with a placebo in two 8-week clinical studies. Both groups dieted and exercised. That means the key ingredients in AcaiBurn were found to cause up to 450% MORE WEIGHT LOSS than dieting and exercise alone will get you."

PI Ex. 15, Attach. A, at 1355, Attach. B, at 1406, 1418, Attach. D, at 1442.

These claims are false and unsubstantiated. Robert F. Kushner, M.D., an expert on obesity and weight loss, states that, based on his professional experience and knowledge and his review of the medical literature, none of the ingredients in these products, individually or in any amount or combination, will cause rapid, substantial weight loss. PI Ex. 16, at 1589, ¶ 11. Although the Willms defendants produced two studies that they assert support their claims that the AcaiBurn and PureCleanse products will cause rapid and substantial weight loss, these studies do not provide competent nor reliable support. Dr. Kushner reviewed the studies the Willms defendants provided to the FTC to support their weight loss claims, as well as additional studies involving some of the ingredients in Acaiburn and PureCleanse, and concluded that none of the studies provides competent and reliable substantiation for the Willms defendants' weight loss claims. PI Ex. 16, at 1593, 1595-96, ¶¶ 20, 27.

## 2. Defendants' False and Unsubstantiated Colon Cancer Cure Claims

The Willms defendants also made strongly implied representations that use of PureCleanse products helps prevent colon cancer. They embedded streaming video of a CBS Early Show interview with Katie Couric on many of the PureCleanse product websites titled "CONQUERING COLON CANCER: PREVENTION AND TREATMENT." PI Ex. 54, Attach. G, at 2730, Attach. I, at 2745 (embedded video at *http://www.youtube.com /watch?v=bOByopVamiQ)*. The video also featured well known actors Diane Keaton, Morgan Freeman, and Jimmy Smits. Audio statements made during the video included the following:

> "Colon cancer is the #2 cancer killer in the United States."

> "Women get colon cancer as often as men."

> "56,000 people die every year from colon cancer."

"Everyone is vulnerable."

See *http://www.youtube.com/watch?v=bOByopVamiQ*.  These statements were played while consumers viewed written representations on the websites that PureCleanse flushes out toxins from the digestive tract, such as:

> "Since people need to eat and drink to survive, we are constantly at risk of bringing these nasty parasites into our bodies."

PI Ex. 54, Attach. H, at 2738.

> "Promote Health & Longevity."

PI Ex. 54, Attach. I, at 2744.

> "Good Way To Maintain Colon Health."

PI Ex. 54, Attach. G, at 2730.

> "Purify & Detoxify Your Body."

PI Ex. 54, Attach. I, at 2744.

The net impression of this audio and graphic combination is that cleaning out one's colon through the use of PureCleanse will help prevent colon cancer by ridding the colon of toxins and parasites.  This claim is false and unsubstantiated.  The Willms defendants have provided no evidence to substantiate this claim.  The active ingredients in the PureCleanse products are natural laxatives.  No competent and reliable scientific evidence exists to provide a reasonable basis for the claim that use of laxatives helps prevent colon cancer.  PI Ex. 17, at 1685-88, ¶¶ 13-16.  Indeed, no studies have shown a connection between the use of laxatives and the risk of colorectal cancer, and, in fact, the frequent use of laxatives may actually be dangerous and seriously harmful.  PI Ex. 17, at 1685-88, ¶¶ 13-16.

### D.  Defendants Have Disseminated False Claims of Celebrity and Other Endorsements

The Willms defendants have also displayed images of celebrities, such as Oprah Winfrey and Rachael Ray, representing to consumers that they endorsed one or more of the Willms defendants' products.  For example, one of the websites showed a picture of Rachael Ray and the statement "Featured on the Rachael Ray Show!"  PI Ex. 15, Attach. A, at 1351; PI Ex. 19,

Attach. A, at 1717, Attach. B, at 1720.  Similar references to Oprah Winfrey appear as well.  PI Ex. 18, Attachs. A-C, at 1711, 1713.  The logos for many media outlets such as CNN, MSNBC, FoxNews, USA Today, CBS, ABC, WebMD, Fitness Magazine, and 60 Minutes, appear on the trial offer and penny auction websites in connection with statements like "Featured On" or "As Seen On TV."  PI Ex. 19, Attach. A, at 1718, Attach. B, at 1721, Attach. C, at 1724, 1726, Attach. D, at 1728, 1730; PI Ex. 18, Attachs. B-C, at 1711, 1713; PI Ex. 15, Attach. B, at 1414, 1420, Attach. C, at 1431, 1434, Attach. E, at 1462, 1472, Attach. F, at 1492-93, 1496, 1498-99, Attach. G, at 1506, 1508, Attach. H, at 1544, 1549, 1551-53, Attach. I, at 1567, 1569-70.  None of these persons or entities has endorsed or positively reported on any of the Willms defendants' products.  PI Ex. 18, at 1707-08, ¶¶ 11-14; PI Ex. 19, at 1716, ¶ 7.  In fact, Oprah Winfrey sued Willms for the unauthorized use of her name and likeness on his websites.  PI Ex. 18, at 1705, 1708, ¶¶ 6, 15.

### E.  Defendants' Unfair Practice of Evading Risk Management Rules to Obtain Merchant Accounts

As a result of the deceptive practices described above, a large number of the Willms defendants' customers disputed the charges on their credit cards to get their money back.  This led to excessive chargeback rates with Visa and MasterCard, which, in turn, led to Visa and MasterCard placing the Willms defendants in chargeback monitoring programs.  PI Ex. 56, at 2918-19, ¶¶ 51, 56; PI Ex. 57, at 2986-87.  A "chargeback" occurs when a cardholder contacts his or her issuer to dispute a charge on the cardholder's account statement and the issuer charges that amount back to the acquirer.  PI Ex. 56, at 2907, ¶ 15.  The chargeback rate is calculated as a ratio of the number of transactions passing through the payment system in a particular month that are charged back to the acquirer with respect to a particular merchant (numerator) and the total number of transactions charged through the payment system by the merchant during the preceding month (denominator).  PI Ex. 56, at 2907-08, ¶ 16.  Both Visa and MasterCard have risk management divisions that monitor merchant chargeback rates.  Visa tracks merchants who, in a calendar month, (1) have at least 100 sales transactions, (2)

1   have at least 100 chargebacks, and (3) for which the chargeback rate is at least 1%.  PI Ex. 56,

2   at 2907-08, ¶ 16.

