THE HONORABLE MARSHA J. PECHMAN

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

                              Plaintiff,

        v.

JESSE WILLMS, et al.,

                              Defendants.

CASE NO. C11-00828-MJP

**CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MOTIONS TO STRIKE, AND FOR EXPEDITED DISCOVERY AND EVIDENTIARY HEARING**

NOTING DATE FOR MOTION FOR EVIDENTIARY HEARING:  August 5, 2011

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1

## I.    INTRODUCTION

Defendants, Jesse Willms ("Mr. Willms"), Circle Media Bids Ltd., JDW Media, LLC, Net Soft Media LLC, Sphere Media LLC, and True Net, LLC (collectively, "the Companies"), oppose the FTC's Motion for Preliminary Injunction ("Motion").  The FTC has fallen far short of meeting its burden for obtaining its proposed injunction.  The fundamental problem with the FTC's request for a broad injunction is based entirely on past, non-continuing alleged misconduct.  The FTC has offered no evidence that the Companies' current websites are not compliant with FTC standards, just as it has provided no evidence that any Defendant is dissipating assets such that an asset freeze is appropriate.  Further, the FTC has provided no legal basis for its proposal to ban the Companies or Mr. Willms from using negative options or continuity features.  For these reasons alone, the FTC's Motion should be denied.

The evidence presented by the FTC suffers from several flaws that are ultimately fatal to the FTC's case.  First, some of this evidence is simply wrong—in support of its allegations regarding past conduct, the FTC has incorrectly attributed a significant number of websites proffered in support of its Motion as being the Companies' websites.  Second, the evidence put forward by the FTC has been misinterpreted.  For example, the FTC overlooks Mr. Willms' legitimate business strategy in creating U.S.-based entities and working with U.S. processors, wrongly concluding that Defendants created "shell" corporations in order to "game" the payment processing system.  Likewise, the FTC has incorrectly concluded that the Companies' chargeback and refund rates reflect false and deceptive practices, ignoring the fact that these rates can be wholly unrelated to advertising practices.  Third, much of the evidence upon which the FTC relies is plainly inadmissible.  This includes not only documents that are unauthenticated (indeed, merely attached to the FTC's Motion), but declarations filled entirely with inadmissible hearsay.  Pursuant to CR 7(b), and as discussed in more detail below, Defendants therefore move to strike much of the evidence upon which the FTC bases its claim for injunctive relief.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 1
CASE NO. C11-00828-MJP

Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Finally, Defendants do not believe that the FTC has met its burden to obtain its proposed

2  preliminary injunction.  However, in the event this Court is inclined to issue the injunction,

3  Defendants respectfully request permission to conduct limited discovery and a half-day evidentiary

4  hearing.  The parties have significant, material disputes regarding the evidence the FTC has offered in

5  support of its Motion.  As proposed, the FTC's injunction will freeze each of the Defendants'

6  personal assets, as well as effectively shut down the Companies' business.  Prior to entering such an

7  injunction, fundamental fairness requires that the Defendants be permitted to test the FTC's evidence

8  in Court.

9                    II.        BACKGROUND FACTS

10  A.      The Business.

11         Jesse Willms is 24 years old and a lifelong resident of Alberta, Canada.  As a teenager,

12  Mr. Willms began experimenting with selling products over the Internet.  Declaration of Jesse

13  Willms ("Willms Decl."), ¶ 2.  To Mr. Willms' surprise, his business exploded.  Mr. Willms attracted

14  more customers than he imagined possible or could personally manage.  *Id.*  Eventually, Mr. Willms

15  dropped out of high school to run his business full time, but as his customer base multiplied, so did

16  his need for resources and the assistance and expertise of others.  *Id.*  Mr. Willms began to recognize

17  the importance of developing strong brand loyalty through customer satisfaction, particularly in the e-

18  commerce world, where a business's reputation is paramount.  *Id.*  Thus, beginning in 2007,

19  Mr. Willms began hiring scores of employees and developing partnerships with industry leaders in

20  customer service, web design, and online marketing who helped transform his business into a

21  recognized brand associated with high rates of consumer satisfaction.  *Id.*, ¶¶ 2-4.

22         Mr. Willms created formal corporations to hold and manage various business lines.  These

23  business entities include the three Alberta numbered corporations identified in the FTC's Complaint:

24  1016363 Alberta Ltd. d/b/a eDirect Software ("eDirect"), 1021018 Alberta d/b/a JustThink Media

25  ("JTM"), and 1524949 Alberta Ltd. d/b/a Terra Marketing Group ("TMG") (collectively, the

26  "Corporations").  The Corporations hired employees to carry out the day-to-day aspects of their

1    business, including legal compliance.  Additionally, the Corporations contracted with outside web

2    designers, database managers, fulfillment centers, and customer service agents.  The Corporations

3    also engaged online marketing firms to refine their marketing practices and to ensure compliance

4    with the law.  Over the years, the Corporations have retained several law firms to review their

5    products, services, and advertisements.  Willms Decl., ¶ 5.

6         As Mr. Willms transitioned from a teenage entrepreneur into a businessman, the Corporations

7    established themselves as bona fide e-commerce companies, managed with a high level of

8    professionalism, and with a focus on legal compliance and customer satisfaction.  Each of the

9    Corporations has sold goods and services through proprietary websites.  From 2004 to 2007, eDirect

10   sold software and consumer products and services, such as health and beauty products, tea, and

11   informational resources about credit scores, identity theft, and online security.  From 2007 through

12   December 2009, JTM sold various health and beauty products online, including teeth-whitening

13   systems, nutritional supplements, and weight-loss products and information.  Willms Decl., ¶ 6.

14        By late 2009, the health and beauty market was highly saturated characterized by decreasing

15   profit margins resulting from ever rising advertising and other business-related expenses.  Willms

16   Decl., ¶ 11.  Rising advertising costs alone made the Corporations' cost per sale skyrocket from $25

17   in 2008 to $55 in 2009.  *Id.*  In addition, the Corporations were relying on independent contractors to

18   advertise and sell the Corporations' products on commission.  Declaration of Mike Stefaniuk

19   ("Stefaniuk Decl."), ¶ 7.  These "affiliate" advertisers defrauded the company by stealing credit card

20   numbers and using them to generate commissions with bogus sales.  *Id.*, Ex. B; Declaration of

21   Shaleen Rana ("Rana Decl."), ¶ 4; Declaration of Ben Meltzer ("Meltzer Decl."), ¶ 32, Ex. G.  The

22   Corporations therefore decided to retool their business model to improve the margins and eliminate

23   affiliate fraud.  Stefaniuk Decl., ¶ 8.  From February through November 2010, TMG operated online

24   "penny-auction" websites, where consumers could bid on and purchase goods and services at deep

25   discounts from ordinary retail prices.  In 2011, TMG switched its focus to the provision of consumer

26   research services.  Willms Decl., ¶ 7.  Of the Corporations, TMG is the only one that is, at present,

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 3
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   actively engaged in the sale of products and services to consumers.  *Id.*  During their respective

2   periods of activity, each of the Corporations had between 15 and 30 employees.  *Id.*

3        JDW Media, LLC, Circle Media Bids, Ltd., Sphere Media, LLC and Net Soft Media ("U.S.

4   Companies") are U.S. companies established by Mr. Willms to facilitate the payment processing

5   system for U.S. sales of the Corporations' goods and services.  Defendants Peter Graver, Adam

6   Sechrist, Brett Callister and Carey Milne have at various times facilitated the creation of certain of

7   these U.S. companies.

8   B.    Compliance Efforts.

9        While Mr. Willms and the Corporations have always aimed to comply with applicable laws

10  and regulations—including those governing consumer transactions—beginning in 2007, they

11  assumed a much more proactive approach.  The Corporations and Mr. Willms sought to educate

12  themselves on FTC and other regulations regarding disclosures made to consumers during online

13  sales.  In January 2007, the FTC hosted a workshop on online negative options, the recommendations

14  of which were later summarized and published in a formal report.  Stefaniuk Decl., ¶ 4; Willms Decl.,

15  ¶ 8.  The Corporations and Mr. Willms took these recommendations seriously, and compiled a

16  guidance manual which incorporated the material presented at the conference.  Stefaniuk Decl., ¶ 5;

17  Willms Decl., ¶ 9; Declaration of Theodore L. Banks ("Banks Decl."), Ex. 2.  This manual was

18  subsequently updated to comport with regulatory expectations as reflected in announced settlements

19  and other FTC activity.  Stefanuik Decl., ¶¶ 5-6, Ex. A.

20       Consistent with FTC guidelines, the Corporations disclosed the terms and conditions on their

21  websites in a clear and conspicuous manner.  Declaration of Kevin Bazinet ("Bazinet Decl."), ¶ 2;

22  Declaration of Revti Nandan ("Nandan Decl."), ¶ 3.  The disclosures on the websites appeared in the

23  following manner:  The terms were presented in a box typically entitled "Offer Details" directly next

24  to the field where consumers entered credit card information.  No other ad copy was placed next to

25  the terms box to ensure that consumers would not be distracted from viewing it.  Scrolling was not

26  required to read it.  *Id.*  The text of the disclosures contained all material terms of the offers including

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 4
CASE NO. C11-00828-MJP

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   the initial charge, the recurring charges, identification of any additional products, and all cancellation

2   information. *Id.* The font size of the disclosures was essentially the same as the size used in the

3   input fields for personal information. *Id.* The term box was consistently located adjacent to a button

4   that consumers clicked on to submit their billing information. *Id.*

5       Important terms of the offer did not solely appear on the billing pages. Nandan Decl., ¶ 3.

6   Many terms were repeated throughout the websites on the landing pages prior to a consumer's arrival

7   to the billing page, including in Frequently Asked Questions sections and via links to Terms and

8   Conditions pages located at the bottom of each page. *Id.* These repeated terms served to augment the

9   terms box located next to where the billing information was input. *Id.*

10      The Corporations were also very careful about the depictions used on the sites. Nandan Decl.,

11  ¶ 3. The Corporations only referenced other websites in a manner such as "AS SEEN ON

12  CNN.COM," if the products were advertised on those sites. *Id.* The products were advertised or

13  promoted on RachelRay.com, cnn.com, abcnews.com, and foxnews.com. *Id.*

14      At the end of 2008, the Corporations hired advertising review counsel to provide further

15  compliance guidance. Nandan Decl., ¶ 3; Banks Decl., ¶ 9. As a result, the sites underwent

16  extensive revisions in January 2009. The Corporations also reviewed FTC case law and other

17  business guidance materials (Bazinet Decl., ¶ 5, Ex. A) and took additional compliance measures,

18  including:

19      •   Use of the word "FREE" was discontinued on the weight-loss sites. Bazinet Decl., ¶ 7.

20      •   Statements that pertained to rapid weight loss were removed. *Id.*

21      •   Font text of the disclosures containing the material terms of an offer were increased. *Id.*

22      The Corporations continually adjusted their business practices as their understanding of

23  compliance grew. By the end of 2009, the Corporations abandoned the use of the term "RISK-

24  FREE," and discontinued promotion of its websites via affiliate networks. The Corporations also no

25  longer offered "upsells"—additional products sold in conjunction with a primary product. The

26  Corporations made adjustments to their websites based on recommendations made by third-party

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 5
CASE NO. C11-00828-MJP

Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   vendors.  Bazinet Decl., Exs. B-F.  The Corporations instituted the changes even though they were

2   certain to result in decreased sales.

