The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No.  2:11-cv-00828-MJP |
| Plaintiff, | **FTC'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTIONS TO STRIKE AND FOR EXPEDITED DISCOVERY AND EXPEDITED HEARING** |
| v. | |
| **JESSE WILLMS**, *et al.*, | |
| Defendants. | |
| | Note on Motion Calendar: July 22, 2011 |
| | Oral Argument: August 4, 2011 |

I.    **INTRODUCTION**

The Internet is an exciting and fast changing medium that provides economic opportunities for both entrepreneurs and consumers.  It also presents huge risks for consumers and challenges to those who enforce consumer protection laws.  The FTC strives not to unduly burden economic opportunity while it endeavors to keep pace with e-Commerce marketers who use the medium to deceive consumers.

Negative option marketing stands as a prime example.  Negative option marketing can provide benefits to both merchants and consumers.  Unfortunately, it also has been used in

FTC Reply To Defendants' Opposition to PI and Motions To Strike and For Expedited Hearing - Page 1

1  recent years to trick countless consumers into paying for products and services that they neither
2  wanted nor agreed to pay for.  For that reason, major players who ensure that Internet
3  commerce operates fairly — Google, the credit card payment systems, and Congress, by
4  enacting the Restore Online Shoppers' Confidence Act — have taken steps to limit online
5  merchants' ability to use this marketing mechanism to deceive consumers.  Jesse Willms is a
6  poster child for the abuse of negative option marketing on the Internet.

7      The FTC has presented strong evidence, and presents additional evidence with this
8  Reply, showing that Jesse Willms's history as an online marketer has been characterized by
9  misusing negative option marketing to wrest as much money as he can from consumers in a
10  short period of time before moving to offering new products or services.  All the while, he
11  engages in practices that have enabled him to stay one step ahead of those who attempt to rein
12  in his illegal activities.

13      His first online business was selling software.  In 2006 and 2007, Symantec and
14  Microsoft filed lawsuits against him for copyright and trademark infringement and software
15  counterfeiting.  These suits resulted in entry of permanent injunctions against Willms.  In 2008,
16  Willms transitioned to marketing health and beauty products and money making schemes online
17  using deceptive free trial offers and negative options.  The evidence shows that, by late 2008,
18  Willms's business partners told him that his manner of disclosing the terms and conditions of
19  his free trial negative option offers needed to change.  Willms resisted changing his websites to
20  disclose the terms and conditions in a way that consumers were likely to see them before
21  submitting payment information because to do so would have decreased his profits.  By the end
22  of 2009, Willms dropped this business model when Google imposed strong restrictions on
23  negative option marketing using the Google platform.

24      In 2010, Willms began the Internet penny auction websites that, once again, deceived
25  consumers into providing credit card information and then imposing undisclosed or
26  inadequately disclosed charges.  Due to complaints and chargebacks, Willms was unable to
27  maintain merchant banking relationships for these businesses and in 2011 he switched to
28  offering online research services.  The FTC submits evidence with this Reply demonstrating

1   that Willms and his companies ("Defendants") continue to use deception to get consumers to
2   pay $1 for an initial search and then impose inadequately disclosed monthly charges of $18.95
3   or $19.95. Further, these websites do not comply with the Restore Online Shoppers'
4   Confidence Act. As such, the relief the FTC seeks is wholly justified and necessary to protect
5   consumers from further harm.

6   **II.    THE FTC HAS PROVIDED PROBATIVE AND SUBSTANTIAL EVIDENCE**
        **SHOWING THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS**
7       **CLAIMS THAT DEFENDANTS' WEBSITES ARE DECEPTIVE**

8           In support of its Motion for Preliminary Injunction ("Motion"), the FTC has produced
9   evidence of thousands of consumer complaints, and declarations from 27 consumers, showing
10  that Defendants' trial offers and online auctions were deceptively marketed with grossly
11  inadequate disclosures. PI Ex. 6, pp. 282-358; PI Ex. 7, pp. 359-63; PI Exs. 20-46, pp. 1731-
12  2234; PI Ex. 50, ¶¶ 3-8, pp. 2432-34, ¶¶ 11-15, pp. 2435-36; PI Ex. 51, pp. 2666-82; PI Ex. 54,
13  ¶¶ 3-7, pp. 2697-98. Defendants have attempted to discount this evidence, but courts have
14  consistently found that consumer complaints (including summaries of voluminous complaints)
15  and declarations are strong evidence of actual deception. See, e.g., FTC v. Cyberspace.com,
16  LLC, No. 0-1806, 2002 U.S. Dist. LEXIS 25565, *13, n.5 (W.D. Wash. Jul. 10, 2002), aff'd
17  453 F.3d 1196, 1199 (9th Cir. 2006). The FTC has also provided substantial evidence regarding
18  Defendants' chronically high chargeback rates, produced by third party banks, payment
19  processors, VISA, and MasterCard pursuant to civil investigative demands issued by the
20  Commission. PI Exs. 47-50, pp. 2235-2665; PI Exs. 56-57, pp. 2904-3002. Courts also have
21  given significant weight to this type of evidence in determining whether marketing and
22  advertisements are deceptive in violation of the FTC Act. See, e.g., FTC v. Amy Travel Svcs.,
23  Inc., 875 F.2d 564, 575 (7th Cir. 1989); FTC v. J.K. Publications, 99 F. Supp. 2d 1176, 1203
24  (C.D. Cal. 2000).

25          The FTC additionally has provided the expert testimony of Dr. Susan Kleimann who
26  concludes that Defendants' websites are designed to maximize product claims and other appeals
27  while minimizing important costs and terms, resulting in a deceptive net impression that
28  consumers would not be charged. PI Ex. 15, pp. 1312-1585. Because of this, she concludes

1 that it is highly unlikely that the consumers who actually purchased Defendants' products saw
2 or understood the disclosures of Defendants' negative option and continuity plan features. Id. at
3 ¶¶ 74-75, pp. 1348-49.

4     A solicitation may mislead by virtue of the net impression it creates, even though the
5 solicitation also contains truthful disclosures. Cyberspace.com, 453 F.3d at 1200. This legal
6 principle is ratified in the context of Internet marketing by Keithly v. Intelius, 764 F. Supp. 2d
7 1257 (W.D. Wash. 2011). The court in Keithly concluded that, in the context of web-based
8 marketing, it is not appropriate to focus strictly on the language or placement of a disclosure, as
9 Defendants urge, in determining whether the disclosure is clear and conspicuous. It is the net
10 impression created by the website, as experienced by a consumer actually navigating through
11 the web pages, that should determine whether a disclosure is legally adequate. Id. at 1266. The
12 evidence presented by the FTC demonstrates that, under this scrutiny, Defendants' website
13 disclosures are inadequate and their websites are deceptive.

