The Honorable Marsha J. Pechman

1

2

3

4

5

6

7

8

9

10 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
11 AT SEATTLE

12

13 | **FEDERAL TRADE COMMISSION,** | Case No. 2:11-cv-8028-MJP

14 Plaintiff,

15 v. | AMENDED COMPLAINT FOR
PERMANENT INJUNCTION AND OTHER
16 **JESSE WILLMS**, individually and as a | EQUITABLE RELIEF
director or owner of 1021018, 1016363, and
17 1524948 Alberta Ltd; Circle Media Bids
Limited; Coastwest Holdings Limited; Farend
18 Services Ltd; JDW Media, LLC; Net Soft
Media, LLC; Sphere Media, LLC; and True
19 Net, LLC;
**PETER GRAVER**, individually and as an
20 officer of JDW Media, LLC;
**ADAM SECHRIST**, individually and as a
21 director and shareholder of Circle Media Bids
Limited and manager of Sphere Media, LLC;
22 **BRETT CALLISTER**, individually and as
an officer of True Net, LLC;
23 **CAREY L. MILNE**, individually and as an
officer of Net Soft Media, LLC;
24 **ELIZABETH GRAVER**, individually and
as an officer of Mobile Web Media, LLC;
25

26

27

28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 1

**1021018 ALBERTA LTD,** also d.b.a. Just Think Media, Credit Report America, eDirect Software, WuLongsource, and Wuyi Source;
**1016363 ALBERTA LTD,** also d.b.a. eDirect Software;
**1524948 ALBERTA LTD,** also d.b.a. Terra Marketing Group, SwipeBids.com, and SwipeAuctions.com;
**CIRCLE MEDIA BIDS LIMITED,** also d.b.a. SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com;
**COASTWEST HOLDINGS LIMITED;**
**FAREND SERVICES LTD;**
**JDW MEDIA, LLC;**
**NET SOFT MEDIA, LLC,** also d.b.a. SwipeBids.com;
**SPHERE MEDIA, LLC,** also d.b.a. SwipeBids.com and SwipeAuctions.com;
**TRUE NET, LLC,** also d.b.a. Selloffauctions.com; and
**MOBILE WEB MEDIA, LLC**

Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 917(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c), to obtain preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for defendants' deceptive sales of products, programs, and services via the Internet, and for defendants' unfair conduct in making unauthorized charges to consumers' credit cards and bank accounts and in obtaining merchant processing accounts, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 1693o(c).

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 2

1    3.    Venue is proper in this district under 28 U.S.C. §§ 1391(b), (c) and (d), and 15
2  U.S.C. § 53(b).

3                                          **PLAINTIFF**

4    4.    **Plaintiff Federal Trade Commission** is an independent agency of the United
5  States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of
6  the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or
7  affecting commerce. The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which
8  prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting
9  commerce. The FTC also enforces EFTA, 15 U.S.C. § 1693 *et seq*, which regulates the rights,
10  liabilities, and responsibilities of participants in electronic fund transfer systems.

11    5.    The FTC is authorized to initiate federal district court proceedings, by its own
12  attorneys, to enjoin violations of the FTC Act and EFTA and to secure such equitable relief as
13  may be appropriate in each case, including rescission or reformation of contracts, restitution, the
14  refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b),
15  56(a)(2)(A), and 1693o(c).

16                                         **DEFENDANTS**

17    6.    **Defendant Jesse Willms** ("Willms"), a resident of Alberta, Canada, owns,
18  directs, or otherwise controls each of the corporate defendants. Willms uses or has used each of
19  the corporate defendants to operate his international enterprise marketing products, programs,
20  and services over the Internet. By and through the corporate defendants, he has harmed U.S. and
21  foreign consumers with his unfair and deceptive business practices. At all times material to this
22  complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the
23  authority to control, or participated in the acts and practices set forth in this complaint. Among
24  other things, Willms creates and/or approves the business plans and marketing materials used by
25  the corporate defendants, and negotiates and signs contracts on behalf of the corporate
26  defendants, including contracts for banking and payment processing services. In connection
27  with the matters alleged herein, Willms transacts or has transacted business in this district and
28  throughout the United States.

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 3

1

2       7.    **Defendant Peter Graver** (" Peter Graver"), a resident of Utah, is an officer of

3 defendant JDW Media, LLC, is the registered agent for defendant Sphere Media, LLC, and has

4 served as a signatory on Sphere Media bank accounts. At all times material to this complaint,

5 acting alone or in concert with others, he has formulated, directed, controlled, had authority to

6 control, or participated in the acts and practices of JDW Media and Sphere Media set forth in

7 this complaint. Peter Graver has contracted with Willms and the corporate defendants to provide

8 an array of services including, but not limited to, establishing bank accounts for Willms, setting

9 up companies for the purpose of obtaining banking and merchant processing services for

10 Willms, and participating in the management of said companies. In connection with the matters

11 alleged herein, Peter Graver transacts or has transacted business in this district and throughout

12 the United States.

13       8.    **Defendant Adam Sechrist** ("Sechrist"), a resident of Pennsylvania, is a director

14 and sole shareholder of defendant Circle Media Bids Limited and manager of defendant Sphere

15 Media, LLC. At all times material to this complaint, acting alone or in concert with others, he

16 has formulated, directed, controlled, had authority to control, or participated in the acts and

17 practices of Circle Media Bids and Sphere Media set forth in this complaint. Sechrist has

18 contracted with Willms and the corporate defendants to provide an array of services including,

19 but not limited to, establishing bank accounts for Willms, setting up companies for the purpose

20 of obtaining banking merchant processing services for Willms, and participating in the

21 management of said companies. In connection with the matters alleged herein, Sechrist transacts

22 or has transacted business in this district and throughout the United States.

23       9.    **Defendant Brett Callister** ("Callister"), a resident of Utah, is an officer of

24 defendant True Net, LLC. At all times material to this complaint, acting alone or in concert with

25 others, he has formulated, directed, controlled, had authority to control, or participated in the acts

26 and practices of True Net set forth in this complaint. Callister has contracted with Willms and

27 the corporate defendants to provide an array of services including, but not limited to,

28 establishing bank accounts for Willms, setting up companies for the purpose of obtaining

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 4

1   banking merchant processing services for Willms, and participating in the management of said
2   companies. In connection with the matters alleged herein, Callister transacts or has transacted
3   business in this district and throughout the United States.

4        10.    **Defendant Carey L. Milne** ("Milne"), a resident of Utah, is an officer of
5   defendant Net Soft Media, LLC. At all times material to this complaint, acting alone or in
6   concert with others, she has formulated, directed, controlled, had authority to control, or
7   participated in the acts and practices of Net Soft Media set forth in this complaint. Milne has
8   contracted with Willms and the corporate defendants to provide an array of services including,
9   but not limited to, establishing bank accounts for Willms, setting up companies for the purpose
10  of obtaining banking merchant processing services for Willms, and participating in the
11  management of said companies. In connection with the matters alleged herein, Milne transacts
12  or has transacted business in this district and throughout the United States.

13       11.    **Defendant Elizabeth Graver** ("Elizabeth Graver"), a resident of Utah, is an
14  officer of defendant Mobile Web Media, LLC. At all times material to this complaint, acting
15  alone or in concert with others, she has formulated, directed, controlled, had authority to control,
16  or participated in the acts and practices of Mobile Web Media set forth in this complaint.
17  Elizabeth Graver has contracted with Willms and the corporate defendants to provide an array of
18  services including, but not limited to, establishing bank accounts for Willms, setting up
19  companies for the purpose of obtaining banking and merchant processing services for Willms,
20  and participating in the management of said companies. In connection with the matters alleged
21  herein, Elizabeth Graver transacts or has transacted business in this district and throughout the
22  United States.

23       12.    **Defendant 1021018 Alberta Ltd.** is a Canadian limited liability company with
24  its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta. Defendant
25  Willms is the sole owner of this defendant. Its registered trade names are Just Think Media,
26  Credit Report America, Wulongsource, and Wuyi Source (collectively "Just Think Media").
27  Just Think Media also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB; 79
28  Charlton Road, Sherwood Park, AB; and #240, 11 Athabascan Avenue, Sherwood Park, AB.

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 5

1  Just Think Media transacts or has transacted business in this district and throughout the United
2  States.

3       13.     **Defendant 1016363 Alberta Ltd.** is a Canadian limited liability company with
4  its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta. Defendant
5  Willms is the sole owner of this defendant. Its registered trade name is eDirect Software.
6  eDirect Software also has used addresses at #204, 85 Cranford Way, Sherwood Park, AB, and 79
7  Charlton Road, Sherwood Park, AB. eDirect Software transacts or has transacted business in
8  this district and throughout the United States.

