1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   FEDERAL TRADE COMMISSION,                    CASE NO. C11-828 MJP

11                        Plaintiff,             ORDER GRANTING
                                                 PRELIMINARY INJUNCTION
12          v.

13   JESSE WILLMS, et al.,

14                        Defendants.

15

16          This matter comes before the Court on Plaintiff's motion for a preliminary injunction.

17   (Dkt. No. 40.)  Having reviewed the motion, the oppositions (Dkt. Nos. 43, 45), the replies (Dkt.

18   Nos. 63, 65, 68), Defendants' surreply (Dkt. No. 73), and all related papers, and having held oral

19   argument on August 4, 2011, the Court GRANTS the motion and enters a preliminary injunction.

20                                          **Background**

21          The FTC accuses Jesse Willms of selling products and services over the internet in

22   violation of the Federal Trade Commission Act ("FTCA").  The FTC's lawsuit names several

23   corporations as defendants, where Willms is either the sole owner or president.  The FTC names

24   several individuals as defendants, where they allegedly created certain corporations to assist

1   Willms in securing merchant processing services. (Dkt. No. 40 at 7-8.)  Through these various

2   corporate entities, Willms is alleged to have violated the FTCA by engaging in misleading or

3   deceptive conduct targeted at consumers.  The FTC also claims Willms has moved assets to

4   offshore accounts to avoid scrutiny and liability.  The FTC addresses three types of internet-

5   based activities that Willms spearheaded.  The first two are alleged as past conduct, while the

6   latter remains actively on offer: (1) the sale of health and beauty supplements; (2) operation of

7   penny auctions; and (3) research services ranging from reverse telephone research to

8   genealogical research.

9   A.      Past Conduct

10          Starting in 2007, Willms and the other Defendants allegedly used deceptive marketing

11  tactics to sell various products, programs, and services through the internet.  These included

12  Acai-based weight loss supplements ("AcaiBurn"), colon cleansing supplements

13  ("PureCleanse"), teeth whiteners, and credit report programs.  Defendants marketed these

14  products and services as either free or risk-free trials in which the purchaser had to pay only a

15  nominal fee.  According to the FTC, the purchasers were not adequately informed that the

16  purchase was not free or that they were being enrolled in a recurring fee program wherein they

17  would be charged for products or services unless they opted out shortly after placing their order.

18  Although details of the charges were visible on Defendants' websites, they were de-emphasized

19  and placed such that it was not obvious to the consumer the products were not free or risk-free.

20          The FTC has produced statements from consumers who complain that they were unaware

21  of exactly how many services with recurring fees they were enrolled into and that they found it

22  exceedingly difficult remove themselves from the continuity plans.  Defendants often used

23  "upsells" to enroll a buyer of one product into several "free" trial programs for unrelated

24

products at the time of purchase.  For example, a customer might buy the weight loss supplement and then be instantly enrolled in three other programs, each of which had its own recurring monthly charges.  The information about the upsells was usually disclosed only on the ordering page, where the buyer was otherwise likely to focus on filing out the requested information to complete the sale.  Defendants assert they no longer offer upsells or enrollment in programs unrelated to the products actually for sale.  (Stefaniuk Decl. ¶ 11.)  Many consumers also complained about the cancellation and refunds policies.  If the consumer did not return the product and affirmatively cancel the service within a narrow window of time, they would be charged for the trial product itself and any recurring fees for enrollment in the continuity programs.  The FTC contends the terms of cancellation were not prominently displayed and customer complaints skyrocketed about the cancellation policies. Refunds were purportedly difficult to obtain.

The FTC also alleges that Defendants made false and misleading claims about the efficacy of the weight loss and colon cleansing products and used false celebrity endorsements. The FTC claims Defendants inaccurately marketed AcaiBurn, the weight loss supplement, as a product that would lead to massive and rapid weight loss without any scientific evidence.  The FTC also argues that the colon cleansing supplement, PureCleanse, was touted as preventing colon cancer without scientific support.  Lastly, the FTC alleges that Defendants used false celebrity endorsements to convince customers of the validity of the products.  Defendants used both Rachel Ray and Oprah Winfrey to market Acai-based supplements without permission from either individual.  (Pl Ex. 18 at 1705, 1708.)  The FTC claims these practices are attempts to mislead customers about the products' safety and reputation.

1    In late 2009, Defendants began operating penny auction websites in a manner the FTC

2  alleges violated the FTCA.  (See Stefaniuk Decl. ¶ 8.)  The FTC asserts the penny auctions use

3  misleading terms to lure customers in with the promise of winning expensive items for mere

4  pennies.  Users of the website are offered bonus bids, but the website requires an enrollment fee

5  of $150 and a recurring monthly charge of $11.95.  (Pl. Ex. 6 at 283.)  The membership fee and

6  recurring charges are not allegedly disclosed up front and are only set forth in small font.  The

7  FTC also contends that refunds of the service are extremely difficult to obtain, because the

8  customer is required to use up all of her bids without winning an item.  This has led to hundreds

9  of customer complaints with the Better Business Bureau and the FTC.