3          The Willms defendants were generating chargeback rates between the threshold level of

4   1% and as high as 22.7%.  PI Ex. 56, at 2904, 2907-11, 2916, 2918-22, ¶¶ 4, 15-17, 40, 51, 56,

5   59, 63, 66, 68, 69; PI Ex. 57, at 2986, 3002; PI Ex. 49, at 2386-422; PI Ex. 55, at 2756-57.

6   Many of these chargebacks were coded as being unauthorized charges to consumers' accounts

7   or fraudulent transactions.  PI Ex. 50, at 2437-40, 2444-45, ¶¶ 17-23, 33 and Attachs. K-M, V,

8   at 2511-30, 2646-61.  The Willms defendants were told that to bring their chargeback rates

9   down to an acceptable level, they needed to improve their website disclosures for billing

10  practices and not include "forced" upsells.  PI Ex. 57, at 2986-87; PI Ex. 47, at 2259-60; PI Ex.

11  48, at 2276-84 (to make changes "would hurt our bottom line significantly" at 2281); PI Ex.

12  50, at 2443-46, ¶¶ 30-31, 33 and Attachs. T, V, at 2619-36, 2646-61.

13         The defendants failed to comply.  PI Ex. 3, at 256-68; PI Ex. 48, at 2281; PI Ex. 57, at

14  2986-87.  Instead, to avoid detection from the payment processing system and to continue

15  charging consumers' accounts, they employed various tactics to minimize or otherwise dilute

16  their high chargeback rates, including: (1) structuring their sales to charge each consumer's

17  account for multiple charges of varying prices (e.g. upsells); (2) processing sales through

18  multiple merchant accounts using different payment processors (see PI Ex. 8, at 381-82; PI Ex.

19  56, at 2904, 2917, ¶¶ 4, 43; PI Ex. 50, at 2434, 2437, 2440-44, ¶¶ 9, 24-30); and (3) frequently

20  changing and using multiple merchant billing descriptors for their products and engaging in

21  "load balancing," or balancing sales across these multiple descriptors and through the multiple

22  merchant accounts.  See PI Ex. 3, at 242-43 (Willms put in touch with payment processor who

23  engages in "load balancing"); PI Ex. 9, at 779-89; PI Ex. 10, at 904-05; PI Ex. 50, at 2434,

24  2441-43, ¶¶ 9, 26, 28-29; PI Ex. 56, at 2904, 2917-21, ¶¶ 4, 46, 51, 54, 56, 59-60, 63, 66, 68.

25  "Billing descriptors," or credit card or merchant descriptors, are the descriptive words that

26  appear on cardholders' account statements next to the charge or debit.  PI Ex. 56, at 2917, ¶ 46.

27

28

1    The Willms defendants also created shell corporations in the U.S. and abroad, fronted by

2    nominee principals, to obtain merchant accounts that would not appear to be associated with

3    them.  They were able to do this through the services of individual defendants Graver, Sechrist,

4    Callister, and Milne.  These individual defendants took on the role of principal and "signer" for

5    the shell entities, and then applied for merchant accounts and opened bank accounts for the

6    Willms defendants.  This made it difficult to trace the merchant accounts to Willms, which

7    enabled the Willms defendants to evade Visa's and MasterCard's risk management rules.  PI

8    Ex. 56, at 2904-05, 2916-17, ¶¶ 4, 40-46; PI Ex. 50, at 2440-46, ¶¶ 24-35 and Attachs. N-W at

9    2531-2665; see PI Ex. 49, at 2313, 2429.  The Willms defendants also processed payments

10   outside the U.S., where some banks allow very high chargeback rates and where monitoring by

11   Visa and MasterCard is more difficult.  PI Ex. 56, at 2921-22, ¶¶ 67-69; PI Ex. 50, at 2442-43,

12   ¶¶ 28-29 and Attachs. R, S, at 2351-2665.  When the Willms defendants were using offshore

13   processors, for much of the time their chargeback rates for some products were 10% to 20%.

14   PI Ex. 50, at 2442, 2444-46, ¶¶ 28, 33-34 and Attach. R, at 2581, 2587, 2590, 2594, 2598,

15   2600.

16   As a result of these evasive maneuvers, and with the participation of defendants Graver,

17   Sechrist, Callister, and Milne, the Willms defendants have been able to continue to accept

18   credit card payments from consumers for far longer than they would have been able to

19   otherwise – causing substantial consumer injury of over $400 million.  See PI Ex. 2, at 51-55

20   (gross revenues January 2009 to January 2010 for trial offers), 101-02 (2008 gross revenues for

21   trial offers), 136 (2010 gross revenues for penny auctions).

22   **IV.   ARGUMENT**

23   **A.      Section 13(b) Authorizes the Court to Grant the Requested Relief**

24   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this

25   Court to grant, permanent injunctive relief in "proper cases" and also to award "any ancillary

26   relief necessary to accomplish complete justice."  FTC v. H.N. Singer, Inc., 668 F.2d 1107,

27   1111-13 (9th Cir. 1982).  Section 13(b) of the FTC Act authorizes the issuance of injunctive

28

1   relief in two different situations.  Because the FTC proceeds here under the second proviso of

2   Section 13(b), the standard that is prescribed in the first proviso of the Section, which relates to

3   the issuance of temporary relief in aid of administrative proceedings, does not apply.  Id. at

4   1111.  A routine fraud case such as this one, replete with misrepresentations of material facts

5   in violation of Sections 5(a) and 12 of the FTC Act, qualifies as a "proper case" under Section

6   13(b).  Id.