3         The Corporations' focus on compliance has helped them evolve into better businesses.

4   TMG's present sites (the only ones currently actively offering services) are fully compliant with the

5   FTC.  *See* Declaration of Ingrid Martin, Ph.D. ("Martin Decl."), ¶¶ 7, 12.  To that end, TMG has

6   hired an FTC monitor to oversee the continuing implementation and effectiveness of additional

7   remedial measures.  Banks Decl., ¶¶ 18-19.  This expert has also reviewed the existing compliance

8   controls and concluded that TMG has demonstrated a commitment to compliance.  *Id., ¶* 10.

9   C.    Third-Party Oversight.

10        The Corporations relied on a network of independent contractors to help them oversee their

11  business operations.  Declaration of Jessie C. Stricchiola ("Stricchiola Decl."), ¶ 39.  As the business

12  grew, Mr. Willms was faced with a choice:  he could either internalize the business functions of many

13  third parties like call centers or more extensively rely on, and thereby subject his business operations

14  to, the audit and compliance responsibilities of outside entities.  *Id.*  Mr. Willms chose the latter and

15  outsourced certain operations, including advertising network, call center, call center oversight,

16  fulfillment, and processing responsibilities.  *Id.*; Willms Decl., ¶ 9.

17        Mr. Willms' developing reliance on third-party contractors resulted in a corresponding

18  increase in transparency which helped the business to more ably identify risks.  These independent

19  third parties retained contractual obligations to ensure compliance with all applicable laws, rules and

20  regulations.  *See* ECF No. 5-14 at 720, 722, 724, 728, PI Ex. 9; Stricchiola Decl., ¶¶ 38-29, Ex. S.

21  Further, these third-party contractors have their own liability for non-compliance so it is in their

22  interest to ensure that their clients' practices are compliant to safeguard against that liability.

23  Stricchiola Decl., ¶ 38.  The use of third-party contractors, therefore, served as another degree of

24  scrutiny over the Corporations.  *Id., ¶* 39, Ex. S.

25        As is typical in the industry, the Corporations relied heavily on these third parties to provide

26  compliance advice.  *See* Stricchiola Decl., ¶ 39, Ex. S.  For example, the Corporations repeatedly

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 6
CASE NO. C11-00828-MJP

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

requested and obtained compliance advice from its advertisers to ensure that the material terms of their offers were clearly and conspicuously disclosed to consumers in locations on the Corporations' web pages that were likely to be seen before consumers completed their purchases.  Bazinet Decl., ¶ 3; Banks Decl., ¶ 14, Ex. E.  In addition, the Corporations relied heavily on merchant processors to review their websites and to provide bona fide risk mitigation strategies which were fully compliant with the industry and legal requirements governing merchant accounts.  Meltzer Decl., ¶ 38; ECF No. 8-15 at 2279, PI Ex. 48.

The Corporations also relied on their customer service support contractors for compliance oversight.  Declaration of Hernan Ortegon-Rico ("Ortegon-Rico Decl."), ¶ 3.  For example, the Corporations relied on the call centers to review customer scripts and protocols.  *Id.*; *see* Rana Decl., ¶ 3; Declaration of Robert Porter ("Porter Decl."), ¶ 3.

The Corporations have remediated those risks which have been identified pursuant to their third-party compliance oversight.  Ortegon-Rico Decl., ¶ 4.  The Corporations' contact with the call centers resulted in script changes, more liberal refund and cancellation policies, including 30-day and 60-day money back guarantees, additional staffing, extension of call center hours, increase in Spanish-speaking agents, and the establishment of dedicated phone numbers to enable customers to contact the Corporations directly.  *Id.*  The Corporations' contact with the processors resulted in the initiation of post-sale confirmation calls to ensure customer satisfaction, removal of lower performing call centers to ensure quality assurance, development of a protocol for tracing calls involving customer dissatisfaction to identify the handling agent and ensure appropriate oversight, reduction in price points to ensure greater customer satisfaction, and improvements in fraud protections, including the elimination of the Corporations' reliance on affiliate networks.  *Id.*; ECF No. 9-4 at 2544, PI Ex. 50.  The Corporations' contact with the advertising networks resulted in additional efforts to ensure that terms and conditions of each offer were presented in a manner that was clear and conspicuous to the customer to avoid unnecessary confusion.  Bazinet Decl., ¶ 5; Banks Decl., ¶ 14, Ex. E.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 7
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

The Corporations committed the resources to make sure that lessons learned were being leveraged by the Corporations to avoid future risks of non-compliance.  The Corporations promoted employees to rank of Operations Manager for each dedicated call center to ensure that each call center was communicating its quality assurance results to the Corporations.  Banks Decl., ¶¶ 10, 15; Ortegon-Rico Decl., ¶ 5.  The Corporations also retained outside counsel to conduct legal and regulatory compliance reviews of company offers and assigned company personnel to liaise with advertising networks to redress and remediate any compliance concerns.  Ortegon-Rico Decl., ¶ 7.  And the Corporations hired a dedicated employee to ensure that new customers were contacted to ensure customer satisfaction.  *Id.*

D.      Transparency in the Online Marketing Industry.

Mr. Willms fully disclosed his control and interest in the U.S. Companies to the processors because he believed that his conduct was fully compliant with industry standards and consistent with good business judgment.  Willms Decl., ¶ 17; *see also* Meltzer Decl., ¶¶ 15-17; Declaration of Dennis M. Lormel ("Lormel Decl."), ¶¶ 7-22.

Towards the end of 2009, the Corporations' transition from health and beauty products to the online marketing industry for consumer research, auction and computer software categories, required new processing companies and branding strategies.  Stefaniuk Decl., ¶ 9.

To find processing companies for its new line of business, Mr. Willms made a strategic business decision to more fully rely on US processors to manage his business.  Willms Decl., ¶ 12.  Consistent with general industry practice, the Corporations correctly believed that U.S. processors would provide the Corporations with lower fees, better processing rates, access to daily as opposed to weekly or even more infrequent payouts and greater sales volume.  *Id.*; *see also* Meltzer Decl., ¶ 12.  Mr. Willms understood that processing firms with the sophisticated billing technology necessary to interface with a merchant's URL were located in the United States.  Willms Decl., ¶ 13; *see also* Meltzer Decl., ¶ 12.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 8
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

A Canadian citizen, Mr. Willms firmly believed that U.S. processors would only process for U.S. Companies.  Willms Decl., ¶ 13.  The Corporations received U.S. merchant processing applications which required a Social Security number or an EIN number.  Meltzer Decl., ¶ 9; *see* ECF No. 5-13 at 628, 635, 647, PI Ex. 8.  U.S. law and industry practices made it necessary and advantageous for Mr. Willms to use a U.S. company to obtain U.S. merchant accounts.  Willms Decl., ¶ 13; Meltzer Decl., ¶ 11; Lormel Decl., ¶¶ 7-9.  Finding a U.S. partner to form U.S. entities was both necessary and advantageous to Mr. Willms to comply with these industry practices.  Willms Decl., ¶ 13; *see also* Meltzer Decl., ¶ 12.

The Corporations and Mr. Willms entered into a series of Corporate Services Agreements with U.S. signers who could associate themselves with U.S. entities.  ECF No. 5-13 at 586-594, PI Ex. 8.  These agreements identify the Corporations and Mr. Willms as the "Customer" and the U.S. signer as the "Service Provider."  *Id.* at 586, 589, 592.  In each, the Recitals state:

> WHEREAS, the Customer is a leading internet marketer, residing in Canada, and is in need of setting up a U.S. company for the purposes of merchant processing,
>
> WHEREAS, Service Provider is a U.S. Citizen, in the business of providing corporate services to parties in need of establishing U.S. companies for various reasons,
>
> WHEREAS, the parties desire to have Service Provider provide certain corporate services to [Companies and Mr. Willms] **to comply with U.S. banking requirements in regards to merchant processing** (emphasis added),
>
> WHEREAS, the parties are willing to enter into this Agreement to define the terms and conditions that will govern their relationship in this regard.

*Id.*

Mr. Willms clearly and expressly used these agreements to control and benefit from the U.S. Companies.  For example, under "Services," the agreements delimit the scope of the Service Provider's responsibilities to include, in part, "participating in the management of said companies **as directed by Customer**."  *Id.* (emphasis added).  In addition, the agreements state that "the Service Provider will have **no rights and or claims to any monies flowing through the U.S. Corporation**."

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 9
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   *Id.* (emphasis added).  Mr. Willms used these formal documents executed around the very time of the

2   entities' incorporation to memorialize these good faith understandings.  *Id.*

3          All of this reflected sound business judgment on behalf of Mr. Willms.  Lormel Decl., ¶¶ 7-9.

4   After completing the Corporate Services agreement, Mr. Willms based each of his new products in

5   U.S. Companies, respectively known as Sphere Media, True Net and Net Soft Media.  *Id.*, ¶¶ 18-20.

6   Branding these corporations and launching their new business in the highly competitive e-commerce

7   marketplace was a challenge requiring a significant depth of industry expertise.  In managing this

8   effort, Mr. Willms relied on an array of third-party contractors, including product suppliers, website

9   developers, ad networks, merchant processors, fulfillment centers, and call centers.  Willms Decl.,

10  ¶ 9; Stricchiola Decl., ¶¶ 37, 39, Exs. B-H, S.  Mr. Willms' management over these entities was

11  consistent with a bona fide strategic decision to secure U.S. presence without compromising the level

12  of expertise necessary to ensure the success of these nascent business ventures.  Willms Decl., ¶ 16;

13  Lormel Decl., ¶¶ 7-9.

14         Mr. Willms then used the U.S. Companies to secure U.S. processors.  Willms Decl., ¶ 17.  In

15  doing so, he disclosed his beneficial interest in and control over the U.S. Companies to the U.S.

16  processors.  *See* Lormel Decl., ¶¶ 16-23, Ex. B; Meltzer Decl., ¶¶ 15-17, Ex. B.  For example, on

17  January 8, 2010, Mr. Willms sent a processor an email in which he wrote:  **"I have a great signer,**

18  **711 credit, just setting up bank account and corp today, which banks do you want to send the**

19  **app to**."  Lormel Decl., Ex. B at 59 (emphasis added).  Mr. Willms fully expected that the processor

20  would closely scrutinize his identity and other information to determine whether an application

21  associated with his beneficial interest and control would be accepted or rejected.  Meltzer Decl., ¶ 15.

22         As a result of Mr. Willms' transparency, the processors clearly treated Mr. Willms as if he

23  was fully in charge.  Meltzer Decl., ¶ 17; Lormel Decl., ¶¶ 16-23.  In multiple contacts with a vast

24  array of processors, Mr. Willms received numerous email communications involving processors

25  concerning the merchant application process.  *Id.*  These emails include the following processors

26  and/or agents:

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 10
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

- Charles Carillo of Power Online Solutions;
- Chris Carr of PaymentSphere;
- Jeff Dunn of Meritus;
- Peter Hamilton of BroadPay;
- Brian Hill of Payment Systems Worldwide;
- Keith Kephart of Offspring Financial;
- Chris Kravinchuk of Paygea;
- Jocko Nesbitt of Credipayments;
- Dustin Sparman of Vantage Payments;
- Travis Taylor of Glacier Payments; and
- Dominic Volpe of Allied Wallet.