14     In their Opposition, Defendants offer no countervailing direct consumer testimony or
15 other relevant probative evidence to rebut the FTC's evidence. Instead, they have presented
16 self-serving declarations from Defendants and those with a financial stake in Defendants'
17 business, and declarations from others, offered as experts, who attempt to cast doubt on the
18 FTC's evidence. These declarations are based on limited, unsubstantiated, and/or inaccurate
19 data selectively chosen by the Defendants. The FTC does not concede that these declarants are
20 qualified to offer the testimony they have provided, or that there is a valid basis for their
21 testimony, and intends to move to strike much of this testimony at a later date. As discussed
22 below, these declarations are so flawed or of such limited relevance and probity, that they are
23 insufficient to rebut the FTC's evidence and this Court should give them little or no weight.

24 **A. Defendants' contentions that the FTC's evidence of consumer deception is
25 inadequate, that 96% of their customers were not deceived, and that their
chargeback rates are lower than they appear, are unsupported legally and
26 factually incorrect**

27     As discussed above, Defendants' contention that the FTC has presented no evidence of
consumer deception is unsupported. The types of evidence the FTC has submitted – direct
28

1  consumer evidence, evidence of high chargeback rates, and product usage and customer
2  retention evidence – are highly probative indicators of deception.

3          Defendants hired Richard Higgins to rebut the FTC's consumer evidence. To rebut the
4  FTC's substantial evidence of actual consumer deception, Higgins contends that the evidence is
5  anecdotal and cannot be used to show that all consumers were misled or did not want the
6  products. Higgins Dec., ¶¶ 11-13, pp. 4-5. Higgins further states that Defendants' cancellation
7  data shows that 96% of consumers were aware of the terms and conditions of the offers, were
8  satisfied with the performance of the products, or were compensated with refunds or
9  chargebacks and thus not injured. Id. at ¶ 7, p. 3. Higgins also speculates that Defendants'
10  chargeback rates are lower than the evidence indicates. Id. at ¶¶ 26-30, pp. 9-11.

11          As an initial matter, all of Higgins's testimony is admittedly based on very limited
12  information and is highly speculative. Further, as a matter of well-established case law, the
13  FTC is not required to prove that all consumers were deceived. FTC v. Wilcox, 926 F. Supp.
14  1091, 1099 (S.D. Fla. 1995); FTC v. U.S. Sales Corp., 785 F. Supp. 737, 748 (N.D. Ill. 1992).
15  The FTC need only show that a material misrepresentation or omission was likely to mislead a
16  consumer acting reasonably under the circumstances. Id. In addition, it is irrelevant that
17  deceived consumers may have received something of value in determining that a practice is
18  deceptive. See FTC v. Figgie Int'l, 994 F.2d 595, 606 (9th Cir. 1993). The FTC has produced
19  more than enough consumer evidence for the Court to conclude that it has met its burden of
20  showing that it is likely to prevail on the merits of its case.

21          Higgins goes on to conjecture, based on a small sampling of Defendants' cancellation
22  data, that 96% of Defendants' customers were satisfied or were not deceived. This analysis is
23  so flawed that it should be disregarded. Higgins admits that Defendants were unable to provide
24  him with detailed data showing how many consumers actually stayed in the various programs
25  after the first two rounds of charges posted to consumer accounts. Higgins Dec., ¶ 33, p. 12.
26  These charges usually occurred within four weeks after the initial trial offer was accepted. See
27  PI Ex. 50, Att. I, p. 2498; Setala/France Dec., Att. F, pp. 85-86 (filed with this Reply). He
28  concedes that the limited amount of data he relied on results in "imprecision" regarding his

1   cancellation rate estimates. Higgins Dec., ¶ 33, p. 12. He also admits that consumers may have
2   terminated their relationship with Defendants in ways other than by canceling, such as by
3   closing their accounts or blocking charges. Id. at ¶ 18, p.7. Higgins also incorrectly assumes
4   that consumers who canceled did not pay anything, id. at ¶¶ 31-40, pp. 11-14, demonstrating a
5   basic misunderstanding of Defendants' business model and practices. Indeed, many consumers
6   canceled within the trial period, but were nonetheless charged for the initial product if they did
7   not return it within the trial period. See, e.g., PI Ex. 23, ¶¶ 3-4, p. 1780. Further, most
8   consumers did not know about the upsells, which Higgins incorrectly assumes were optional
9   and he did not appear to know that canceling the trial product usually did not result in
10   cancellation of the forced upsells. Higgins Dec., ¶ 9, p. 37.

11   A much more telling figure bearing on consumers' understanding of the deal made with
12   Defendants is provided by Defendants' own sales data. According to Defendants, in 2009,
13   2,307,517 consumers accepted initial trial offers from Defendants, generating $315,123,979.20
14   in gross revenues. PI Ex. 2, pp. 49-98. Dividing the revenues by the number of consumers
15   results in average revenue per consumer of $136. This is substantially less than the amount
16   consumers were charged in the first four weeks after they placed their order. Typically,
17   Defendants charged consumers for the trial product (often $79.95) and the upsells ($5-10 for
18   each of two upsells) within a week after the end of the 14-day trial period (which begins on the
19   order date, not the receipt of product date), and then, one week after that, imposed monthly
20   charges for the product ($79.95). See PI Ex. 50, Att. I, p. 2498; Setala/France Dec., Att. F, pp.
21   85-86. Even reducing the number of consumers by 30% (Higgins's unsubstantiated estimate of
22   consumers who paid nothing), the average revenue per consumer is $195, still about the amount
23   of charges that the typical consumer would receive in the first four weeks. This supports the
24   conclusion that most consumers who accepted one of Defendants' trial offers got themselves
25   out of the transaction with Defendants when they discovered that they were being charged for
26   purchases they did not want and had not authorized. Defendants' cancellation practices often
27   prevented these consumers from undoing these charges. If consumers had been satisfied and
28   continued to receive Defendants' products and services over several months, as Defendants

1  suggest, revenues would have been much higher.  Courts have found that low usage of the
2  products or services offered is probative of actual deception under Section 5 of the FTC Act.
3  See Cyberspace.com, 453 F.3d at 1201; FTC v. Bay Area Bus. Council, Inc., No. 02-5762, 2004
4  U.S. Dist. LEXIS 6192, *33 (N.D. Ill. Eastern Div. 2004).