9       14.     **Defendant 1524948 Alberta Ltd.** is a Canadian limited liability company with
10 its registered place of business at #2500, 10104 103rd Avenue, Edmonton, Alberta. Defendant
11 Willms is the sole owner of this defendant. Its registered trade name is Terra Marketing Group;
12 Terra Marketing Group had done business under various names, including as SwipeBids.com
13 and SwipeAuctions.com. Terra Marketing transacts or has transacted business in this district and
14 throughout the United States.

15      15.     **Defendant Circle Media Bids Limited** is a private limited company
16 incorporated in England, with its registered place of business at 72 High Street, Haslemere,
17 Surrey, England. Circle Media Bids has done business under various names, including
18 SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com. Defendant Willms controls
19 Circle Media Bids pursuant to an agreement entered into between Willms and defendant
20 Sechrist. Under that agreement, defendant Sechrist established Circle Media Bids to facilitate
21 the operation of penny auctions, including those featured on SwipeBids.com,
22 SwipeAuctions.com, and Selloffauctions.com, and to secure banking and merchant processing
23 services for Willms. Circle Media Bids transacts or has transacted business in this district and
24 throughout the United States.

25      16.     **Defendant Coastwest Holdings Limited** is a Cyprus corporation with its
26 registered place of business at Vasilissis Frederikissis, 33, First Floor, Nicosia, Cyprus.
27 Defendant Willms is the sole owner of Coastwest Holdings, which Willms established to
28 facilitate his Internet operations, as well as to secure offshore merchant banking services.

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 6

1  Coastwest Holdings transacts or has transacted business in this district and throughout the United
2  States.

3        17.    **Defendant Farend Services Ltd**. is a Cyprus corporation with its registered
4  place of business at Athinodorou, 3, Dasoupoli, Strovolos, P.C. 2025, Nicosia, Cyprus.
5  Defendant Willms controls Farend Services, and has signed as "President" a Cease and Desist
6  entered into by Farend Services with the State of Utah.  Farend Services was established to
7  facilitate Willms's Internet operations, as well as to secure offshore merchant banking services
8  for Willms.  Farend Services transacts or has transacted business in this district and throughout
9  the United States.

10        18.    **Defendant JDW Media, LLC** is an Idaho limited liability corporation with its
11  registered place of business at 2184 Channing Way, #322, Idaho Falls, Idaho.  Defendant Willms
12  controls JDW Media pursuant to an agreement entered into between Willms and defendant Peter
13  Graver.  Under that agreement, defendant Peter Graver established JDW Media to facilitate
14  Willms's Internet operations and to secure banking and merchant processing services for
15  Willms.  JDW Media transacts or has transacted business in this district and throughout the
16  United States.

17        19.    **Defendant Net Soft Media, LLC** is a Utah limited liability corporation with its
18  registered place of business at 2150 S. 1300 E., Suite 500, Salt Lake City, Utah.  Net Soft Media
19  has done business as SwipeBids.com.  Defendant Willms controls Net Soft Media pursuant to an
20  agreement entered into between Willms and defendant Milne.  Under that agreement, defendant
21  Milne established Net Soft Media to facilitate the operation of penny auctions, including those
22  featured on SwipeBids.com, and to secure banking and merchant processing services for Willms.
23  Net Soft Media transacts or has transacted business in this district and throughout the United
24  States.

25        20.    **Defendant Sphere Media, LLC** is a Utah limited liability corporation with its
26  registered place of business at 906 W 400 S., Orem, Utah.  Sphere Media has done business
27  under various names, including as SwipeBids.com and SwipeAuctions.com.  Defendant Willms
28  controls Sphere Media pursuant to an agreement entered into between Willms and defendant

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 7

1 Sechrist. Under that agreement, defendant Sechrist established Sphere Media to facilitate the
2 operation of penny auctions, including those featured on SwipeBids.com and
3 SwipeAuctions.com, and to secure banking and merchant processing services for Willms.
4 Sphere Media transacts or has transacted business in this district and throughout the United
5 States.

6        21.    **Defendant True Net, LLC** is a Nevada limited liability corporation with its
7 registered place of business at 1555 E. Tropicana Ave., Suite 250, Las Vegas, Nevada. True Net
8 has done business as Selloffauctions.com. Defendant Willms controls True Net pursuant to an
9 agreement entered into between Willms and defendant Callister. Under that agreement,
10 defendant Callister established True Net to facilitate the operation of penny auctions, including
11 those featured on Selloffauctions.com, and to secure banking and merchant processing services
12 for Willms. True Net transacts or has transacted business in this district and throughout the
13 United States.

14        22.    **Defendant Mobile Web Media, LLC** is a Utah limited liability corporation with
15 its registered place of business at 9980 S 300 W, Suite 200, Sandy, Utah. Mobile Web Media
16 has also used the address at 147 West Election Road, Suite 200, Draper, Utah. Defendant
17 Willms controls Mobile Web Media pursuant to an agreement entered into between Willms and
18 defendant Elizabeth Graver. Under that agreement, defendant Elizabeth Graver established
19 Mobile Web Media to facilitate Willms's Internet operations and to secure banking and
20 merchant processing services for Willms. Mobile Web Media transacts or has transacted
21 business in this district and throughout the United States.

22        23.    The corporate defendants have operated as a common enterprise while engaging
23 in the deceptive, unfair, and unlawful acts and practices alleged below. The corporate
24 defendants have conducted the business practices described below through an interrelated
25 network of companies that have common ownership, control, officers, managers, business
26 functions, employees, and office locations, and have commingled funds. Because these
27 corporate defendants have operated as a common enterprise, each of them is jointly and severally
28 liable for the acts and practices alleged below. Defendant Willms has formulated, directed,

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 8

1  controlled, had the authority to control, or participated in the acts and practices of the corporate
2  defendants that constitute the common enterprise. Collectively the corporate defendants and
3  defendant Willms are referred to as the "Willms defendants."

4                                      **COMMERCE**

5        24.     At all times relevant to this complaint, defendants have maintained a substantial
6  course of business in or affecting commerce, as "commerce" is defined in Section 4 of the FTC
7  Act, 15 U.S.C. § 45.

8                          **DEFENDANTS' BUSINESS PRACTICES**
9                                      **Introduction**

10       25.     Using deceptive marketing tactics for a variety of products, programs, and
11  services offered via the Internet, the Willms defendants have made charges to consumers' credit
12  and debit cards that the consumers neither knew about nor agreed to. Since at least 2007, the
13  Willms defendants' illegal practices have raked in more then $467 million from consumers in
14  the U.S., Canada, the U.K., Australia, and New Zealand.

15       26.     The Willms defendants contract with a network of third parties known as
16  "affiliate marketers" to direct consumers to the Willms defendants' websites. The affiliate
17  marketers use a variety of e-commerce advertising techniques, including banner ads, pop-ups,
18  sponsored search terms, and unsolicited email to drive consumer traffic to "landing pages" (the
19  Willms defendants' websites) for the Willms defendants' offers. The Willms defendants provide
20  their affiliate marketers with creative content describing the offers for the affiliate marketers to
21  use in their advertising. Some affiliate marketers also create their own advertising. The Willms
22  defendants pay the affiliate marketers for each consumer who, originating from the affiliate
23  marketer's advertisement, lands on one of the Willms defendants' websites, enters his or her
24  credit or debit card information, and is successfully charged by the Willms defendants.

25       27.     Regardless of the specific product, program, or service offered – which has varied
26  widely, from teeth whiteners and quick weight loss products to work-at-home schemes and
27  penny auctions – the Willms defendants induce consumers to enter their credit or debit card
28  information by making false claims about the nature of the offer, including the total cost to the

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 9

1 consumer, recurring monthly charges that the Willms defendants make to the consumer's
2 account, and the availability of refunds.

3         28.     The Willms defendants also fail to disclose, or they disclose inadequately, the
4 actual terms and conditions governing the offer. Information critical to consumers' decision to
5 provide credit or debit card account information is displayed in small fonts, using pale colors
6 that are difficult to view. This information appears before or after long paragraphs and graphics
7 in places widely separated from the box where consumers are asked to enter billing information,
8 or appears on a separate "terms and conditions" or "terms of use" page, the information hidden
9 in lengthy and dense prose that is difficult to understand. Other features, such as streaming
10 video, graphics, differing colors and font sizes, and false claims about the limited availability of
11 the offer further distract consumers' attention away from important disclosures about cost,
12 recurring charges, or refund limitations.