10    Throughout 2009 and 2010, the FTC alleges that Defendants unfairly and improperly

11  charged clients for services in violation of the FTCA.  As evidence, the FTC points to

12  Defendants' high charge-back rates from various credit card companies and the use of various

13  corporations as shells.  A charge-back occurs when the cardholder contacts his or her issuer to

14  dispute a charge and the charge is cancelled or refunded.  The ratio of charge-backs to a

15  merchant is monitored by Visa and MasterCard to ensure the merchant is not engaging in overly-

16  risky or predatory conduct.  Generally any rate of 1% or more will invite scrutiny from Visa or

17  MasterCard's risk management divisions.  (See Pl. Ex. 56 at 2907-08, 2918-19; Pl. Ex. 57 at

18  2986-87.)   The FTC alleges that Defendants had charge-back rates over 1% and as high as

19  22.7%.  Defendants allegedly could not get their charge-back rates down, and created new shell

20  companies that contracted with new and different merchant processors to avoid any investigation

21  from Visa and MasterCard.  These companies were used, the FTC alleges, to hide Defendants

22  Willms' association with them and artificially lower the charge-back rates.  Defendants also

23

24

1   allegedly changed the billing descriptions that appear on consumers' bills in order to deceive

2   consumers and avoid further scrutiny.

3        The FTC alleges Defendant Willms moved substantial funds offshore through the

4   corporate defendants to his corporations in Cyprus.  Defendants are alleged to have produced

5   over $400 million in gross revenues from their various products and services over the time in

6   question.  Emails the FTC has provided suggest that at least some of these funds were moved to

7   accounts in Cyprus, potentially to avoid scrutiny.  The FTC has requested a full accounting of the

8   funds, as it is not clear the full status of Defendants' holdings.

9   B.   Current Conduct

10        The FTC alleges that Defendants' current eighty-eight websites offering services ranging

11   from phone number lookup services to criminal background checks and to judicial records search

12   services violate the FTCA by inadequately disclosing the existence and terms of negative option

13   continuity plans with recurring monthly charges.  The websites contain nearly identical landing

14   pages where users enter in information about which they wish to search.  Several pages later, the

15   user is presented with a page stating "For a Limited time, we are offering your report for $1.

16   Please continue to ensure you get your report."  (See, e.g., Dkt. No. 79-1 at 6.)  The page also

17   says that the report just costs one dollar.  If the user presses the "SHOW ME MY REPORT!"

18   button, she is directed to a page where she can fill in her credit card information.  On the page in

19   larger font in red is stated "Your Report is Ready.  Please Order Now to Ensure You Get Your

20   Report."  (See e.g., Dkt. No. 79-1 at 7.)  In smaller font to the upper right of the page and below

21   the credit card information space is written "Pay just $1.00 today to receive your search report,

22   after 7 days if you do not cancel your account you will be billed $18.95 and each month

23   thereafter for up to 5 searches of 500 million records and additional searches for only $1.  To

24

1  cancel anytime simply contact us by calling 866-437-1702."  (See, e.g., id.)  These disclosures,

2  the FTC argues, are inadequate to satisfy the FTCA.

3  **Analysis**

4  A.   <u>Standards</u>

5  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

6  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

7  balance of equities tips in his favor, and that an injunction is in the public interest."  <u>Winter. v.</u>

8  <u>Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008).  The parties agree that the under § 13(b)

9  of the FTCA, the FTC does not have to demonstrate irreparable harm.  <u>F.T.C. v. Affordable</u>

10 <u>Media</u>, 179 F.3d 1228, 1236 (9th Cir. 1999); (see Dkt. No. 43 at 17; Dkt. No. 40 at 34).  "Under

11 this more lenient standard, 'a court must 1) determine the likelihood that the Commission will

12 ultimately succeed on the merits and 2) balance the equities.'" <u>Affordable Media</u>, 179 F.3d at

13 1233 (quoting <u>FTC v. Warner Commc'ns Inc.</u>, 742 F.2d 1156, 1160 (9th Cir. 1984)).  "Under

14 this Circuit's precedents, 'when a district court balances the hardships of the public interest

15 against a private interest, the public interest should receive greater weight.'"  <u>Id.</u> (quoting <u>F.T.C.</u>

16 <u>v. World Wide Factors, Ltd.</u>, 882 F.2d 344, 347 (9th Cir. 1989)).

17 B.   <u>Injunction</u>

18 The FTC argues that Defendants' past and current conduct violates Section 5(a) of the

19 FTCA.  The FTC also argues that certain claims about the weight loss and colon cleanse

20 products and the use of celebrity endorsements violates Section 12 of the FTCA.  Lastly, the

21 FTC argues Defendants violated Section 5(a) of the FTCA and the Electronic Funds Transfer Act

22 by using unauthorized billing practices.  The FTC has shown a likelihood of success on these

23 claims.

24

1       1.      Likelihood of Success on Merits: Section 5(a) Claims

2       The FTC argues that the following practices violate Section 5 of the FTCA: (1) failing to

3 disclose negative option and continuity features for services offered for low initial costs or that

4 were advertised as free or risk-free; (2) misleading consumers that cancellation and refunds were

5 easy to obtain.   The FTC has shown a likelihood of success that Defendants' practices violate

6 the Act.

7       a.   Standard

8       Section 5(a) of the FTCA declares unlawful "[u]nfair methods of competition in or

9 affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  15

10 U.S.C. § 45(a)(1).  "[A] practice falls within [Section 5(a)'s] prohibition (1) if it is likely to

11 mislead consumers acting reasonably under the circumstances (2) in a way that is material."

12 F.T.C. v. Cyberspace.com LLC, 453 F.3d 1196, 1199 (9th Cir. 2006).  "An act or practice is

13 deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead

14 consumers acting reasonably under the circumstances, and third, the representation, omission, or

15 practice is material."  F.T.C. v. Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009) (quotation

16 omitted).  "Deception may be found based on the net impression created by a representation."