7           The Court may exercise the full breadth of its equitable authority in a Section 13(b)

8   action because Congress "did not limit that traditional equitable power" when it passed the

9   FTC Act.  Id. at 1113.  Thus, under Section 13(b), the Court may order ancillary equitable

10  remedies, such as rescission of contracts and restitution, as well as whatever additional

11  preliminary relief is necessary to preserve the possibility of effective final relief.  Id. at 1113-

12  14; see S. Rep. No. 103-130 (1993), as reprinted in 1994 U.S.C.C.A.N. 1790-91 ("Section 13

13  of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act]").  The

14  exercise of this broad, equitable authority is particularly appropriate where, as here, the public

15  interest is at stake.  Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946); United States v.

16  Laerdal Mfg., 73 F.3d 852, 857 (9th Cir. 1995).

17          Injunctive relief is appropriate even if a defendant has ceased its illegal activities if there

18  is "cognizable danger of recurrent violation."  United States v. W.T. Grant Co., 345 U.S. 629,

19  633 (1953).  The commission of past illegal conduct is "highly suggestive of the likelihood of

20  future violations."  CFTC v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979) (quoting SEC v.

21  Management Dynamics, 515 F.2d 801, 807 (2d Cir. 1975)); see also FTC v. Direct Mktg.

22  Concepts, Inc., 648 F. Supp. 2d 202, 212 (D. Mass. 2009) aff'd, 624 F.3d 1 (1st Cir., Oct.

23  2010); FTC v. Think Achievement Corp., 144 F. Supp. 2d 1013, 1017 (N.D. Ind. 2000); FTC

24  v. Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000).  The defendants are

25  skilled in online marketing and at marketing virtually any product or program, and are still

26  marketing trial offers on websites with free-to-pay conversion and negative option continuity

27

28

1  plan features.  PI Ex. 55, Attach. A, at 2763-95, 2798-2900.  The risk of continuing law

2  violations necessitates ongoing injunctive relief.

3       **B.**    **This Case Meets the Applicable Standard for Entry of a Preliminary Injunction**

4

5       A plaintiff in a lawsuit between two private parties may obtain a preliminary injunction if

6  it demonstrates that:  (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely

7  to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in

8  plaintiff's favor; and (4) an injunction is in the public interest.  Winter v. Natural Res. Def.

9  Council, Inc., 129 S. Ct. 365, 374 (2008).  In a statutory enforcement action, however, the

10 government need not show irreparable injury because, if the government shows a likelihood of

11 success on the merits, irreparable injury is presumed.  United States v. Odessa Union

12 Warehouse Co-op, 833 F.2d 172, 175-76 (9th Cir. 1987); FTC v. World Wide Factors, Ltd., 882

13 F.2d 344, 347 (9th Cir. 1989) (unlike private litigants, the FTC need not prove irreparable

14 injury, which is presumed).  In FTC v. Inc21, 688 F. Supp. 2d 927, 936, n.17 (C.D. Ca. 2010),

15 the court held that "[C]ongress determined that the traditional standard was *not* 'appropriate for

16 the implementation of a Federal statute by an independent regulatory agency where the

17 standards of the public interest measure the propriety and the need for injunctive relief'"

18 [citation omitted].  In this light, the recent Supreme Court holding in Winter, which clarified the

19 test for applying the "traditional" equity standard for issuing an injunction, does not affect the

20 analysis under Section 13(b) of the FTC Act.  Thus, the FTC need only show a likelihood of

21 success on the merits, that the balance of equities tips in its favor, and that the injunction serves

22 the public interest.  FTC v. Affordable Media, 179 F.3d 1228, 1233 (9th Cir. 1999).  In addition,

23 when weighing the public and private equities, the public interest should receive greater weight.

24 Winter, 129 S. Ct. at 376-77; Affordable Media, 179 F.3d at 1236.  As explained in detail

25 below, the FTC is likely to succeed in showing defendants' multiple law violations.  Moreover,

26 the balance of the equities tips decidedly in favor of protecting the public from further harm and

27 preserving assets for eventual consumer redress.  Requiring defendants to comply with the FTC

28 Act, to refrain from fraudulent representations, or to preserve their assets from dissipation or

concealment, is not an oppressive hardship.  <u>World Wide Factors</u>, 882 F.2d at 347; <u>FTC v. City West Advantage, Inc.</u>, 2008 WL 2844696 (D. Nev. 2008) (no hardship in requiring defendants merely to follow the law – to refrain from making misrepresentations to consumers).

### C.   The Evidence Demonstrates a Substantial Likelihood of Success on the Merits

#### 1.   Defendants' Deceptive and Unfair Business Practices Violate Sections 5 and 12 of the FTC Act

There is no doubt that the Willms defendants' activities qualify as deceptive acts or practices under Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.  An act or practice is deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.  <u>FTC v. Stefanchik</u>, 559 F.3d 924, 928 (9th Cir. 2009); <u>FTC v. Gill</u>, 265 F.3d 944, 950 (9th Cir. 2001); <u>FTC v. Pantron I Corp.</u>, 33 F.3d 1088, 1095 (9th Cir. 1994).  A representation is likely to mislead consumers if it is false.  <u>Pantron I</u>, 33 F.3d at 1096 & n. 22.  A representation, omission, or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."  <u>FTC v. Cyberspace.com, LLC</u>, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting <u>In re Cliffdale Associates, Inc.</u>, 103 F.T.C. 110, 165 (1984)).  A misrepresentation may be express or implied, and express product claims are presumed to be material.  <u>FTC v. Figgie Int'l</u>, 994 F.2d 595, 604 (9th Cir. 1993); <u>Pantron I</u>, 33 F.3d at 1095-96.