Lormel Decl., ¶¶ 17-22, Ex. B.

In these emails, the processors (1) solicit Mr. Willms and/or the Corporations' help in completing the application (Lormel Decl., Ex. B at 25-27, 30-31, 33, 37, 39-42, 45, 53-54, 59-60, 62, 69-70, 78); (2) notify Mr. Willms that the application has been approved (Lormel Decl., Ex. B at 32, 63-66, 76-77); (3) discuss sales volume, multiple URLs, inaccurate descriptors and other issues related to the management of the account (Lormel Decl., Ex. B at 19, 21, 23, 28, 36, 46, 56, 58, 67, 70, 80, 82-90); and (4) schedule in-person meetings with Mr. Willms and his company employees (Lormel Decl., Ex. B at 47-52, 72-74). These processors clearly knew of Mr. Willms' beneficial interest. Moreover, many of these emails were sent by the processor directly to Mr. Willms with a cc: to the signer or specifically reference the signer in the text. Lormel Decl., Ex. B at 26, 37, 42, 63-66, 68-69.

Mr. Willms operated the U.S. Companies with the same intent. He contracted with independent third parties rather than bring them under one roof. Willms Decl., ¶ 9. For example, he relied on customer call centers that conducted their own review of the scripts and recommended changes as appropriate. Ortegon-Rico Decl., ¶ 5. The Corporations consistently subjected themselves to the independent oversight and corresponding audit rights of these third parties. ECF No. 5-14 at 720, 722, 724, 728, PI Ex. 9; Meltzer Decl., ¶¶ 5-8; Stricchiola Decl., Ex. S. The

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 11
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  Corporations did not merely delegate their important compliance obligations, but partnered with these

2  third parties to ensure customer satisfaction.  *See* Banks Decl., ¶ 14 (identifying corrective actions

3  initiated by Corporations to grant more refunds).

4      Consistent with past advice from a processor (ECF No. 8-15 at 2279, PI Ex. 48), Mr. Willms

5  relied on multiple merchant accounts to engage in a bona fide risk mitigation strategy.  On March 20,

6  2009, for example, a processor told the Company the following:  "[T]he long term goal is to have you

7  processing through as many solutions as possible (Paygea included so long as you happy with their

8  service) but no less than 3 at any given time.  PPS has solid relationships with 8 banks...."  Willms

9  Decl., ¶¶ 18-19, Ex. E.

10      Mr. Willms agreed with this processor that the use of multiple merchant accounts was a good

11  long term business strategy.  This strategy was especially useful when a spike in consumer

12  complaints caused by affiliate fraud occurred, victimizing both the consumer and Mr. Willms.

13  Willms Decl., ¶ 20; *see also* Meltzer Decl., ¶ 37.  Mr. Willms appropriately used multiple processors

14  and other bona fide measures to protect against these actual business risks.  Stricchiola Decl., ¶¶ 14-

15  18.

16      Mr. Willms also used multiple merchant accounts and corresponding descriptors to manage

17  high sales volume.  Willms Decl., ¶ 20; Meltzer Decl., ¶ 36.  Consistent with industry practice,

18  merchant processors capped the sales volume they allowed the U.S. Companies to process.  Meltzer

19  Decl., ¶¶ 36-38.  Between April and August, 2010, volume caps imposed by Payment Systems

20  Worldwide were reached.  The Companies used iMax Bankcard Network to obtain more sales

21  volume for a similar product under a different descriptor.  Consistent with his general practice,

22  Mr. Willms used different descriptors for these products to ensure that customer service could

23  identify the appropriate merchant account and procedure for which any particular consumer was

24  being billed.  Willms Decl., ¶ 20; Rana Decl., ¶ 6; Meltzer Decl., ¶ 43.  However, he maintained

25  consistent uniformity in selling the same type and quality of products, regardless of descriptor,

26  among these various processors.  Willms Decl., ¶ 20; Meltzer Decl., ¶ 44.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 12
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

As a result, Mr. Willms employed multiple descriptors to ensure transparency with the consumer.  Willms Decl., ¶ 20; Meltzer Decl., ¶ 43.  In an email dated March 24, 2009, a processor forwarded to Mr. Willms the following comments from underwriting a bank:

> [] Recurring transactions—Can you please advise as to how the merchant intends to process recurring transactions?  Please note that if they want to charge for 3 products with 3 transactions having 3 different descriptors after trial period they also will need to charge 3 transactions for the initial signups.  All these initial sign up transactions should have clear billing terms and descriptors which will appear on card holder statements.  Alternatively, they can charge 1 initial signup transaction and 1 recurring for the total amount of $59.95+$6.95=$9.95....

ECF No. 8-15 at 2276, PI Ex. 48; Willms Decl., ¶ 19, Ex. E.

Mr. Willms accepted the processor's proposal to bill the charges under the three different descriptors.  Willms Decl., ¶ 19.  Mr. Willms firmly believed that his use of multiple billing descriptors was consistent with recommended best practices to maximize a company's accountability for each aspect of any commercial transaction.  *Id.*, ¶ 20; *see also* Meltzer Decl., ¶ 43.

E.      Transparency in Business Dealings.

Since 2010, Mr. Willms has used the U.S. Companies to operate a high volume internet marketing organization which generated significant income and expenses.  *See* Declaration of Bryan C. Moser ("Moser Decl."), ¶¶ 9, 15.  Mr. Willms only spent these business proceeds to pay the routine costs incurred by the Corporations in the ordinary course of business.  *See id.*  The U.S. Companies engendered significant financial obligations to pay third parties for product, shipment, customer service, processing and advertisement.  *Id.*, ¶ 25.  Mr. Willms used this money, and continues to use this money, to comply with these responsibilities.  *See id.*, ¶ 29.  Contrary to the claims of the FTC, Mr. Willms never wired any money off shore to Cyprus or to any other destination for an illicit purpose.  *Id.*, ¶ 16.

Mr. Willms used a large fraction of disbursements from the bank accounts of the U.S. Companies to pay vendors for products and services received in the ordinary course of business.  *See* Moser Decl., ¶ 15.  These disbursements to vendors totaled $28 million and payments to the 20

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 13
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

largest recipients totaled approximately $19 million.  *Id.*  Vendors and amounts paid by Mr. Willms included (in millions):

| Vendor | Product/Service | Amount |
|---|---|---|
| Clickbooth.com | advertising platform services | $4.8 |
| Intermark Media | interactive advertising company | 4.0 |
| Mim Media Inc. | interactive advertising company | 1.6 |
| Tigerdirect | online computer sales | 1.6 |
| E Cruz Inc. | internet marketing | 1.4 |
| Google, Inc | online services | 0.8 |
| Nethues Technologies Pvt. Ltd. | IT outsourcing | 0.6 |
| Efls, Inc. | call center | 0.6 |
| Roi Revolution, Inc. | online marketing | 0.5 |
| Kronenberger Burgoyne, LLP | internet law | 0.5 |

*Id.*

At the same time, Mr. Willms was paying vendors with disbursements from his Canadian accounts.  Moser Decl., ¶ 15.  These vendors included RDP Fulfillment, a fulfillment company, Tigerdirect, a computer retailer, and Intermark Media, a digital advertising company.  *Id.*  Mr. Willms paid $7 million in disbursements from the Canadian accounts to pay vendors.  He used 61% of that total to pay the following five vendors:

| Vendor | Product/Service | Amount |
|---|---|---|
| Assertigy | internet marketing | $1.6 |
| Google | web advertising | .9 |
| Visa | credit card | .9 |
| Experian Consumer Data | credit reporting | .8 |
| Kronenberger Burgoyne, LLP | internet law | .5 |

*Id.*

The Corporations received deposits in the tens of millions of dollars.  Nevertheless, the Corporations only transferred $300,000 to Mr. Willms or his relations.  This amount consists of .1% of total disbursements from the U.S. bank accounts and 1.0% of the total disbursements from the Canadian accounts.  Moser Decl., ¶ 23.

Mr. Willms only used proceeds from the Corporations to pay for expenses related to bona fide ongoing business activities of the Corporations.  He never made a payment to another entity or person

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 14
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  outside the ordinary course of business, and never received a deposit into any of the Company

2  accounts from a source outside the ordinary course of business.  Mr. Willms has no hidden accounts.

3  *See* Moser Decl., ¶ 11.

4  Mr. Willms declared his responsibility for any taxes owed from the U.S. entities by filing a

5  2010 IRS Form 4868 Application for Automatic Extension of Time to File U.S. Individual Income

6  Tax Return.  *See* Lormel Decl., Ex. C at 92.  Furthermore, Mr. Willms filed additional IRS Forms in

7  which he identified himself as the President of the U.S. entities.  *See id.* at 94-96.

8  III.   ARGUMENT

9  The FTC's Motion tells a one-sided story, and the theme of that story is that Defendants are

10  cynical opportunists whose sole motive was, is, and will forever remain, to deceive consumers.

11  Despite its "kitchen sink" voluminous record, however, the FTC has failed to provide support for

12  numerous assertions that form the basis for its conclusions.  This Section addresses the most obvious

13  flaws in the FTC's evidence and legal theories.  On this record, the preliminary injunction the FTC

14  requests simply is not warranted.

15  A.   Standard for Preliminary Injunction.

16  A "preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren,* 553 U.S.

17  674, 676 (2008).  As such, the Court may only grant such relief "upon a clear showing that the

18  plaintiff is entitled to such relief."  *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 18 (2008).  A

19  preliminary injunction is never awarded as of right.  *Id.* at 7.  In each case, courts "must balance the

20  competing claims of injury and must consider the effect on each party of the granting or withholding

21  of the requested relief."  *Id.*

22  Because the purpose of a preliminary injunction is to preserve the status quo, it is not

23  appropriate to issue a preliminary injunction solely to remedy alleged past misconduct.  *See, e.g.,*

24  *Burndy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 774 (2d Cir. 1984) (injunctive relief was

25  "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL

26  mark into compliance with UL standards and where there was not a likelihood of repetition or hazard

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 15
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    to the public); *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 479 F. Supp. 2d 968, 993 (N.D.

2    Iowa 2007) (present harm as the result of past misconduct is not sufficient to justify the injury to the

3    non-movant of granting a preliminary injunction requiring some additional corrective action because

4    such relief "goes beyond the purpose of a preliminary injunction."); *United Farm Workers Nat'l*

5    *Union v. Sloan's Supermarkets, Inc.*, 352 F. Supp. 1025, 1028-29 (S.D.N.Y. 1972) (preliminary

6    injunction not appropriate where defendant corrected missteps).

7            When the FTC moves for a preliminary injunction under the FTCA, it has the burden of

8    establishing a likelihood of success on the merits, that the balance of equities tips in its favor, and that

9    the injunction serves the public interest.  *FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir.

10   1999).  As discussed below in Sections B-D, a preliminary injunction is not appropriate in this case

11   because the FTC's claims are based solely on past, non-continuing conduct.  In addition, in light of

12   the Corporations' current compliance and the FTC's failure to offer any evidence in support of asset

13   dissipation, the balance of equities does not support the FTC's over-reaching request for injunctive

14   relief.

15   B.      The FTC Cannot Establish a Likelihood of Success on the Merits of Its Claims.

16           While the FTC presents this as a case involving wide-ranging and pervasive marketing fraud,

17   the evidence put forward by the Corporations—marshaled in the mere two months that this case has

18   been pending—demonstrates that the FTC's case is not nearly as strong as it purports to be and does

19   not meet the FTC's burden of showing likelihood of success on the merits.