5      Higgins further states that chargeback rates alone are not indicative of fraud.  Higgins
6  Dec., ¶ 28, p. 10.  The FTC is not relying solely on Defendants' chargeback rates to show that
7  consumers were deceived, although courts have found that such evidence is probative of actual
8  consumer deception.  See, e.g., Amy Travel Svcs., Inc., 875 F.2d at 575.  In any event,
9  Higgins's speculation that the FTC's evidence of Defendants' high chargeback rates should be
10 discounted is without merit.  First, he acknowledges that he has received only a small portion of
11 the chargeback data and his analysis is incomplete.  Higgins Dec., ¶ 27, p. 10.  More
12 importantly, the evidence undisputedly shows that, from the end of 2008 through at least the
13 first half of 2010, the Defendants had chronically excessive chargeback rates that left them
14 continually seeking out new merchant banking relationships to maintain their ability to obtain
15 payments from consumers.  PI Ex. 8, pp. 387-694; PI Ex. 47, pp. 2259-60; PI Ex. 48, pp. 2276-
16 91; PI Ex. 49, p. 2313; PI Ex. 50, ¶¶ 20-34, pp. 2439-46; PI Ex. 56, p. 2904; PI Ex. 57, p. 2972;
17 PI Ex. 59, pp. 3018-63 (Merchant e-Solutions, Inc., response to FTC CID, filed with this
18 Reply); PI Ex. 63, pp. 3185-97 (complaint filed in 1021018 Alberta Ltd. v. Netpaying, Inc, No.
19 8:10-cv-00568 (M.D. Fla. Mar. 5, 2010), filed with this Reply).

20     **B.    Defendants' contention that their high chargeback rates are due to affiliate
              fraud is unsubstantiated**

21
       Defendants also argue that, to the extent they had high chargeback rates, these were due
22
    to affiliate marketers who fraudulently put charges through on Defendants' trial product
23
    websites to obtain commissions.  Def. Opp. at p. 27.  To support this argument, Defendants
24
    hired Jessie Stricchiola to provide a declaration regarding affiliate marketing fraud.  Stricchiola
25
    claims, without any support, that industry estimates of affiliate fraud are between 5-15% of
26
    acquisitions if the marketer is vigilant in attempting to manage it.  Stricchiola Dec., ¶ 14, p. 4.
27
    She further states that she would expect a conservative affiliate fraud rate of 5-15% for
28

1   Defendants' sales and bases her "estimate" on her "understanding of the affiliate marketing
2   industry, combined with [her] experience in handling online advertising fraud." Id. at ¶ 18, p. 6.

3           Stricchiola provides no substantiation for her estimates and, in fact, admits that "there is
4   little formal research on the pervasiveness of affiliate fraud." Id. at ¶ 14, p. 4.  Moreover,
5   affiliate fraud does not directly correspond to chargeback rates, nor does she make such an
6   assertion. Thus, she has no idea what percentage of Defendants' chargeback rates, if any, can
7   be attributed to affiliate fraud.

8           Defendants' own data indicates that affiliate fraud could have accounted for only a small
9   percentage of Defendants' reported chargebacks. Defendants were aggressively managing
10   affiliate fraud and had at least one employee whose sole purpose was to ferret out such sales. PI
11   Ex. 58 at ¶ 2, p.1, ¶ 6, p. 3 (Declaration of Andrea Taylor, attached to this Reply); Stricchiola
12   Dec., ¶¶ 19-23, pp. 6-7. In August 2009, Defendants generated $19,935,000.00 in sales. PI Ex.
13   2, pp. 51-55. Ms. Taylor reported 1,732 sales attributed to affiliate fraud for that month. PI Ex.
14   58, Att. A, pp. 3011-16. The products Defendants sold typically ranged in price from $60 to
15   $126. Assigning a cost of $100 to each fraudulent affiliate sale, the amount of sales attributed
16   to affiliate fraud for that month would have been only $173,200.00 (1,732 sales at $100 each).
17   This is less than 1% of total sales revenues for August 2009. During that same month,
18   chargeback rates for PureLift, Resveratrol, and PureCleanse were 11.06%, 4.28%, and 16.06%
19   respectively. PI Ex. 59, pp. 3058-59, 3061. Even allowing for 1% chargebacks for affiliate
20   fraud sales, the chargeback rates for these products greatly exceed credit card industry standards
21   and indicate fraud occurred.

22       **C.      Defendants' critique of Dr. Kleimann inaccurately characterizes her
23                testimony and does not contradict her opinion that the net impression of the
                 design of Defendants' websites has the effect of displaying important costs
24                and terms in an unclear and inconspicuous manner**

25           Defendants present the testimony of Dr. Ingrid Martin to critique Dr. Susan Kleimann's
26   analysis of the Defendants' websites. However, Martin misses a crucial analytical point that
     makes her opinion irrelevant as to the issues in this case. Her declaration does nothing to
27
     undercut Kleimann's opinion that Defendants' websites inadequately disclose the true terms
28

1 and conditions of the offers so that consumers who purchase are not likely to see or understand
2 what they are supposedly agreeing to.

3      Martin criticizes Kleimann for not analyzing the website behavior of all consumers, but
4 rather focusing on those who are in a "which-to-buy" mind set. Martin Dec., ¶¶ 14-23, pp. 5-8.
5 The error is Martin's. As Kleimann states in her Second Declaration, attached to this Reply:
6 "My analysis properly focused only on consumers who were ready to purchase and did
7 purchase the product, because those are the consumers for whom the adequacy of the terms and
8 conditions disclosures is relevant." PI Ex. 62, ¶ 3, p. 3183 (Second Declaration of Susan
9 Kleimann, PhD., filed with this Reply). As to these consumers, the website design techniques
10 Defendants used draw consumers' attention to product claims and away from the costs and
11 details of the purchase so that consumers are unlikely to understand what they will be charged.
12 PI Ex. 15, ¶ 18, pp. 1321-22.

13      Martin also incorrectly asserts that Kleimann's analysis assumes that consumers are
14 passive viewers of websites incapable of making choices. Martin Dec., ¶ 15, p. 5. To the
15 contrary, Kleimann states: "Consumers skim websites and choose what to read to match their
16 motivation. This is precisely why the design features in the websites I reviewed are able to
17 distract consumers from reading the important terms and conditions disclosures." PI Ex. 62,
18 ¶ 4, p. 3184. Kleimann's testimony strongly supports the FTC's deception allegations.