13         29.     Through these means, the Willms defendants have charged consumers for
14 undisclosed membership or access fees, and for additional unwanted products, programs, or
15 services bundled in with the initial offer from which consumers could not opt-out (called "forced
16 upsells" in the industry). The Willms defendants have also made recurring monthly charges to
17 consumers' accounts to which consumers had not agreed, often for continued access to programs
18 or services that consumers did not know they were purchasing (called "continuity plans" in the
19 industry).

20         30.     In addition to their deceptive billing practices, in connection with weight loss and
21 colon cleansing products offered by the Willms defendants from 2007 through February 2010,
22 the Willms defendants made false and unsubstantiated representations that the products caused
23 rapid, effortless weight loss or could help prevent colon cancer. To lend credibility to these
24 assertions, the Willms defendants also falsely claimed that the products had been endorsed or
25 recommended by celebrities.

26         31.     The defendants obtain and retain merchant bank accounts through which charges
27 to consumers' VISA and MasterCard accounts can be processed. The Willms defendants'
28 deceptive sales practices, however, have generated a high rate of chargebacks (consumer efforts

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 10

1  to cancel or reverse charges to their credit card accounts), which has caused the credit card
2  chargeback monitoring system used by merchant banks to flag the defendants' merchant
3  accounts as problematic. Merchants, like the defendants, with flagged accounts must either
4  lower their chargeback rates or be expelled from the credit card processing system. The Willms
5  defendants, rather than change their business practices and reduce chargebacks, have provided
6  merchant banks with inaccurate information and manipulated sales data to create artificially low
7  chargeback rates. By these tactics, the defendants have been able to continue to process
8  undisclosed, unwanted, and unauthorized charges to consumers' accounts, causing significant
9  and widespread consumer injury.

10  ## The Willms Defendants' Offers

11      32.     The Willms defendants' offered products, programs, and services have changed
12  over time. From August 2007 through February 2010, the Willms defendants offered purported
13  risk-free trials of teeth whiteners, acai berry weight loss products, colon cleansers, and health
14  supplements containing resveratrol, the supposedly healthful ingredient in red wine. The Willms
15  defendants also offered purported risk-free trials of a work-at-home scheme, access to
16  government grants, and free credit reports.

17      33.     The Willms defendants changed the product names and associated website
18  landing pages frequently. Sometimes just the landing pages would change, and formatting of
19  graphics, pictures, disclosures, or the product claims would differ. Other times, the Willms
20  defendants would change the name of the product itself (even though the ingredients did not
21  vary) so that a particular affiliate marketer could have an "exclusive" offer, or the product could
22  be marketed as new, enhanced, or target a different market.

23      34.     The Willms defendants have offered weight loss products under many names
24  including, but not limited to, Wuyi Burn, Wuyi Tea, Wuyi Source, Easy Weight Loss Tea,
25  AcaiBurn, AcaiBurn Max, Ultra AcaiBurn, AcaiBurn Plus, AcaiEdge Max, Detox AcaiBurn,
26  Max AcaiBurn, Extreme AcaiBurn, Maximum AcaiBurn, Premium AcaiBurn, and AcaiSlim
27  Detox (collectively referred to as "AcaiBurn Products"). The Willms defendants' colon
28  cleansing products include, but are not limited to, PureCleanse, PureCleanse Detox, PureCleanse

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 11

1  Ultra, Ultimate PureCleanse, Nature PureCleanse, and PureCleanse Max (collectively referred to
2  as "PureCleanse products"). The Willms defendants' resveratrol products include, but are not
3  limited to, PureResV, ResvEdge, ResvElite, ResvSupreme, and Pureresver.

4      35.     The Willms defendants' teeth whitening products include, but are not limited to,
5  DazzleWhite, DazzleWhiteNow, DazzleWhitePure, DazzleWhiteSupreme, DazzleSmileNow,
6  DazzleSmilePro, DazzleSmilePure, DazzleSmileSupreme, DazzleWhitePro, PremiumWhitePro,
7  PremiumWhiteSource, PremiumWhiteUltra, and VibrantSmileKit.

8      36.     Other products offered by the Willms defendants included a work-at-home
9  scheme marketed under the names OnlineCashSuccessKit, QuickProfitKit, and
10 QuickProfitKitPro; a government grants program, marketed as SuccessGrants; and a free credit
11 report program called CreditReportAmerica.

12     37.     During this period, the Willms defendants also charged consumers for various
13 forced upsells, including programs called Insider Secrets Expert Tips package, Comprehensive
14 Weight Loss ebook, World Club Fitness, Fraud Protection, and ID Theft.

15     38.     Since at least March 2010, the Willms defendants also have marketed penny
16 auctions through web sites called SwipeBids.com, SwipeAuctions.com, and Selloffauctions.com
17 (collectively referred to as "SwipeBids.com"). Penny auctions offer consumers the opportunity
18 to bid on a variety of goods, including electronic devices, retailer gift cards, and even
19 automobiles, for a fraction of their market value. Before a consumer can participate in a penny
20 auction, the consumer must purchase bids that typically cost between fifty cents to one dollar.
21 Thus, regardless of whether a consumer ultimately wins or loses a penny auction, the consumer
22 has paid for each bid the consumer places during the auction. In a penny auction, every time a
23 bid is placed on an offered item, the cost of the item increases by a fixed amount, and the auction
24 deadline is extended by a short period of time. The winning bidder must pay the final bidding
25 price on the item, plus shipping and handling charges.

26     39.     Since at least January 2011, the Willms defendants also have marketed online
27 consumer research services through various websites including, but not limited to,
28 publicrecords1.com and cellphonenumberlookupus.com. The websites highlight different search

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 12

1 topics, such as ancestry records, cell phone numbers, criminal history records, and other
2 searches, but are similarly set up and perform the same basic search function.

### Misrepresentations About "Free," "Risk-free""Bonus," and "$1.00"

4     40.     Regardless of the offer, the Willms defendants induce consumers to provide
5 their credit or debit card account information by falsely promising that the product, program, or
6 service can be had on a "free" or "risk-free" trial basis for which consumers pay only a nominal
7 shipping and handling fee. In some instances, the Willms defendants have represented that the
8 product, program, or service is a "bonus" that consumers receive simply by signing up.

9     41.     In connection with their trial offers marketed prior to February 2010, the Willms
10 defendants routinely represented that the offers were "free" or "risk-free." For example, the
11 following and other similar representations appeared on pages of the Willms defendants'
12 websites for each of their offers:

13     a.     "Your risk-free trial is almost ready to ship. Simply use this 100% secure
14 order form to tell us how to bill the small cost to ship you your trial. Oh and don't worry,
15 today you are only being charged for the small shipping charge, and nothing more."

16     b.     "GET YOUR RISK-FREE BOTTLE TODAY!"

17     c.     "Let me allow you to evaluate the results before you pay a cent. The only
18 thing I ask is that you cover the small cost to ship it straight to your door."

19     d.     "We let you try it, before you buy it!"

20     e.     "If you order Resveratrol Edge with Acai today you can have a free trial
21 bottle and only pay for the shipping and handling."

22     f.     **"CLICK HERE** TO TRY IT FOR FREE! Just pay shipping!"

23     42.     Further highlighting that consumers' total monetary outlay was only the nominal
24 shipping and handling fee, many order pages included a summary of ordering information.
25 Consumers viewing such a summary had no reason to believe that they would be charged for the
26 trial product or the additional bonus products beyond the listed shipping and handling fee.

27     43.     In connection with their penny auction offers, the Willms defendants have
28 routinely represented that consumers would receive "bonus" bids when registering on their

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 13

1 websites. For example, the following and other similar representations appeared on pages of the
2 Willms defendants' penny auction websites:

3          a.       "What You Get: 300 Bonus Bids, Just for Signing Up." and

4          b.       **"CONGRATULATIONS! AS A BONUS YOU WILL RECEIVE 50**
5 **BIDS EACH MONTH. CLICK CONTINUE TO START BIDDING NOW."**

6     44.      In connection with the Willms defendants' consumer research service websites,
7 the Willms defendants routinely have represented that their trial offers cost $1.00. The
8 following are representative of claims that appeared on pages of the Willms defendants'
9 consumer research service websites:

10         a.       "$1 Special Price today with database trial."

11         b.       "Due to the nature of this valuable and sensitive information , there is a
12                  $1.00 processing fee for one report. Other companies offer you free
13                  reports, because they are only using public records. We charge you
14                  because we provide real results."

15         c.       "Why does it cost $1.00 For My Report and 5 Day Trial?" and

16         d.       "For Limited Time, We are offering Your Report for $1. Please Continue
17                  to Ensure You Get Your Report."