17 Id. (quotation omitted).  "A misleading impression created by a solicitation is material if it

18 'involves information that is important to consumers and, hence, likely to affect their choice of,

19 or conduct regarding, a product.'"  Cyberspace.com, 453 F.3d at 1201 (quoting In re Cliffdale

20 Assocs., Inc., 103 F.T.C. 110, 165 (1984)).

21       b.   Past Practices

22       The FTC has provided substantial information showing Defendants' websites contain

23 misleading and deceptive offers or advertisement of "risk free" or "free" trial offers.  The basic

24 scheme used in the sale of weight loss, colon cleanse, and teeth whitener products was to lure the

1   purchaser in with only the payment of a low shipping fee.  This was not the only charge.  At the

2   same time as the trial package was ordered, the purchaser was enrolled in a membership plan that

3   included recurring charges unless the trial was cancelled in a narrow window of time.  As part of

4   the "upselling" practice, Defendants would also enroll the purchaser into several unrelated

5   programs that had recurring fees.  Similarly, Defendants offered the penny auction services with

6   purportedly "bonus" introductory bids, while the $150 membership fee and monthly charges

7   were not adequately disclosed.  (See Pl. Ex. 15, Attach. F., at 1497; Attach H at 1554-55; Pl Ex.

8   38 at 2016-18; Pl Ex. 40, at 2042-44; Pl. Ex. 43 at 2130.)  As explained further, the Court finds

9   these practices likely violate the FTCA.

10          The FTC provides substantial anecdotal testimony these billing practices were actually

11   misleading.  The FTC provides declarations from twenty-seven individuals who purchased

12   products or services from the Defendants in which they nearly all complain that the true costs of

13   the products were not made clear.  (Pl. Exs. 20-46.)  The FTC also offers a statistical sampling of

14   forty-eight customer calls made to Defendants that the Defendants provided, which show that

15   customer confusion over the terms of the offers.  (Declaration of Eleanor Durham ¶¶ 3-4.)

16   Forty-four percent of the forty-eight calls showed the consumer did not understand the true

17   nature of the charges, fifty-five percent of the call showed the customers were not aware they

18   were enrolled in a monthly program, and nineteen percent of the callers were unaware that they

19   were enrolled in related "upsell" programs.  (Durham Decl. ¶¶ 6.)  The FTC also provides data

20   from roughly six-hundred-thirty-five consumer complaints submitted to the FTC with regard to

21   the penny auction sites run by Defendants, wherein six hundred complained of being charged a

22   sign-up fee that was not fully disclosed.  (Brannon-Quale Decl. ¶¶ 3, 6.)  In addition, between

23   March 2010 to February 2011, the Better Business Bureau of Alberta, Canada received roughly

24

1,100 consumer complaints, most of which were about the charges made for the membership

fees and monthly bid fees. (Brozek Decl. ¶¶ 5-6.)  Defendants' argument that these sampling

sizes are too small to be significant misses the mark.  Consumer complaints are highly probative

of whether a practice is deceptive, and the mere fact that some persons did not know they were

deceived is not proof the acts are not deceptive.  See Cyberspace.com, 453 F.3d at 1199, 1201.

The FTC has provided an expert declaration from Susan Kleimann, who concludes the

AcaiBurn and SwipeBids websites are misleading.  First, she explains the landing pages

advertising the services do not contain the terms and conditions laying out the recurring charges

and membership fees. (Kleimann Decl. ¶¶ 20-21, 28, 39-40.)  Second, the websites use font size,

white spaces, color, boxes and arrows to emphasize the purported benefits of the products and

services, while minimizing the information about the costs. (Id. ¶¶ 42-53.)  Third, the websites

provide information about costs below the "fold" of the page, which is unreadable unless the

viewer scrolls down. (Id. ¶¶ 54-55.)  This helps obscure the material terms of the bargain.

Fourth, the webpages place the key information about the costs on pages where the user is

focused on filling out other information and distracted. (Id. ¶¶ 66-67.)  Defendants' expert,

Ingrid Martin, disputes Kleimann's conclusions.  Martin argues that Kleimann's approach

assumes improperly that buyers are not capable of making their own decisions.  This argument

may ultimately convince a jury, but it does not plainly rebut Kleimann's analysis of the

placement of key elements of the bargain outside of the buyer's view.  Martin's analysis does

directly controvert Kleimann's analysis that the net impression of the websites is misleading.

See Cyberspace.com, 453 F.3d at 1200.

Lastly, the FTC attacks the misleading nature of Defendants' cancellation policies and

practices.  Defendants made claims that refunds were available and customers would have full

1   satisfaction.  (See Pl Exs. 19 at 1728-30; 54 at 2730, 2737; 15 at 1418, 1497.)  Consumers were

2   often told that "you will never be charged" and that there was a "TRUE SATISFACTION

3   GUARANTEE" for many of the services.  (Dkt. No. 40 at 25; Pl. Ex. 54 at 2730; Pl. Ex. 15 at

4   1418.)  Yet refunds were usually only available by jumping through a myriad of hoops.

5   Cancellation periods were exceedingly short and the terms required for a refunds were difficult

6   to meet.  (Dkt. No. 40 at 25.)  For those enrolling in penny auctions, a refund was only possible

7   when all of the bids were used and the buyer won no items.  (Pl Ex. 43 at 2131 ¶ 6.)  Out of six-

8   hundred-thirty-five consumer complaints related to the auctions, five-hundred-twenty-nine stated

9   that they never received a refund, despite trying to follow the complex process.  (Pl. Ex. 51 at

10   2667.)  Similarly, with regard to the trial products, nearly half of those complaining to the FTC

11   did not receive full refunds.  (Pl Ex. 54 at 2697-98.)  The Court finds this likely violates § 5 of

12   the FTCA.