##### a.   Material Misrepresentations About "Free," "Risk Free," and "Bonus" Offers and Failure to Disclose or Adequately Disclose Charges to Consumers' Accounts

As discussed in Section III(A) above, the Willms defendants induced consumers to provide their payment information by falsely and prominently representing that an item or service could be had on a "free" or "risk-free" trial basis or as a "bonus," for which consumers pay only a nominal shipping and handling fee.  In fact, this was not true.  As also discussed above, consumers who ordered the trial products often were charged not only for shipping and handling, but also for costly initial membership fees and forced to pay the full price of the trial products sent to them without their knowledge unless they cancelled before the expiration of the

1    trial period.  The Willms defendants also charged consumers on a recurring basis for additional

2    "upsell" products and programs without consumers' knowledge.  Likewise, consumers who

3    "registered" to participate in the Willms defendants' online penny auctions were charged a

4    purportedly optional and costly initial membership fee to obtain the offered 300 "bonus" bids

5    and, unknown to the consumers, also charged them for additional bids on a recurring basis.  See

6    Section III(A) above.

7           The material terms and conditions for the offers and auctions were not disclosed or were

8    inadequately disclosed.  As discussed in Section III(A) above, to the extent that they were

9    disclosed, such disclosures appeared in vague, unnoticeable small print or in the separate, hard

10   to find terms and conditions pages on the websites and were minimized, while appeals for the

11   products offered were overly emphasized.  The evidence shows that the Willms defendants

12   knew that consumers did not understand the terms and conditions pages, were unlikely to read

13   them, and purposely designed the websites to make it difficult for consumers to find important

14   costs and terms.  The price and terms of a product or service are material to consumers and

15   small print disclaimers, even if truthful, are inadequate to inform consumers of material

16   information.  Cyberspace, 453 F.3d at 1200.  Based on these marketing practices, reasonable

17   consumers would conclude that further charges would not be incurred.

18          Indeed, the law is clear that negative option plans such as these are deceptive and violate

19   Section 5 of the FTC Act.  In Keithly v. Intelius, Inc., 2011 U.S. Dist. LEXIS 16861 (W.D.

20   Wash. Feb. 8, 2011 ), this Court recently found the use of similar negative options and

21   continuity features to market products and services on the Internet to be deceptive.  The Court

22   stated that one must consider the net impression an Internet offer creates when determining

23   whether disclosures concerning the offer's features are legally adequate.  Id. at *22.  Although

24   the case involved Washington State's Consumer Protection Act, the Court looked to case law

25   construing the FTC Act for guidance.  Id. at *20-22.  The Court opined that: (a) details about

26   the Intelius upsell programs were "the least conspicuous elements on the page," and (b) "there

27   was nothing on the screen (outside of the disclosure box) to suggest that [the plaintiff] was

28

1    agreeing to pay for anything other than the background check he had originally sought." Id. at

2    *23, *26.  The Court remarked that "subdued" and "easily-overlooked" terms, even if true, did

3    not defeat the plaintiff's claim and concluded that the overall transaction had the capacity to

4    deceive.  Id. at *28-29.

5        Negative option and continuity marketing plans are increasingly undergoing scrutiny

6    because of their capacity to deceive.  These practices are so pernicious and harmful to

7    consumers that on December 29, 2010, Congress enacted the Restore Online Shoppers'

8    Confidence Act, S. 3386-2 ("ROSC Act") to address them.  Congress specifically found that

9    sales such as these, which involve "free-to-pay" conversions  (i.e., free trial offers) combined

10   with "negative option" sales, take advantage of consumers' expectations that they will have an

11   opportunity to accept or reject an offer at the end of the trial period.  See Pub. L. No. 111-345,

12   124 Stat. 3618 (2010).  Section 4 of the ROSC Act prohibits negative option marketing on the

13   Internet unless the marketer clearly and conspicuously discloses all material terms of the

14   transaction *before* obtaining a consumer's billing information, obtains a consumer's express

15   informed consent *before* charging him or her, and provides "simple mechanisms" for a

16   consumer to stop recurring charges.  Id.  The record Congress relied on included testimony that

17   when negative options are used to secure assent to transactions, disclosures must be especially

18   clear and prominent because consumers are not accustomed to purchasing items without

19   affirmatively assenting to those purchases.  See PI Ex. 13, at 1267-1308.

20       The evidence overwhelmingly shows that the Willms defendants' marketing techniques

21   fall squarely within the description of the kind of tactics that Congress and the Court in Keithly

22   sought to halt.  As such, the Willms defendants' misrepresentations of the risk free nature of

23   their offers and failure to disclose or adequately disclose their material costs and terms clearly

24   violate Section 5 of the FTC Act.

25            **b.      Deceptive and Undisclosed or Inadequately Disclosed
                        Limitations on Cancellations and Refunds**

26       To emphasize that their offers were truly risk free, the Willms defendants have

27   represented to consumers that they could easily cancel the offers and obtain a full refund.  See