20           In order to prove that Defendants' acts were deceptive under 15 U.S.C. §§ 45(a), the FTC

21   must prove that:  (1) the Defendants engaged in a representation, omission, or practice; (2) that is

22   likely to mislead consumers acting reasonably under the circumstances; and (3) the representation,

23   omission, or practice is material.  *See, e.g., FTC v. Stefanchik,* 559 F.3d 924, 928 (9th Cir. 2009).  As

24   demonstrated below, the FTC overstates both the law and facts supporting its claim that it is likely to

25   succeed on the merits.  Contrary to the FTC's claims, negative options and continuity plans are not

26   *per se* unlawful.  Further, substantial factual disputes prevent the FTC from satisfying the elements of

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 16
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    its FTCA claims.  Most relevant in the context of its requested relief, the FTC has provided _no_

2    _evidence_ that the alleged past misconduct is continuing or likely to continue.  In fact, Defendants

3    have introduced evidence that demonstrate the opposite.  Because the FTC has not met its burden to

4    demonstrate that it is likely to succeed on the merits, its request for a preliminary injunction must be

5    denied.

6         1.    Negative Options and Continuity Plans Are Not Unlawful *Per Se*.

7         The FTC's argument regarding its likelihood of success on the merits is premised upon its

8    assertion that negative option plans are deceptive and violate Section 5 of the FTC Act.  *See* ECF

9    No. 40 at 33, Amend. Mot.  But, contrary to this assertion, negative options are not *per se* unlawful.

10   Indeed, so-called negative options can be lawful and are employed by highly reputable companies

11   such as the New York Times, Amazon and Apple.  Stricchiola Decl., ¶¶ 35-36.

12        Although the FTC is correct that negative options and continuity marketing plans are

13   undergoing increasing scrutiny, Congress chose *not* to outlaw such practices when it enacted the

14   Restore Online Shoppers' Confidence Act, 15 USC § 8403, in December 2010.  Pursuant to this

15   recent Act, on-line merchants who use a negative option feature must:

> **(1)** provide text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information;
>
> **(2)** obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and
>
> **(3)** provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

22   15 USCA § 8403.  Merchants who comply with these requirements simply do not run afoul of the

23   law.  Nor does *Keithly v. Intelius, Inc.*, 764 F. Supp. 2d 1257 (W.D. Wash. 2011), cited by the FTC,

24   suggest that negative options or continuity plans are inherently unlawful.  To the contrary, Judge

25   Lasnik's very detailed analysis of the defendant's website in that case makes it clear that the

26   determination of whether such programs are lawful must be made on a case-by-case basis.  The FTC,

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 17
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

therefore, cannot sustain its burden to show a likelihood of success on the merits by merely showing that Corporations employed negative options or continuity plans.

2.      The FTC's Evidence in Support of Past Non-Compliance Is Flawed.

The FTC's conclusions regarding the Corporations' past websites and related customer service practices are based on flawed methods of interpretation, material inaccuracies, and a disregard of the Corporations' compliance efforts.

First, the FTC's conclusion that the Corporations' disclosures were ineffective is based upon a flawed methodology that abandons adherence to the clear and conspicuous standard.  Martin Decl., ¶¶ 14-23.  The FTC relies on its expert, Susan Kleimann, to conclude that consumers were not able to read or see the material terms of the Corporations' offers.  *See* ECF No. 40 at 13, Amend. Mot.  But according to Ingrid Martin, a Ph.D. in Marketing and specializing in Consumer Behavior, Kleimann's analysis is based on the false premise that consumers are passive and therefore incapable of making decisions and choices concerning whether the offered products fulfill an important need or goal. Martin Decl., ¶¶ 8, 15-23.  Kleimann fails to take into account what motivates consumers when they are visiting a website and the pattern and behavior that they use to navigate a website.  *Id.*  As such, Kleimann's critique of the websites fails.

Second, the FTC implies that the number of complaints lodged against the Corporations is probative of all customers' experiences, even though the total number of complaints, when considered in light of the total number of transactions, renders the FTC's complaint data anecdotal. Declaration of Richard S. Higgins ("Higgins Decl."), ¶¶ 14-16.  The FTC errs by projecting the anecdotal experiences of aggrieved consumers to the entire population of buyers.  *Id.*  The FTC extrapolated that 4,000 inquiries submitted to the Better Business Bureau and State Attorney General were pertinent to its evaluation of the Corporations' practices, even though the complaints only comprised .07% of the Corporations' customers.  *Id.*, ¶ 15.  That extrapolation is materially flawed: the relevant criterion is a complaint rate—the total number of complaints over the total number of customers.  *Id.*, ¶ 16.  In other words, a total number of 100 complaints would have different

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 18
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   inferences about a company's practices if the total number of customers was only 100 as opposed to

2   1,000,000.  The Corporations had over six million customers.  *Id.*, ¶ 14.  The FTC does not attempt to

3   make any statistically-significant analysis taking that number into account—it merely presents the

4   total number of complaints in a virtual vacuum.  Had the FTC completed such a statistical analysis, it

5   would have discovered that at least 96% of all customers were most likely aware of the terms and

6   conditions of their purchases, sufficiently satisfied with the performance of their purchases, or

7   received a refund or charge reversal.  *Id.*, ¶ 7.  When viewed in the appropriate context, the complaint

8   data the FTC presents does not serve as a meaningful basis for its conclusions.

9        Third, over half of the websites upon which the FTC bases its accusations of misconduct and

10  wrongdoing were websites that were either not affiliated with the Corporations or did not experience

11  any traffic.  *See* Declaration of Ben Charny ("Charny Decl."), ¶ 5, Ex. A.  As such, the expert and

12  consumer declarants who have based their conclusions and experiences on this information are not

13  persuasive, let alone determinative.

14       Fourth, the FTC relies on an analysis of chargeback activity for a merchant account that does

15  not pertain to the Corporations.  *Cf.* ECF No. 9-14 at ¶ 51, PI Ex. 56, and Charny Decl., ¶¶ 7, 25-31,

16  Ex. C.  This inaccurate information undermines the FTC's overall conclusions.

17       Fifth, the Corporations have also put forward evidence to rebut the FTC's claims that they

18  made false and/or unsubstantiated claims about the AcaiBurn and PureCleanse products.  The

19  Corporations offered the AcaiBurn product as one part of a weight-loss system.  While the FTC

20  suggests that the Corporations offered the AcaiBurn as a miracle weight-loss product, in fact the

21  AcaiBurn product was accompanied by a guide that included six steps for weight loss.  *See*

22  Declaration of Frank Greenway, M.D. ("Greenway Decl."), ¶ 2, Ex. B.  Consuming AcaiBurn was

23  only one step in this process; other steps included proper exercise and diet, including calorie

24  restriction, portion control, dietary fiber, reduced fat, hydration and reduced calorie density.  *Id.*,

25  ¶¶ 2-3.  These steps were discussed in detail in the guide accompanying the AcaiBurn product.  *Id.*,

26  Ex. B.  Dr. Greenway analyzed the AcaiBurn system and concluded that following this system would

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 19
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   in fact result in medically significant weight loss.  *Id.*, ¶ 2.  Dr. Greenway also opines that competent

2   and reliable scientific data support the fact that each step of the system has value in a weight-loss

3   program, including the AcaiBurn supplement portion.  *Id.*, ¶ 3.  Similarly, the FTC's assertion that

4   the mere use of an embedded video gives rise to an implied claim that the PureCleanse product helps

5   prevent colon cancer is baseless.  The PureCleanse site contained an embedded video featuring Katie

6   Couric that discussed the benefits of a colonoscopy.  Martin Decl., ¶ 26.  Dr. Martin analyzed the site

7   and found that no reasonable consumer could have concluded that PureCleanse provided a disease-

8   prevention benefit.  Martin Decl., ¶ 36.  Nowhere was there an express or implied claim that

9   PureCleanse somehow helped prevent colon cancer, or in any way replaced the importance of a

10   colonoscopy for early detection and/or prevention of colon cancer.  *Id.*, ¶¶ 31-33.

11       Finally, the Corporations made good faith efforts to ensure that their practices were

12   compliant.  The Corporations constantly reviewed their advertising and made adjustments with

13   compliance in mind.  Nandan Decl., ¶ 3.  The Corporations discontinued use of the word "FREE" in

14   early 2009, and the term "RISK FREE" in late 2009.  The Corporations reviewed FTC case law and

15   guidance materials to make changes to its promotional materials to render them more compliant.

16   Disclaimers were added to testimonials.  Font sizes were increased.  Limited-time offers were

17   verified.  Bazinet Decl., ¶ 7.

18       In addition, the Corporations created transparent procedures to achieve customer satisfaction

19   after the sale.  Customers were immediately presented with a confirmation page which displayed the

20   material terms of the offers including the company's trial duration, which was generally 30 or 60

21   days depending on the offer, and the cancellation telephone number.  Bazinet Decl., ¶ 7.  Thereafter,

22   the company sent a confirmatory email to repeat these very same terms to the customer.  *Id.*  In

23   addition, transparency was further enhanced by the Corporations' decision to disclose individual

24   descriptors, and corresponding cancellation numbers, for each discrete purchase referenced in the

25   billing statement.  Meltzer Decl., ¶ 41.  As a result of these transparent procedures, customers were

26   made aware of the Company's refund policies.  *See* Higgins Decl., ¶ 37.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 20
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Customers who sought refunds received them.  Declaration of Eric Fraterman ("Fraterman Decl."), ¶ 6.  The Corporations' successful refund practices were based on its "thorough and well-documented" compliance efforts.  Banks Decl., ¶ 18.  These practices included comprehensive and detailed review of performance by call centers and by individual agents.  *Id.*, ¶ 15.  At the behest of the Corporations, refunds were encouraged and discipline was imposed when agents failed to issue refunds when they should have.  *Id.*  The Corporations' refund policies were consistent with industry norms (*see* Fraterman Decl., ¶ 8) and effective.

3.     Defendants' Current Websites Are Compliant.

While the evidence presented by the FTC to support its claims regarding the Corporations' prior websites is flawed, the FTC offers virtually no evidence that the Corporations' current websites do not comply with the FTCA.  Even a cursory review of the mountain of evidence put forward by the FTC reveals that this evidence relates to websites and programs available during the 2009-2010 time period.  Of the consumer declarations submitted by the FTC, two-thirds complain about alleged misrepresentations made or misconduct that occurred in 2009.  *See* ECF Nos. 7-4 through 7-17; 8-1 through 8-13, PI Exs. 20-46.  The latest of these declarations addresses a website visited in November of 2010—more than seven months ago.  *See* ECF No. 8-13, Spilo Decl., PI Ex. 46.

Meanwhile, the evidence before the Court shows that the Corporations are currently complying with the FTCA, and that their compliance efforts are ongoing.  The Corporations streamlined their business practices in January 2011.  Stefaniuk Decl., ¶ 9.  They currently offer consumer research services that include reverse look-up, court document and family genealogical search sites.  *Id.*  Further, the Defendants have put forward expert testimony showing that the terms disclosures contained on the Corporations' current websites are clear and conspicuous and satisfy the standards contained in the FTC's business guidance materials as to disclosure.  Martin Decl., ¶¶ 7, 10-12.