19      **D.      Defendants incorrectly and misleadingly state that the FTC has relied on
         websites that do not belong to Defendants**

20
21      Defendants present the testimony of Ben Charny, a private investigator, to claim that the
22 FTC has relied on websites that do not belong to Defendants or were inactive. Charny Dec.,
23 ¶¶ 5-8, p. 2. This is inaccurate and misleading. The FTC and its expert, Dr. Kleimann, have
24 relied only on evidence Defendants provided to the FTC to identify websites that belong to
25 them. Charny states that, <u>based on simple Whois searches</u> over the Internet, he was unable to
26 link Defendants to a large number of websites cited by the FTC. Id. at ¶¶ 12-13, pp. 3-5. Some
27 of the websites he states do not belong to the Defendants – such as Intelius – were not attributed
28 to Defendants by the FTC. Id. at ¶ 12, p. 4. The other websites he challenges in connection

1   with the Declarations of Kleimann, Durham, Daoust, and certain consumers, id. at Att. A, pp. 1-
2   4, do belong to Defendants but, because of Defendants' tactics to hide their involvement, it
3   requires more than a Whois search on the Internet to figure that out.  Some of these websites
4   belong to Farend Services Ltd., Besiana, or Rivierco, which are shell companies either owned
5   or controlled by the Defendants for the purpose facilitating merchant banking relationships.  PI
6   Ex. 2, pp. 39, 95; PI Ex. 3, pp. 207-13; PI Ex. 50, ¶ 9, p. 2436, Att. E., pp. 2469-70.  Others
7   belong to companies such as Netpaying, Inc., who were marketing products on behalf of
8   Defendants.  PI Ex. 63, pp. 3185-97.  Mobile Web Media, LLC, owns the remaining websites,
9   which are now being used to market a wide range of Defendants' research offers.  PI Ex. 64,
10  ¶¶ 8-34, pp. 3199-203 (Declaration of Burton Eggleston, filed with this Reply); PI Exs. 47-52,
11  pp. 3206-07; Setala/France Dec., ¶ 12, p. 4.  Defendants have contracted with Elizabeth Graver
12  to create Mobile Web Media, LLC, pursuant to a contract with Jesse Willms that is identical to
13  the contracts Peter Graver, Adam Sechrist, Brent Callister, and Carey Milne signed.  PI Ex. 8,
14  pp. 595-97.  The FTC is considering seeking to add Mobile Web Media, LLC, and Ms. Graver
15  as defendants in this action.

16  **E.    Defendants' claims that they made good faith efforts to comply with the law
17         and relied on third parties for compliance oversight are legally insufficient
               as a defense to FTC Act violations and are patently untrue and unsupported
               by the evidence**
18
19         The overarching theme of Defendants' opposition is that they made good faith efforts to
20  comply with the FTC Act by (1) reviewing their advertising and making adjustments; (2)
21  discontinuing the use of the word "FREE" in early 2009 and the term "RISK FREE" in late
22  2009; (3) reviewing FTC case law and guidance materials to make changes to ads to "render
23  them more compliant;" (4) providing post-sale confirmation pages displaying material terms of
24  the offers; and (5) other proactive efforts.  Def. Opp. at pp. 4-6.  Defendants also claim they
25  relied "heavily" on the oversight of third parties to ensure compliance with the law and
26  "remediated those risks which have been identified pursuant to their third-party oversight."
27  Def. Opp. at pp. 6-7.  To support their claims, Defendants have submitted declarations from
28

1  Jesse Willms and his employees (Bazinet, Ortegnon-Rico, Stefaniuk) and third party agents
2  (Porter, Chatterjee, Rana, Nandan).

3          The law is well established that good faith is not a valid defense to a Section 5 violation.
4  See, e.g., Feil v. FTC, 285 F.2d 879, 896 (9th Cir. 1960); FTC v. Direct Marketing Concepts,
5  Inc., 569 F. Supp. 2d 285, 302 (D. Mass. 2008); FTC v. World Travel Vacation Brokers, Inc.,
6  861 F.2d 1020, 1029 (7th Cir. 1988); FTC v. Hang-Ups Art Enterprises, Inc., No. 95-0027, 1995
7  U.S. Dist. LEXIS 21444, at *9-11 (C.D. Cal. Sept. 27, 1995) ("Good faith is not a defense to
8  relief sought under section 13(b) for violation of section 5 of the FTC Act."). In addition,
9  reliance on the advice of counsel – or of any third party – does not relieve Defendants of
10 liability for violations of the FTC Act. See Amy Travel Svcs. Inc., 875 F.2d at 575.

11         The evidence more clearly supports the conclusion that Defendants did not act in good
12 faith. Willms's first online business venture ended as a result of lawsuits filed against him. PI
13 Exs. 60 - 61, pp. 3064-182 (Microsoft and Symantec complaints, filed with this Reply). Since
14 then, Defendants have designed their websites so that consumers who decide to purchase do not
15 notice the true terms and conditions of their offers. As early as November 2008, Defendants'
16 third party business partners advised them that they should reduce chargeback rates by (1)
17 improving the disclosure of the negative option features, (2) discontinuing forced upsells, (3)
18 more prominently displaying costs and terms, (4) providing check boxes for consumers, and (5)
19 improving cancellation and refund practices. See, e.g., PI Ex. 3, pp. 256-64; PI Ex. 47, pp.
20 2259-60; PI Ex. 48, pp. 2276-84. The Defendants resisted making these changes because doing
21 so would mean they would make less money. Id. Eventually, the inability to obtain payment
22 processing for the trial offers and Google's restrictions on negative option offers drove
23 Defendants out of the health and beauty product market in late 2009. PI Ex. 3, pp. 256-64; PI
24 Ex. 50, ¶¶ 33-34, pp. 2621-36. By early 2010, Defendants instead began operating the Internet
25 penny auctions using similar deceptive tactics and hiding behind the U.S. corporations and their
26 nominee principals.

27         To bolster their "appearance" of good faith law compliance, Defendants also submitted
28 the declaration of Theodore Banks, a monitor that Defendants hired to audit Defendants'

1  compliance procedures. Banks concedes that he was hired only a short time before the filing of
2  his declaration and he was not able to review all of the documents related to Defendants'
3  compliance activities. Banks Dec., ¶ 9, pp. 4-5. He reviewed Defendants' compliance guides
4  (id.), some of Defendants' websites (id. at ¶10, pp. 5-6), and copies of some of Defendants'
5  email traffic (id. at ¶ 13, pp. 7-8) and concluded that Defendant Terra Marketing had made
6  "substantial compliance efforts, especially since mid-2009." Id. at ¶18, p. 14. However,
7  Banks's examination is a short-term retrospective review of Defendants' practices based on
8  selective information provided by Defendants. It has little probative value and is, in any event,
9  irrelevant to determining Defendants' liability under the FTC Act.