18    45.      These representations were followed by a prominent red button stating "SHOW
19 ME THE REPORT." Clicking this button transferred the consumer to the order page where the
20 consumer input payment information. Right below the order form another prominent red button
21 stated, "GET FULL REPORT NOW!" Pressing this button submitted the consumer's payment
22 information.

23    46.      In fact, the Willms defendants' trial offers and "bonus bids" were not free, risk-
24 free, or bonuses. Consumers who provided the Willms defendants their credit or debit card
25 information to cover the costs of shipping and handling or to facilitate future purchases of
26 auction items were charged for products, programs, and services that they did not know about
27 and had not agreed to purchase. For example, in connection with the Willms defendants "risk-
28 free" trial offers, some consumers were charged for a full month's supply of the relevant product

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 14

1   trial sample (typically $79.95) and were assessed a similar recurring monthly charge, while other
2   consumers were charged a "membership" fee for access to products at a reduced cost for a year.
3   Consumers also were charged monthly recurring fees for the so-called "bonus" products.
4   Cancelling these charges, or obtaining refunds, involved separate time-consuming phone calls
5   and other steps that made the process far from "risk-free."

6       47.    In connection with the Willms defendants' penny auction sites, the Willms
7   defendants' "bonus" bids were not bonuses at all, but rather, in connection with signing up,
8   consumers were charged for the 300 introductory bonus bids, typically $150.  The monthly
9   bonus bids were not free either, and consumers were charged $11.95 each month to receive that
10  "bonus."

11      48.    In connection with the Willms defendants' consumer research service sites, the
12  Willms defendants' $1 trial offer did not cost only $1, but rather, in connection with signing up
13  to purchase a report, consumers were charged $18.95 to $19.95 each month to receive the right
14  to order additional consumer research reports.

15                                           **Undisclosed Charges**

16      49.    The Willms defendants' representations about "free," "risk-free," and "bonus"
17  products, programs, or services caused consumers to believe that they would not be charged for
18  additional amounts after providing their billing information.  The Willms defendants failed to
19  disclose, or to disclose adequately, critical information about the additional charges associated
20  with these offers.

21                                           *Initial Charges*

22      50.    In connection with some of the Willms defendants' trial offers, the Willms
23  defendants failed to adequately disclose that consumers who did not affirmatively cancel within
24  a specified trial period would automatically be enrolled in a one-year membership program for
25  which the Willms defendants charged consumers an up-front, non-refundable fee, often $126.
26  The Willms defendants placed the non-refundable fee disclosure in various places on ordering
27  pages, but never in close proximity to the box where consumers entered their credit or debit card
28  information, in a font size and color comparable to those used for displaying other information

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 15

1   (including the numerous references to "free" and "risk-free" trials), or otherwise in a manner that
2   was clear and conspicuous and understandable. In addition, the charge for the non-refundable
3   fee was mentioned in the separate "terms and conditions" page associated with each offer. In
4   numerous instances, however, that "terms and conditions" page was not accessible from the
5   ordering page where consumers input their account information because there was no hyperlink
6   to it. Especially because the web pages repeatedly proclaimed that the trial offer was free or
7   risk-free, and that the only cost to the consumer was a nominal shipping and handling fee,
8   consumers had no reason to search out fine print disclosures or scrutinize dense "terms and
9   conditions" pages looking for information about additional charges or onerous cancellation and
10  refund policies. The Willms defendants never required consumers to click on or otherwise
11  indicate that they had read, understood, or agreed to those terms and conditions. Consumers who
12  did locate the page and tried to review it were confronted with a page packed with lengthy,
13  legalistic fine print that typically did not mention a membership fee until they had scrolled half-
14  way through the page.

15          51.     In other instances in connection with the Willms defendants' trial offers, the
16  Willms defendants failed to adequately disclose that consumers who did not affirmatively cancel
17  within a specified trial period – by following the Willms defendants' onerous and poorly
18  disclosed rules about cancellations – would automatically be charged for the trial product or
19  service. The initial charges for the Willms defendants' trial products, programs, and services
20  ranged from $40 to $90, depending on the product and the offer. Like the offers where the
21  Willms defendants failed to adequately disclose the annual $126 membership fee, although the
22  placement of the disclosures about the charges varied, the disclosures were not displayed clearly
23  and conspicuously in a place or manner where consumers likely would read and understand them
24  prior to entering their payment information (or any other time). Disclosures about charges to
25  consumers on the terms and conditions pages associated with these offers were similarly
26  obscure. As discussed above, consumers usually could not access the terms and conditions page
27  from the page where they entered payment information, and were not required to affirm that they
28  agreed to or understood the terms associated with their purchase.

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 16

52. In connection with the Willms defendants' penny auctions, the Willms defendants typically have failed to disclose adequately that consumers who entered their payment information would be immediately charged a one-year membership fee, often $150 or $159. Consumers' payment information was requested in a box titled "Where Do We Send Your Winning Auctions," which consumers associated with paying for auction items won, or shipping and handling charges, not with a membership fee. A separate box of information, titled "Membership Details" listed "Item: 1-Year Membership; You Pay: 50 cents/bid" and underneath the "1-Year Membership" stated "(Includes 300 Bids)." Underneath, a "You're Guaranteed to Win" box promises consumers that if they "do not win a single auction using the 300 start-up bids included, we will fully refund your bids." Consumers did not understand from this that they would be charged in connection with entering their payment information and joining Swipebids.com. The terms of use page associated with this offer – which consumers typically are not required to accept or agree to prior to joining – obliquely mentions the membership charge in a section detailing the process for exchanges and refunds, but nowhere does it affirmatively state that consumers who provide their credit or debit card information will be charged a membership fee.

*Monthly Recurring Charges*

53. In connection with some offers, consumers who failed to cancel their trial offer within a specific trial period were automatically enrolled in a monthly continuity plan and were charged each month for recurring shipments of the product or continued access to the program or service until the consumer cancelled. Consumers were not adequately told about these recurring charges at the time they provided their payment information and were not provided a way to avoid them. (This form of billing is sometimes known as a negative option continuity program.) At no point during the ordering process were consumers required to affirmatively agree to these ongoing charges.

54. In addition to the monthly recurring charges for the advertised product, most consumers who provided their credit or debit card information were also charged monthly recurring charges for two additional products that they did not order or even want. These upsells

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 17

1 were typically digital products (websites to which consumers were provided password access).
2 As discussed above, these purported upsells were often referred to as "bonuses" or otherwise
3 listed as special items that the consumer was receiving for free. For example, on one AcaiBurn
4 website, the Insider Secrets Experts Tips package and Comprehensive Weight Loss ebook were
5 described as "Today's Special #1 and #2 Included in Your Trial!" Without expecting to be
6 charged for these items, consumers had no reason to look for disclosures about these monthly
7 recurring fees. The Willms defendants' ordering pages typically provided information about the
8 monthly charges for upsells, but in fonts smaller than most others used on the page, in places
9 neither obvious nor unavoidable to consumers prior to consumers' entry of their account
10 information, and often buried in boxes with other fine print information. The charges were also
11 disclosed – in dense, fine print, in the middle of lengthy jargon-filled text – in the "Terms and
12 Conditions" page, but that page was not typically accessible from the ordering page where
13 consumers entered their account information. The Willms defendants did not adequately disclose
14 these recurring charges to consumers at the time they provided their payment information.
15 Consumers had no way to avoid these charges. At no point during the ordering process were
16 consumers required to affirmatively agree to these ongoing charges.

17       55.      In connection with their penny auction offers, the Willms defendants have also
18 charged consumers a monthly recurring fee. This fee, typically $11.95, is not disclosed at all
19 prior to the consumer's entry of payment information. As discussed above, because consumers
20 think that they are providing their account information so that they may be charged in the future
21 for any bids bought or items shipped, consumers have no expectation that their account will be
22 charged any amount, much less on a recurring basis. After consumers enter payment
23 information, a screen welcomes them to the auction site and in extra-large font tells consumers
24 that as a "bonus" they will receive 50 bids per month. In micro-print at the top of that screen is
25 the first mention of the monthly charge, and a box is provided that consumers may check to
26 purportedly avoid the charge. (Even this box is a red herring, because clicking on it does not, in
27 fact, provide consumers a way to cancel the recurring monthly charge.) Because many
28 consumers believe that the 50 bonus bids are free and do not expect to be charged for them, they

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 18

1 do not look for this information or for ways to avoid such charges. At no point during the
2 ordering process are consumers required to affirmatively agree to the ongoing charges.