13        The Court finds the FTC likely to succeed on its claims that Defendants' websites

14   violated the FTCA.  The Court finds it likely that Defendants' failure to disclose the true terms of

15   the negative option and continuity plans, as well as their refund and cancellation policies violate

16   the FTCA.

17              c.   Current Practices

18        Defendants contend that their current websites are compliant with the FTCA, and that an

19   injunction should not issue.  The Court does not agree.  Regardless of these changes, the FTC is

20   likely to succeed in demonstrating that Defendants' current websites violate Section 5 of the

21   FTCA.

22        The FTC offers evidence of current websites Defendants operate likely violate Section 5

23   of the FTCA.  The Court has reviewed evidence submitted by the FTC showing Defendants new

24

1   websites selling phone number search services, as well as evidence submitted by Defendants of

2   eighty-eight websites they currently operate selling similar services.  These websites continue to

3   contain negative option and continuity plans (e.g."trial" packages) whose enrollment fees and

4   recurring costs are poorly disclosed.  Notably, the fact that the services for sale contain any

5   continuity plan or negative option is not disclosed until the user lands on the sixth page on which

6   he or she is required to enter credit card information.  The landing page and the four following

7   pages nowhere suggest there are any other charges but a one-dollar fee.  (See, e.g., Dkt. No. 79-1

8   at 2-6.)  The ordering page itself discloses the terms of the continuity plan in text that is smaller

9   than the other text.  The placement is not central, and there is no means of purchasing the service

10  without accepting enrollment into the continuity plan.  The website design and layout are similar

11  to those the FTC's expert reviewed and found to have a net impression that was misleading.

12  (See Kleimann Decl. ¶¶ 42-53.)  The Court finds the FTC likely to succeed in demonstrating

13  these websites violate the FTCA.

14          Defendants argue that their current websites are indistinguishable from a website run by

15  Intellius that the district court found not to be deceptive.  (Dkt. No. 73 at 7.)  The Intellius

16  websites merely highlight the reasons why Defendants' websites likely violate the FTCA.

17  (Engel Decl. (Dkt. No. 74) Ex. 2.)  First, the Intellius website contains a stand-alone page

18  explaining the terms of the offer, including the continuity plan and negative option, without any

19  requirement to input information.  Second, there is a separate box on the same page labeled

20  "Remove Identity Protect Trial" that the user may select to avoid being enrolled in the continuity

21  plan before making the purchase.  (Id.)  This is a key difference, as Defendants' websites do not

22  permit the purchase of the services without the continuity plan.  Third, the font size, placement

23  of text, and overall display of the page is entirely different.  The font size on the Intellius page

24

ORDER GRANTING PRELIMINARY
INJUNCTION- 11

1  appears roughly the same throughout the page disclosing the continuity plan, while Defendants

2  webpages minimize the font size and prominence.  Fourth, on the Intellius site, two successive

3  pages disclose to the user she is being enrolled in a continuity plan before she arrives at the page

4  where she has to input credit card information.  In the case before the Court, Defendants'

5  websites only make the disclosure of a negative option continuity plan on the same page where

6  the user is required to input credit card information.  There is no opportunity to unenroll from the

7  trial plan before purchasing the service.  As the Ninth Circuit has held, even if the solicitation

8  contains truthful disclosures, it may still leave a net impression that is misleading and violates

9  the FTCA.  Cyberspace.com, 453 F.3d at 1200.  The comparison of Defendants' websites to the

10 Intellius website Defendants present helps reaffirm the FTC's likelihood of success.

11     Defendants' experts do not rebut the FTC's showing that the websites are likely

12 deceptive under the FTCA.  Ingrid Martin and Thomas Maronick argue that the fees are

13 adequately disclosed and placed on the websites.  The experts conclude that no reasonable

14 consumer would be deceived, a highly speculative proposition.  The FTC's expert analysis of

15 websites similar to those Defendants currently operate suggests a different view: that the

16 disclosures do not satisfy the FTCA and may leave a net impression that is misleading and

17 deceptive.  Having reviewed the evidence of the current websites, the Court finds the FTC has

18 shown a likelihood of success on their claim that the current websites violate the FTCA by

19 inadequately disclosing the negative option and continuity plans.

20     2.    Likelihood of Success on Merits: Section 12 Claims

21     The FTC argues Defendants have violated Section 12 of the FTCA by making false

22 claims about AcaiBurn and PureCleanse products; and (2) by using false celebrity or other

23 endorsements.

24

1    Section 12 of the FTCA is specifically directed to false advertising.  F.T.C. v. Pantron I

2  Corp., 33 F.3d 1088, 1095 (9th Cir. 1994).  "That section prohibits the dissemination of 'any

3  false advertisement'' in order to induce the purchase of 'food, drugs, devices, or cosmetics.'" Id.

4  (quoting 15 U.S.C. § 52(a)(2)).  The dissemination of any such false advertisement is an "unfair

5  or deceptive act or practice in or affecting commerce" within the meaning of Section 5 of the

6  FTCA.  15 U.S.C. § 52(b).  The Act defines "false advertisement" as "an advertisement, other

7  than labeling, which is misleading in a material respect."  15 U.S.C. § 55.  The FTC generally

8  satisfies its burden by showing the advertisement is false or by showing the advertiser "lacked a

9  reasonable basis for asserting that the message was true."  Pantron I, 33 F.3d at 1096 (quotation

10  omitted).  A representation may be misleading if express or implied.  F.T.C. v. Figgie Int'l, Inc.,

11  994 F.2d 595, 604 (9th Cir. 1993).