28

Section III(B) above.  In fact, the Willms defendants have made it virtually impossible for consumers to obtain refunds and cancel the recurring offers and charges through the use of undisclosed or poorly disclosed limitations.  Further, instructing their customer service and live chat representatives to avoid giving refunds or to remain silent about the undisclosed upsells, forcing consumers to jump through numerous hoops to cancel and obtain refunds, made the Willms defendants' claims of  "risk free" and "easy to cancel" a lie.  These undisclosed terms and conditions, which resulted in consumers sometimes paying hundreds of dollars for what they believed were "free" offers, were clearly material to consumers, who would not have agreed to the offers if they knew the real costs and difficulties involved.  See, e.g., PI Ex. 20, at 1733, ¶ 8; PI Ex. 21, at 1743, ¶ 12; PI Ex. 22, at 1761, ¶ 7; PI Ex. 24, at 1796, ¶ 10; PI Ex. 25, at 1808, ¶ 13; PI Ex. 26, at 1825-26, ¶¶ 5, 7; PI Ex. 27, at 1834, ¶ 13; PI Ex. 29, at 1861, ¶ 7; PI Ex. 30, at 1885, ¶ 8; PI Ex. 31, at 1898, ¶ 11; PI Ex. 32, at 1917, ¶ 15; PI Ex. 33, at 1930, ¶ 11; PI Ex. 34, at 1954, ¶ 9; PI Ex. 35, at 1970, ¶ 13; PI Ex. 36, at 1979-80, ¶ 13; PI Ex. 37, at 1999, ¶ 12; PI Ex. 38, at 2020, ¶ 16; PI Ex. 39, at 2030, ¶ 12; PI Ex. 41, at 2100, ¶ 12; PI Ex. 42, at 2110, ¶ 14; PI Ex. 43, at 2136, ¶ 23; PI Ex. 44, at 2180-81, ¶ 15; PI Ex. 46, at 2228, ¶ 12.  In calls to the Willms defendants' customer service center, consumers seethe with  frustration in their attempts to obtain refunds.  The Willms defendants' high chargeback rates and poor BBB ratings are further proof that consumers were largely unsuccessful in obtaining refunds from them directly.  Despite ample notice of the problems with their cancellation and refund disclosures (or the lack of them), the Willms defendants nonetheless have continued to blatantly misrepresent that consumers can easily cancel and obtain refunds, and have omitted material information about the conditions and limitations of obtaining refunds, in violation of Section 5 of the FTC Act.

**c.**     **False and Unsubstantiated Claims About the AcaiBurn and PureCleanse Products**

Section 12 of the FTC Act makes it unlawful to "disseminate, or cause to be disseminated, any false advertisement."  15 U.S.C. § 52.  The FTC Act defines a "false advertisement" as "an advertisement, other than labeling, which is misleading in a material respect."  15 U.S.C. § 55.

1    Further, Section 12(b) of the FTC Act provides that "the dissemination or the causing to be

2    disseminated of any false advertisement within the provisions of subsection (a) of this section

3    shall be an unfair or deceptive act or practice . . . within the meaning of section 45 of this title."

4    15 U.S.C. § 52(b).  Thus, a claim that is deemed a false advertisement in violation of Section 12

5    is also a deceptive and misleading claim under Section 5.

6         Alternatively, a representation or advertisement that lacks a reasonable basis is considered

7    false.  FTC Policy Statement on Deception, 103 F.T.C. 174, 175 n.5 (appended to In re Cliffdale

8    Associates, Inc., 103 F.T.C. 110 (1984)); see also, Pantron I, 33 F.3d at 1096; FTC v. Tashman,

9    318 F.3d 1273, 1277 (11th Cir. 2003); FTC v. US Sales Corp., 785 F. Supp. 737, 748 (N.D. Ill.

10   1992) ("Apart from challenging the truthfulness of an advertiser's representations, the FTC may

11   challenge the representation as unsubstantiated if the advertiser lacked a reasonable basis for its

12   claims").  For health-related claims, the advertiser must possess "competent and reliable

13   scientific evidence" to substantiate the claim.  FTC v. QT, Inc., 448 F. Supp. 2d 908, 961 (N.D.

14   Ill. 2006), aff'd 512 F.3d 858 (7th Cir. 2008), citing Sterling Drug, Inc. v. FTC, 741 F.2d 1146,

15   1156-57 (9th Cir. 1984).  For medical, health-related claims, courts have long held that a well-

16   conducted, placebo-controlled, randomized, and double-blind study is necessary to satisfy the

17   "competent and reliable scientific evidence" standard.  QT, 448 F. Supp. 2d at 962; FTC v.

18   SlimAmerica, Inc., 77 F. Supp. 2d 1263, 1274 (S.D. Fla. 1999).  When the advertiser lacks

19   adequate substantiation evidence, the advertiser necessarily lacks any reasonable basis for its

20   claims and, as such, the claim is deceptive as a matter of law.  Removatron Int'l Corp. v. FTC,

21   884 F.2d 1489, 1498 (1st Cir. 1989).

22        As discussed in Section III(C)(1) above, the Willms defendants represented to consumers

23   that their AcaiBurn and PureCleanse products will cause rapid and substantial weight loss and

24   that scientific evidence, including two eight-week, placebo-controlled clinical studies, supports

25   this claim.  In fact, these claims are false.  Dr. Kushner, an obesity expert, has reviewed the

26   studies on which the Willms defendants rely and stated that they do not adequately substantiate

27

28

Amended Mot. for Prelim. Inj. and Memo of  P&A (Reformatted) Page - 36

1  these claims.  Further, these representations are express and, as such, are presumed material to

2  consumers.  Thus, the representations are false in violation of Sections 5 and 12 of the FTC Act.

3      The Willms defendants also have represented to consumers that their PureCleanse

4  products help prevent colon cancer.  See Section III(C)(2) above.  They juxtaposed written

5  statements on the websites that PureCleanse "rids the body of toxins," "promotes health &

6  longevity," and is "research tested," with an embedded video of Katie Couric and other

7  celebrities discussing colon cancer and its prevalence.  This created the net impression that

8  using PureCleanse helps prevent colon cancer by flushing toxins out of the colon.

9      This claim is false and unsubstantiated.  As discussed above in Section III(C)(2), the

10  Willms defendants have offered no credible substantiation for their cancer prevention claims.

11  In addition, a search of the relevant medical literature over the Internet did not reveal any

12  studies showing that there is a connection between the use of laxatives and the risk of colorectal

13  cancer.  It is well accepted in the medical community that the frequent cleansing of one's

14  bowels by the use of laxatives may, in fact, be seriously harmful.  Therefore, this representation

15  is unsubstantiated and likely also false in violation of Sections 5 and 12 of the FTC Act.