In addition to ensuring that their current disclosures are sufficient, the Corporations have taken additional steps to ensure that their business practices remain in compliance with federal law.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MOTIONS TO STRIKE, AND FOR EXPEDITED DISCOVERY AND EVIDENTIARY HEARING - 21 CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

The Corporations no longer promote their services via affiliate networks.  Stefaniuk Decl., ¶ 10.  The Corporations do not offer their services with upsells or any other additional services.  *Id.*, ¶ 11.  The Corporations have employed an expert to assist in maintaining and improving compliance efforts. The Corporations are willing to work with the FTC to resolve any concerns that may arise in the future.  Willms Decl., ¶21.  As such, a complete ban on the use of continuity programs is not only overly severe; it is unwarranted.

4.     The FTC Has Not Shown That Defendants Acted to Evade Risk Management Rules.

The FTC misstates Mr. Willms conduct in obtaining and using merchant accounts.  In fact, Mr. Willms used the U.S. Companies to comply with U.S. banking laws and merchant practices. Meltzer Decl., ¶¶ 9-14; Willms Decl., ¶¶ 13-17.  Since their inception, Mr. Willms has operated the U.S. Companies with full transparency in compliance with applicable U.S. and state law.

Mr. Willms sought access to U.S. processors for legitimate business reasons and formed U.S. entities to satisfy U.S. banking and industry requirements.  *See, e.g*., Lormel Decl., ¶¶ 4, 7-9. Because these companies actively and regularly engaged in commercially viable businesses that generated significant independent income and expenses, the FTC's argument inaccurately and dismissively refers to these entities as "shells."  *See id.* at ¶¶ 5-6.  The import of this error is more than semantic:  the FTC completely ignores the bona fide business and legal reasons which are the basis for Mr. Willms' use of the U.S. Companies.  *See* Meltzer Decl., ¶¶ 9-13; Lormel Decl., ¶ 4.

Mr. Willms indeed sought and obtained control over these entities in significant ways.  But the FTC misses the mark when it suggests that such control was "evasive."  Mr. Willms used his control over the U.S. Companies for legitimate purposes, including to comply with U.S. banking requirements, to ensure appropriate financial and quality controls, to leverage his industry expertise, to utilize existing business partners to assist in making the U.S. Companies successful, and to enhance tax planning for the domestic and foreign companies.  *See* Lormel Decl., ¶ 4.  In short,

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 22
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Mr. Willms' use of the U.S. entities was consistent with the law and generally accepted business

2    practices. *Id.*

3           The FTC's most glaring and dispositive error, however, is its failure to recognize Mr. Willms'

4    transparent disclosure of his beneficial interest in the U.S. Companies to the processors.  Meltzer

5    Decl., ¶¶ 15-17.  The FTC's Motion is replete with references to Visa's and Mastercard's risk

6    management rules (*see, e.g.,* ECF No. 40 at 22, Amend. Mot.), but merchants, such as the

7    Corporations, rely on the processor, not Visa and MasterCard, to obtain access to merchant accounts,

8    to identify material terms for any processing agreement, to monitor for compliance, and to determine

9    the appropriate penalty for instances of non-compliance.  *See* Meltzer Decl., ¶¶ 5-9.  In fact, Visa and

10   MasterCard never contract with or even discipline the merchant and only rarely discipline the

11   processor.  *See id.*, ¶ 8.  The processor, on the other hand, is the merchant's "street cop and local

12   magistrate" who is responsible for establishing, monitoring and enforcing the terms of compliance in

13   the processing contract.  *See id.*, ¶¶ 9, 15.

14          Mr. Willms therefore saw his compliance obligations solely through the prism of the

15   Corporations' relationship with the processor, not Visa and MasterCard.  The manner in which he

16   acted towards the processor is, therefore, pivotal.  From applying and receiving, to managing and

17   maintaining these credit accounts, Mr. Willms' relationship with the processor was consistently

18   transparent and compliant with both legal and industry requirements.  Meltzer Decl., ¶¶ 16-17,

19   Ex. B.; Lormel Decl., ¶¶ 16-23, Ex. B.

20          With respect to the application process, Mr. Willms fully disclosed his beneficial interest in

21   and control over the U.S. Companies to the processors.  Mr. Willms relied on the processor to obtain

22   access to credit accounts and understood that the information he provided to the processors would be

23   scrutinized to determine the qualifications of the application.  The volumes of email exchanges

24   between Mr. Willms and the processors clearly demonstrate that Mr. Willms identified himself in the

25   application process to processors as the beneficial owner of the U.S. Companies and that the

26   processors clearly understood this.  Meltzer Decl., ¶¶ 16-17, Ex. B; Lormel Decl., ¶¶ 16-22, Ex. B.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 23
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Again, the FTC misses the mark.  Its own evidence includes emails between a processor and Peter

2    Graver with cc to the company.

3         The same is true for Mr. Willms' use of the merchant accounts at issue in this case.  The FTC

4    relies on its expert Andrew Chen to support its contention that the Corporations used a scheme to

5    "game" the payment processing system.  For several reasons, however, the FTC's assertions lack

6    merit.

7         First, the FTC erroneously relies on Mr. Chen to argue that the Corporations used upsells to

8    reduce chargebacks.  *See* ECF No. 9-14, ¶¶ 28-31, Chen Decl., PI Ex. 56.  Notwithstanding this broad

9    assertion, which reveals the FTC's bias against the sales model at the heart of this case, upsells, along

10   with negative options, in general, are completely permissible and accommodated by the merchant

11   banking system.  Meltzer Decl., ¶¶ 34-35.  Moreover, the FTC's argument assumes a flawed factual

12   premise.  A merchant cannot effectively reduce its chargeback ratio by billing separately for small-

13   dollar upsell offers because merchants have no way to discern how cardholder banks handle small

14   dollar disputes.  *Id.*, ¶ 34.  Some banks process small dollar charges as chargebacks, including

15   disputes for as little as $.01.  *Id.*  Finally, billing separately for upsells actually stands to increase

16   rather than decrease a merchant's chargeback ratio.  *Id.*, ¶ 35.

17        Second, the government mistakenly relies on Mr. Chen to argue that the Corporations

18   manipulated sales data by relying on multiple processors.  ECF No. 9-14, ¶¶ 32-33, Chen Decl., PI

19   Ex. 56.  The government fails to present any evidence that the Corporations changed billing

20   descriptors on a sale-by-sale basis.  Nor is there any indication that such a practice, even if

21   implemented, would have been effective since, according to the FTC's theory, *all*, not just some, of

22   the Corporations' products were mere "lures."  *See* ECF No. 40 at 1:20, Amend. Mot.  Moreover, a

23   merchant who markets all goods or services in a deceptive manner will have chargebacks occur on

24   each merchant account.  Meltzer Decl., ¶ 39.  Using multiple accounts would, therefore, not be an

25   effective way to reduce chargebacks.

26

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 24
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

In fact, using multiple processors is considered a good business practice.  A processing error may occur which can disrupt business on any single account.  Meltzer Decl., ¶¶ 37, 40.  For example, in January 2009, a descriptor was misprinted for 20 days until the processor corrected it.  *Id.*  Despite the short period of the misprint, chargebacks continued to spike for the following six months as customers were unable to process refunds.  *Id.*  Moreover, all merchants' processors cap the sales volume, and using multiple processors is a common industry practice to accommodate sales volume in excess of a processor's cap on any single account.  *Id.*, ¶ 36.  Mr. Willms used multiple processors to obtain increased volume to satisfy the bona fide customer demand for his product and not for any other reason.  Willms Decl., ¶ 20.  He used multiple processors for the same product identified under different descriptors to overcome these caps in volume.  Meltzer Decl., ¶ 36.  As the FTC's evidence demonstrates, Mr. Willms based this practice on the bona fide advice of an actual processor who advised Mr. Willms to use multiple processors for his "long term" business objectives.  Willms Decl., Ex. E.  He thereafter complied with industry standards which require multiple merchant accounts for each site.  Meltzer Decl., ¶¶ 37-38, 40.

Third, the FTC relies on Mr. Chen for its claim that the Corporations manipulated sales data by changing billing descriptors.  ECF No. 9-14 at ¶ 32, Chen Decl., PI Ex. 56.  In fact, some of the processing contracts required Mr. Willms under certain circumstances to use changing descriptors.  Meltzer Decl., ¶ 42, Ex. J.  Moreover, changing billing descriptors for the same product is a legitimate business practice which is prevalent in the e-commerce industry.  Stricchiola Decl., ¶¶ 30-33.  This is particularly true because small changes to a website, product description or advertising campaign can have large effects on the total sales of a product or service.  *Id.* at ¶ 30; *see also* Meltzer Decl., ¶ 45.

Another important reason for changing billing descriptors is Mr. Willms' commitment to post-transaction transparency.  In correspondence with processors, the Corporations asked for changes in the billing descriptors and specifically cited, in their written requests, the desire to minimize merchant name confusion.  Meltzer Decl., ¶ 44, Ex. K.  The FTC's objection to this

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 25
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

practice underscores its instrumentalist use of the facts: the FTC complains that the Corporations engaged in obfuscatory efforts to conceal the discrete sales being made by the consumer at the time of purchase (*see* ECF No. 40 at 28-29, Amend. Mot.), but then complains that the Corporations engaged in obfuscatory efforts by disclosing the discrete sales being made at the time of billing. *Id.*

In fact, the Corporations clearly believed that using multiple descriptors was a legitimate business practice. Merchants with multiple websites must use multiple descriptors. Meltzer Decl., ¶¶ 40-41. Moreover, a processor in this case offered the Companies the choice to bill under three descriptors or to bundle them as two. *Id.*, ¶ 43; ECF No. 8-15 at 2278, PI Ex. 48. Multiple processors accepted the Companies' written instructions to change. Meltzer Decl., ¶ 43. In addition, multiple descriptors were necessary to assist in refund process where a customer calling center is servicing multiple merchants. *Id.*, ¶ 41. Without multiple descriptors, a customer service agent would have to search every single account pertaining to a merchant, dramatically extending the customer queue. Rana Decl., ¶ 6.

The FTC not only misses the bona fide reasons for changing descriptors, but also overstates its potential for harm. Slight variations in the wording of a descriptor would not provide a way for merchants to avoid scrutiny. Melzter Decl., ¶ 45. Processors closely scrutinize the merchant account as a whole and not just the billing descriptor for chargeback ratio and other security issues. *Id.* The whole point of the changing descriptor is to be transparent, *e.g.*, to parlay a consumer's sense of brand loyalty to the merchant by marketing the same product to different demographic segments. Stricchiola Decl., ¶ 31. Successfully optimizing a marketing campaign requires consumer identification with, not confusion about, the merchant. There is no evidence of any bad faith in the Corporations' use of multiple descriptors. *Id.*, ¶ 33.