10        Finally, contrary to Defendants' claims, the third party customer service and fulfillment
11  centers and ad networks hired to conduct some of Defendants' business operations did not serve
12  as oversight for the business. These parties were not retained to provide oversight; they were
13  paid to adhere to scripts and ads that Defendants created and required them to use. The scripts
14  heavily emphasized providing barriers to cancellations and refunds, such as not disclosing
15  upsells when consumers canceled trial offers and charging consumers for the trials unless they
16  returned the product during the trial periods, despite that consumers, often received the product
17  after the trial period expired. See PI Ex. 50, Atts. C-D, pp. 2449-68, Atts. H-I, pp. 2480-501.
18  The declarations submitted by Defendants' employees and third party business partners to show
19  Defendants' law compliance and reliance on third party oversight are not credible. They are
20  self-serving statements of Defendants' paid agents, whom Defendants acknowledge have
21  independent liability for the deceptive practices,  and should be disregarded as irrelevant and
22  without credibility.

23  **III.   THE FTC HAS PROVIDED PROBATIVE AND SUBSTANTIAL EVIDENCE
           SHOWING THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS
24         CLAIMS THAT DEFENDANTS ENGAGED IN THE UNFAIR PRACTICE OF
           EVADING RISK MANAGEMENT RULES TO OBTAIN MERCHANT
25         ACCOUNTS**

26        The FTC has presented substantial evidence from Defendants' records and the records
27  of VISA, MasterCard, merchant banks, and payment processors showing that Defendants
28  created U.S. corporations, fronted by Defendants Peter Graver, Adam Sechrist, Brent Callister,

1 | Carey Milne, and recently Elizabeth Graver, and used them to obtain merchant accounts for
2 | processing consumers' payments that Defendants otherwise would not have been able to obtain
3 | because of their prior high chargeback rates and long history of non-compliance with VISA and
4 | MasterCard risk management rules. PI Ex. 48, pp. 2278-86; PI Ex. 50, ¶ 9, p. 2434, ¶¶ 24-35,
5 | pp. 2440-46. The evidence also shows that Defendants have used other individuals and
6 | companies for the same purpose. PI Ex. 2, p. 39; PI Ex. 3, pp. 192-96, 245-46, 254-60; PI Ex.
7 | 50, ¶¶ 27-29, 33, 35, pp. 2441-46; PI Ex. 63, pp. 3185-97. These practices are unfair and
8 | violate Section 5 of the FTC Act.

9 | To rebut this evidence, Defendants present the testimony of Ben Meltzer and Dennis
10 | Lormel to state that the Defendants disclosed to the payment processors that Jesse Willms was
11 | the beneficial owner of the corporations and, thus, were not keeping this information from the
12 | merchant banks or unfairly avoiding VISA and MasterCard risk management programs.
13 | Meltzer Dec., ¶¶ 15-17, pp. 5-7; Lormel Dec., ¶ 16, p. 7. Both Meltzer and Lormel erroneously
14 | suggest that, because the *payment processors* knew of Willms's ownership and control of these
15 | entities, the merchant banks and, therefore, VISA and MasterCard also knew. Meltzer Dec.,
16 | ¶¶ 15-17, pp. 5-7; Lormel Dec. ¶¶ 16-23, pp. 7-11. In fact, the evidence is clear that the
17 | merchant banks, VISA, and MasterCard did **not** know, and it is clear that Willms and the
18 | payment processors were intentionally keeping it that way. PI Ex. 8, pp. 647-52, 685-92; PI Ex.
19 | 49, p. 2313.

20 | Lormel also suggests that, because Jesse Willms signed corporate IRS documents and
21 | entered into service contracts with the nominee principals, he was not hiding his connection to
22 | the U.S. companies from the merchant banks and VISA and MasterCard. Lormel Dec., ¶ 11,
23 | pp. 5-6, ¶ 24, pp. 11-12. This is disingenuous. Filing documents with the IRS does not alert
24 | merchant banks or VISA/MasterCard of Willms's ownership interests in the U.S. corporations,
25 | because they do not have access to IRS filings. Nor does the argument that the U.S. companies
26 | were legally formed pursuant to contract demonstrate that merchant banks would know of
27 | Willms's beneficial ownership or that they were used entirely for legitimate purposes. Lormel
28 | Dec., ¶ 24, pp. 11-12.

1    An act or practice is unfair if (1) it causes or is likely to cause substantial injury to

2   consumers that (2) is not reasonably avoidable by consumers, and (3) is not outweighed by

3   countervailing benefits to consumers or to competition.  15 U.S.C. § 45(n).  Thus, the purpose

4   of the practices and the intention of the parties engaging in them is irrelevant.  VISA and

5   MasterCard risk management programs are designed to protect the integrity of the payment

6   processing system and to protect consumers from fraud.  Circumventing those programs

7   enabled Defendants to continue causing harm to consumers, who could not reasonably avoid the

8   injury of having their credit card or bank accounts charged as a result of deceptive sales

9   practices.  Without doubt, being able to continue deceptively selling products benefits neither

10  consumers nor competition.

11  **IV.   THE FACTS DEMONSTRATE THAT A PRELIMINARY INJUNCTION WITH
         STRONG INJUNCTIVE RELIEF AND AN ASSET RESTRICTION IS**
12  **WARRANTED IN LIGHT OF THE EGREGIOUSNESS OF DEFENDANTS'
         DECEPTIVE AND UNFAIR PRACTICES, THE LIKELIHOOD OF**
13  **RECURRENCE, AND THE AMOUNT OF CONSUMER INJURY ALREADY
         CAUSED AND THAT WILL LIKELY ENSUE**

14
         In light of the egregiousness of Defendants' unlawful conduct, the huge amount of
15
    consumer injury, and the likelihood that the unlawful conduct will continue, strong injunctive
16
    relief is warranted.  In particular, the FTC seeks conduct relief that would prevent Defendants
17
    from continuing to market products or services over the Internet that have negative option
18
    and/or continuity features.  To ensure that funds from these fraudulent practices can be traced
19
    and preserved for consumer restitution, asset restrictions on Defendants are also warranted.
20
         Section 13(b) of the FTC Act permits Courts to enter broad injunctive relief, including
21
    occupational bans, to "prevent transgressors from violating the law in a new guise."  FTC v.
22
    Wolf, No. 94-8119, 1996 U.S. Dist. LEXIS 1760, *26 (S.D. Fla. 1996) (citing FTC v. Ruberoid
23
    Co., 343 U.S. 470, 473 (1952).  The Supreme Court has recognized that the FTC "is not limited
24
    to prohibiting illegal practices in the precise form in which it is found to have existed in the
25
    past;" however, the injunction must bear a reasonable relation to the unlawful practices found to
26
    exist.  FTC v. Colgate-Palmolive Co., 380 U.S. 374, 395 (1965).  Courts mainly consider two
27
    factors in exercising their discretion to enter injunctive relief under Section 13(b): (1) the
28

1  deliberateness and seriousness of the present violation; and (2) the violator's past record. See

2  Sears. Roebuck & Co. v. FTC, 676 F.2d 385, 392 (9th Cir. 1982). Numerous courts have

3  imposed bans enjoining Defendants from future participation in a particular line of business.