3    56.    In connection with their $1.00 trial consumer research service offers, the Willms
4 defendants have also charged consumers a monthly recurring fee. This fee, either $18.95 or
5 $19.95, is not mentioned until the consumer reaches the order page and there it appears in a much
6 smaller and lighter colored font than the balance of the text and under the heading "Secure
7 Payment." The disclosure is overwhelmed by the representation on the prior web page that the
8 search costs just $1.00 and by the prominent red button that is the focus of the page and that urges
9 the consumer to click to get their full report now. There are no check boxes the consumer must
10 check confirming that they understand that they are agreeing to be charged $18.95 or $19.95 on a
11 monthly basis. These disclosures are not sufficient to overcome the net impression that the search
12 costs only $1.

13                          **Deceptive Refund Policies**

14    57.    The Willms defendants have routinely represented that they make full refunds to
15 consumers who are dissatisfied with their products, programs, or services. Sometimes the refund
16 process is even described as "easy."

17    58.    For example, in connection with the Willms defendants' trial product offers, the
18 following and other similar statements appeared on the Willms defendants' websites:

19         a.    "We are so confident that AcaiBurn is the most effective and powerful
20    anti-oxidant cleansing product on the market that if you do not find AcaiBurn right for
21    you we will gladly give you a full refund, no questions asked. You have nothing to lose
22    except the weight."

23         b.    "Our products are also backed by a risk-free guarantee."

24         c.    "TRUE SATISFACTION GUARANTEE. Should you decide to purchase
25    PureCleanse Pro after trying our trial sample bottle, we will back up your order with our
26    100% satisfaction guarantee."

27         d.    "Now Every Order Is Fully Covered By Our Iron-clad 60-day Money-back
28    Guarantee."

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 19

1   59.   In connection with the Willms defendants' penny auctions, the following and
2   other similar statements appeared on the Willms defendants' websites:

3           a.      "Easy Money Back Guarantee . . . Just Follow The 3 Easy Steps"

4           b.      "Although, most penny auction sites do not offer refunds to their
5   customers, we are so confident that you will win an auction with us that we created our
6   easy Money Back Guarantee; this means that if you are not completely satisfied with
7   Swipebids.com, and have not won any auction items, we will refund the price of your
8   original membership bid pack purchase back to you, no questions asked!"

9   60.   In numerous instances, the Willms defendants have not provided the promised full
10  refunds to consumers. Often, the Willms defendants' customer service agents have simply denied
11  the availability of refunds. Sometimes the Willms defendants have promised refunds, but never
12  actually issued them.

13  61.   In addition, in numerous instances, the process to obtain a refund, whether for one
14  of the Willms defendants' trial products, a monthly recurring charge, a forced upsell, or a penny
15  auction membership fee, is not "iron-clad," "easy," or "no questions asked." As further discussed
16  below, the Willms defendants often impose onerous, undisclosed conditions and limitations on
17  issuing refunds. In some instances, consumers only receive refunds after they complain to law
18  enforcement or the Better Business Bureau. Even in those instances, the Willms defendants
19  frequently have only issued partial refunds.

20                  **Undisclosed Limitations on Cancellations and Refunds**

21  62.   Although the Willms defendants made prominent representations about
22  "Satisfaction Guaranteed," "money back guarantee," and "risk-free," the Willms defendants
23  failed to inform consumers about important limitations on consumers' abilities to cancel future
24  charges and obtain refunds for past payments.

25  63.   In connection with their trial offers, the Willms defendants failed to adequately
26  inform consumers that in order to cancel the trial and avoid charges for the advertised product,
27  consumers were required to cancel and return the "free trial" product, and the Willms defendants
28  had to receive the returned "free trial" product, before the expiration of the trial period. For

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 20

1   offers with tangible products, the trial period was typically 14 days from the date of purchase of
2   the product, but for offers with digital products, such as the work at home products, consumers
3   had as short a period as 24 hours to cancel. Moreover, for tangible products, the Willms
4   defendants required consumers to bear the costs of returning the trial sample, including postage,
5   insurance, and delivery confirmation. The Willms defendants accepted returns only if the
6   consumer first obtained a cancellation number and a separate identification number from
7   customer service prior to shipping the return package. Consumers who did not successfully
8   cancel within the proscribed period were charged the full price of the product, which was not
9   refundable. If the next month's shipment had already left the warehouse, consumers had to return
10  that, too, or be charged (and if they waited to return multiple products at one time, they were only
11  eligible for a refund on the most recent shipment). Future recurring charges for the advertised
12  product would be cancelled, but no money would be refunded. Some of these requirements were
13  explained in the "terms and conditions" page associated with each offer, but the disclosures were
14  neither obvious nor avoidable.

15      64.     In connection with the Willms defendants' forced upsells, the Willms defendants
16  failed to disclose that consumers wishing to cancel had to call a separate toll free number *for each*
17  *upsell* (meaning that to escape all charges associated with the Willms defendants' "risk-free"
18  offer consumers needed to make three separate telephone calls). Moreover, the Willms
19  defendants failed to disclose that each upsell had a different "trial" period in which cancellations
20  were allowed. Consumers who failed to cancel within that trial window, typically 14 or 21 days,
21  would be charged the monthly recurring fee for each upsell product, a charge that was not
22  refundable. The short trial periods for the upsells were particularly pernicious because most
23  consumers did not know they were being charged for these products until they received their
24  monthly account statements and saw the charges – which by that time were not refundable. Even
25  then, some consumers did not notice the charges because, in numerous instances, the Willms
26  defendants intentionally charged odd amounts (e.g., \$3.24 or \$7.35), more reflective of a single
27  purchase than a recurring charge. The Willms defendants did not provide refunds for any but the
28  most recent charges to consumers' accounts.

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 21

1     65.    In connection with the recurring monthly charge for the Willms defendants' penny

2  auction offers, despite providing (in micro-print) a link to click for cancellation information, the

3  Willms defendants failed to disclose how to cancel the recurring monthly charge. Consumers

4  who did click to cancel were routed through an array of pages not one of which allowed

5  cancellation of the charge.

6     66.    In connection with the recurring monthly charge for the Willms defendants'

7  consumer research service offers, some of the sites have stated that in order to cancel, the

8  consumer must call the number on his or her credit card statement. Because the trial period only

9  lasts five or seven days, many consumers who wish to cancel would not be able to do so before

10  the expiration of the trial period. Further, when the consumer has attempted to cancel within the

11  trial period via the "live chat" option provided on some websites, the cancellation process

12  requires several steps that must take place over at least two days, and was not designed to ensure

13  that consumers who want to cancel during the trial period can easily do so.

14
### False and Unsubstantiated Efficacy Claims

15
*Weight Loss Claims*

16     67.    The Willms defendants have represented that use of the AcaiBurn and PureCleanse

17  products will cause rapid and substantial weight loss and that scientific evidence, including two

18  eight-week, placebo-controlled clinical studies, shows that AcaiBurn and PureCleanse cause rapid

19  and substantial weight loss. The following and other similar representations appeared in banner

20  advertising approved by the Willms defendants for use by their affiliate marketers and also on

21  multiples pages of the Willms defendants' websites:

22     a.    "Lose Weight Fast! Fit into your favorite Jeans! Lose Weight fast with

23  AcaiBurn."

24     b.    "Fast + Natural Weight Loss! A system to help you burn calories

25  faster is finally revealed in America!"

26     c.    "WARNING...The Acai Burn System was not created for those people who

27  only want to lose a few measly pounds. The AcaiBurn System was created to help you

28  achieve the incredible body you have always wanted...USE WITH CAUTION!"

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 22

d. "BACKED BY CLINICAL RESEARCH The AcaiBurn System is simply fast weight loss that works. The key ingredients in AcaiBurn were clinically tested and found to help cause up to 450% MORE WEIGHT LOSS than dieting and exercising alone. Our risk-free trial is in very high demand, and will not be available forever. AcaiBurn is composed of a breakthrough new formula that combines scientific clinical research with the amazing anti-oxidant power of Acai Berry."

e. "The average weight loss was 14.99 and 12.54 pounds with AcaiBurn's key ingredients vs. just 3.06 and 3.53 pounds with a placebo in two 8-week clinical studies. Both groups dieted and exercised. That means the key ingredients in AcaiBurn were found to cause up to 450% MORE WEIGHT LOSS than dieting and exercise alone will get you."

f. "But the true power of PureCleanse Pro comes from clinically proven ingredients (Garcinia cambogia extract, chromium polynicotinate, and Gymnema sylvestre extract). The average weight loss was 14.99 and 12.54 pounds with PureCleanse's key ingredients vs. just 3.06 and 3.53 pounds with a placebo in two 8-week clinical studies. Both groups dieted and exercised. That means the key ingredients in PureCleanse Pro were found to help cause up to 450% MORE WEIGHT LOSS than dieting and exercise alone will get you."