12    The FTC has shown a likelihood of success on its claim Defendants falsely advertised the

13  effectiveness of the AcaiBurn product.  AcaiBurn was advertised as a weight loss product, a

14  claim that "the key ingredients in AcaiBurn were found to cause up to 450% MORE WEIGHT

15  LOSS than dieting and exercise alone will get you."  (Pl Ex. 15 at 1355, 1406, 1518 and 1442

16  (emphasis in original).)   The FTC provides a declaration from Robert F. Kushner, M.D., an

17  expert on obesity and weight loss, who states that these ingredients will not cause rapid,

18  substantial weight loss.  (Pl. Ex. 16 at 1589.)  In response, Defendants offer the declaration of

19  Frank Greenway, M.D., who argues that the AcaiBurn product was marketed as just one

20  component of a weight loss regime, and that the claims about rapid weight loss were not false.

21  (Dkt. No. 56 at 1-6.)  However, Dr. Greenway's opinion does not provide any factual basis that

22  substantiates Defendants' claim that the key ingredients of AcaiBurn will cause rapid weight

23  loss.  The Court finds the FTC has a likelihood of success on this claim.

24

1      The FTC also argues that the PureCleanse products "made strongly implied

2  representations . . . [they] help prevent colon cancer." (Dkt. No. 40 at 28.)  The FTC argues an

3  embedded video of Katie Couric on the PureCleanse website discussing colon cancer misled

4  consumers to think the cleansing of the colon would prevent cancer.  (Id.)  Defendants respond

5  by arguing that nowhere did the website actually state that the PureCleanse would prevent colon

6  cancer.  Ingrid Martin, a marketing expert, avers that no one would conclude that PureCleanse

7  prevents colon cancer. (Dkt. No. 51.)  Martin argues that the video of Couric only goes on to

8  show that the colonoscopies are important thing to obtain in order to prevent and catch colon

9  cancer at an early stage. (Dkt. No. 51 at 9-10.)  The inclusion of the video, however, suggests

10  that the pills may have a strong correlation to prevention of colon cancer, a fact that has not been

11  shown to be true.  While this is a close question, the Court is persuaded that the FTC has a

12  likelihood of success on the merits.

13      The FTC also argues that the use of celebrity endorsements to advertise the products

14  violates § 12 of the FTCA.  Defendants offer no response.  This is unsurprising, as both Rachel

15  Ray and Oprah have denounced the use of their personalities to advertise these products.

16      The Court finds the FTC has a likelihood of success on its § 12 claims tied to

17  Defendants' statements about the efficacy of their products, and the use of false celebrity

18  endorsements.  Although there is no evidence that Defendants continued claims and

19  endorsements, the Court finds it proper to issue an injunction barring such activity.  See FTC v.

20  Colgate-Palmolive Co., 380 U.S. 374, 395 (1965).   Defendants do not seem to disagree.

21  Defendants' proposed injunction forbids any misrepresentation of "[a]ny material aspect of the

22  benefits, performance, efficacy, nature or central characteristics of the product, program or

23

24

service" and misrepresenting any celebrity endorsements.  (Dkt. No. 73-1 at 8, 13.)   The Court

finds an injunction appropriate to forbid such activity.

       3.    <u>Likelihood of Success on Merits: Unauthorized Billing Practices</u>

      The FTC argues Defendants have violated Section 5 of the FTCA by charging

consumers' accounts without express informed consent and ignoring proper attempts to cancel

charges.  (Dkt. No. 40 at 41.)  The evidence is sufficient to support a finding a likelihood of

success for the FTC.

      As explained above, Section 5(a) of the FTCA declares unlawful "[u]nfair methods of

competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting

commerce."  15 U.S.C. § 45(a)(1).  An act is unfair if it "causes or is likely to cause substantial

injury to consumers which is not reasonably avoidable by consumers themselves and not

outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).

Courts have found a violation of Section 5(a) where the defendant has withdrawn money from a

consumer's bank account without informed consent.  <u>See</u> <u>F.T.C. v. Global Marketing Group,</u>

<u>Inc.</u>, 594 F. Supp. 2d. 1281, 1288-89 (M.D. Fla. 2008); <u>F.T.C. v. J.K. Publications, Inc.</u>, 99 F.

Supp. 2d 1176, 1201 (C.D. Cal. 2000) (noting that debiting a consumer's account without

authorization is an unfair practice under the FTCA).  The FTC also argues these practices

violated the Electronic Funds Transfer Act and its regulations because Defendants failed to

obtain written authorization from consumers for the merchant to place recurring charges on

consumers' debit accounts, and provide a copy of the written authorization to the consumers.

<u>See</u> 15 U.S.C § 1693(a); 12 C.F.R. §205.10(b).  Failure to comply with these requirements is a

violation of the FTCA, 15 U.S.C. § 1693o(c).

1    The FTC argues that the high charge-back rates from Visa and MasterCard to Defendants

2    is evidence that Defendants were making unauthorized charges to consumers.  (Dkt. No. 40 at

3    30-32.)  Defendants do not necessarily dispute that they had charge-back rates above the 1%

4    limit that Visa and MasterCard require, and that they were as high as 22.7%.  (Chen Decl.)