16  Avoiding cancer is material to consumers, who forever seek ways to improve their odds against

17  this deadly disease.

### d.    False Celebrity and Other Endorsements

18  

19      On their websites, the Willms defendants depict celebrities, such as television

20  personalities Rachael Ray and Oprah Winfrey, and/or news media outlet logos, such as CNN,

21  ABC News, and FOX News, to represent that their offers or products were "seen on" or

22  "featured on" those shows and were therefore endorsed by those celebrities and entities.  See

23  Section III(D) above.  Celebrity and media outlet endorsements tend to convince consumers that

24  the advertised products are effective.  PI Ex. 15, at 1325, 1332, ¶¶ 23(e), 23(g), 36(c).  Indeed,

25  many consumers relate that these endorsements influenced their decision to agree to the Willms

26  defendants' trial offers.  Unfortunately, these consumers were duped because neither Rachael

27  Ray nor Oprah Winfrey, nor the media outlets depicted, endorsed or otherwise approved of the

28

Willms defendants' products.  Therefore, these claims are false representations in violation of Section 5 of the FTC Act.

### e.   Unfair Practice of Unauthorized Billing and Evading Risk Management Rules to Obtain Merchant Accounts

Section 5(n) of the FTC Act provides that an act or practice is unfair if:  (1) it causes or is likely to cause substantial injury to consumers that (2) is not reasonably avoidable by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition.  15 U.S.C. § 45(n); see also Orkin Exterminating Co., Inc. v. FTC, 849 F.2d 1354, 1363-66 (11th Cir. 1988).  The Willms defendants routinely submitted charges to consumers' accounts without their express informed consent, either because the consumer was not adequately informed of the terms and conditions of the offer, or the consumer followed the terms and conditions of the offer to avoid charges but was charged nonetheless.  Such conduct has consistently been held to be an unfair practice in violation of Section 5 of the FTC Act. See, e.g., FTC v. Global Mktg. Group, Inc., 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla.  2008); FTC v. J.K. Publications, Inc., 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

By routinely submitting unauthorized charges to consumers' accounts, the Willms defendants also generated extremely high chargeback rates.  As discussed in Section III(E) above, to continue processing consumers' payments, the Willms defendants engaged in tactics to "game" the payment processing system and avoid detection.  They created shell corporations in the U.S. and abroad with the participation of defendants Graver, Sechrist, Callister, and Milne, who fronted them as officers and "signers" and applied for merchant accounts and accounts with payment processors.  This enabled the Willms defendants to evade Visa's and MasterCard's risk management rules and cause enormous consumer injury – an estimated net injury of over $400 million.  This practice is not only fraudulent, enabling the Willms defendants to continue injuring consumers, but it also offers no countervailing benefit to consumers or to competition.  To the contrary, this practice undermines the entire payment processing system and efforts to ensure its stability.  Therefore, this is an unfair practice in violation of Section 5 of the FTC Act.

1

**2.      Defendants' Unauthorized Billing Practices Violate Section 907(a) of the EFTA and Section 205.10(b) of EFTA's implementing Regulation E**

2

3      The Willms defendants' unauthorized billing practices also violate the EFTA and its

4   implementing Regulation E, as well as the FTC Act.  When the Willms defendants accepted

5   recurring debit card payments from consumers, they failed to:  (1) obtain written authorization

6   from consumers for the merchant to place recurring charges on consumers' debit accounts; and

7   (2) provide a copy of this written authorization to consumers. Section 907(a) of EFTA, 15

8   U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. §205.10(b).  Because the

9   Willms defendants did not comply with either requirement, they violated EFTA, Regulation E,

10   and, in turn, the FTC Act.  15 U.S.C. § 1693o(c).

11   **3.      Liability of Individual Defendants**

12      The named individual defendants are personally liable for their participation in the law

13   violations of the corporate defendants.  An individual may be held liable for injunctive relief for

14   a corporate defendant's violations of the FTC Act if he or she either (a) participated in the

15   challenged conduct, or (b) had authority to control it.  See, e.g., Cyberspace, 453 F.3d at 1202;

16   Affordable Media, 179 F.3d at 1234; Pantron I, 33 F.3d at 1103.  An individual's status as a

17   corporate officer, authority to sign documents on behalf of the corporate defendant, and active

18   involvement in the making of corporate policy are all factors that tend to demonstrate an

19   individual's authority to control the corporation.  See, e.g., FTC v. Publishing Clearing House,

20   Inc., 104 F.3d 1168, 1170 (9th Cir. 1996); FTC v. Amy Travel Service, Inc., 875 F.2d 564, 573-

21   74 (7th Cir. 1988).  To hold an individual defendant jointly and severally liable for restitution,

22   the FTC must additionally show that he or she has actual knowledge of material

23   misrepresentations, was recklessly indifferent to their truth or falsity, or, at a minimum, was

24   aware of a high probability of fraud and intentionally avoided the truth.  See, e.g., Amy Travel

25   Service, 875 F.2d at 574.  The degree of an individual's participation in business affairs is

26   probative of his knowledge.  Id.

27

28

1

### a.  Jesse Willms

As discussed in Section II(C) above, defendant Jesse Willms fully controlled or had the authority to control every aspect of the corporate defendants' activities.  Further, he either had actual knowledge that the websites were deceptive or, at the very least, he was recklessly indifferent to the truth or falsity of the material misrepresentations made to consumers, or was aware of the high probability of fraud.  The poor BBB ratings and the large number of consumers who complained to the BBB of unauthorized charges to their bank and credit card accounts, in addition to the high chargeback rates and the reasons consumers gave for seeking chargebacks, should have alerted Willms that there were significant problems with the disclosures on the websites.  As set forth in Section III(A) above, the customer service scripts, which Willms admits he personally approved, acknowledge that many consumers do not understand or even read the terms and conditions pages on the websites.  Further, as discussed in Section III(E) above, Willms was told on several separate occasions, starting as early as 2008, that the company had to reduce charge reversals in order to retain payment processing.