Moreover, the FTC has proffered no motive to support the Defendants' purported scheme. Chargebacks and placement on the Match list are not an automatic indication of deceptive marketing practices. In fact, this can be evidence of wrongdoing wholly unrelated to the conduct of the merchants. Meltzer Decl., ¶¶ 18-32. For example, the chargeback category with the greatest number

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 26
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   of chargebacks cited by the FTC pertains to instances of identity theft which victimized the merchant

2   and the consumer alike. *Id.*, ¶ 32, Ex. G; *see also* Stricchiola Decl., ¶ 18. Far from supporting the

3   FTC's case, this evidence supports the fact that the Corporations were repeatedly victimized by

4   affiliate fraud. Rana Decl., ¶ 4; Porter Decl., ¶ 6. The Corporations took significant steps to protect

5   against affiliate fraud and thereafter ceased relying on affiliates in order to reduce its chargebacks, a

6   fact which explains why its present chargeback rate has been and remains so low. Higgins Decl.,

7   ¶ 24; Stefaniuk Decl., ¶ 10. Moreover, the chargeback category with the second greatest number of

8   chargebacks cited by the FTC is erroneously used in this case. Meltzer Decl., ¶ 25. A customer who

9   fails to cancel an upsell which resulted in recurring charges for that uspell does not give rise to a valid

10  cancelled recurring transaction dispute. *Id.* Finally, the 2010 chargeback history of the Meritus

11  Sweipebids account is consistent with a spike in chargebacks based exclusively on the closure of the

12  merchant's account unrelated to a pattern of excessive chargebacks. *See* Meltzer Decl., ¶ 31.

13      With respect to the Match list, the Corporations were placed on the Match list in June 2010

14  when its previous four months of chargeback activity never exceeded .88%. Meltzer Decl., ¶ 18. A

15  merchant application in this case contains the disclosure that the average chargeback rate for the

16  previous months was 1.8%, thereby demonstrating that 1% does not represent a strict enforcement

17  standard. *Id.*, ¶ 30. Placement on the Match list is not subject to an automatic trigger as the FTC

18  suggests, but reflects a discretionary judgment on the part of the processor which is not necessarily

19  based on chargebacks. *Id.*, ¶ 29.

20      Many merchants, like Mr. Willms, experience spikes in chargebacks for a variety of reasons

21  and are not thereby placed on the Match list. Meltzer Decl., ¶ 29. The mere issuance of a CID or

22  industry knowledge of a government investigation would support placement on the Match list. *Id.*,

23  ¶ 18.

24      Perhaps even more important, a merchant's placement on the Match list is not a bar to

25  continued processing by that very same merchant. Meltzer Decl., ¶ 28. The evidence in this case

26  demonstrates that the Corporations continued to receive approval for processing despite their

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 27
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

placement on the Match List.  *Id.*  The Corporations then developed appropriate protocols to manage

its chargeback issues.  For example, "Just Think – Chargeback Strategy" identifies significant

compliance measures which the Corporations introduced to reduce chargebacks.  *See* ECF No. 9-4 at

2544, Durham Decl., PI Ex. 50.  Business disputes did arise, as evidenced by the fact that Payment

Systems did not like the Corporations' price point for Swipebids.  However, this bona fide business

disagreement does not qualify as evidence of a failure to address chargeback issues since another

processor, Allied Wallet, processed the same offer for the same price around the same time as this

disagreement.  *See* Lormel Decl., ¶ 18.

The Corporations' actual financial dealings also defeat any suggestion that the Corporations

had a motive to evade.  An audit of the U.S. and Canadian business entities' business operations

demonstrates that these entities were actively and regularly engaged in commercially-viable

businesses that generated significant income and expenses.  Moser Decl., ¶ 30.  Funds were disbursed

to vendors and transferred among the Corporations as part of ongoing business activities, and were

not being transferred to entities outside of the US and Canada for non-business related purposes.  *Id.*,

¶ 29.

Finally, Mr. Willms' tax filings foreclose any credible suggestion of evasion.  Mr. Willms

acknowledged his interest in the U.S. entities in tax filings to the U.S. government.  Lormel Decl.,

¶¶ 11-14, Ex. C.  In so doing, Mr. Willms voluntarily elected to not report the income from the U.S.

Companies as related to a separate corporation in a filing which requires little if any disclosure of

ownership in the corporation's income tax return.  Rather, he declared his responsibility for any taxes

owed from the LLC by filing a 2010 IRS Form 4868 Application for Automatic Extension of Time to

File U.S. Individual Income Tax Return, thereby declaring his beneficial interest in the proceeds of

the U.S. Companies to the United States government.  *Id.*, ¶ 12.  Furthermore, Mr. Willms filed

additional IRS Forms in which he identified himself as the President of the U.S. entities.  *Id.*, ¶ 14.

The former chief of the FBI's Financial Crimes Program has reviewed these and other facts,

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 28
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  including the FTC's allegations, and concluded that Mr. Willms has operated the U.S. Companies

2  with full transparency in compliance with applicable U.S. and state law.  *Id.*, ¶ 4.

3          The FTC's attempt to equate Defendants' allegedly unlawful billing practices to that at issue

4  in *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) and *FTC v. Global Mktg. Group,*

5  *Inc.,* 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla. 2008) is disingenuous at best.  *See* ECF No. 40 at 38,

6  Amend. Mot.  In *J.K. Publications,* the undisputed evidence showed that the defendants billed the

7  credit and debit card accounts of thousands of individuals who had *no connection or contact* with the

8  defendants' companies, and who had not authorized *any charges by the defendants*.  99 F. Supp. 2d at

9  1191.  Indeed, the evidence in *J.K. Publications* suggested that the defendants simply charged credit

10  card numbers obtained from a bank's historical databases.  *Id.* at 1186.  In the *Global Marketing*

11  *Group* case, defendant employed telemarketers to induce consumers to purchase unsecured credit

12  cards and credit card loss protection services for advance fees, but then never provided either the

13  cards or the services.  594 F. Supp. 2d at 1285.

14          There are simply no allegations here that even approach the level of misconduct involved in

15  these cases.  There is no evidence that the Corporations ever charged the accounts of individuals who

16  had no contact or connection to their websites, or that the Corporations ever failed to deliver the

17  products purchased by the customers.  The FTC (and the consumers who submitted declarations in

18  support of the preliminary injunction motion) may dispute the question of whether the Corporations'

19  disclosures were sufficiently clear, but there is no evidence that the Corporations knowingly or

20  intentionally made unauthorized charges to its customers' accounts.  Even the FTC concedes that the

21  Corporations' websites contained disclosures and terms and conditions—it just disputes their

22  sufficiency.

23  C.     The Balance of Equities Requires a Denial of the FTC's Request for Preliminary
         Injunction.

24

25          For several reasons, the FTC has failed to show that the equities in this case warrant the

26  requested relief.  The FTC's abject failure to show any ongoing consumer injury, together with other

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 29
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  factual errors, result in the FTC grossly misstating the public equities it asserts in the Motion.  As a

2  result, the FTC's balancing of the equities in this case lacks merit.

3       First, the FTC has failed to demonstrate any ongoing consumer injury.  In its 48-page brief,

4  the FTC remarkably uses only eight lines to specifically discuss the purported existence of ongoing

5  harm.  *See* ECF No. 40 at 5, Amend. Mot. (asserting "ongoing" harm); 44-45 (relying on

6  presumption); 14-18 (relying on trash from the dumpster).  The reason for this is simple:  the FTC

7  bases its request for a forward-looking remedy on an entirely retrospective analysis.

8       In so doing, the FTC's Motion completely ignores any facts demonstrating whether ongoing

9  consumer injury does, in fact, exist.  In the voluminous exhibits which have accompanied the

10  government's filing, there is not a single analysis, let alone reference to a present site, pattern of

11  chargeback activity or other purported indication upon which the government so aggressively relies

12  to show past wrongdoing.  The omission of such evidence is jarring:  the FTC says too much with too

13  little.

14       The FTC broadly asserts that the Corporations have not changed their practices.  In fact, the

15  Corporations' present sites are fully compliant with the FTC.  Martin Decl., ¶¶ 7, 12; Banks Decl.,

16  ¶ 10.  The Corporations stopped using the term "FREE" in early 2009 (Bazinet Decl., ¶ 7), the term

17  "RISK FREE" at the end of 2009, and the term "BONUS" at the end of 2010.  Importantly, the

18  Corporations no longer offer upsells.  Stefaniuk Decl., ¶ 11.  There is not a single company site

19  presently in use which involves an upsell.  *Id.*

20       The FTC's reliance on past conduct to support the probability of future violations, therefore,

21  states nothing more than a non-sequitur.  The Corporations' internal compliance measures with

22  respect to advertising review (Banks Decl., ¶ 12, Exs. B, C), customer call protocols (*id.*) and other

23  practices (*id.*, ¶ 9), all confirm that the Corporations have exhibited a culture of compliance to

24  identify and remediate the very regulatory risks at issue in this case.  The Corporations' compliance

25  efforts, reflected in a U.S. Company's A- rating by the BBB, belies the FTC's implicit argument that

26  these are static entities entrenched in a culture of indifference to consumer satisfaction.  What the

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 30
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

FTC's entirely retrospective focus on the Corporations' conduct ignores is this:  these companies have evolved and continue to evolve in a serious and systematic way to ensure customer satisfaction and brand loyalty.  Banks Decl., ¶¶ 10, 18.

Second, the FTC not only relies on the wrong facts, but also misstates the facts on which it does rely.  This practice causes the FTC to grossly mischaracterize the public equities implicated by the Corporations' alleged past practices.  For example, the FTC relies on an anecdotal set of consumer complaints to present sweeping conclusions on consumer injury.  This analysis, however, assumes that the consumer complaints are representative of the total population of buyers, which includes over six million consumers.  Higgins Decl., ¶ 15.  There is no reasonable basis for making this assumption, which is, in fact, contradicted by actual sales data.  *Id.*, ¶ 16.  Similarly, the government's reliance on PPS data, which was obtained pursuant to a discovery request seeking only customer complaints (*see* Ortegon-Rico Decl., ¶ 10), is similarly flawed.  Higgins Decl., ¶ 12.  As a result, the FTC's estimate of consumer injury completely ignores the significant fact that a vast majority of consumers who purchased the Corporations' products actually continued to subscribe to their purchases after billing.  *Id.*, ¶ 40.  These and other facts establish that 96% of the Corporations' customers knew of the offers' terms and conditions.  *Id.*  The Corporations do not intend to evade responsibility for whatever consumer injury may have resulted from any of its past practices and will work with the FTC to resolve this matter.  Willms Decl., ¶ 22.  The FTC, however, has failed to show the magnitude of harm that would support the extraordinary relief it requests.

Moreover, the FTC misstates the Corporations' purposes and intent.  The FTC argues that the Corporations' sole intent has been to deceive consumers.  In fact, the Corporations' documented compliance efforts tell a far different story.  Banks Decl., ¶¶ 10-19.  Begun even before the hint of an FTC investigation, the Corporations initiated significant compliance measures which reflected the exact opposite intent:  "to improve the company's policies and procedures designed to ensure compliance with applicable laws and regulations."  *Id.*, ¶ 10.  These compliance measures reflect "significant efforts" to protect against the very risks implicated by the allegations in this case.  *Id.*  A

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 31
CASE NO. C11-00828-MJP

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

review of the Corporations' communications with their call centers demonstrate that the Corporations were urging and even disciplining call center agents to make more and prompter refunds and cancellations. *Id.*, ¶ 15. As a result of these efforts, the Corporations now maintain a compliance program for live and on-line call center operators that is "very thorough and well documented." *Id.*, ¶ 18. The Corporations' compliance efforts are, in fact, consistent with the FTC's own evidence. The FTC cites to a "Just Think – Chargeback Strategy" which identifies significant compliance measures which the Corporations introduced to enhance consumer satisfaction and brand loyalty. *See* Pl. Exhibit 50, p. 2544. In lieu of facts, however, the FTC relies on a series of inaccuracies and rank speculation involving documents that the Corporations never wrote, read or adopted, to suggest a different picture. The FTC misreads call center documents and unreasonably imputes a bad motive to good industry practices intended to assure shorter queue lines. Meltzer Decl., ¶ 21. The Corporations had every reason to believe that their offers were fully compliant as processors continued to solicit them for business, and advertisers continued to accept the Corporations' offers.