4  See, e.g., FTC v. Gill, 265 F.3d 944, 957-58 (9th Cir. 2001) (ban on engaging in credit repair);

5  FTC v. Holiday Enter.. Inc., No. 1:06-cv-2939 (N.D. Ga. Feb. 5, 2008) (ban on involvement in

6  franchises, business opportunities, and business ventures); FTC v. Neiswonger, 494 F. Supp. 2d

7  1067, 1084 (E.D. Mo. 2007) (ban on marketing of business opportunities, including

8  telemarketing prohibition); FTC v. Int'l Prod. Design. Inc., No. 1:97-cv-01114-AVB (E.D. Va.

9  Jul. 12, 2007) (ban on participating in invention promotion services); FTC v. Five Star Auto

10  Club, 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000) (ban on multi-level marketing); FTC v. Publ.

11  Clearinghouse. Inc., No. S-94-623, 1995 U.S. Dist. LEXIS 19659, at *10-11 (D. Nev. May 12,

12  1995) (ban on participating in telephone premium promotion).

13        The evidence the FTC has produced shows consumer harm of nearly half a billion

14  dollars. Further, Defendants have demonstrated a consistent history of marketing products and

15  services over the Internet with deceptive claims, inadequate disclosures of negative option and

16  continuity features, and illusory cancellation and refund features. Indeed, Defendants refused to

17  change their practices in any meaningful way because to do so would have resulted in fewer

18  sales. See PI Ex. 3, pp. 190-92; PI Ex. 48, pp. 2276-84.

19        Defendants continue to offer services on the Internet with deceptive trial offer/negative

20  option/continuity plan features. PI Ex. 64, pp. 3198-208; Setala/France Dec., ¶¶ 1-17 and Atts.

21  A-F, pp. 1-87. Their current websites, owned by MobileWeb Media, LLC, with Elizabeth

22  Graver as its nominal officer, contain deceptive trial offers of consumer research services that

23  (1) do not clearly and conspicuously disclose the negative option feature and that consumers

24  will be billed recurring charges unless they cancel, or (2) impose significant difficulties in

25  canceling the programs and thus avoiding the recurring charges. Setala/France Dec., ¶¶ 8-9, p.

26  3, Att. D, pp. 44-45. None of these websites mention any costs until after the consumer has

27  typed in a search request. Id. at ¶¶ 5-7, pp. 2-3. When consumers click on the link to obtain a

28  report, a bright red screen pops up telling them why the trial offer only costs $1. Id. at Att. E, p.

1   54. This creates the net impression that consumers will only be charged $1, which is not
2   corrected by the small print price and term disclosures placed near the ordering box. Id. These
3   websites also do not comply with the Restore Online Shoppers' Confidence Act, Pub. L. No.
4   111-345, 124 Stat. 3618 (2010), which requires, among other things, the merchant to obtain
5   express informed consent from consumers to be billed for the recurring charges before
6   consumers submit payment information. Defendants' current websites do not obtain express
7   informed consent from consumers for the monthly charges. Under these circumstances, the
8   injunctive relief the FTC seeks is clearly warranted.

9           Defendants also argue that injunctive relief prohibiting them from marketing products
10  on the Internet with negative option and continuity features is unconstitutionally broad. An
11  injunctive remedy for a violation of the FTC Act is constitutional if is "reasonably necessary to
12  the prevention of future violations and does not impinge upon constitutionally protected
13  speech." Litton Indus. v. FTC, 676 F.2d 364, 373 (9th Cir. 1982) (citing United States v.
14  Reader's Digest Ass'n, 662 F.2d 955, 965 (3d Cir. 1981)). Regulation of commercial speech is
15  permissible "if the government's interest in regulation is substantial and if the regulation
16  directly advances the interest and is not more extensive than necessary." Id. The FTC has a
17  substantial interest in preventing deception. Prohibiting the precise practices that Defendants
18  have consistently used to cause harm – negative options and recurring charge features – is
19  reasonable and necessary to ensure that consumer harm does not continue. Courts have recently
20  enjoined other defendants engaged in nearly identical conduct from continuing to market their
21  products and services over the Internet using negative options features. See, e.g., FTC v.
22  Inc21.com Corp., 745 F. Supp. 2d 975, 1010 (N.D. Cal. 2010); FTC v. Swish Mktg., Inc., No.
23  5:09-cv-03814-RS (N.D. Cal. June 14, 2011); FTC v. Jeremy Johnson, No. 2:10-cv-02203-
24  RLH-GWF (D. Nev. Feb. 10, 2011).

25          Finally, Defendants argue that the asset restrictions the FTC seeks are overly
26  burdensome and that the FTC has not met its burden to show that there is a likelihood of
27  dissipation of assets, claiming that the FTC is seeking an asset freeze on the sole ground that the
28  Defendants committed fraudulent acts. Def. Opp. at pp. 35-37. Defendants cite FTC v. John

FTC Reply To Defendants' Opposition to PI and Motions To Strike and For Expedited Hearing - Page 16

1 Beck Amazing Profits, LLC, No. 2:09-cv-4719, 2009 U.S. Dist. LEXIS 130923 (C.D. Cal.
2 Nov. 17, 2009), for the proposition that evidence of misleading marketing practices, without
3 more, is insufficient to warrant an asset freeze.

4     Defendants offer the testimony of Bryan Moser, who asserts that Defendants had
5 significant expenses, there were no significant payments to Jesse Willms outside of the ordinary
6 course of business, and there is no evidence of unknown bank accounts owned or controlled by
7 Defendants. Moser Dec., ¶ 29, p.10. Moser's document review, however, did not include
8 banking activity for 2009, id. at ¶ 7, p.3, which is when Defendants extensively created offshore
9 shell corporations and used offshore bank accounts, and was the year during which Defendants
10 made the most money – over $300 million. PI Ex. 2, pp. 51-55; PI Ex. 3, pp. 192-96, 198, 254,
11 256-60; PI Ex. 50, ¶¶ 9, 28-30, pp. 2434, 2442-44. Moser completely ignores the evidence of
12 the offshore companies and accounts despite the fact that use of such companies and bank
13 accounts is a common tactic to avoid creditors and the payment of taxes.