68. The AcaiBurn and PureCleanse products do not cause rapid and substantial weight loss, and the Willms defendants did not possess and rely upon a reasonable basis to substantiate representations that consumers who use the AcaiBurn and PureCleanse products will rapidly lose a substantial amount of weight.

*Colon Cancer Claims*

69. The Willms defendants also have represented that use of PureCleanse products helps prevent the development of colon cancer. The Willms defendants have used an embedded streaming video of a CBS Early Show interview with Katie Couric on many of the PureCleanse product websites. The title of the video clip is "CONQUERING COLON CANCER: PREVENTION AND TREATMENT." The video features, in addition to Ms. Couric, well

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 23

1  known actors Diane Keaton, Morgan Freeman, and Jimmy Smits talking about the dangers of

2  colon cancer.  Statements made during the video include, but are not limited to:

3         a.     "Colon cancer is the #2 cancer killer in the United States."

4         b.     "Women get colon cancer as often as men."

5         c.     "Hispanics are more likely to be diagnosed in advanced states of colon

6  cancer."

7         d.     "African-Americans have higher mortality rates from colon cancer."

8         e.     "130,000 people in the United States are diagnosed with colon cancer every

9  year."

10        f.     "56,000 people die every year from colon cancer."

11        g.     "Everyone is vulnerable."

12     70.     The Willms defendants juxtaposed the statements about the deadly nature of colon

13  cancer contained in the Katie Couric interview with numerous representations about PureCleanse

14  that implied that PureCleanse would help prevent the development of colon cancer.  For example,

15  the Willms defendants' websites have included one of more of the following statements:

16        a.     "Parasites & Toxic Build Up Could be haunting your body."

17        b.     "Promote Health & Longevity."

18        c.     "FLUSH BUILT UP WASTE."

19        d.     "Rid yourself of toxins and parasites."

20        e.     "Research-backed."

21     71.     The PureCleanse products do not help prevent the development of colon cancer,

22  and the Willms defendants did not possess and rely upon a reasonable basis to substantiate

23  representations that the PureCleanse products will help prevent the development of colon cancer.

24                  **False Celebrity and Other Endorsements**

25     72.     In addition to claims about the efficacy of their products, the Willms defendants

26  have displayed the images of celebrities, such as Oprah Winfrey and Rachael Ray, on their

27  websites, and have represented to consumers that such celebrities have endorsed one or more of

28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 24

1  the Willms defendants' products. For example, one of the Willms defendants' websites for Pro
2  AcaiBurn showed a picture of Rachel Ray and the statement "Featured on the Rachel Ray Show!"

3        73.     Neither Oprah Winfrey nor Rachael Ray has endorsed any of the Willms
4  defendants' products. Oprah Winfrey has sued Willms in the Southern District of New York for
5  the unauthorized use of her name and likeness on his websites.

6        74.     The Willms defendants also have placed on most of their websites the names and
7  logos for many news agencies and other trusted entities including, but not limited to, CNN,
8  MSNBC, USA Today, CBS, and 60 Minutes, in connection with statements like "Featured On" or
9  " As Seen On TV." None of these entities have endorsed or positively reported on any of the
10  Willms defendants' products.

11                    **Evading Risk Management Rules to Obtain Merchant Accounts**

12        75.     In numerous instances, the Willms defendants, as well as defendants, Peter Graver,
13  Sechrist, Callister, Milne, and Elizabeth Graver have submitted inaccurate information to
14  financial institutions and manipulated sales data reported to the credit card processing system in
15  order to obtain and retain access to merchant processing accounts through which consumers'
16  credit and debit cards may be charged.

17        76.     Merchants (like the Willms defendants) that want to accept credit cards for sales
18  transactions contract with financial institutions called "merchant banks." Merchant banks have
19  various underwriting criteria that a merchant must meet in order to establish a merchant account
20  with the bank. Because merchant banks want to avoid losses associated with consumer reversals
21  of credit card transactions (known as chargebacks), in many instances, these underwriting criteria
22  require that the terms and conditions of a sale are clearly and prominently disclosed to the
23  consumer before the consumer authorizes a credit card payment.

24        77.     On numerous occasions, the Willms defendants have been advised by merchant
25  banks or others involved in arranging for payment processing that their websites did not
26  adequately disclose to consumers the costs and terms of their offers. Rather than curing these
27  deceptions, the Willms defendants have created "dummy" or inactive web sites that were used
28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 25

1  only to show merchant banks their purported marketing materials. The Willms defendants then
2  directed consumers to different websites that do not include compliant language.

3      78.    In addition to meeting underwriting requirements with respect to the offer, in most
4  instances, the merchant bank also requires that the merchant be in good standing with the credit
5  card associations. In large part, this means that the merchant has a chargeback or reversal rate
6  that is acceptable to Visa and MasterCard.

7      79.    Both Visa and MasterCard have risk management divisions that monitor merchant
8  chargeback rates. A merchant's chargeback rate is calculated as a ratio or percentage. The
9  numerator is the number of transactions passing through the credit card system in a particular
10  month that are charged back to the merchant bank by the consumer or by the consumer's bank.
11  The denominator is the total number of transactions processed by that merchant through the credit
12  card system in the preceding month. The permissible chargeback ratio for Visa is 1%; the
13  permissible chargeback ratio for MasterCard is .5%. Credit card associations deem chargeback
14  rates exceeding these rates as an indication of a problem involving the merchant, including
15  unauthorized charges to a cardholder's account or deceptive business practices. For much of the
16  time that the Willms defendants marketed products using a trial offer enticement, their
17  chargeback rates far exceeded the chargeback ceilings set by Visa and MasterCard. During some
18  periods, the Willms defendants chargeback rates for some products were as high as 10% to 20%.

19      80.    Merchants with impermissible chargeback rates are required to reduce their rates
20  to an acceptable level. If they do not, or cannot, the merchant bank will terminate the merchant.
21  (VISA and MasterCard assess penalties on merchant banks that tolerate merchants with ongoing
22  high chargeback rates.) When a merchant bank terminates a merchant, the merchant is placed on
23  a list of terminated merchants (called the MATCH list) made available to other merchant banks.
24  Once on this list, the merchant may no longer be able to secure a merchant account.

25      81.    Shortly after they began accepting credit card payments, the Willms defendants'
26  chargeback rates exceeded the allowable ratios, and they were terminated by one or more
27  merchant banks and placed on the MATCH list. In response, the defendants created shell
28  corporations in the names of other people but which really belonged to the defendants.

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 26

1    Defendants then applied for merchant accounts using the shell corporations they had created.
2    Thus, the new merchant accounts could not be easily traced to the defendants. Individual
3    defendants Peter Graver, Sechrist, Callister, Milne, and Elizabeth Graver have participated in this
4    by, among other things, serving as nominees for Sphere Media and Circle Media Bids, and
5    signing applications for bank accounts and merchant processing applications for these entities.

6           82.    In addition, the Willms defendants have manipulated the manner in which
7    payment data has been submitted to the system. For example, they have structured their sales to
8    assess cardholder accounts for multiple charges of varying prices to artificially increase the
9    volume of sales and thereby lower the ratio of chargebacks to sales; frequently changed the
10   billing descriptors for their products and used multiple merchant descriptors for their products to
11   obscure the actual chargeback rate associated with their products; and engaged in "load
12   balancing," which involves balancing sales across multiple descriptors and through multiple
13   merchant accounts to artificially decrease their chargeback rate. The Willms defendants have
14   also processed payments outside the United States where some banks allow very high chargeback
15   rates and have frequently opened new merchant accounts and used numerous merchant accounts
16   at the same time.

17          83.    By submitting inaccurate information to merchant banks and manipulating
18   payment data, the Willms defendants were able to continue to accept credit card payments from
19   consumers for far longer than they would have otherwise been able to, causing substantial
20   consumer injury that was not avoidable by consumers. There are no countervailing benefits to
21   consumers or competition associated with these practices.

22                                     **Consumer Harm**

23          84.    As described above, the Willms defendants have deceived consumers across the
24   United States and worldwide out of millions of dollars. The Willms defendants'
25   misrepresentations, deceptive omissions, and unfair billing practices have generated more than
26   $467 million in gross sales, with unreimbursed consumer injury totaling more than $412 million.

27          85.    The Willms defendants are not ignorant of the harm they are causing, having been
28   advised of their deceptive practices directly by consumers seeking cancellations and refunds, in

1  consumer complaints to the Better Business Bureau, class action lawsuits by aggrieved
2  consumers, in news stories and expose's, by law enforcement agencies, and by third parties who
3  have terminated business relationships with them. Their chargeback and refund rates far exceed
4  the norm. Nevertheless, the Willms defendants have refused to change their business practices or
5  the manner in which they disclose material information.