5    Throughout 2009, companies associated with Defendant Willms had very high charge-back

6    rates.  (Id. at 13-19.)  Many of the charge-backs were coded as unauthorized charges or

7    fraudulent charges.  (Durham Decl. ¶¶ 17-23, 33.)  For example, from July 1, 2009 to August 18,

8    2009, MasterCard had 1,273 charge-backs (thirty-eight percent of the total) that were coded as

9    "fraud transaction – no cardholder authorization" or "non-possession of card" as the reason for

10   the chargeback.  (Id. ¶ 18.)  This significant level was found throughout 2010.  (See id. ¶ 33.)

11   The FTC alleges that Willms and the other individual defendants tried to minimize charge-backs

12   by using splitting up charges, relabeling them in a confusing way, and processing sales through

13   multiple merchant accounts with different payment processors.  (See Pl Ex. 381-82, 2904, 2917,

14   2434.)  Defendants also allegedly created different corporations with nominee principals to

15   obtain merchant accounts that would appear unrelated to Willms' companies already flagged by

16   Visa and MasterCard.  (Pl Ex. 56 at 2921-22; Pl Ex. 50 at 2442-43, 2351-2665.)

17   The Defendants present a substantial defense that the use of corporate affiliates to obtain

18   merchant processing was not an unfair practice that violates the FTCA, and that the affiliates

19   were responsible for the high chargebacks.  First, Defendants argue that because merchant

20   processers require an American citizen to be the signatory, Willms was required to use other

21   individuals to open these accounts.  (Meltzer ¶¶ 9-13.)  Defendants stress the Willms did not hide

22   his beneficial interest in the companies and that he never directly dealt with Visa or MasterCard.

23   (Id. ¶¶ 15-17.)  Willms states that he used multiple processors "to obtain increased volume to

24

1  satisfy the bona fide customer demand for his product and not for any other reason." (Willms

2  Decl. at 20.)  Defendants argue there was no motive for using multiple processors as part of a

3  deceptive practice.  Lastly, Defendants argue that they were "repeatedly victimized by affiliate

4  fraud." (Dkt. No. 43 at 28.)  This, they argue, is the reason for the high chargebacks.

5      The FTC mounts a substantial attack to these defenses that the Court finds sufficient to

6  find a likelihood of success on this claim.  The FTC presents substantial testimony that Willms'

7  beneficial ownership interests in the corporations were not adequately disclosed and that the

8  structure of the affiliate defendant corporations was a means to avoid further scrutiny.  The FTC

9  also presents unrebutted evidence that the charges were coded in a confusing manner on

10 consumers' charge accounts.  Whether the corporations related to Willms are shells is a close

11 question.  The Court need not resolve that issue to find sufficient evidence here that the FTC is

12 likely to succeed on its claim that Defendants violated the EFTA and the FTCA.

13     4.    Public Interest

14     In weighing the equities, the Court is to favor the public interest against the private

15 interest where the FTC establishes a likelihood of success on the merits.  Affordable Media, 179

16 F.3d at 1236.  The Court finds the equities weigh in favor of the FTC, as the evidence of

17 consumer harm is substantial.  Defendants' main argument is that they have ceased to engage in

18 any conduct that violates the FTCA.  As explained above, the Court disagrees.

19     5.    Scope of Injunction

20     The Court finds that an injunction should issue in this case.  The evidence of Defendants'

21 past conduct is sufficiently serious and deliberate to suggest a strong likelihood of continued

22 unfair advertising practices in the absence of an injunction.  See Sears, Roebuck and Co. v.

23 F.T.C., 76 F.2d 385, 392 (9th Cir. 1982).  This is particularly the case where Defendants' present

24

1   conduct also likely violates the FTCA.  The Court finds the scope of the injunction the FTC

2   requests in its proposed order to be properly tailored to the controversy before the Court.  (Dkt.

3   No. 3-1.)  The FTC seeks an injunction that would prohibit Defendants from a plethora of

4   activities, including: (1) offering for sale any product with a negative option and continuity plan

5   feature; (2) offering any products, programs or services as "free" trial" or "bonus"; (3)

6   misrepresenting the nature of the costs to receive the product and any cancellation policy; (4)

7   failing to disclose the amount, timing, and manner of payment of fees and the terms and

8   conditions of any refunds; (5) making representations about the performance, benefits, and safety

9   of any products, including those about weight loss and colon cancer; (6) misrepresenting that any

10  product is endorsed by a celebrity or using consumer testimonials about obtaining refunds; (7)

11  charging or debiting a consumer's bank account or credit car without express informed consent;

12  and (8) ceasing collection activities, maintaining proper accounting, and preserving all records

13  related to this action.  (Dkt. No. 3-1 at 9-12, 14, 18-20.)  The FTC also asks that Defendants be

14  ordered to engage in compliance monitoring and to distribute copies of the order.  (Id. at 20-22.)

15  The Court finds these aspects of the requested order proper.

16      Defendants primarily argue that the restriction on negative option and continuity plans is

17  unconstitutional and improper.  The Court does not agree.  "Commercial expression is protected

18  only if it concerns lawful activity and is not misleading."  Litton Indus., Inc. v. F.T.C., 676 F.2d

19  364, 373 (9th Cir. 1982).  "Even truthful commercial speech can be regulated if the

20  government's interest in regulation is substantial and if the regulation directly advances that

21  interest and is not more extensive than necessary."  Id.  "Any remedy formulated by the FTC that

22  is reasonably necessary to the prevention of future violations does not impinge upon

23  constitutionally protected commercial speech."  United States v. Reader's Digest Ass'n, 662 F.2d

24

955, 965 (3d Cir. 1981) (emphasis in original).  Here, the speech to be regulated appears to violate the FTCA in that it is deceptive and misleading.  The prohibitions the FTC seeks to impose are tailored only to those activities the FTC has shown likely violate the FTCA.  As such, the proposed injunction does not run afoul of the First Amendment.