Instead of changing the websites to include better disclosures, Willms created shell corporations to allow him to obtain credit card processing when his chargeback rates became too high.  Willms hoodwinked payment processors so that he could continue to make money from this fraudulent scheme.  As discussed in Section III(E) above, time and again he was told what he needed to do to bring his business into compliance with the law, yet he did not do so; instead, his representatives callously acknowledged that if cost and terms disclosures were made clearer to consumers, the companies would make less money.  Thus, Willms should be held personally liable to provide restitution to consumers for the violations of Sections 5 and 12 of the FTC Act.

### b.  Peter Graver, Adam Sechrist, Brett Callister, and Carey Milne

Defendants Graver, Sechrist, Callister, and Milne participated in the Willms defendants' efforts to avoid having merchant accounts traced to them and to manipulate payment data.  <u>See</u> Sections II(C) and III(E) above.  Through the activities of these individuals, the Willms

1   defendants were able to continue to accept credit card payments from consumers for far longer

2   than they otherwise would have, which caused substantial consumer injury.

3       These individual defendants participated directly in these activities and either actually

4   knew that they were submitting inaccurate information to merchant banks, or were recklessly

5   indifferent to the truth or falsity of the information they provided, or, at a minimum, were aware

6   of a high probability of fraud and intentionally avoided the truth.  Graver was aware that

7   Willms was creating these shell corporations to avoid detection and to obtain merchant

8   processing.  He also had reason to know of Willms's unsavory business practices.  PI Ex. 8, at

9   468-74 (law enforcement showed up at Graver's door regarding fraud allegations), 552 (BBB

10   consumer complaints sent to him to pass on to Willms's employees), 580 (Graver knows of

11   "blow up" with MasterCard).  Each of the other individuals also knew or had reason to know

12   that they were being used to create corporations and obtain bank accounts for processing

13   consumer transactions, each having signed a contract with Jesse Willms to do this for

14   compensation.  See Section II(C) above.  They stated on merchant account applications that

15   they were the owners of the companies they fronted when they knew for a fact that Jesse

16   Willms was the real owner and they had no right to the money flowing through the

17   corporations.  Id.  Therefore, each of these defendants should be held personally liable for

18   restitution to injured consumers for the Willms defendants' unfair practices to evade VISA's

19   and MasterCard's risk management rules and obtain merchant accounts to continue charging

20   consumers.

21       **D.      The Balance of the Equities Requires Preliminary Relief**

22       Preliminary relief is appropriate if, once the FTC establishes the likelihood of its ultimate

23   success, the Court finds that the equities weigh in favor of granting the relief sought.  In

24   weighing the equities, the Ninth Circuit has held that the public interest should receive far

25   greater weight than private interests.  Affordable Media, 179 F.3d at 1236; FTC v. Warner

26   Communications, Inc., 742 F. 2d 1156, 1165 (9th Cir. 1984).  The equities in this case weigh

27   heavily in favor of preliminary injunctive relief.  Given the pervasive nature of the unlawful

28

1  activity, there is a strong likelihood that, absent injunctive relief, future law violations will

2  occur.  See FTC v. Southwest Sunsites, 665 F.2d 711, 723 (5th Cir. 1982) ("A large-scale

3  systematic scheme tainted by fraudulent and deceptive practices gives rise to the reasonable

4  expectation of continued violations absent restraint.").  These violations will result in continued

5  and substantial consumer loss.

6        The private equities in this case are not compelling.  In light of the inherently deceptive

7  nature of free-to-pay conversions and negative option continuity plans, the danger to consumers

8  is great.  As discussed above, Willms failed to comply with payment processor requests that he

9  disclose the true costs and terms because better disclosures would adversely affect his sales.

10  Further, despite his knowledge of the FTC's investigation and the imminent filing of this action,

11  he is busy generating new website offers with free-to-pay conversion trial offers and negative

12  options.  PI Ex. 55, Attach. A, at 2744-50, 2758-2864.  Customer service call transcripts for

13  these new offers indicate that most consumers are unaware that they are being billed until after

14  their credit cards are charged.  A transcript of online customer service agents' discussions with

15  consumers recently obtained from the Willms defendants' trash dumpster reveals that customers

16  signing up for new offers are unaware of the charges.  PI Ex. 55, Attach. A, at 2756-57, 2866-

17  68, 2875, 2877, 2882, 2887, 2890, 2893-96.  The defendants have not changed their practices

18  and need a court order to govern their activities during the pendency of this litigation.  Thus, the

19  evidence demonstrates that the public equities – the protection of innocent consumers from

20  fraud and the effective enforcement of the law – far outweigh the defendants' private interest in

21  continuing to make money in this dubious way.  The preliminary relief requested is the only

22  way to ensure that consumers are not further injured by these defendants.

23        **E.**    **An Asset Freeze is Necessary to Preserve Funds for Consumer Redress**

24        To preserve the availability of funds for injured consumers, plaintiff requests that the

25  Court issue an order requiring the preservation of assets and evidence.  Such an order is well

26  within the Court's authority.  Singer, 668 F.2d at 1113 ("§ 13(b) provides a basis for an order

27  freezing assets").  An asset freeze or restriction is appropriate once the Court determines that

28

1    the FTC is likely to prevail on the merits and restitution would be an appropriate final remedy.