Third, the private equities are significant. The FTC is asking the Court to issue an order which would logically prevent Mr. Willms, a 24-year-old businessman, from selling a newspaper subscription with recurring billing. Such a draconian remedy and the concomitant harm which it would cause on Mr. Willms, his employees and independent contractors, are simply not justified by the facts in this case.

D.   The FTC's Proposed Preliminary Injunction Is Overbroad and Unsupported by the Law or Evidence.

The FTC fails to offer any support in the law or in its proffered evidence for the broad scope of the injunction it seeks. Case law is clear that, in the event that injunctive relief is awarded, it "must be tailored to remedy the specific harm alleged." *FTC v. John Beck Amazing Profits, LLC*, 2:09-CV-4719-FMC-FFM, 2009 WL 7844076 (C.D. Cal. Nov. 17, 2009), *quoting Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991); *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendants than necessary to

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 32
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax:  (206) 676-7001

provide complete relief to the plaintiffs"). "An overb[road] injunction is an abuse of discretion." *Id.* (citing *United States v. BNS, Inc.,* 858 F.2d 456, 460 (9th Cir. 1988)); *see also Natural Resources Defense Council, Inc. v. Winter,* 508 F.3d 885, 886 (9th Cir. 2007) ("Injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion."); *Stormans, Inc. v. Selecky,* 571 F.3d 960, 968 (9th Cir. 2009) (citing *Lamb–Weston,* 941 F.2d at 974. "This is particularly true when, as here, a preliminary injunction is involved. A preliminary injunction can only be employed for the 'limited purpose' of maintaining the status quo." *Zepeda v. U.S. Immigration & Naturalization Serv.,* 753 F.2d 719, 728 n.1 (9th Cir. 1984) (citing *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981); *King v. Saddleback Junior Coll. Dist.,* 425 F.2d 426, 427 (9th Cir. 1970). "Therefore, an injunction must be narrowly tailored ... to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" *Price v. City of Stockton,* 390 F.3d 1105, 1117 (9th Cir. 2004) (quoting *Zepeda,* 753 F.2d at 728 n.1) (citation omitted). "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Lamb–Weston,* 941 F.2d at 974. A preliminary injunction must do no more or less than maintain the status quo and "must be narrowly tailored … to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" *Price,* 390 F.3d at 1117 (9th Cir. 2004).

The FTC is overreaching by seeking a ban in this matter and ordering the Corporations to stop billing for services ordered via the new sites. The vast majority of FTC cases that involve negative options do not result in such relief. The FTC typically crafts settlements or seeks orders to enjoin the defendants from inadequately disclosing the material terms of a negative option offer. *FTC v. John Beck Amazing Profits, LLC,* CV-09-4719-FMC-CW (Nov. 17, 2009, C.D. Cal.); *FTC v. Ultralife Fitness, Inc.,* 2:08-cv-07655-DSF-PJW (Dec. 1, 2008, C.D. Cal.); *FTC v. FTN Promotions,* 8:07-cv-01279-JSM-TGW (Aug. 27, 2008, M.D. Fla.); *FTC v. Jab Ventures LLC,* 2:08-cv-04648-SVW-RZ (Aug. 20, 2008, C.D. Cal.); *FTC v. Think All Publishing LLC,* (May 28, 2008, E.D. Tex.); *FTC v. Complete Weightloss Center, Inc.,* 1:08-cv-00053-DLH-CSM (May 14, 2008, D.N.D.); *FTC v.*

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 33
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

*Commerce Plane, Inc.*, 8:09-cv-01324-CJC-RNB (Nov. 16, 1990, C.D. Cal); *FTC v. Nextclickmedia, LLC,* 3:08-cv-01718 (Nov. 3, 1990, N.D. Cal.).  The FTC has not pointed to any evidence that would warrant such draconian relief in comparison with prior cases.  Indeed, Mr. Willms and the Corporations' repeated willingness to cooperate with the FTC and their good faith efforts to comply with advertising and marketing laws sets them apart from the previous defendants.  As such, a ban and order to stop billing current customers is inappropriate in this case.

The FTC's proposed preliminary injunction is overbroad in at least two critical respects:  First, the FTC seeks to ban Defendants from using a negative option feature in *any* advertising, marketing, or selling of any product.  As proposed, Defendants would be prohibited from using a negative option or continuity feature even where such a feature complies with the FTC's "clear and conspicuous" standard.  Second, the FTC seeks to impose an asset freeze on Defendants.  The FTC has failed to demonstrate that either of these provisions is warranted.

1.      The FTC Improperly Seeks to Ban Negative Option and Continuity **Features.**

The FTC offers no evidence regarding any Company website that is not currently in compliance with FTC standards.  As discussed above in Section B.3., the Corporations' present websites are in compliance (Martin Decl., ¶¶ 7, 12), and create no public harm and no risk of continuing consumer loss.

Even if the FTC *did* have evidence that the websites were not currently complying with FTC standards, its proposed injunction is extremely overbroad in that it would prohibit the Corporations from engaging in lawful conduct.  The proposed injunction would prohibit the Corporations from offering *any* negative options or continuity plan, despite the fact that such programs are not *per se* unlawful, and are offered by numerous reputable companies.  Even if the Corporations' websites indisputably complied with the FTCA, they would violate the proposed injunction.  As such, the FTC's proposed remedy has the very real potential to infringe the Corporations' First Amendment rights.  The First Amendment protects commercial speech as long as it concerns lawful activity and is not misleading.  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983).  The FTC has offered

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 34
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  no evidence to establish that the Corporations' current websites are deceptive, misleading or

2  otherwise in violation of any law.  Thus, they are protected commercial speech under the First

3  Amendment and should not be subject to a preliminary injunction.

4        As protected commercial speech, a preliminary injunction may only issue if it is narrowly

5  tailored to include only the alleged deceptive or misleading conduct.  *See Central Hudson Gas &*

6  *Elec. Corp. v. Public Servs. Comm'n,* 447 U.S. 557, 566 (1980) (if speech proposes a commercial

7  transaction, it may only be regulated if three criteria are satisfied:  1) the government has a substantial

8  interest in supporting the regulation; 2) the regulation directly advances that interest; and 3) the

9  regulation is not more intrusive than necessary to serve that interest.).  If a proposed injunction

10 includes both deceptive *and* legitimate commercial speech, it is overly-broad and in violation of the

11 First Amendment.  *See, e.g., MySpace, Inc. v. Wallace,* 498 F. Supp. 2d 1293, 1307-08 (C.D. Cal.

12 2007) (finding that a proposed injunction was overly-broad because in addition to covering the

13 deceptive conduct it risked infringement of the defendant's legitimate commercial speech activities in

14 violation of the First Amendment).

15       In this case, the FTC's proposed preliminary injunction seeks a blanket ban preventing the

16 Corporations from advertising, marketing or selling any product with a "negative option" or

17 continuity feature, FTC Proposed Preliminary Injunction, 9-10, even if not deceptive or misleading.

18 Thus, the FTC's attempt to prevent Defendants from using legal negative option features in their

19 advertising or sales is overly-broad and in violation of Defendants' First Amendment rights to engage

20 in legitimate commercial speech.

21       The Corporations' current compliance and the First Amendment's protection of non-deceptive

22 commercial speech weigh in favor of not granting the FTC's proposed ban on the use of negative

23 options and continuity features.

24       2.      The FTC Has Failed to Provide Evidence in Support of an Asset Freeze.

25       "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets,

26 or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier,* 572

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 35
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    F.3d 1067, 1085 (9th Cir. 2009) (concluding a *likelihood* of dissipation is necessary post-*Winter* to

2    support an asset freeze instead of the lower standard, a *possibility* of dissipation).  If there is no

3    evidence that defendants have ever previously attempted to intentionally dissipate, hide or otherwise

4    shelter corporate or personal assets from an effort to collect a debt or judgment against defendants,

5    then an asset freeze is not appropriate.  *See FTC v. John Beck Amazing Profits, LLC*, 2009 WL

6    7844076 (C.D. Cal. 2009) (denying FTC request for asset freeze).

7              There is no such evidence here.  Rather, the FTC has simply asserted that due to the nature of

8    Defendants' alleged conduct, Defendants will dissipate assets.  In *John Beck,* the FTC argued that an

9    asset freeze was appropriate because the defendants committed fraudulent acts, which, the FTC

10   assumed, meant the defendants would likely dissipate their assets to thwart potential collection

11   activity.  The district court found this argument unavailing:

12              The Court finds the FTC has failed to satisfy its burden of demonstrating that an
                asset freeze is warranted. Courts have previously considered fraudulent activity as a
13              factor in support of a likelihood of dissipation.  *See SEC v. Manor Nursing Centers,*
                *Inc.,* 458 F.2d 1082, 1106 (2d. Cir. 1972) ("Because of the fraudulent nature of
14              appellants' violations, the court could not be assured that appellants would not waste
                their assets prior to refunding public investors' money.")  However, in *Manor*
15              *Nursing,* additional factors were present that supported an asset freeze.  *Id.*
                (uncertainty existed over the total amount of defendants' proceeds, where the
16              proceeds were located, and defendants' failure to furnish information to remove the
                uncertainty). In this case, the only evidence in support of an asset freeze is
17              Defendants' misleading marketing practices.  If this were sufficient to support an
                asset freeze, one would issue in every deceptive advertising case.  Given the more
18              stringent standard of a likelihood of dissipation, the Court concludes an asset freeze
                is not supported by the FTC's evidence.
19

20   *Id.* at 15.

21

22              In addition, Defendants have provided evidence that there is no risk that Defendants will

23   dissipate assets.  Lormel Decl., ¶ 4.  Ben Moser, a Director with Grant Thornton LLP in the McLean,

24   Virginia office within the Forensics, Investigations and Litigation Practice, reviewed nearly 400

25   monthly bank statements for Jesse Willms-related entities covering the period January 2010 through

26   June 2011.  Moser Decl., ¶¶ 7, 29.  That review did not reveal any transfers of money to entities

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 36
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  outside the United States and Canada for which there is not a reasonable business purpose. *Id.*

2  Specifically, Mr. Moser's review showed no support for the FTC's allegation that the Willms-related

3  corporations were moving funds to Cyprus—the review revealed only one transfer from a bank in

4  Cyprus, which was related to income received from a processor in the ordinary course of business.

5  *Id.,* ¶ 7. Rather, funds were disbursed to vendors and transferred among Willms related entities as

6  part of ongoing business activities. *Id.,* ¶ 29. In addition, Mr. Moser's review did not find any

7  significant payments to Willms related entities that seemed unreasonable or outside the ordinary

8  course of business. *Id.,* ¶ 30. Finally, Mr. Moser found no support for the FTC's allegation that there

9  are unknown bank accounts owned or controlled by Mr. Willms or his related entities. *Id.,* ¶ 31.

10        The asset freeze proposed by the FTC simply is not warranted on this record.

11  E.    Motion to Strike.

12        Pursuant to Local Rule CR 7(g), Defendants hereby move to strike certain materials submitted

13  by the FTC in support of their motion.