14     For this reason, Defendants' reliance on the holding in Beck is misplaced. In Beck, the
15 Court denied the FTC's request for an asset freeze on the grounds that the only evidence the
16 FTC submitted was evidence of fraud. Beck, 2009 U.S. Dist. LEXIS 130923, at 846 (the Court
17 ultimately appointed a monitor over the defendants to safeguard funds). The Court, citing SEC
18 v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1106 (2d Cir. 1972), stated that additional
19 factors would have supported an asset freeze, such as evidence of uncertainty over the total
20 amount of defendants' proceeds and where the defendants' proceeds were located, and
21 defendants' failure to furnish information to remove the uncertainty. Id. The FTC has
22 submitted evidence sufficient to show that money from Willms's fraudulent businesses was
23 transferred to offshore companies and bank accounts, none of which has been accounted for by
24 Moser. PI Ex. 2, pp. 51-55; PI Ex. 3, pp. 192-96, 198, 254, 256-60; PI Ex. 50, ¶ 9, p. 2434,
25 ¶¶ 28-30, pp. 2442-44. Nor has Willms furnished the FTC with financial information to
26 account for this money. As such, the FTC can show a likelihood of dissipation of assets
27 sufficient to warrant the requested asset restrictions. If the Court is not inclined to order an
28

FTC Reply To Defendants' Opposition to PI and Motions To Strike and For Expedited Hearing - Page 17

1 asset freeze and repatriation of funds, the FTC requests, alternatively, that the Court order a full
2 accounting and restrictions on transfers of the funds to preserve the status quo.

3 **V.   DEFENDANTS' MOTION TO STRIKE CERTAIN EVIDENCE SHOULD BE DENIED**

Defendants' motion to strike a significant number of the FTC's exhibits on the ground
that they are not properly authenticated or are hearsay should be denied. The argument that
lack of authentication requires evidence to be stricken is specious. The nature of the documents
and the circumstances under which the FTC obtained them ensure that authentication is simply
a formality, easily accomplished by the FTC before trial. The materials sought to be excluded
include materials that Defendants produced voluntarily as part of an FTC investigation or in
response to FTC Civil Investigative Demands (CIDs) (PI Exs. 2, 3, and 8); documents produced
by third parties in response to CIDs (PI Exs. 9-12, 47-49, and 57); a public record filed in the
State of Utah (PI Ex. 5); testimony presented to a U.S. Senate Committee (PI Ex. 13); and
declarations of FTC staff (PI Exs. 50, 51, and 54) summarizing voluminous materials obtained
by the FTC during its investigation of Defendants.

As set forth below, all of the Exhibits are fully admissible under the Federal Rules of
Evidence (FRE). Even were the materials not admissible at trial, the standard for admission of
evidence in support of a motion for preliminary injunction (PI) is not the same as at trial. The
Ninth Circuit has long held that even normally inadmissible evidence may be given some
weight, when to do so serves the purpose of preventing irreparable harm before trial. Flynt
Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984); see also Ross-Whitney Corp. v.
Smith Kline & French Laboratories, 207 F.2d 190, 198 (9th Cir. 1953) (PI may be granted on
affidavits).

Courts have recognized that, in the context of issuing a PI, the court is not strictly bound
by all rules of evidence as it would be at trial. Ticketmaster LLC v. RMG Technologies, 507 F.
Supp.2d 1096, 1103 (C.D. Cal. 2007). Fed. R. Civ. P. 65, which governs issuance of PIs, notes
that only admissible evidence from the PI stage automatically "becomes part of the trial record
and need not be repeated at trial." Fed. R. Civ. P. 65(a)(2). The typical urgency of obtaining a

1  PI necessitates a prompt determination and makes it difficult to obtain testimony from persons

2  who would be competent to testify at trial. Flynt, 734 F.2d at 1394.

3        **A.**    **PI Exs. 2, 3, 8, 9-12, 13, 47-49, and 57 are self-authenticating and therefore admissible.**

4

5        Authentication of evidence is "satisfied by evidence sufficient to support a finding that

the matter in question is what its proponent claims." FRE 901(a). The government need only
6
make a *prima facie* showing of authenticity "so that a reasonable juror could find in favor of
7
authenticity or identification." United States v. Workinger, 90 F.3d 1409, 1415 (9th Cir. 1996).
8
Once the *prima facie* case for authenticity is met, the probative value of the evidence is a matter
9
for the trier of fact. Id. Documents produced by a party in discovery, such as PI Exs. 2, 3 and
10
8 (produced by Defendants in response to investigatory access letters and CIDs) are deemed
11
authentic when offered by the party-opponent. Maljack Prods., Inc. v. GoodTimes Home Video
12
Corp., 81 F.3d 881, 889 n. 12 (9th Cir. 1996); see also FTC v. Hughes, 710 F. Supp. 1520, 1523
13
(N.D. Tex. 1989) (holding documents produced in response to discovery requests were
14
authenticated under FRE 901(b)(4) and constituted party admissions under FRE 801(d)(2)(A)).
15
That the documents are in defendant's possession at the time of production is enough to
16
authenticate them. United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985); see also
17
Burgess v. Premier Corp., 727 F.2d 826, 835-36 (9th Cir. 1984).
18
      PI Exs. 9-12, 47-49, and 57 are business records produced by various third parties in
19
response to FTC CIDs. There is no evidence that the third parties have interests adverse to
20
Defendants. MGM v. Grokster, 454 F. Supp.2d 966, 972 (C.D. Cal. 2006) (a reasonable jury
21
could find documents authentic when produced by non-party business partners to defendant
22
whose interests are not adverse to theirs). Each was accompanied by a declaration or statement
23
from its custodian or a designated representative. A business record is self-authenticating when
24
"accompanied by a written declaration of its custodian or other qualified person, in a manner
25
complying with any Act of Congress." FRE 902(11). "A declaration that satisfies 28 U.S.C.
26
§1746 would satisfy the declaration requirement of Rule 902(11)." SEC v. Franklin, 348 F.
27

28

1   Supp. 2d 1159, 1161 (S.D. Cal. 2004) (quoting FRE 902(11) advisory committee's note). A
2   *prima facie* showing has been made as to their authenticity under FRE 901.