6  ## VIOLATIONS OF THE FTC ACT

7        86.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts
8  or practices in or affecting commerce. Misrepresentations or deceptive omissions of material fact
9  constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. 15 U.S.C.
10 § 45(a). Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial
11 injury to consumers that consumers cannot reasonably avoid themselves and that is not
12 outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

13       87.     Section 12(a) of the FTC Act, 15 U.S.C. § 52(a), prohibits the dissemination of
14 any false advertisement in or affecting commerce for the purpose of inducing, or which is likely
15 to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of
16 Section 12 of the FTC Act, 15 U.S.C. § 52, AcaiBurn and Pure Cleanse, and other similar
17 products, are either a "food" or "drug" as defined in Section 15(b) and (c) of the FTC Act,
18 15 U.S.C. § 55(b) and (c).

19 ## COUNT ONE

20 ### Misrepresentations About Risk-free Trial Offers and Bonuses

21       88.     In connection with the advertising, marketing, promotion, offering for sale, or sale
22 of products, programs, or services, the Willms defendants have represented, directly or indirectly,
23 expressly or by implication, that consumers can obtain a product, program, or service on a "trial"
24 basis, for "free," or "risk-free" for only a nominal shipping and handling fee, or have represented
25 that consumers can obtain a product, program, or service as a "bonus" for which consumers
26 would not be charged.

27       89.     In truth and in fact, in numerous instances in which the Willms defendants have
28 made the representations set forth in Paragraph 88, consumers could not obtain products,

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 28

1 | programs, or services on a trial basis, for "free," or "risk-free" for only a nominal shipping and

2 | handling fee, or obtain products, programs, or services as a "bonus" without charge.

3 |      90.    Therefore, the making of each of the representations as set forth in Paragraph 88 of

4 | this Complaint constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act,

5 | 15 U.S.C. § 45(a).

6 | **COUNT TWO**

7 | **Misrepresentation About Refunds**

8 |      91.    In connection with the advertising, marketing, promotion, offering for sale, or sale

9 | of products, programs, or services, the Willms defendants have represented, directly or indirectly,

10 | expressly or by implication, that they will provide a full refund to consumers who request one.

11 |      92.    In truth and in fact, in numerous instances in which the Willms defendants have

12 | made the representation set forth in Paragraph 91, the Willms defendants do not provide a full

13 | refund to consumers who request one.

14 |      93.    Therefore, the making of the representation as set forth in Paragraph 91 of this

15 | Complaint constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15

16 | U.S.C. § 45(a).

17 | **COUNT THREE**

18 | **Failure to Disclose Charges to Consumers**

19 |      94.    In numerous instances, in connection with the advertising, marketing, promotion,

20 | offering for sale, or sale of products, programs, or services, the Willms defendants have

21 | represented, directly or indirectly, expressly or by implication, that consumers who provide their

22 | billing information will incur no risks or obligations, not be charged, or pay only a nominal fee.

23 |      95.    In numerous instances in which the Willms defendants have made the

24 | representations set forth in Paragraph 94, the Willms defendants have failed to disclose, or

25 | disclose adequately, material terms and conditions of the offer including, but not limited to, that:

26 |           a.    consumers who sign up for some of the Willms defendants' trial offers will

27 |           be enrolled in a membership program and charged an upfront membership fee if they do

28 |           not cancel within a certain time period;

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 29

1      b.     consumers who sign up for some of the Willms defendants' penny auction

2      programs will immediately be charged an upfront fee for registering for which there is no

3      opportunity to cancel;

4      c.     consumers who sign up for some of the Willms defendants' trial offers will

5      be charged the full price for a month's supply of the product, or a month's access to the

6      service or program, if they do not cancel and return the product within a certain time

7      period;

8      d.     consumers who sign up for some of the Willms defendants' penny auction

9      programs or trial offers for consumer research services will be enrolled in a membership

10     program and be charged a recurring monthly fee if they do not cancel within a certain time

11     period; or

12     e.     consumers who sign up for some of the Willms defendants' trial offers will

13     be enrolled in a membership program for upsell items and be charged recurring monthly

14     fees if they do not cancel within a certain time period.

15     96.    The Willms defendants' failures to disclose, or disclose adequately, the material

16     information described in Paragraph 95, in light of the representation as set forth in Paragraph 94

17     of this Complaint, constitute deceptive acts or practices in violation of Section 5(a) of the FTC

18     Act, 15 U.S.C. § 45(a).

19                                    **COUNT FOUR**

20          **Failure to Disclose Limitations on Cancellations and Refunds**

21     97.    In numerous instances, in connection with the advertising, marketing, promotion,

22     offering for sale, or sale of products, programs, or services, the Willms defendants have

23     represented, directly or indirectly, expressly or by implication, that consumers who sign up for

24     one of the Willms defendants' trial offers or penny auction programs will incur no risks, that their

25     satisfaction is guaranteed, or that they can obtain a full refund.

26     98.    In numerous instances in which the Willms defendants have made the

27     representations set forth in Paragraph 97, the Willms defendants have failed to disclose, or

28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 30

1  disclose adequately, material terms and conditions relating to cancelling future charges or
2  obtaining refunds including, but not limited to:

3          a.      that consumers who attempt to cancel and/or seek a refund must obtain a
4  return tracking number from the Willms defendants before returning the product;

5          b.      that consumers who seek to cancel and/or receive a refund will incur
6  additional costs in returning the product including, but not limited to, paying for return
7  shipping, insurance, and delivery confirmation;

8          c.      that consumers who seek to cancel the upsell products must cancel each
9  program separately within specific, different time periods to avoid additional charges; or

10         d.      the process for consumers to cancel the monthly recurring charges
11 associated with the Willms defendants' trial offers or penny auctions, and the details of
12 defendants' cancellation and refund processes.

13         99.    The Willms defendants' failures to disclose, or disclose adequately, the material
14 information described in Paragraph 98, in light of the representation as set forth in Paragraph 97
15 of this Complaint, constitute a deceptive act or practice in violation of Section 5(a) of the FTC
16 Act, 15 U.S.C. § 45(a).

## COUNT FIVE

### False and Unsubstantiated Product Claims

19         100.   In numerous instances, in connection with the advertising, marketing, promotion,
20 offering for sale, or sale of AcaiBurn and PureCleanse, the Willms defendants have represented,
21 directly or indirectly, expressly or by implication, that use of AcaiBurn and PureCleanse will
22 result in rapid and substantial weight loss, including the claim that individuals who used
23 AcaiBurn or PureCleanse lost 450% more weight than those who only dieted and exercised.

24         101.   In numerous instances, in connection with the advertising, marketing, promotion,
25 offering for sale, or sale of AcaiBurn and PureCleanse, the Willms defendants have represented,
26 directly or indirectly, expressly or by implication, that scientific evidence, including two eight-
27 week, placebo-controlled clinical studies, shows that AcaiBurn and PureCleanse cause rapid and
28 substantial weight loss.

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 31

1    102.   In numerous instances, in connection with the advertising, marketing, promotion,
2  offering for sale, or sale of PureCleanse, the Willms defendants have represented, directly or
3  indirectly, expressly or by implication, that use of PureCleanse will aid in the prevention of colon
4  cancer.

5    103.   The representations set forth in Paragraphs 100 through 102 are false, misleading,
6  or were not substantiated at the time the representations were made.

7    104.   Therefore, the making of each representation as set forth in Paragraphs 100
8  through 102 of this Complaint constitutes a deceptive act or practice and the making of false
9  advertisements, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

10                                    **COUNT SIX**

11                                **False Endorsements**

12    105.   In numerous instances, in connection with the advertising, marketing, promotion,
13  offering for sale, or sale of products, the Willms defendants have represented, directly or
14  indirectly, expressly or by implication, that their products are used, endorsed, or approved by
15  specifically identified celebrities, such as Oprah Winfrey and Rachael Ray.

16    106.   The representations set forth in Paragraph 105 are false or misleading.

17    107.   Therefore, the making of each of the representations as set forth in Paragraph 105
18  of this Complaint constitutes a deceptive act or practice and the making of false advertisements,
19  in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

20                                   **COUNT SEVEN**

21                **Unfairly Charging Consumers Without Authorization**

22    108.   In numerous instances, the Willms defendants have caused charges to be submitted
23  for payment to the credit and debit cards of consumers without the express informed consent of
24  consumers.