The Court GRANTS the preliminary injunction.  As part of this order, the Court incorporates the FTC's proposed order in full, with only one exception as to the asset freeze, as explained below.  (Dkt. No. 3-1.)

C.    Asset Freeze

The FTC requests a freeze of all assets held by Defendants and to require repatriation of the funds to the United States.  There is adequate evidence to support both requests as to Defendant Willms only.

Congress has given district courts equitable authority to order the freezing of assets under § 13(b) of the FTCA.  F.T.C. v. H. N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982). An asset freeze is proper to ensure that a rescission of contract damages can be awarded and funded by the defendants.  Id.  "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009).  The Court is to consider whether the freezing of assets "under certain circumstances . . . might thwart the goal of compensating investors if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed."  Id. (quoting SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1106 (2d Cir. 1972)).

The FTC has shown sufficient evidence to justify an asset freeze.  Not only has it shown a likelihood that Defendants have engaged in misleading marketing practices, but it has also

1  shown that Defendants have moved substantial funds to offshore companies and bank accounts.

2  (Pl. Ex. 2 at 51-55; Pl. Ex. 3 at 192-96, 198, 254; Pl. Ex. 50 at 2442-44.)  Willms has admitted to

3  establishing several holding companies in Cyprus to facilitate international merchant banking.

4  (Pl. Ex. 2 at 95.)  Email exchanges show that funds were likely transferred from Willms'

5  accounts to Cyprus and possibly for the purpose of hiding assets.  For example, on October 22,

6  2009, Phyllis Plester sent an email to Willms showing the daily movement of funds to Cyprus:

7  "Why can't we have Dan wire lump sum $ to our HSBC accounts in Seattle from each of the 4

8  Cyprus accounts . . . ?  Right now he's transferring $ daily from 3 Cyprus accounts to one major

9  Cyprus account [Rivierico] anyway."  (Pl. Ex. 3 at 194.)  Elsewhere Plester wrote of Willms'

10  contact in Cyprus: "First and foremost, the 'money laundering squad' I'm sure is watching us

11  very closely and we don't want to look 'stupid' in Dan's and/or Dee's eyes."  (Id. at 254.)  These

12  facts, combined with the FTC's purported inability to trace the whereabouts of the over $400

13  million in revenue suffice to support the asset freeze and an accounting.

14       Defendants argue that the FTC has not produced any evidence that any significant funds

15  were moved to Cyprus.  Defendants rely on two declarations from Bryan Moser who reviewed

16  bank statements from 2009 through 2011.  Mr. Moser contends that he analyzed bank statements

17  for Defendant Willms' related business for 2009 and did not find "significant transfers of money

18  to entities outside of the United States and Canada for which there was not a reasonable business

19  purpose."  (Second Moser Decl. ¶ 9.)  Moser's conclusion does not satisfy the Court that there

20  has been a full accounting of the Willms accounts or the revenue generated in 2009.  Nowhere

21  has Mr. Moser suggested he examined the accounts of the two Cyprus entities who are

22  defendants to this action.  He has not stated with any certainty that there have not been

23  movements of assets outside of the United States from Defendants.  He does not rebut the other

24

1    evidence the FTC has offered of such movement of funds.  The Court is not persuaded by

2    Defendant Willms' argument on this issue.

3         Defendants rely on <u>F.T.C. v. John Beck Amazing Profits, LLC</u>, 2009 WL 7844076, at

4    *15 (C.D. Cal. Nov. 17, 2009), to argue that the FTC cannot meet its burden to obtain an asset

5    freeze.  The FTC correctly points out, in <u>John Beck</u> there was no evidence of any dissipation or

6    transfer of assets.  Rather, the FTC in <u>John Beck</u> relied on evidence that the defendants' conduct

7    alone was fraudulent.  Here, the FTC has shown that at the bare minimum, Defendants have bank

8    accounts in Cyprus through which they have transferred funds and there is no full accounting of

9    where their assets are.  The email activity cited above also suggests the movement of funds

10   outside of the United States may be for an improper purpose.  This is sufficient to justify the

11   asset freeze.  There is also no showing that the asset freeze will hamper the recovery of funds for

12   consumers, should damages be awarded.

13        Given that the FTC has not shown little if any evidence of the other individual defendants

14   engaging in off-shore transfers of assets, the Court finds that the asset freeze should apply only

15   to Defendant Willms and those corporate Defendants that he controls and directs.  The FTC's

16   proposed order, which the Court incorporates into its own, is modified on page 15 lines 5-9 to be

17   phrases as follows:

18          IT IS FURTHER ORDERED that Defendant Willms, whether acting
19       directly or through any corporation, partnership, subsidiary, division, affiliate, or
         other entity or device, and all other persons or entities in active concert or
20       participation with them who receive actual notice of this Order by personal
         service or otherwise, except as directed by further order of the Court, is hereby
21       preliminary restrained and enjoined from . . .

22   (<u>See</u> Dkt. No. 3-1 at 15.)  This excludes the other individual Defendants and their personal

23   assets.  Should the FTC discover evidence that the individual Defendants are engaged in any

24

1   activities in concert with Defendant Willms that violates the injunction, it may seek leave of

2   Court to expand the asset freeze.

3   D.      Motion to Strike

4          Defendants move to strike several of Plaintiffs' exhibits submitted in support of the

5   motion for a preliminary injunction.  Defendants' attack to Exhibits 2, 3, 8-13, 47-49, 50, 51, 54,

6   and 57 is without merit.