2    FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1031 (7th Cir. 1988).  "A party

3    seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other

4    inability to recover monetary damages, if relief is not granted."  Johnson v. Couturier, 572 F.3d

5    1067, 1085 (9th Cir. 2009).  In Johnson, the Ninth Circuit upheld an asset freeze because

6    plaintiffs had established they were "likely to succeed in proving that [defendant]

7    impermissibly awarded himself tens of millions of dollars," and because:

8        Such an individual is presumably more than capable of placing assets in his
         personal possession beyond the reach of a judgment.  Accordingly, [defendant's]
9        own prior conduct establishes a likelihood that in the absence of an asset freeze
         and accounting, Plaintiffs will not be able to recover the improperly diverted funds
10       and will thus be irreparably harmed.

11   Johnson, 572 F.3d at 1085.  Further, where a defendant's business is permeated with fraud, the

12   Court may conclude that the defendant is likely to attempt to dissipate or conceal assets while

13   the action is pending and, to avoid this, may grant an asset freeze.  See, e.g., SEC v. Manor

14   Nursing Ctrs., Inc., 458 F.2d 1082, 1106 (2d Cir. 1972); SEC v. R.J. Allen & Assocs., Inc., 386

15   F.Supp. 866, 881 (S.D. Fla. 1974).  A defendant's transfer of assets to offshore accounts

16   establishes the likelihood that without an asset freeze, the plaintiff will be unable to recover any

17   funds.  Affordable Media, 179 F.3d at 1236 (likelihood of dissipation existed "[g]iven the

18   [defendants'] history of spiriting their commissions away to a Cook Islands trust").

19        An asset freeze in the instant case is necessary to preserve funds for consumer redress.

20   Defendants have caused consumer injury of at least $400 million.  They have created shell

21   corporations in several countries to shield themselves from detection and have used offshore

22   bank accounts to move large amounts of cash.  See PI Ex. 3, at 194-96 (moving money to

23   companies and bank accounts in Cyprus).  Much of this activity aims to conceal or otherwise

24   permit the dissipation of money obtained from their fraudulent business operations.  Further,

25   defendants have not disclosed to plaintiff the location of their funds and unknown bank

26   accounts may be in the U.S. and other countries.  These funds should be frozen or their use

27   restricted and the offshore funds should be repatriated to preserve the ability to provide

28

1   restitution for injured consumers.  Finally, the defendants may have large amounts of money

2   held in reserve accounts for payment processing.  The Court should ensure that this money does

3   not make it back into the hands of the defendants, instead of ultimately being used either to

4   provide consumers with restitution or to resolve consumer chargebacks.

5         The asset freeze should include any assets of the individual defendants, who have no right

6   to dissipate or conceal funds that the Court may later determine were wrongfully gained.  If

7   frozen, those assets can be located and inventoried.  Freezing individual assets is warranted

8   where the individual defendant controls the business that perpetrated the unfair and deceptive

9   acts or participated directly in those practices.  <u>World Travel Vacation Brokers</u>, 861 F.2d at

10  1031.

11  **V.   CONCLUSION**

12        For the foregoing reasons, plaintiff FTC hereby moves the Court to grant its motion for

13  preliminary injunction to ensure that defendants cannot continue their fraudulent Internet

14  marketing and billing schemes.  As discussed above, defendants have engaged in and are likely

15  to engage again in acts or practices that violate Sections 5(a) and 12 of the FTC Act, 15 U.S.C.

16  §§ 45(a) and 52, Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of

17  EFTA's implementing Regulation E, 12 C.F.R. § 205.10(b).  Without the requested relief

18  pending final disposition of this case, defendants will continue to dupe consumers into "risk

19  free" schemes and then impose credit card and debit charges without their consent.

20  Dated: June 21, 2011.

21                          Respectfully Submitted,

22

23                          <u>s/Nadine Samter</u>
                        NADINE S. SAMTER, WSBA #23881

24                          KATHRYN C. DECKER, WSBA #12389
                        ELEANOR DURHAM (Md. Bar)

25                          JULIE K. MAYER, WSBA #34638
                        Federal Trade Commission, 915 Second Ave., Suite 2896
                        Seattle, WA 98174

26                          206-220-6350 (telephone);206-220-6366 (fax)
                        Email:  nsamter@ftc.gov; kdecker@ftc.gov;edurham@ftc.gov

27

28                          Attorneys for Plaintiff Federal Trade Commission

1

## CERTIFICATE OF SERVICE

2   I hereby certify that on June 21, 2011, I electronically filed the foregoing
**REFORMATTED MOTION FOR PRELIMINARY INJUNCTION AND**
3   **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** with the Clerk of the
Court using the CM/ECF System, which will send notification of such filing to the following:

4

5   James Kaminski
Hughes & Bentzen, PLLC
1100 Connecticut Avenue, NW, Suite 340
6   Washington, DC 20036
(202) 293-8875, Ext. 208
7   jkaminski@hughesbentzen.com

8   Jonathan N. Rosen
Shook, Hardy & Bacon, LLP
9   1155 F Street, NW, Suite 200
Washington, DC 20004-1305
10   (202) 639-5608
jrosen@shb.com
11

Molly A. Terwilliger
12   Summit Law Group, PLLC
315 Fifth Avenue, S., Suite 1000
13   Seattle, WA 98104
(206) 676-7000
14   mollyt@SummitLaw.com

15   Attorneys for Defendants Jesse Willms, 101636 Alberta Ltd., 1021018 Alberta Ltd., 1524948
Alberta Ltd., Circle Media Bids Limited, JDW Media LLC, Net Soft Media LLC, Sphere Media
16   LLC, True Net LLC, Farend Services Ltd., and Coastwest Holdings Ltd., Peter Graver, Adam
Sechrist, Brett Callister, and Cary Milne
17

18   Dated: June 21, 2011

19

20                              s/Nadine Samter
                               Nadine Samter
21

22

23

24

25

26

27

28