14        Exhibits 2 (ECF Nos. 5-2, 5-3), 3 (ECF Nos. 5-4, 5-5), 5 (ECF No. 5-7), 8-13 (ECF Nos. 5-11

15  – 5-16, 6-1 – 6-6), 47-49 (ECF Nos. 8-14, 8-15, 9-1, 9-2), and 57 (ECF No. 9-15): Defendants

16  request that the Court strike these exhibits for failure to authenticate the documents as required by

17  Fed. R. Evid. 901. The requirement that materials be authenticated applies in the preliminary

18  injunction context. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1153-54

19  (C.D. Cal. 2002) (finding declaration sufficient to authenticate exhibits). Yet the FTC has not even

20  tried to authenticate these exhibits—it has merely attached them to its Motion. Because this is

21  insufficient to establish that the documents "are what they purport to be," these exhibits should be

22  excluded.

23        Ex. 51 (ECF No. 9-6) (Declaration of Amy Brannon-Quale) and Attachment A; Ex. 54 (ECF

24  Nos. 9-9, 9-10, 9-11) ¶¶ 3-7 (Declaration of Eric M. Setala) and Attachment A; Ex. 50 (ECF Nos. 9-

25  3, 9-4, 9-5) (Declaration of Eleanor Durham) and Attachments A-W: Defendants request that the

26  Court strike these documents on the grounds that they are based on evidence that is not admissible.

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 37
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  In the case of the attachments to these declarations, the documents are either inadmissible hearsay or

2  summaries of information that contains multiple levels of hearsay.  Although Rule 1006 permits

3  summaries of information, it "is not a back-door vehicle for the introduction of evidence which is

4  otherwise inadmissible."  *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir.

5  2004).  "Rule 1006 evidence may ... be excluded where the source materials are inadmissible hearsay

6  or even where just some parts of those materials are inadmissible hearsay."  C.A. Wright & V.J.

7  Gold, 31 Federal Practice and Procedure § 8043, at 527 (2000).  It is the proponent of the summary

8  who bears the burden to demonstrate the admissibility of the underlying records or writings that are

9  summarized.  *United States v. Johnson*, 594 F.2d 1253, 1256 (9th Cir. 1979).  The FTC has not—and

10  cannot—meet its burden here.  For example, the spreadsheet attached to Ms. Brannon-Quale's

11  declaration purports to summarize reports of calls made by unknown consumers to unknown private

12  or governmental entities, allegedly to complain about Defendants and their websites.  The FTC

13  cannot avoid the multiple levels of hearsay inherent in this evidence by submitting it in summary

14  form.  Even if the FTC can avoid the first level of hearsay (by arguing that transcripts provided to the

15  FTC are admissions of a party opponent), it cannot get around the fact that the records of the calls

16  themselves are out-of-court statements being offered for the truth of the matter asserted.  Because the

17  evidence underlying these summaries is plainly inadmissible, the summary and its accompanying

18  declaration should be excluded.

19  Defendants recognize that courts are not "strictly bound" by the rules of evidence in the

20  context of requests for preliminary injunctions.  *See, e.g., Ticketmaster LLC v. RMG Techs., Inc.*, 507

21  F. Supp. 2d 1096, n.2 (C.D. Cal. 2007).  However, these rulings are founded in concerns about the

22  exigency of such motions—concerns not relevant here.  *See, e.g., Flynt Distrib. Co., Inc. v. Harvey*,

23  734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates

24  a prompt determination ....  The trial court may give even inadmissible evidence some weight, when

25  to do so serves the purpose of preventing irreparable harm before trial.").  Moreover, this authority

26

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 38
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  simply does not give the government leeway to simply disregard the relevant rules.  For this reason,

2  Defendants' Motion to Strike should be granted.

3  F.    Motion for Expedited Discovery and Evidentiary Hearing.

4       Defendants contend that the FTC has failed to meet its burden to demonstrate a likelihood of

5  success on the merits and that the balance of equities requires the requested relief; therefore, the

6  FTC's Motion should be denied.  At a minimum, however, Defendants request that the Court grant an

7  evidentiary hearing before ruling on the FTC's Motion.  Defendants dispute core evidence upon

8  which the FTC relies in support of its accusations regarding Defendants' alleged wrongdoing—

9  evidence that allegedly justifies the FTC's requests for an incredibly broad injunction accompanied

10 by an asset freeze.  In the mere two months that this matter has been pending, Defendants have

11 marshaled significant evidence that calls the FTC's evidence into question.  Because the parties'

12 substantial factual disputes are material to the ultimate determination of the FTC's Motion,

13 Defendant should be provided the opportunity to challenge in open court the evidence presented

14 against them.

15      An evidentiary hearing on a motion for preliminary injunction is required when the

16 nonmoving party raises genuine issues of material fact in its response to a motion for preliminary

17 injunction.  *See, e.g., Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir. 1997); *Int'l*

18 *Molders' & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 555 (9th Cir. 1986) (a

19 party should have an opportunity to take limited discovery and present witnesses where the issues are

20 sharply disputed).  It is the duty of a court of equity granting injunctive relief to do so upon

21 conditions that will protect all whose interests the injunction may affect.  *Inland Steel Co. v. United*

22 *States,* 306 U.S. 153, 157 (1939).  The need for an evidentiary hearing is particularly acute when the

23 moving party is seeking to freeze the defendant's assets because the question of whether to freeze a

24 defendant's assets "requires particularly careful consideration" by the Court.  *FTC v. Kuykendall,* 371

25 F.3d 745, 749-50 (10th Cir. 2004).

26

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Although affidavits can be used in support of motions for preliminary injunctions, they are not sufficient if there are serious disputes on questions of fact:

> It is well established that, in general, a motion for a preliminary injunction should not be resolved on the basis of affidavits alone.  Normally, an evidentiary hearing is required to decide credibility issues....  Discovery deposition testimony, in fact, will often, if not usually, present even less of a complete picture of a party's position than affidavits presented by that party.  The trial court's reading of such a deposition is an inadequate substitute for the hearing of oral testimony and the observing of a witness' demeanor in these highly contested cases where the proper characterization of the factual occurrences is crucial and where credibility is a major determinative factor.

*Medeco Sec. Locks, Inc. v. Swiderek,* 680 F.2d 37-39 (7th Cir. 1981).  *See also General Elec. Co. v. Am. Wholesale Co.,* 235 F.2d 606, 609 (7th Cir. 1956) ("[W]here the plaintiff chooses to support its motion solely by affidavits and neither the trial court nor the defendants are offered an opportunity to observe the plaintiff's witnesses or to cross-examine them, it is a rule, subject to a few exceptions, that a preliminary injunction should not be awarded on ex parte affidavits except in a very clear case."); Wright & Miller, 11A *Federal Practice and Procedure* § 2949 (2d ed.) ("However, if there is a factual controversy, oral testimony is preferable to affidavits because of the opportunity it provides to observe the demeanor of the witnesses. Accordingly, a motion for a preliminary injunction supported only by written evidence usually will be denied when the facts are in dispute.").

Here, the parties have material disputes regarding the FTC's core evidence in support of its Motion.  Specifically, as set forth above, Defendants have offered substantial evidence demonstrating:  (1) the Corporations' current  compliance with the FTC's clear and conspicuous standard; (2) that a significant number of websites upon which the FTC relies in support of its Motion are either not the Corporations' websites or were never live websites; (3) the Corporations' chargeback rates are not reflective of false and deceptive practices; (4) Defendants did not create "shell" corporations, but in fact, the Companies are bona fide operating entities; and (5) there is no evidence regarding risk of asset dissipation and therefore, no need for an asset freeze.  Discovery and

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 40
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    live testimony during an evidentiary hearing is necessary for the Court to determine the credibility of

2    the FTC's witnesses and to evaluate the grounds for the FTC's claims.

3         Given the scope of the injunction the FTC seeks, fundamental fairness requires that

4    Defendants be permitted to take limited discovery of Plaintiff's declarants and conduct an evidentiary

5    hearing.  Defendants seek to depose Plaintiff's experts, Dr. Susan Kleimann and Andrew Chen, as

6    well as the following fact declarants, to the extent Defendants' motion to strike is not granted,

7    Eleanor Durham (ECF Nos. 9-3, 9-4, 9-5, Ex. 50), Amy Brannon-Quale (ECF No. 9-6, Ex. 51), Eric

8    Setala (ECF Nos. 9-9, 9-10, 9-11, Ex. 54).

9         Granting the FTC's proposed injunction will freeze each of the Defendants' personal assets,

10   as well as effectively shut down the Corporations' business.  Prior to entering such an injunction, this

11   Court should be confident that it is basing its decision on valid evidence.  Accordingly, the Court

12   should allow limited expedited discovery of the above-named declarants, and then conduct an

13   evidentiary hearing, before ruling on the FTC's Motion.

14                           IV.    CONCLUSION

15        As the moving party, the FTC bears the burden of demonstrating that it is entitled to the relief

16   it seeks.  The FTC has spent more than 18 months assembling its best case, but instead of providing

17   evidence to satisfy its burden, including evidence of any ongoing consumer injury, the FTC merely

18   repeats its conclusions that Mr. Willms and his related companies are false and deceptive.  This

19   showing is not facially sufficient to warrant the aggressive relief that the FTC seeks and is

20   contradicted by the present lack of consumer injury resulting from the Corporations commitment to

21   compliance.  The FTC's motion for preliminary injunction should therefore be denied.

22

23

24

25

26

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 41
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    DATED this 18th day of July, 2011.

2                                         Respectfully submitted,

3                                         SUMMIT LAW GROUP PLLC

4
                                          By /s/ *Lynn M. Engel*
5                                             Lynn M. Engel, WSBA #21934
                                              Molly A. Terwilliger, WSBA #28449
6                                             *lynne@summitlaw.com*
                                              *mollyt@summitlaw.com*
7
                                          And by
8
                                              James Kaminski (*pro hac vice*)
9                                             HUGHES & BENTZEN, PLLC
                                              1100 Connecticut Avenue NW, Suite 340
10                                            Washington, DC  20036
                                              Tel:  (202) 293-8875
11                                            *jkaminski@hughesbentzon.com*

12                                            Jonathan N. Rosen (*pro hac vice*)
                                              SHOOK, HARDY & BACON L.L.P.
13                                            115 F Street NW, Suite 200
                                              Washington, DC  20004-1305
14                                            Tel:  (202) 639-5608
                                              *jrosen@shb.com*
15
                                          ***Attorneys for Defendants***
16

17

18

19

20

21

22

23

24

25

26

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 42
CASE NO. C11-00828-MJP

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Kathryn C. Decker
> Eleanor Durham
> Julie K. Mayer
> Nadine S. Samter
> FEDERAL TRADE COMMISSION
> 915 2nd Avenue, Suite 2896
> Seattle, WA  98174
> *kdecker@ftc.gov*
> *edurham@ftc.gov*
> *jmayer@ftc.gov*
> *nsamter@ftc.gov*

DATED this 18th day of July, 2011.

/s/        *Marcia A. Ripley*
Marcia A. Ripley

---

CERTAIN DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
MOTIONS TO STRIKE, AND FOR EXPEDITED
DISCOVERY AND EVIDENTIARY HEARING - 43
CASE NO. C11-00828-MJP