3           PI Ex. 13 consists of testimony before the U.S. Senate Committee on Commerce,
4   Science, and Transportation. As such it is self-authenticating under FRE 902(5). State ex rel.
5   Parikh v. Premera, No. C01-0476P, 2006 U.S. Dist. LEXIS 70933, at *22-23 (W.D. Wash. Sept.
6   29, 2006) (excerpt of record of hearing before House Subcomittee on Oversight and
7   Investigations is self-authenticating as a government publication under FRE 902(5)).

8           **B.      As a Public Record, PI Ex. 5 should be granted judicial notice.**

9           Judicial notice may be taken of "records of state agencies and other undisputed matters
10  of public record." Disabled Rights Action Comm. v. Las Vegas Events, Inc., 375 F.3d 861, 866
11  n. 1 (9th Cir. 2004); Reyn's Pasta Bella. LLC v. Visa, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (the
12  Court may "take judicial notice of court filings and other matters of public record"). PI Ex. 5
13  was filed in the State of Utah by the Division of Consumer Protection of the Utah Department
14  of Commerce. As such, it constitutes a public record filed by a state agency, entitled to judicial
15  notice by the Court.

16          **C.      PI Exs. 50, 51, and 54 are summaries of voluminous documents.**

17          Finally Defendants have moved to strike PI Exs. 50, 51, and 54. PI Ex. 50 (Durham
18  Declaration) is a summary of information obtained from Defendants' response to the FTC's
19  CIDs and third party CID responses. The responses are self authenticating as discussed *supra*.
20  PI Ex. 51 (Brannon-Quale Declaration) summarizes voluminous consumer complaints found in
21  the FTC databases, while PI Ex. 54 (Setala Declaration) summarizes the consumer complaints
22  produced by Defendants. FRE 1006 expressly states that "contents of voluminous writings,
23  recordings, or photographs which cannot conveniently be examined in court may be presented
24  in the form of a chart, summary, or calculation." The purpose of FRE 1006 is to allow the use
25  of summaries, in cases such as this, where the volume of documents being summarized is so
26  large as to make their use impractical or impossible; summaries may also prove more
27  meaningful to the judge. U.S. v. Johnson, 594 F.2d 1253, 1255 (9th Cir. 1979). The consumer
28  complaints that are the subject of the summaries are also admissible under FRE 807, the

1   residual hearsay exception. See, e.g., Figgie, 994 F.2d at 608-09 ("Conceivably, FTC could

2   bring letter-writers into court to swear, under oath and subject to cross-examination, that the

3   contents of their letters were true. But such efforts would not be reasonable."); FTC v.

4   Cyberspace.com, No. 0-1806, 2002 U.S. Dist. LEXIS 25565, at 813 n. 5 (W.D. Wash. Jul. 10,

5   2002), aff'd, 453 F.3d 1196 (9th Cir. 1996) (quoting Figgie and admitting emails and letters of

6   complaint under Rule 807). Because each of these declarations is a summary designed to assist

7   the Court in comprehension of the voluminous evidence, under FRE 1006, PI Exs. 50, 51, and

8   54 and their attachments should be admitted for purposes of preliminary injunction.

9   **VI.   AN EVIDENTIARY HEARING WITH EXPEDITED DISCOVERY IS NOT**
    **NECESSARY, WILL CAUSE UNDUE DELAY, AND WILL PROLONG**
10  **CONSUMER HARM**

11          Defendants also request that the Court hold a full evidentiary hearing with experts and

12  expedited discovery, in addition to the oral argument already scheduled. Def. Opp. at pp. 32-

13  37. Such proceedings are unnecessary, will cause undue delay in resolving the issues at hand

14  for purposes of a preliminary injunction, and will prolong ongoing consumer injury. At issue is

15  whether the FTC has met its burden that it is likely to succeed on the merits of its case and

16  whether the preliminary relief it seeks is warranted. The FTC has submitted a large body of

17  evidence for which Defendants have already been granted six weeks of additional time to

18  respond. Defendants now claim they require an opportunity to test the FTC's evidence through

19  discovery and cross examination. This request is unwarranted, particularly in light of the fact

20  that Defendants have already produced declarations from ten purported experts opining that the

21  FTC's evidence is deficient. The FTC respectfully requests that the Court enter the requested

22  injunction and decline to delay disposition of the FTC's motion for what can only be a lengthy

23  period of discovery and preparation for presentation of live testimony. To assist the Court, the

24  FTC is hand-delivering disks containing live recordings of Defendants' websites so that the

25  Court can evaluate those websites.

26

27

28

1 | Dated:   July 22, 2011

2 | Respectfully Submitted,

3 | s/Nadine S. Samter
NADINE S. SAMTER, WSBA #23881
4 | KATHRYN C. DECKER, WSBA #12389
Federal Trade Commission
5 | 915 Second Ave., Suite 2896
Seattle, WA 98174
6 | 206-220-6350 (voice)
206-220-6366 (fax)
7 | nsamter@ftc.gov; kdecker@ftc.gov

8 | Attorneys for Plaintiff Federal Trade Commission

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3

4

5

I hereby certify that on July 22, 2011, I electronically filed the foregoing **FTC'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTIONS TO STRIKE AND FOR EXPEDITED DISCOVERY AND EXPEDITED HEARING** with the Clerk of the Court using the CM/ECF system. I certify that I served the foregoing on the following parties via electronic mail and first class U.S. mail:

6

7

8

9

10

11

James A. Kaminski
Hughes & Bentzen, PLLC
1100 Connecticut Avenue, NW
Suite 340
Washington, D.C. 20036
Telephone: (202) 293-8975
Fax: (202) 293-8973
E-Mail: jkaminski@hughesbentzen.com

12

13

14

Attorney for Defendants Jesse Willms, 1021018 Alberta Ltd, 1016363 Alberta Ltd, 1524948 Alberta Ltd, Circle Media Bids Limited, Coastwest Holdings Limited, Farend Services Ltd, JDW Media LLC, Net Soft Media, LLC, Sphere Media, LLC, and True Net, LLC

15

16

17

18

Dawn C. Stewart
The Stewart Law Firm, PLLC
1050 Connecticut Avenue, NW, 10th Fl.
Washington, D.C. 20036
Telephone: (202) 772-1080
Fax: (202) 293-8973
E-Mail: dstewart@thestewartlawfirm.com

19

20

Attorney for Defendants Peter Graver, Adam Sechrist, Brett Callister, and Carey Milne

21

22

23

24

25

26

27

DATED: July 22, 2011

/s/ Nadine Samter
Nadine Samter
Attorney for Plaintiff  Federal Trade Commission
915 2nd Ave., Ste. 2896
Seattle, WA 98174
Telephone: (206) 220-4479
Fax: (206) 220-6366
E-mail: nsamter@ftc.gov

28