25    109.   The Willms defendants' practice as set forth in Paragraph 108 causes or is likely to
26  cause substantial injury to consumers that consumers cannot reasonably avoid themselves and
27  that is not outweighed by countervailing benefits to consumers or competition.

28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 32

1    110.   Therefore, the Willms defendants' practice as set forth in Paragraph 108 of this

2  Complaint constitutes an unfair act or practice in violation of Section 5 of the FTC Act, 15 U.S.C.

3  §§ 45(a) and 45(n).

## COUNT EIGHT

### Unfairly Evading Credit Card Transaction Risk Management Systems

6    111.   In numerous instances, as set forth in Paragraphs 75 to 83, the defendants have

7  provided merchant banks with false or misleading information to obtain and maintain merchant

8  accounts through which the Willms defendants place charges on consumers' credit and debit card

9  accounts.

10    112.   The defendants' act or practice as set forth in Paragraph 111, causes or is likely to

11  cause substantial injury to consumers that is not reasonably avoidable by consumers themselves

12  and is not outweighed by countervailing benefits to consumers or competition.

13    113.   Therefore, the defendants' act or practice as alleged in Paragraph 111 of this

14  Complaint constitutes an unfair act or practice in violation of Section 5 of the FTC Act, 15 U.S.C.

15  §§ 45(a) and 45(n).

## VIOLATIONS OF EFTA AND REGULATION E

17    114.   Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized

18  electronic fund transfer from a consumer's account may be authorized by the consumer only in

19  writing, and a copy of such authorization shall be provided to the consumer when made." Section

20  903(9) of EFTA, 15 U.S.C. § 1693a(9), provides that the term "preauthorized electronic fund

21  transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular

22  intervals."

23    115.   Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), provides that

24  "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a

25  writing signed or similarly authenticated by the consumer. The person that obtains the

26  authorization shall provide a copy to the consumer."

27    116.   Section 205.10(b) of the Federal Reserve Board's Official Staff Commentary to

28  Regulation E, 12 C.F.R. § 205.10(b), Supp. I, provides that "[t]he authorization process should

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 33

1   evidence the consumer's identity and assent to the authorization." *Id.* at ¶10(b), cmt 5. The

2   Official Staff Commentary further provides that "[a]n authorization is valid if it is readily

3   identifiable as such and the terms of the preauthorized transfer are clear and readily

4   understandable." *Id.* at ¶10(b), cmt 6.

5        117.   Pursuant to Section 917(c) of EFTA, 15 U.S.C. § 1693o(c), every violation of

6   EFTA and Regulation E constitutes a violation of the FTC Act.

7 

**COUNT NINE**

8 

**Unauthorized Electronic Fund Transfers from Consumers' Bank Accounts**

9        118.   In numerous instances, the Willms defendants have debited consumers' bank

10   accounts on a recurring basis without obtaining a written authorization signed or similarly

11   authenticated from consumers for preauthorized electronic fund transfers from their accounts,

12   thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of

13   Regulation E, 12 C.F.R. § 205.10(b).

14        119.   In numerous instances, the Willms defendants have debited consumers' bank

15   accounts on a recurring basis without providing to the consumer a copy of a written authorization

16   signed or similarly authenticated by the consumer for preauthorized electronic fund transfers from

17   the consumer's account, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and

18   Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b).

19        120.   By engaging in violations of EFTA and Regulation E as set forth in Paragraphs

20   118 and 119 of this Complaint the Willms defendants have engaged in violations of the FTC Act.

21   15 U.S.C. § 1693o(c).

22 

**CONSUMER INJURY**

23        121.   Consumers have suffered and will continue to suffer substantial injury as a result

24   of defendants' violations of the FTC Act and EFTA. In addition, the defendants have been

25   unjustly enriched as a result of their unlawful acts and practices. Absent injunctive relief by this

26   Court, the defendants are likely to continue to injure consumers, reap unjust enrichment, and

27   harm the public interest.

28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 34

1

## THIS COURT'S POWER TO GRANT RELIEF

2    122.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant
3  injunctive and such other relief as the Court may deem appropriate to halt and redress violations
4  of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable
5  jurisdiction, may award ancillary relief, including rescission or reformation of contracts,
6  restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and
7  remedy any violation of any provision of law enforced by the FTC.

8

## PRAYER FOR RELIEF

9        WHEREFORE, plaintiff Federal Trade Commission, pursuant to Section 13(b) of the FTC
10  Act, 15 U.S.C. § 53(b), and Section 917(c) of EFTA, 15 U.S.C. § 1693o(c), and the Court's own
11  equitable powers, requests that this Court:

12    1.    Award plaintiff such preliminary injunctive and ancillary relief as may be
13        necessary to avert the likelihood of consumer injury during the pendency of this
14        action, and to preserve the possibility of effective final relief including, but not
15        limited to, a preliminary injunction and an order freezing assets;

16    2.    Enter a permanent injunction to prevent future violations of the FTC Act and
17        EFTA;

18    3.    Award such relief as the Court finds necessary to redress injury to consumers
19        resulting from defendants' violations of the FTC Act and EFTA including, but not
20        limited to, rescission or reformation of contracts, restitution, the refund of monies
21        paid, and the disgorgement of ill-gotten monies; and

22    4.    Award plaintiff the costs of bringing this action, as well as such other and
23        additional equitable relief as the Court may determine to be just and proper.

24

25

26

27

28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 35

1  Dated: September 2, 2011

2

3                                    Respectfully Submitted,

4       WILLARD K. TOM
        General Counsel

5       ROBERT J. SCHROEDER
        Regional Director

6

7

8       s/Nadine Samter
        NADINE S. SAMTER, WSBA #23881
9       KATHRYN C. DECKER, WSBA #12389
        ELEANOR DURHAM
10      JULIE K. MAYER, WSBA #34638
        RICHARD MCKEWEN
11      Federal Trade Commission
        915 Second Ave., Suite 2896
12      Seattle, WA 98174
        206-220-4479 (Samter)
13      206-220-4486 (Decker)
        206-220-4476 (Durham)
14      206-220-4475 (Mayer)
        206-220-6366 (fax)
15      nsamter@ftc.gov
        kdecker@ftc.gov
16      edurham@ftc.gov
        jmayer@ftc.gov
        rmckewen@ftc.gov
17
        Attorneys for Plaintiff Federal Trade Commission
18

19

20

21

22

23

24

25

26

27

28

Amended Complaint for Permanent Injunction/Other Equitable Relief - Page 36

1

## CERTIFICATE OF SERVICE

2

     I hereby certify that on September 2, 2011, I electronically filed the foregoing
AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE

3

RELIEF with the Clerk of the Court using the CM/ECF System, which will send notification of
such filing to the following:

4

5

James A. Kaminski                             Jonathan N. Rosen
Hughes & Bentzen, PLLC               Shook, Hardy & Bacon, LLP
1100 Connecticut Avenue, NW         1155 F Street, NW, Suite 200

6

Suite 340                                  Washington, DC 20004-1305
Washington, D.C. 20036              (202) 639-5608

7

Telephone: (202) 293-8975          jrosen@shb.com
Fax: (202) 293-8973

8

E-Mail: jkaminski@hughesbentzen.com

9

Lynn Engel
Molly A. Terwilliger

10

Summit Law Group, PLLC
315 Fifth Avenue, S., Suite 1000

11

Seattle, WA 98104
(206) 676-7000

12

mollyt@SummitLaw.com;lynne@SummitLaw.com

13

Attorneys for Defendants Jesse Willms, 101636 Alberta Ltd., 1021018 Alberta Ltd., 1524948
Alberta Ltd., Circle Media Bids Limited, JDW Media LLC, Net Soft Media LLC, Sphere Media

14

LLC, True Net LLC, Farend Services Ltd., and Coastwest Holdings Ltd., Peter Graver, Adam
Sechrist, Brett Callister, and Cary Milne

15

Dawn C. Stewart

16

The Stewart Law Firm, PLLC
1050 Connecticut Avenue, NW, 10th Fl.

17

Washington, D.C. 20036
Telephone: (202) 772-1080

18

Fax: (202) 293-8973
E-Mail: dstewart@thestewartlawfirm.com

19

Attorney for Defendants Peter Graver, Adam Sechrist, Brett Callister, and Carey Milne

20

DATED: September 2, 2011        /s/ Nadine Samter

21

                                Nadine Samter
                                Attorney for Plaintiff  Federal Trade Commission

22

                                915 2nd Ave., Ste. 2896, Seattle, WA 98174
                                Telephone: (206) 220-4479;Fax: (206) 220-6366

23

                                E-mail: nsamter@ftc.gov

24

25

26

27

28