7          In the preliminary injunction context, the Court "may give even inadmissible evidence

8   some weight, when to do so serves the purpose of preventing irreparable harm before trial."

9   Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984).  Generally, however, the

10  government must make a "prima facie showing of authenticity so that a reasonable juror could

11  find in favor of authenticity or identification."  United States v. Workinger, 90 F.3d 1409, 1415

12  (9th Cir. 1996) (quotation omitted).  Documents produced by a party in discovery can be deemed

13  authentic where the documents bear evidence of authenticity and the producing party does not

14  dispute the authenticity.  Maljack Prods, Inc. v. GoodTimes Home Video Corp., 81 F.3d 881,

15  889 n.12 (9th Cir. 1996).

16         The Court does not find exhibits 2, 3, and 8 properly stricken.  The FTC claims that its

17  exhibits 2, 3, and 8 were produced by Defendants in response to investigatory access letters and

18  civil investigation demands ("CID") and are therefore authenticated.  (Dkt. No. 63 at 19.)

19  Exhibits 2 and 3 contain a letter from counsel for Defendants to the FTC in which counsel

20  responds to investigatory questions with a large body of appended materials that are Bates

21  stamped and specifically cited in the letter.  This has sufficient indicia of authenticity to qualify

22  as admissible, particularly under the relaxed standards for a preliminary injunction motion.

23  Maljack, 81 F.3d at 889 n.12.  Similarly, the documents in Exhibit 8 were produced by

24

ORDER GRANTING PRELIMINARY
INJUNCTION- 22

1    Defendants to the FTC as part of a CID, and Defendants' counsel again provided a detailed letter

2    with corresponding Bates stamping to explain the nature of the documents.

3           Defendants' request to strike Exhibits 9-13, 47-49, and 57 as non-authenticated is not

4    sufficient.  The documents in these exhibits were produced to the FTC in response to CIDs issue

5    to third-party businesses.  Exhibits 9-11, 47-49, and 57 are CID responses from attorneys or

6    representatives of the third-party companies explaining the nature of the documents which also

7    contain Bates stamping.  Such responses from non-adverse third-parties in response to a de facto

8    discovery request are sufficient to satisfy authenticity.  See Metro Goldwyn-Mayer Studios, Inc.

9    v. Grokster, Ltd., 454 F. Supp. 2d 966, 972 (C.D. Cal. 2006).  Exhibit 12 also contains a

10   certification of authenticity, which is sufficient to establish authenticity.  See SEC v. Franklin,

11   348 F. Supp. 2d 1159, 1161 (S.D. Cal. 2004).  Exhibit 13 is a transcript of testimony given to the

12   Senate, which is self-authenticating under FRE 902(5).  See United States ex rel. Parikh v.

13   Premera Blue Cross, No. C01-0476P, 2006 WL 2841998, at *8 (W.D. Wash. Sept. 29, 2006)

14   (finding an excerpt of a hearing before the House Subcommittee on Oversight and Investigations

15   self-authenticating).  The Court DENIES the motion to strike these exhibits.  Defendants' motion

16   to strike Exhibit 5 is MOOT, as the Court did not consider this exhibit in ruling on the motion.

17          Defendants lastly argue that Exhibits 50, 51, and 54 are inadmissible because they

18   contain hearsay or summaries of information with multiple levels of hearsay.  The exhibits are

19   admissible.  First, Exhibit 50 is a declaration of Eleanor Durham in which she summarizes

20   information taken from documents produced by Defendants and third-party businesses in

21   response to CIDs.  These are authenticated and Durham has averred that they are not purely

22   hearsay.  They are admissible summaries under FRE 1006.  Exhibit 51 summarizes complaints

23

24

ORDER GRANTING PRELIMINARY
INJUNCTION- 23

1  filed with the FTC itself and it is admissible under FRE 1006.  Exhibit 54 summarizes consumer

2  complaints produced by Defendants.  The Court will not strike these documents.

3  E.      Evidentiary Hearing

4          Defendants request that the Court hold an evidentiary hearing prior to ruling on the

5  motion for preliminary injunction.  There is no presumption in favor of an evidentiary hearing.

6  Int'l Molders and Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547, 554 (9th Cir.

7  1986).  Only "[w]here sharply disputed the facts are simple and little time would be required for

8  an evidentiary hearing, proceeding on affidavits alone might be inappropriate."  Id.  The Court

9  does not find itself in that position.  Rather, the parties dispute the interpretation of and spin on

10  the facts more than the accuracy of the facts themselves.  Moreover, even a lengthy evidentiary

11  hearing would not likely clarify the record.  The Court thus DENIES the request.

12                                          **Conclusion**

13          The Court finds the FTC has shown a likelihood of success on its claims brought under

14  the FTCA.  Defendants' past and present conduct justifies issuance of the preliminary injunction

15  as presented by the FTC in its proposed order.  (Dkt. No. 3-1.)  The Court adopts and

16  incorporates the FTC's proposed order as part of this ruling.  The Court, however, limits the

17  asset freeze to Defendant Willms.  It does not apply to the other Defendants.  The Court DENIES

18  Defendants' motion to strike and request for an evidentiary hearing.

19          The clerk is ordered to provide copies of this order to all counsel.

20          Dated this 12th day of September, 2011.

21

22

23                                          _____
                                            Marsha J. Pechman
24                                          United States District Judge